No. 25-7194

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

STATE OF OREGON, et al.,
*Plaintiffs-Appellees,*

v.

DONALD J. TRUMP, *in his official capacity as President of the United States,* et al.,
*Defendants-Appellants.*

On Appeal from the United States District Court
for the District of Oregon

**EMERGENCY MOTION UNDER CIRCUIT RULE 27-3 FOR STAY
PENDING APPEAL AND A PARTIAL ADMINISTRATIVE STAY BY
NOVEMBER 21**

BRETT A. SHUMATE
  *Assistant Attorney General*

ERIC D. McARTHUR
  *Deputy Assistant Attorney General*

MARK R. FREEMAN
SHARON SWINGLE
ANDREW M. BERNIE
J. KAIN DAY
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7539*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *202-514-3511*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................ii

INTRODUCTION .............................................................................1

STATEMENT ...................................................................................3

      A.    Legal Background ...........................................................3

      B.    Factual Background .........................................................3

      C.    Prior Proceedings............................................................9

ARGUMENT ...................................................................................10

I.     The federal government is likely to prevail on the merits....................10

II.    The other stay factors strongly favor the government. .......................20

III.   The Court should administratively stay the order as to the federalization of the Oregon Guard. ...............................................................21

CONCLUSION ...............................................................................22

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Cases:**                                                                  **Page(s)**

*Dalton v. Specter,*
511 U.S. 462 (1994) ...................................................................20

*Federal Express Corp. v. U.S. Dep't of Com.,*
39 F.4th 756 (D.C. Cir. 2022) ...................................................12

*Franklin v. Massachusetts,*
505 U.S. 788 (1992) ...................................................................11

*Global Health Council v. Trump,*
153 F.4th 1 (D.C. Cir. 2025) .....................................................13

*Illinois v. Trump,*
155 F.4th 929 (7th Cir. 2025) ...................................................22

*Martin v. Mott,*
25 U.S. (12 Wheat.) 19 (1827) ..................................................11

*Newsom v. Trump,*
141 F.4th 1032 (9th Cir.), *reh'g en banc denied,*
No. 25-3727, 2025 WL 2977104 (9th Cir. Oct. 22, 2025) ..................... 2, 9, 11, 12, 20

*NRC v. Texas,*
605 U.S. 665 (2025) ...................................................................11

*Oregon v. Trump,*
--- F.4th ----, No. 25-6268, 2025 WL 2951371 (9th Cir. Oct. 20, 2025) .....................10

*Perpich v. Department of Def.,*
496 U.S. 334 (1990) ............................................................... 3, 20

*Printz v. United States,*
521 U.S. 898 (1997) ...................................................................20

*Starbucks Corp. v. McKinney,*
602 U.S. 339 (2024) ...................................................................21

*United States v. Comstock,*
560 U.S. 126 (2010) ...................................................................20

*United States v. Hatch*,
    722 F.3d 1193 (10th Cir. 2013) ........................................................................20

**U.S. Constitution:**

U.S. Const. art. I, § 8, cl. 15 ...........................................................................3

U.S. Const. art. II, § 2, cl. 1 ...........................................................................3

**Statutes:**

10 U.S.C. § 10106 ..........................................................................................3

10 U.S.C. § 12406 .................................................................................... 1, 10

10 U.S.C. § 12406(2) .....................................................................................19

10 U.S.C. § 12406(2)-(3) ...............................................................................10

10 U.S.C. § 12406(3) ............................................................................. 13, 17

18 U.S.C. § 115 ..............................................................................................16

**Other Authorities:**

*Rebellion*, An American Dictionary of the English Language (1900) ..............19

*Rebellion*, Black's Law Dictionary (1st ed. 1891) .........................................19

35 Fed. Reg. 5003 (Mar. 24, 1970) ...............................................................14

iv

## INTRODUCTION

Since June, the Immigration and Customs Enforcement (ICE) office in Portland has been targeted by violence and threatened violence. In mid-June, crowds of approximately 450 agitators started fires, assaulted officers, blocked traffic, and vandalized the facility. Unrest continued over the next three months. Agitators have hurled mortars at the facility, assaulted and thrown objects at officers, blocked traffic, pounded on vehicles, unloaded sticks and bats, doxed and threatened to kill federal agents, and made other threats against the facility.

As a result, ICE was forced to close the Portland office for more than three weeks. Federal officials had to reassign a large contingent of Federal Protective Service (FPS) officers and other federal officers for round-the-clock protection, an arrangement that has proven unsustainable. On September 26, the Department of Homeland Security (DHS) thus sought "assistance from the Department of War (DoW) in order to safeguard federal personnel, facilities, and operations in the State of Oregon" that "have come under coordinated assault by violent groups intent on obstructing lawful federal enforcement action." The President granted the request and directed the federalization of a small number of Oregon National Guard members (subsequently extended to members from other States).

The President's determination was plainly lawful. Under 10 U.S.C. § 12406, the President may federalize the Guard when he "is unable with the regular forces to execute the laws of the United States" or "there is a rebellion or danger of a rebellion

against the authority of the Government of the United States." And federal courts must "give a great level of deference to the President's determination that [one of Section 12406's] predicate condition[s] exists," asking at most whether "it reflects a colorable assessment of the facts and law." *Newsom v. Trump*, 141 F.4th 1032, 1048, 1051 (9th Cir.) (per curiam), *reh'g en banc denied*, No. 25-3727, 2025 WL 2977104 (9th Cir. Oct. 22, 2025).

The district court nonetheless issued a permanent injunction barring federalization and deployment of the Oregon National Guard or Guardsmen from any other state to Portland. In so ruling, the district court wholly failed to give the President's determination the deference required, instead effectively reviewing de novo the law and facts. The court also wrongly downplayed the dangerous conditions at the ICE facility. The court acknowledged large-scale violent protests in June, but treated them as irrelevant to the President's determination just a few months later. And while the court attempted to paint a picture of sharp decline in violent activity since then, the record shows that violence and threats of violence recurred more-or-less continuously. More broadly, the court emphasized that certain incidents did not result in significant violence. But this ignores the substantial and continuous *threat* of violence and resulting inhibition of federal operations. The President certainly had "colorable" grounds to determine that regular forces were "unable" to sufficiently protect federal personnel and property and that the conditions rose at least to the level of a "danger" of rebellion.

The district court's order impinges on the Commander in Chief's supervision of military operations, countermands a military directive to officers in the field, and

2

endangers federal personnel and property. The balancing of harms weighs strongly in favor of a stay pending appeal. At the least, Defendants respectfully request an administrative stay by November 21 of the portion of the injunction requiring defederalization of Oregon Guard members, given the harms and alteration of the status quo worked by that portion of the injunction.[1]

## STATEMENT

### A.     Legal Background

The Constitution authorizes Congress to raise and support a national Army and to organize "the Militia." *See* U.S. Const. art. I, § 8, cl. 15. Congress has "created the National Guard of the United States, a federal organization comprised of state national guard units and their members." *Perpich v. Department of Def.*, 496 U.S. 334, 338 (1990). Once called into federal service, members become federal soldiers, 10 U.S.C. § 10106, and serve under the President, *see* U.S. Const. art. II, § 2, cl. 1. Section 12406 authorizes the President to call the National Guard into federal service if, as relevant here:

> (2) there is a rebellion or danger of a rebellion against the authority of the Government of the United States; or (3) the President is unable with the regular forces to execute the laws of the United States . . . .

### B.     Factual Background

**1.** Throughout the summer, ICE has seen a sharp increase in protests aimed at impeding enforcement of federal immigration laws. ICE's facility in downtown

---

[1] Before trial, Defendants asked the district court to stay any injunction pending appeal, Dkt. 115 at 34, but the district court granted only a limited stay. *See infra* p.10.

Portland has experienced significant unrest targeting both the facility and those who work in it. On June 11, a crowd of 60-100 people (estimated by the Portland Police Bureau (PPB)) gathered outside and "engaged in behavior such as starting fires next to a federal building, assaulting police officers, and interfering with officers arresting persons." A444. The size of the protests surged throughout the next day, reaching "well over 400" people that night. A422. "[A]pproximately half the crowd (~200) [was] in black bloc and ready for a fight." A422. "Corkers" intentionally blocked all traffic lanes. A422. Protestors screamed at federal officials, and several individuals were observed carrying squirt guns with unknown fluids and bags of rocks. A422. Agitators attempted to light a fire in the driveway. A422. Violent agitators also threw or slingshot a rock through a second story window, breaking it. A423.

The PPB was "directed not to engage in this hostile crowd for safety reasons." A421. An hour into the event, with "graffiti spreading," the PPB declined to intervene because it had not observed any felony offenses or "life-safety risk that requires intervention." A421. Officers attempted to engage with protestors blocking traffic, but when their attempted engagement was met with "hostility," officers "disengage[d] to prevent flashpoint." A422.

The violence and unrest continued through June 14, when the PPB declared a riot. A414. According to the Oregon State Police (OSP), "[t]he crowd numbered approximately 400, with around 1/3 . . . dressed in 'black bloc.'" A417; *see* A435 (PPB estimated crowd-size of 450). The OSP strongly criticized the PPB's response, noting

that their "seemingly high threshold . . . for arrests" "resulted in no real intervention by law enforcement, while simultaneously allowing low-level public disorder criminal activity to continue." A418. "Protesters were free to throw objects at the building, kick at doors, graffiti the windows and walls and no enforcement action was taken by local law enforcement." A419.

DHS had to close the ICE facility for more than three weeks starting in mid-June because it was too dangerous to work there. A148. DHS had to relocate its personnel to an alternate site while some immigration processing was diverted to a DHS processing center in Tacoma, Washington, requiring aliens to travel there. A149-50.

Throughout June, crowds and disruptions remained high, albeit in reduced numbers. On June 19, activists began pouring motor oil on the driveway in front of the facility, potentially creating a fire risk and causing hazards for federal officials protecting the property. A413. On June 24, approximately 70 people blocked the driveway, shouting "FUCK ICE" and "ICE out of Portland"; FPS was able to clear the driveway only by using pepperballs and other non-lethal munitions. A404-12. On July 4, a crowd of about 150 gathered; PPB described the protesters as "intent on altercation with FPS." A394. Protestors hurled mortars at the facility and FPS made multiple arrests. A394.

On August 9, a group of 30-40 protesters dressed in black bloc with helmets and gas masks threatened federal officers with violence and began hitting ICE and FPS vehicles with their fists as the vehicles left the facility. A381. FPS officers were outnumbered three-to-one and had to use pepper balls to push protesters away. A382.

5

On August 18, there were further protests in which agitators shouted threats at FPS officers and screamed racial slurs and profanities, and a protestor deliberately abandoned her vehicle in the facility's driveway, disrupting operations due to fears that it contained explosives. A371.

Unrest continued throughout September. On September 1, approximately 200 protestors gathered, with agitators assembling a mock guillotine and blocking the roadway. A352. The protesters were confrontational, yelling obscenities toward FPS and ICE personnel. A359. On September 3, an individual illegally flew a drone near the upper windows of the facility and, while being arrested, became violent and spit on agents. A352. On September 4, FPS arrested a person described as "a daily chronic problem," who is "very aggressive," "can be very violent," and was armed with a rifle. A352. On September 6, protesters spread fake blood at the driveway entrance, threw objects at FPS officers, and aimed high-powered lights at them. A345. On September 9, protestors again aimed high-powered lights at federal agents; a group of approximately twelve protestors surrounded a counter-demonstrator, and physically harassed her. A331-33. On September 12, there were more protesters in black bloc, some of whom unloaded weapons from a vehicle. A326. On September 18, "the afternoon started with around 150 plus" protesters outside the ICE facility; later there were 50 to 60 of the "normal agitators." A325. Protesters screamed and threw objects at a PPB car. A325. On September 19, approximately 50 protesters gathered. As summarized by the PPB, "once a marked car drives through," the protesters "will flip

off, scream and throw objects at the car and in most cases run towards the car as if they are going to charge the car." A324. A protester assaulted a journalist with a large sword or stick. A324. The next day, there were again about 50 protesters, which PPB characterized as "more agitated than most nights." A322.

The Portland facility and officials working there have also been subject to repeated threats. On July 22, a social media account with more than 7,000 followers posted a picture of a utility pole less than 40 feet from the ICE facility and detailed instructions about how to turn off the facility's power. A391. The mock guillotine that protestors placed outside the ICE facility on September 1 was also viewed as a death threat by the officers. A140-41. On September 4, doxing flyers for three agents containing threatening language were discovered. A354. On September 9, one of the doxed agents' home addresses was listed on Google. A340. And multiple social media accounts with Oregon-based users have posted death threats. A327. As FPS's Deputy Regional Director testified, it was common for the officers to be filmed going in and out of the facility, to have their license plate numbers taken down, and to be followed to their home or hotel, to the point that there were flyers organizing people to gather at hotels where FPS or supporting agencies are staying. A134-35.

In response to these volatile conditions, FPS has been forced to surge officers from around the country to Portland. A156. FPS's Deputy Regional Director explained that these irregular deployments were unsustainable. A129. Whereas before June 2025 only four FPS inspectors protected the ICE facility along with approximately 100 other

federal facilities, A127, the ICE facility now has required the protection of anywhere from 120 to 196 federal officers in a 24-hour period sourced from not just FPS but also other DHS and Department of Justice components, with 180 being the optimal number to meet the potential threat. A130-33. FPS has had to reduce FPS officers' rotation from 30 days to 20 days to reduce fatigue from the long shifts and the stress on officers' mental health due to their close proximity to protestors "who say some of the most vulgar, foul, racial slurs consistently throughout the day, throughout the night, on bullhorns." A127-28.

**2.** On September 26, DHS transmitted a memorandum to DoW requesting "immediate and sustained assistance . . . in order to safeguard federal personnel, facilities, and operations in the State of Oregon." A320. DHS requested this assistance because "Federal facilities, including those directly supporting Immigration and Customs Enforcement (ICE) and the Federal Protective Service (FPS), have come under coordinated assault by violent groups intent on obstructing lawful federal enforcement actions." A320. DHS sought 200 DoW personnel to "direct[ly] support [] federal facility protection, access control, and crowd control measures." A321.

On September 27, the President directed the Secretary of War to coordinate the deployment of forces to Portland to protect ICE personnel and facilities. A317. The DoW first contacted the Oregon Adjutant General to see if Oregon would supply National Guard members in a federally funded but non-federalized status. *See* A144,319. Governor Kotek rejected the request. A147. The President judged that the conditions

8

in Portland met the conditions of Section 12406 and federalized Oregon National Guard members. A311.

Those conclusions were consistent with assessments the President made in federalizing California National Guard members in response to violence in Los Angeles, finding that "violent protests threaten the security of and significant damage to Federal immigration detention facilities and other Federal property." A459. This Court stayed a district court order enjoining that federalization and deployment, concluding that the President likely acted lawfully in invoking Section 12406. *See Newsom*, 141 F.4th at 1040-41.

**3.** On September 28, Secretary of War Pete Hegseth issued a memorandum mobilizing 200 members of the Oregon National Guard for sixty days. A315.

### C.    Prior Proceedings

Plaintiffs filed suit alleging violations of 10 U.S.C. § 12406, the Posse Comitatus Act, the Administrative Procedure Act (APA), and the Constitution. The district court granted a temporary restraining order (TRO) on October 4, enjoining implementation of the September 28 memorandum as to the Oregon National Guard. A278. The next day, Defendants redirected approximately 200 federalized California National Guard troops to Portland. A183. The district court then granted a second TRO enjoining the deployment in Oregon of any "federalized members of the National Guard." A181.

Defendants appealed the first TRO and this Court granted an administrative stay, allowing Defendants to maintain the federalization of the Oregon Guard. A177. A

divided panel of this Court granted a stay pending appeal of the TRO. *Oregon v. Trump*, --- F.4th ----, No. 25-6268, 2025 WL 2951371 (9th Cir. Oct. 20, 2025) (per curiam). The Court then voted for rehearing en banc, vacating the panel decision. A154.[2]

After further proceedings, including a three-day hearing and bench trial, the district court granted partial final judgment on November 7, holding that Defendants violated 10 U.S.C. § 12406 and the Tenth Amendment and permanently enjoining them from federalizing and deploying the Oregon National Guard or the Guard of any other State based on the same predicate conditions. The court issued a 14-day administrative stay of its order as to federalization of the Oregon National Guard.

## ARGUMENT

### I.     The federal government is likely to prevail on the merits.

Congress empowered the President to "call into Federal service" members of the National Guard when "there is a rebellion or danger of a rebellion against the authority of the Government of the United States" or "the President is unable with the regular forces to execute the laws of the United States." 10 U.S.C. § 12406(2)-(3). The President judged that those conditions were satisfied in Portland, and the district court had no basis to override that judgment.

---

[2] Defendants have since moved to dismiss that appeal as moot..

**1.** Even if some judicial review of the President's determination is permitted,[3] courts must "give a great level of deference to the President's determination that [one of Section 12406's] predicate condition[s] exists." *Newsom*, 141 F.4th at 1048; *see id.* at 1047, 1052 ("highly deferential" and "especially deferential."). The President's determination must be upheld so long as it "reflects a colorable assessment of the facts and law within a range of honest judgment." *Id.* at 1051. That conclusion accords with general principles governing judicial review of presidential action. The President is not an agency subject to the APA, *see Franklin v. Massachusetts*, 505 U.S. 788, 800-01 (1992), and Plaintiffs' only path to judicial review of the President's determination is an *ultra vires* claim, which requires showing that the President acted "entirely in excess of [his] delegated powers and contrary to a *specific prohibition* in a statute." *NRC v. Texas*, 605 U.S. 665, 681 (2025).

**2.** Plaintiffs cannot satisfy these demanding standards. In the weeks leading up to the federalization in Portland, ICE and FPS came "under coordinated assault by violent groups intent on obstructing lawful federal enforcement actions." A320. Starting with the initial violent protests in June, when large crowds started fires, assaulted officers, and vandalized the Portland ICE facility, unrest continued on a regular basis throughout the subsequent months. *See supra* pp.4-8. And as also discussed above, the

---

[3] Defendants maintain and preserve for further review their argument that the President's determination that the statutory criteria are met is unreviewable. *Martin v. Mott*, 25 U.S. (12 Wheat.) 19, 30 (1827).

11

facility and officials working there have been subject to repeated threats. Defendants have done their best to cope with the violence and threats by relocating officers across the country, including from outside FPS and outside DHS, but that redeployment is unsustainable.

Based on all of this, the President had ample and certainly "colorable" grounds to determine that regular forces were "unable" to sufficiently protect federal personnel and property, and that the conditions in Portland at least rose to the level of a "danger" of rebellion. And it is common sense that federal agents would be able to engage in greater enforcement of the immigration laws or otherwise perform their duties in protecting federal facilities and personnel if they were not operating under the threat of assaults and obstruction.

**3.** In concluding otherwise, the district court made several critical errors.

**i.** The court substituted its own judgment for the President's rather than engage in the "highly deferential" review mandated by *Newsom*, which asks whether the President's determination "reflects a colorable assessment of the facts *and law* within a range of honest judgment." 141 F.4th at 1049, 1051-52 (emphasis added). Again, *Newsom* is consistent with *ultra vires* review more generally, which requires showing that the decisionmaker "has plainly and openly crossed a congressionally drawn line in the sand." *Federal Express Corp. v. U.S. Dep't of Com.*, 39 F.4th 756, 765 (D.C. Cir. 2022). "[C]hallengers must show more than the type of routine error in statutory interpretation or challenged findings of fact that would apply if Congress had allowed APA review."

*Id.*; *Global Health Council v. Trump*, 153 F.4th 1, 20 (D.C. Cir. 2025) (error must be "so extreme that one may view it as jurisdictional or nearly so").

The district court did not heed these restrictions. It stated that "this Court must determine the *relative* importance of the facts that go toward whether the President violated 10 U.S.C. § 12406(3)." A83. And it conducted its own assessment of the President's calling-forth authority (concluding that Section 12406(3) requires a total failure of the "civil power") and of the facts (finding, among other things, that the President wrongly relied in part on significant violence and unrest in mid-June when he made his determination approximately three months later). A84-88. The district court's effectively de novo analysis would be impermissible even if this were an APA case. But *at most*, the district court's disagreement with the President's determination amounts to the sort of "routine error" in statutory interpretation or factual assessments that cannot support an *ultra vires* claim.

**ii.** Lack of deference aside, the court's legal analysis was wrong. The district court reasoned that the President could not invoke Section 12406(3) unless the "civil power"—"i.e., the civil government"—was unable to execute the laws. A74. That standard was not met, in the court's view, because "law enforcement resources from Customs and Border Patrol, the Bureau of Prisons, and other law enforcement agencies were available between June and September 27, 2025." A86. But nothing in Section 12406 suggests that, before the President can federalize the National Guard in response to an exigency, he first must exhaust every other resource at his disposal. Nor did

President Nixon appear to think such a requirement applied when he invoked Section 12406's predecessor to federalize the National Guard in response to the 1970 postal strike. *See* 35 Fed. Reg. 5003 (Mar. 24, 1970).

Nor does *Newsom* lend any support to this framework. The Court did not there probe whether the President could have surged DHS officials from other areas of the country or personnel from other law enforcement agencies, before holding that the President had a sufficient basis to determine that Section 12406(3)'s predicate conditions existed.

**iii.** The district court's application of the law to the facts is also untenable. Most obviously, the district court erred in discounting the importance of the mob violence occurring in mid-June. Even the court acknowledged this serious violence, A6, and the significant similarities between events on those days and the unlawful activities in *Newsom*, A78. The court nonetheless deemed it irrelevant because the President waited until September to federalize the Guard. A78. But it is untenable to hold that the still-recent mob violence in mid-June was categorically irrelevant such that the President's consideration of it cannot reflect even a *colorable* assessment of the facts. Nothing in Section 12406 suggests the President may consider only events immediately preceding his federalization decision.

The district court's reasoning also ignores that FPS responded to the earlier mob violence by relocating federal law enforcement officers from across the country. The President was well within his discretion to consider months-long unrest in Portland, as

14

well as the potential for continuing unrest over the foreseeable future and the fact that ongoing redeployment of outside forces was not sustainable conduct by "regular forces."

**iv.** Even artificially excluding the serious unrest in June from the analysis, it is clear that the President had a "colorable basis" for federalizing and deploying the Guard. It is true that the sheer volume of protestors has not since reached the same levels. But there is no support for the district court's characterization of subsequent violence as "aberrational," A84, or "at most, an emergency in the past." A83. The record is clear that violence—and certainly *threats of violence*—have recurred essentially continuously since mid-June, necessitating a significant diversion of FPS and other officers to address the ongoing risk of violence. To summarize just some of the incidents: in late June, a crowd blocked the ICE facility driveway, forcing FPS to use pepper spray and other non-lethal munitions to clear the crowd; a crowd of about 150 people that PPB stated were "intent on altercation" gathered on July 4, and threw mortars at the facility; during multiple protests in August, activists shouted threats and hit ICE and FPS vehicles, forcing FPS officers (who were outnumbered three-to-one) to use pepper balls to push protesters away; and unrest continued throughout September, with significant incidents on September 1, 3, 4, 6, 9, 11, 12, 18, and 19. *See supra* pp. 5-8. Even the district court acknowledged that "[t]he decline in protest activity was not linear," and "there were occasional spikes in activity after June 14…" A24.

**v.** The district court largely downplayed or dismissed these numerous more recent instances by concluding that no serious violence ultimately occurred. *See* A24 (noting spikes but contending that "any crime was generally low-level"). For example, the court acknowledged that the September 1 guillotine incident (in a protest of approximately 200 people) "was alarming given previous protester statements that federal officers deserve[d] to be decapitated." A39 (quotation marks omitted). But the court observed that this incident "never evolved into physical violence" and appeared to treat it as irrelevant. A39. Similarly, the court noted that "[p]rotesters frequently made verbal threats to FPS and ICE personnel" (a considerable understatement), A79-80, but it dismissed these threats too. A79 ("But by the end of June, most of this violence was rhetorical."). The court acknowledged that between June and October, there were "some acts of doxing, as well as some concerning tips or perceived threats," but it stated these concerns "turned out to be unfounded." A81. And while noting that multiple activists deliberately abandoned cars right in front of the ICE facility—raising obvious and well-founded concerns about explosive devices—the court simply noted that no explosive devices were ultimately found. A81.

This was error on multiple levels. For one, threats against federal officials are themselves often crimes. *See* 18 U.S.C. § 115. More fundamentally, officials cannot know in advance which threats will materialize and which "low-level physical violence," A80, will escalate into more substantial violence. As an FPS incident commander noted, the ICE facility and personnel at the facility have been under a constant threat of

violence. A137-38. And as noted above, that threat has only been controlled by a massive and unsustainable deployment, including officials from outside FPS. These conditions amply support the President's judgment that he was "unable with the regular forces to execute the laws of the United States," 10 U.S.C. § 12406(3), warranting federalization of a limited number of Guard members.

**vi.** Finally, the district court contended that "from June 17 to September 27, 2025, PPB maintained an open line of communication with federal law enforcement and consistently responded to requests for assistance when PPB resources permitted." A87-88. The first and last clauses of this sentence are telling. As the use of "June 17" as the starting point illustrates, not even the district court concluded that PPB's handling of the mid-June riot was sufficient. And "when PPB resources permitted" is a significant qualification. The PPB's Central Precinct has only 12-18 officers working each shift, to cover 200,000 people and 40 square miles. A123-24.

Even after June 17, the record is replete with evidence of the PPB not responding or indicating that it would not be able to respond to disturbances. During the June 24 disturbances, PPB provided no assistance, while acknowledging that they *could have* provided assistance if the protests were not targeting ICE. A411. On July 4, PPB acknowledged that the protesters "were clearly energized, and intent on altercation with FPS," but made no arrests and did not otherwise provide meaningful assistance. A394-95. On September 9, after protestors surrounded a counter-demonstrator, PPB officers drove by the area but did not exit their cars or otherwise respond. A332. On September

19, PPB noted that "FPS Agents were busy," but stated that "even if these folks were still at ICE or nearby, we would not be able to address the call or make an arrest with the resources we have." A324.

And even when PPB *is* available, it offers only limited help. PPB policy is "not [to] provide traffic control in the immediate area of the ICE facility" absent narrow exceptions. A158. A PPB official acknowledged that "the chief is on record stating that we would not be removing barricades from the ICE driveway." A119. That same official noted that it was "fairly common" for protestors to stand in the driveway, that this sometimes means vehicles cannot enter or exit, that this represents criminal trespass, but that "[t]he PPB cannot remove these people because that might be facilitating immigration enforcement." A120. And while the PPB acknowledged that protestors frequently block and even charge at cars entering and existing the facility, A324, a PPB official confirmed that it "can't assist in removing the protesters to allow for that exit." A121. This prohibition applies even if the PPB has no reason to believe the blocked vehicle is engaged in immigration enforcement. A121. Another PPB officer testified that PPB officers were not to make arrests at the ICE facility even when protestors threw objects at their cars and in most cases the officers would leave if protestors started charging their cars. A125. Through PPB's inaction, it became "common knowledge that [PPB] [was] not going to respond to assist [FPS] with the protest activity at the ICE facility." A143.

Section 12406 does not impose any sort of local exhaustion requirement. But the President could reasonably conclude that the PPB is not a reliable partner in protecting federal officials and property, which only further underscores that he had a colorable basis for his determination.

**vii.** Although the Court need not reach this issue to grant a stay, the President's action was independently warranted under 10 U.S.C. § 12406(2). The President reasonably explained why "protests or acts of violence" that "directly inhibit the execution of the laws . . . constitute a form of rebellion against the authority of the Government of the United States," A459, or, at minimum, create a "danger of a rebellion." The district court construed "rebellion" in Section 12406(2) to mean "an organized group engaged in sustained, armed hostilities for the purpose of overtaking an instrumentality of government by unlawful or antidemocratic means." A102-03. But dictionaries from the 1890s and 1900s define "rebellion" to focus on deliberate resistance to the government's laws and authority. *E.g.*, *Rebellion*, Black's Law Dictionary (1st ed. 1891); *Rebellion*, An American Dictionary of the English Language (1900). And the district court's definition would fail to encompass numerous instances in which the President has called the militia into federal service to address open defiance of federal authority in situations that fell short of organized efforts to overthrow the government. The district court emphasized that, in its view, the crowds were not "organized." A28-30. But the record at least reflects "some level of organic organization," A118, as the

district court acknowledged. That degree of organization is sufficient to establish a rebellion or, at the least, a danger of rebellion.

**viii.** Contrary to the district court, the federalization and deployment does not violate the Tenth Amendment, which "gives way" if federal action is authorized by the Constitution. *United States v. Hatch*, 722 F.3d 1193, 1202 (10th Cir. 2013); *see United States v. Comstock*, 560 U.S. 126, 144 (2010). Plaintiffs did not contend—and the district court did not hold—that Section 12406 is unconstitutional. If the President's determination complies with the statute, the Tenth Amendment has no role to play. *See Dalton v. Specter*, 511 U.S. 462, 473 (1994) ("claims simply alleging that the President has exceeded his statutory authority are not 'constitutional' claims"). The district court repeatedly contended that the federal government unlawfully "commandeered" state officials. A62-63,67,107; *see Printz v. United States*, 521 U.S. 898, 935 (1997). But the National Guard is composed of *both* state and federal Guards. *Perpich*, 496 U.S. at 345. The President does not unlawfully commandeer state officials when he federalizes the Guard *consistent with* Section 12406.

## II.  The other stay factors strongly favor the government.

The federal government has "an uncontested interest in the protection of federal agents and property and the faithful execution of law," and threats directed at federal personnel and property harm that interest. *Newsom*, 141 F.4th at 1054. The government also suffers irreparable harm when its federal immigration officials are prevented from safely and successfully enforcing the law.

By contrast, Plaintiffs did not establish any irreparable injury warranting permanent injunctive relief, let alone any injury outweighing Defendants' interests supporting a stay. In concluding otherwise, the district court contended that Plaintiffs had demonstrated constitutional violations that themselves constituted irreparable harm. A108. But as discussed above, Plaintiffs' claims are fundamentally statutory, not constitutional, and alleged violations of a federal statute do not give rise to any presumption of irreparable harm. *See Starbucks Corp. v. McKinney*, 602 U.S. 339, 345-48 (2024). Plaintiffs also complained that the federalization required diversion of Oregon National Guard members from state responsibilities, but Oregon provided no example of present or reasonably likely future needs that the state government will be prevented from addressing.

## III. The Court should administratively stay the order as to the federalization of the Oregon Guard.

While it considers this motion, the Court should administratively stay the portion of the district court's order requiring defederalization of Oregon Guardsmen. As the district court acknowledged (in administratively staying that aspect of its order for 14 days), a panel of this Court stayed that aspect of the October 4 TRO to "preserve[] the status quo in which National Guard members have been federalized but not deployed." A116. And the en banc court, after vacating the panel's stay order, clarified that this administrative stay remained in place. Plaintiffs will suffer no meaningful harm from a similar administrative stay of that aspect of the new order.

By contrast, an order requiring expedited defederalization imposes significant harms and challenges on the federal government and individual Guard members. "[T]he Oregon National Guard members were scheduled to remain on Title 10 orders until November 26, but the Department of War intends to extend this mobilization." Declaration of Carrie L. Perez ¶ 2 (filed with this brief). "Demobilization necessitates transporting guardsmen to a designated site in Texas and conducting out-processing, which includes essential medical and administrative screenings that require both time and manpower." *Id.* ¶ 4. Defederalized Guard members will not receive federal pay after they return to civilian status, and some members may not immediately be able to return to civilian jobs. *Id.* ¶ 5. Curtailment of the federalization may also result in loss of healthcare benefits, in addition to other consequences. *Id.* ¶¶ 6-7. Defendants thus respectfully request that, at a minimum, the Court stay this aspect of the district court's order, as it did at the TRO stage (and as the Seventh Circuit did, *Illinois v. Trump*, 155 F.4th 929, 940 (2025)).

## CONCLUSION

The Court should stay the district court's order pending appeal and grant an immediate partial administrative stay.

Respectfully submitted,

BRETT A. SHUMATE
   *Assistant Attorney General*

ERIC D. McARTHUR
   *Deputy Assistant Attorney General*

MARK R. FREEMAN
SHARON SWINGLE
J. KAIN DAY

*/s/ Andrew M. Bernie*
ANDREW M. BERNIE
   *Attorneys, Appellate Staff*
   *Civil Division, Room 7539*
   *U.S. Department of Justice*
   *950 Pennsylvania Avenue NW*
   *Washington, DC 20530*
   *(202) 353-7203*
   *andrew.bernie@usdoj.gov*

November 2025

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 27(d)(2)(A) and Local Rules 27-1(d) and 32-3 because it contains 5,567 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*/s/ Andrew M. Bernie*
ANDREW M. BERNIE

**IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

| | | |
|---|---|---|
| STATE OF OREGON, et al., | ) | |
| | ) | |
| *Plaintiffs-Appellees,* | ) | |
| | ) | No. 25-7194 |
| v. | ) | |
| | ) | |
| DONALD J. TRUMP, *in his official capacity* | ) | |
| *as President of the United* States, et al., | ) | |
| | ) | |
| *Defendants-Appellants.* | ) | |

_____

## DECLARATION OF BRIGADIER GENERAL CARRIE L. PEREZ

I, Brigadier General Carrie L. Perez, hereby state and declare as follows:

1.      I am currently the Assistant Director, Personnel & Talent Management (G1) for the Army National Guard (ARNG), which oversees all Personnel Operations including Personnel Readiness and Mobilization.  G1 serves as the principal office for the strategic direction and oversight of human capital functions relating to the ARNG's military personnel. I have held this position since July 2025. I previously served as the commander for the 36th Sustainment Brigade, 36th Infantry Division and mobilized with the unit to the Middle East in 2022. I previously served fulltime as the Chief, Joint Staff, Texas Military Department and Chief of Staff, 36th Infantry Division. I have also held positions as a Battalion Maintenance Officer, Supply & Transportation Platoon Leader, Maintenance Control Officer, Battalion S4, and Battalion S1 during which time I deployed to Iraq in support of Operation Iraqi Freedom.  My current responsibilities include recruiting and retention, manning, personnel readiness, personnel policy, and strength reporting for the ARNG. This declaration is based on my personal

1

knowledge, as well as information made available to me during the routine execution of my official duties.

2.    I am aware that the district court in this case on November 7 enjoined, among other things, the federalization of the Oregon National Guard. I am also aware that the court stayed that aspect of its injunction for a period of 14 days until November 21. Previously, the Oregon National Guard members were scheduled to remain on Title 10 orders until November 26, but the Department of War intends to extend this mobilization. I understand that the Oregon National Guard members will be demobilized despite the Department of War's intent for those members to remain on Title 10 orders unless the district court's injunction is subject to a further stay.

3.    I do not have command responsibility for the Oregon National Guard members in this case, but I am generally aware of the issues and hardships when the mobilization of National Guard members is prematurely cut short. I also do not have responsibility for the demobilization process owned by U.S. Army Forces Command.

4.    Absent a stay pending appeal, demobilization may present logistical challenges in this case. Demobilization necessitates transporting guardsmen to a designated site in Texas and conducting out-processing, which includes essential medical and administrative screenings that require both time and manpower.

5.    Demobilization may cause financial harm to guardsmen currently serving under Title 10 orders. Once defederalized under the district court's injunction, however, those Guard members will not receive federal pay. While some guardsmen may be able to immediately return to civilian jobs, some may not if they made previous arrangements to be absent from their employers (for example, shift workers who are required to sign up in advance). Accordingly, it is conceivable this injunction will cause direct financial harm to currently mobilized guardsmen.

6.      Guardsmen mobilized into Title 10 service become eligible for TRICARE coverage for themselves and their families. Accordingly, most if not all the guardsmen in this case are currently eligible for health care benefits. These guardsmen expected this coverage to last until the end of the scheduled mobilization. Curtailment of this federalization may result in loss of healthcare benefits, which could result in hardship for the soldiers and their families.

7.      There are a variety of other miscellaneous and sometimes unforeseeable consequences of guardsmen prematurely coming off Title 10 status. Guardsmen make a wide variety of life arrangements including education, family care, and housing. Any interruption of their deployment schedule may cause hardship or financial difficulty.

8.      Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

PEREZ.CARRIE.LY
NN.1232299190

Digitally signed by
PEREZ.CARRIE.LYNN.1232299190
Date: 2025.11.16 06:41:19 -05'00'

CARRIE L PEREZ
DIRECTOR, ARMY PERSONNEL
MANAGEMENT (G1)
National Guard Bureau

ADDENDUM

# TABLE OF CONTENTS

Partial Final Judgment, Dkt. 147 (Nov. 7, 2025) .................................................A1

Findings of Fact and Conclusions of Law, Dkt. 146 (Nov. 7, 2025) ...........................A5

No. 25-6268 (9th Cir.), Dkt. 90.1 (Oct. 30, 2025) ......................................... A111

Excerpts of Trial Transcript (Oct. 29-31, 2025) .......................................... A117

No. 25-6268 (9th Cir.), Dkt. 89.1 (Oct. 28, 2025) ......................................... A154

Exhibit 773 (approximately Oct. 15, 2025) ................................................. A156

Exhibit 1202 (approximately Oct. 8, 2025) ................................................. A157

No. 25-6268 (9th Cir.), Dkt. 32.1 (Oct 8, 2025) .......................................... A177

Second Temporary Restraining Order, Dkt. 68 (October 5, 2025) .......................... A181

Exhibit 202 (Oct. 5, 2025) ................................................................. A183

Amended Complaint, Dkt. 58 (Oct. 5, 2025) ................................................ A187

Opinion and Order Granting Motion for Temporary Restraining Order, Dkt.
    56 (Oct. 4, 2025) ................................................................... A278

Exhibit 194 (Oct. 1, 2025) ................................................................. A311

Exhibit 525 (Sept. 28, 2025) ............................................................... A312

Exhibit 1051 (Sept. 28, 2025) .............................................................. A315

Exhibit 1 (Sept. 27, 2025) ................................................................. A316

Exhibit 1048 (Sept. 27, 2025) .............................................................. A319

Exhibit 1050 (Sept. 26, 2025) .............................................................. A320

Exhibit 514 (Sept. 21, 2025) ............................................................... A322

Exhibit 513 (Sept. 20, 2025) ............................................................... A324

Exhibit 511 (Sept. 18, 2025) ........................................................... A325

Exhibit 1077 (Sept. 13, 2025) ......................................................... A326

Exhibit 1065 (Sept. 10, 2025) ......................................................... A327

Exhibit 855 (Sept. 9, 2025) ............................................................. A328

Exhibit 1070 (Sept. 9, 2025) ........................................................... A340

Exhibit 852 (Sept. 6, 2025) ............................................................. A341

Exhibit 496 (Sept. 4, 2025) ............................................................. A352

Exhibit 1066 (Sept. 4, 2025) ........................................................... A354

Exhibit 847 (Sept. 1, 2025) ............................................................. A355

Exhibit 835 (Aug. 18, 2025) ........................................................... A367

Exhibit 827 (Aug. 9, 2025) ............................................................. A378

Exhibit 1079 (Jul. 22, 2025) ........................................................... A390

Exhibit 410 (Jul. 4, 2025) ............................................................... A394

Exhibit 788 (June 29, 2025) ............................................................ A396

Exhibit 372 (June 24-25, 2025) ....................................................... A404

Exhibit 1076 (June 19, 2025) .......................................................... A413

Exhibit 327 (June 14-15, 2025) ....................................................... A414

Exhibit 36 (June 14, 2025) .............................................................. A417

Exhibit 318 (June 13, 2025) ............................................................ A421

Exhibit 319 (June 12-13, 2025) ....................................................... A425

Exhibit 1111 (June 11, 2025) .......................................................... A444

Exhibit 1052 (June 7, 2025) ............................................................ A459

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **STATE OF OREGON** and the **CITY OF PORTLAND**, and **STATE OF CALIFORNIA**,<br><br>      Plaintiffs,<br><br>   v.<br><br>**DONALD TRUMP**, in his official capacity as President of the United States; **PETE HEGSETH**, in his official capacity as Secretary of Defense; **U.S. DEPARTMENT OF DEFENSE**; **KRISTI NOEM**, in her official capacity as Secretary of Homeland Security; and **U.S. DEPARTMENT OF HOMELAND SECURITY**,<br><br>      Defendants. | Case No. 3:25-cv-1756-IM<br><br><br>**PARTIAL FINAL JUDGMENT** |

**IMMERGUT, District Judge.**

PAGE 1 – PARTIAL FINAL JUDGMENT

This Court held a three-day bench trial that commenced on October 29, 2025, on

Plaintiffs' two claims that Defendants' (1) federalization and deployment of members of the

Oregon National Guard, and (2) the deployment of federalized California National Guard in

Oregon was *ultra vires* because it violated 10 U.S.C. § 12406 and violated the Tenth

Amendment. ECF 125; Amended Complaint, ECF 58 ¶¶ 113–21, 131–45. This Court issued its

Findings of Fact and Conclusions of Law on November 7, 2025, ECF 146. This Court finds that

there is "no just reason for delay" to enter final judgment on Plaintiffs' two claims that

proceeded to trial on the merits. Fed. R. Civ. P. 54(b); *see* Fed. R. Civ. P. 65(a)(2).

**IT IS HEREBY ORDERED AND ADJUDGED THAT:**

1) Judgment is entered in favor of Plaintiffs State of Oregon, City of Portland and State
   of California, and against Defendants Donald Trump in his official capacity as
   President of the United States, Pete Hegseth in his official capacity as Secretary of
   Defense, the U.S. Department of Defense, Kristi Noem in her official capacity as
   Secretary of Homeland Security, and the U.S. Department of Homeland Security.

2) This Court **GRANTS** Plaintiffs' declaratory relief. Defendants' actions exceeded the
   scope of the President's authority pursuant to Title 10, United States Code, Section
   12406 and therefore were *ultra vires* and in violation of the Tenth Amendment.

3) This Court **GRANTS** Plaintiffs' request for permanent injunctive relief.

This Court **PERMANENTLY ENJOINS** Defendants[1] Pete Hegseth, the U.S.

Department of Defense, Kristi Noem, and the U.S. Department of Homeland Security from

---

[1] As this Court may lack jurisdiction to enjoin President Trump in the performance of his official
duties, *see Franklin v. Massachusetts*, 505 U.S. 788, 802–03 (1992) (plurality opinion);

PAGE 2 – PARTIAL FINAL JUDGMENT

**A002**

implementing the following memoranda federalizing and deploying members of the National

Guard in Oregon:

1.  Defendant Secretary Hegseth's September 28, 2025 Memorandum federalizing and

    deploying the Oregon National Guard, Ex. 1051;

2.  Defendant Secretary Hegseth's October 5, 2025 Memorandum federalizing and

    deploying the Texas National Guard, to the extent that it deploys members of the Texas

    National Guard in Oregon, Ex. 6;

3.  Defendant Secretary Hegseth's October 16, 2025 Memorandum to the extent that it

    authorizes the deployment of federalized members of the California and Texas National

    Guards to Oregon, Ex. 2; and

4.  any memoranda deploying members of any other State's National Guard to

    Oregon based on the same predicate conditions that were relied upon to authorize the

    above orders.

This Court retains jurisdiction pursuant to the All Writs Act, 28 U.S.C. § 1651, to enforce

the terms of this permanent injunction against any party.

This Court **STAYS IN PART** this Partial Final Judgment to the extent that it enjoins the

federalization of members of any State's National Guard. With respect to the federalization of

the Oregon National Guard, that **STAY** will be in effect for a period of 14 days. This partial

administrative stay "preserves the status quo in which National Guard members have been

federalized but not deployed." Order at 6, *Oregon v. Trump*, No. 25-6268, ECF 90 (9th Cir. Oct.

---

*Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 501 (1866), this injunction applies only against the
other Defendants.

PAGE 3 – PARTIAL FINAL JUDGMENT

30, 2025). However, with respect to the deployment of any state's National Guard to Oregon, based on any of the above orders, **THIS PERMANENT INJUNCTION ORDER IS IN FULL FORCE AND EFFECT.**

**IT IS SO ORDERED.**

DATED this 7th day of November, 2025.

<u>/s/ Karin J. Immergut</u>
Karin J. Immergut
United States District Judge

PAGE 4 – PARTIAL FINAL JUDGMENT

**A004**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **STATE OF OREGON** and the **CITY OF PORTLAND**, and **STATE OF CALIFORNIA**, | Case No. 3:25-cv-1756-IM |
| | **FINDINGS OF FACT AND CONCLUSIONS OF LAW** |
| Plaintiffs, | |
| v. | |
| **DONALD TRUMP**, in his official capacity as President of the United States; **PETE HEGSETH**, in his official capacity as Secretary of Defense; **U.S. DEPARTMENT OF DEFENSE**; **KRISTI NOEM**, in her official capacity as Secretary of Homeland Security; and **U.S. DEPARTMENT OF HOMELAND SECURITY**, | |
| Defendants. | |

**IMMERGUT, District Judge.**

## INTRODUCTION

On September 27, 2025, the President of the United States federalized 200 members of the Oregon National Guard over the objection of Oregon's governor and deployed them to a

single federal building in Portland, Oregon. In the ensuing days, the President ordered the deployment of 400 federalized members of the Texas and California National Guards, all to the same federal building in Oregon. The mission of these deployments of military troops was ostensibly to quell violent protests outside the one-block Immigration and Customs Enforcement ("ICE") building in Portland. But after a three-day trial that included the testimony of federal, state, and local law enforcement officials and hundreds of exhibits describing protest activity outside the Portland ICE building, the evidence demonstrates that these deployments, which were objected to by Oregon's governor and not requested by the federal officials in charge of protection of the ICE building, exceeded the President's authority. While violent protests did occur in June, they quickly abated due to the efforts of civil law enforcement officers. And since that brief span of a few days in June, the protests outside the Portland ICE facility have been predominately peaceful, with only isolated and sporadic instances of relatively low-level violence, largely between protesters and counter-protesters. When considering these conditions that persisted for months before the President's federalization of the National Guard, this Court concludes that even giving great deference to the President's determination, the President did not have a lawful basis to federalize the National Guard under 10 U.S.C. § 12406.

To be clear, today this Court does not rule that the President can never deploy the National Guard to Oregon, or to any other location, if conditions on the ground justify the Guard's intervention. But under the U.S. Constitution, Congress possesses the power to call up the National Guard "to execute the Laws of the Union, suppress Insurrections, and repel Invasions," U.S. Const. art. I, § 8, cl. 15, and Congress's delegation of its power to the President is by statute. Unless and until the President lawfully federalizes National Guardsmen under a statute such as 10 U.S.C. § 12406, "National Guard members serve solely as members of the

PAGE 2 – FINDINGS OF FACT & CONCLUSIONS OF LAW
**A006**

State militia under the command of a state governor." *Stirling v. Minasian*, 955 F.3d 795, 799 (9th Cir. 2020) (internal quotations omitted). Therefore, the President's unlawful federalization of the National Guard violates the Tenth Amendment, which "reserves to the States" any powers not expressly delegated to the federal government in the Constitution. U.S. Const. amend. X.

In *Newsom v. Trump*, 141 F.4th 1032 (9th Cir. 2025), the Ninth Circuit interpreted the provision permitting the President to call up the National Guard when he "is unable with the regular forces to execute the laws of the United States." 10 U.S.C. § 12406(3). This Court is bound to apply *Newsom*. However, this case presents novel issues not addressed in *Newsom*. *Newsom* did not discuss Section 12406(2), which permits the President to call up the National Guard when "there is a rebellion or danger of a rebellion against the authority of the Government of the United States," nor did it fully delve into the meaning of "to execute the laws of the United States," contained in Section 12406(3). In resolving these issues, this Court draws on both *Newsom*'s reasoning and the constitutional scope of Congress's calling forth power, which defines the outer boundaries of the President's power under 10 U.S.C. § 12406. Indeed, this Court, "as in all cases, [must] interpret the Constitution in light of its text, purposes, and 'our whole experience' as a Nation." *NLRB v. Noel Canning*, 573 U.S. 513, 557 (2014) (quoting *Missouri v. Holland*, 252 U.S. 416, 433 (1920)).

After analyzing these statutory provisions, as applied to the facts in this case, this Court arrives at the necessary conclusion that there was neither "a rebellion or danger of a rebellion" nor was the President "unable with the regular forces to execute the laws of the United States" in Oregon when he ordered the federalization and deployment of the National Guard. 10 U.S.C. § 12406(2)–(3).

This Court acknowledges that some citizens may support these deployments as a helpful military supplement to effectuate the President's immigration agenda. But the Founders "embodied their profound fear and distrust of military power . . . in the Constitution and its Amendments," *Reid v. Covert*, 354 U.S. 1, 29 (1957) (plurality op.), which has lived on through the decades as "a traditional and strong resistance of Americans to any military intrusion into civilian affairs." *Laird v. Tatum*, 408 U.S. 1, 15 (1972). In the Supreme Court's words, "[s]light encroachments create new boundaries from which legions of power can seek new territory to capture." *Reid*, 354 U.S. at 39 (1957). This principle has been foundational to the safeguarding of our fundamental liberties under the Constitution. *See New York Times Co. v. Sullivan*, 376 U.S. 254, 271–72 (1964) (noting that under the First Amendment, "freedoms of expression are to have the breathing space that they need to survive" (ellipses and internal quotations omitted)); *Silverman v. United States*, 365 U.S. 505, 512 (1961) (noting in the Fourth Amendment context that "illegitimate and unconstitutional practices get their first footing . . . by silent approaches and slight deviations from legal modes of procedure" (internal quotations omitted)).

The "precise standard" to demarcate the line past which conditions would satisfy the statutory standard to deploy the military in the streets of American cities is ultimately a question for a higher court to decide. *Newsom*, 141 F.4th at 1051. But based on this Court's application of *Newsom* to the factual findings at trial and the meaning of 10 U.S.C. § 12406 in light of history and tradition, this Court finds that wherever this line precisely is, Defendants have failed to clear it. Therefore, for all the reasons stated below, this Court permanently enjoins Defendants' orders to deploy federalized members of the National Guard to Oregon.

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................... 1

TABLE OF CONTENTS ........................................................................................... 5

PROCEDURAL BACKGROUND ............................................................................. 7

    A.   First Temporary Restraining Order ........................................................... 7

    B.   Second Temporary Restraining Order ...................................................... 10

    C.   Subsequent Proceedings ............................................................................ 11

    D.   Preliminary Injunction and Court Trial ................................................... 12

FINDINGS OF FACT ............................................................................................... 13

    A.   National Guard Callout to Oregon ........................................................... 13

    B.   The Law Enforcement Agencies .............................................................. 16

        1.   Federal Protective Service ................................................................ 16

        2.   Immigration and Customs Enforcement ......................................... 17

        3.   Portland Police Bureau .................................................................... 17

        4.   Oregon State Police .......................................................................... 18

    C.   The National Guard .................................................................................. 18

    D.   The ICE Facility Protests .......................................................................... 19

        1.   Decrease in Number of Protesters .................................................... 21

        2.   Number of Federal Officers .............................................................. 23

        3.   Lack of Crowd Organization ............................................................ 24

        4.   Minimal Presence of Weapons .......................................................... 27

        5.   Decreased Interference with the ICE Building ................................. 28

        6.   Lack of Violence Towards Federal Officers .................................... 32

        7.   Protestor-on-Protestor Confrontations ............................................. 38

    E.   Portland Police Bureau's Response .......................................................... 39

        1.   First Weeks of the Response: Mid-June ........................................... 40

        2.   Refining the Approach: Mid-June to Late September ...................... 43

        3.   Post-Callout PPB Response .............................................................. 46

    F.   Federal Protection of the ICE Building .................................................... 47

    G.   ICE's Ability to Enforce Immigration Law ............................................. 51

H.  Post-Callout ................................................................................. 53

CONCLUSIONS OF LAW .......................................................................... 54

A.  The National Guard ...................................................................... 54

B.  Article III Standing ..................................................................... 57

C.  Permanent Injunction .................................................................. 61

1.  Actual Success on the Merits ................................................ 62

a.  Section 12406(3) ............................................................ 64

i.  *Newsom v. Trump* ................................................. 64

i.  History and Tradition ............................................. 67

ii.  Application ............................................................. 73

b.  Section 12406(2) ............................................................ 86

i.  Ordinary Meaning .................................................. 87

ii.  History and Tradition ............................................. 94

iii.  Application ............................................................. 99

c.  Tenth Amendment ........................................................ 103

2.  Remaining Permanent Injunction Factors .............................. 103

CONCLUSION ........................................................................................ 104

## PROCEDURAL BACKGROUND

This case concerns the President's September 27, 2025 federalization order, which directed Secretary of Defense Pete Hegseth to call into federal active duty status the Oregon National Guard for deployment at the ICE facility in Portland, Oregon. Ex. 1; Ex. 1051. This ICE facility is a sub-office of the ICE Enforcement and Removal Operations ("ERO") Seattle field office, and it is housed in a one-block building located at the corner of South Bancroft Street and South Macadam Avenue ("Portland ICE building" or "Portland ICE facility"). Tr. 10/31/2025 671:6–8; Ex. 307. Secretary Hegseth swiftly implemented the President's order by issuing the September 28, 2025 Memorandum, which calls "200 members of the Oregon National Guard . . . into service effective immediately for a period of 60 days." Ex. 1051. On the same day that Secretary Hegseth issued this September 28, 2025 Memorandum, Plaintiffs the State of Oregon and the City of Portland filed this lawsuit. Their complaint raised five claims: that Defendants' federalization and deployment of the Oregon National Guard violated (1) 10 U.S.C. § 12406; (2) the Posse Comitatus Act and 10 U.S.C. § 275; (3) the Tenth Amendment of the Constitution; (4) the Administrative Procedure Act ("APA"); and (5) the Constitution's separation of powers doctrine and the Take Care Clause. Complaint, ECF 1 ¶¶ 98–142. Plaintiffs requested a permanent injunction to "enjoin Defendants' federalization and deployment of members of the Oregon National Guard." *Id.* at 39.

### A. First Temporary Restraining Order

The next day, on September 29, 2025, Plaintiffs moved for a temporary restraining order to enjoin Secretary Hegseth's September 28, 2025 Memorandum. Motion for Temporary Restraining Order ("First TRO Motion"), ECF 6. On October 2, 2025, Defendants filed a response, and on October 3, 2025, this Court held a hearing on the First TRO Motion. ECF 54.

On October 4, 2025, this Court issued an opinion and order granting Plaintiffs' First TRO Motion and "temporarily enjoin[ing] Defendants' September 28, 2025, Memorandum ordering the federalization and deployment of Oregon National Guard service members to Portland" for fourteen days until the end of the day on October 18, 2025. Opinion and Order Granting First TRO Motion ("TRO Opinion"), ECF 56 at 31; *see* Fed. R. Civ. P. 65(b)(2). This Court concluded that Plaintiffs were likely to succeed in demonstrating that Defendants' federalization of the Oregon National Guard (1) was an *ultra vires* action in violation of 10 U.S.C. § 12406(3) and (2) violated the Tenth Amendment. TRO Opinion, ECF 56 at 16–27; *see Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). This Court also found that Plaintiffs showed a likelihood of irreparable harm in the absence of an injunction and that the balance of equities and the public interest weighed in Plaintiffs' favor. TRO Opinion, ECF 56 at 27–30. This Court therefore issued a Temporary Restraining Order that temporarily enjoined Defendants from implementing the September 28, 2025 Hegseth Memorandum. Temporary Restraining Order ("First TRO"), ECF 56-1.

Within hours of the issuance of the First TRO, Defendants redirected federalized California National Guard personnel to Portland. Tr. 10/31/2025 634:25–635:3. These California Guardsmen were federalized in June "[i]n response to disturbances in Los Angeles" and had remained in federal service. *See Newsom*, 141 F.4th at 1040. The next day, on October 5, 2025, the 200 California National Guard troops were transported to Oregon. Ex. 202 at 2; *see* Tr. 10/31/2025 618:5–19.

Meanwhile, at 11:35 AM PDT on October 4, 2025, a few hours prior to this Court's issuance of the First TRO at 4:27 PM PDT, and less than 24 hours after this Court's hearing on the TRO, Defendants deployed nine federalized members of the Oregon National Guard "at the

ICE Facility in downtown Portland, Oregon where they assumed their first support mission." Ex. 201 at 1. The nine National Guardsmen "completed the first shift at the ICE Facility" at 12:00 AM PDT, after this Court had enjoined their deployment. Ex. 202 at 2–3. Prior to the start of trial, when asked to address why the nine National Guardsmen remained deployed at the Portland ICE facility throughout the evening of October 4, 2025, Defendants stated that "there's, obviously, time that it took to convey the message to people on the ground." Tr. 10/29/2025 9:20–21. Defendants' counsel further explained that "[c]ompliance advice has to be fashioned, and then it has to be relayed down the chain of command." Tr. 10/30/2025 304:14–15.

Ordinarily, this Court would be inclined to accept Defendants' explanation for their violation of the First TRO given that "the first shift" at the Portland ICE facility commenced prior to this Court's issuance of the First TRO. However, in light of the following facts, this Court is deeply troubled by Defendants' continued deployment of Oregon National Guardsmen at the Portland ICE facility in violation of the First TRO. In the seven hours that Defendants took to "convey the message" of the First TRO "to people on the ground," Defendants simultaneously "convey[ed] the message" to the U.S. Army Northern Command to send 200 of the federalized California National Guard personnel in Los Angeles to Portland. Ex. 202; Tr. 10/31/2025 618:5–24; Tr. 10/31/2025 634:25–635:3. In other words, Defendants had time to order and coordinate the transport of federalized California National Guardsmen from Los Angeles to Portland but needed more time to communicate with the Oregon National Guardsmen at the Portland ICE facility.

This Court has not issued any finding of contempt based on Defendants' apparent violation of the First TRO. However, this Court expects Defendants will provide further

explanation when ordered to do so by this Court in the future, and this Court retains jurisdiction over the issue.

## B. Second Temporary Restraining Order

On Sunday, October 5, 2025, the day after this Court issued the First TRO, Plaintiffs amended their complaint to join the State of California as a plaintiff and filed a Motion for a Second Temporary Restraining Order, seeking to "enjoin Defendants' deployment of members of the California National Guard to Oregon." Amended Complaint, ECF 58 at 43; Motion for a Second Temporary Restraining Order ("Second TRO Motion"), ECF 59. Plaintiffs asserted the same claims brought in the initial Complaint, Amended Complaint ¶¶ 113–59, and added allegations concerning the dead-of-night deployment of the California National Guard, *id.* ¶¶ 99–112, 121, 130. That evening, this Court held an emergency hearing on Plaintiffs' Second TRO Motion. ECF 68. Minutes before the hearing, this Court learned that Defendant Secretary Hegseth issued a new Memorandum to the Adjutant General of the Texas National Guard that authorized "the mobilization of up to 400 members of the Texas National Guard under section 12406 of title 10, U.S. Code," to Oregon and other states. Ex. 6.

During the October 5, 2025 hearing, this Court noted that Defendants' deployment of federalized members of other states' National Guards to Oregon "appear[s] to be in direct contravention" of the First TRO. Tr. of October 5, 2025, Hearing at 20:1–2. After hearing argument from the parties, this Court issued the Second Temporary Restraining ("Second TRO"), temporarily enjoining the deployment of any "federalized members of the National Guard in Oregon." ECF 68. This Court based the Second TRO "on this Court's prior Opinion and Order Granting Plaintiffs' First Motion for Temporary Restraining Order." Second TRO, ECF 56. As this Court explained during the hearing, "the prerequisites in § 12406 were not satisfied . . . based on the facts in Portland, Oregon." Tr. of October 5, 2025, Hearing at 21:3–5.

On October 15, 2025, this Court extended the First and Second TROs both by fourteen days. ECF 85.

## C. Subsequent Proceedings

On October 4, 2025, Defendants appealed this Court's First TRO to the Ninth Circuit. Notice of Appeal, ECF 57. However, Defendants did not appeal the Second TRO. On October 5, 2025, Defendants filed a motion in the Ninth Circuit to stay the First TRO pending appeal. Motion to Stay, *Oregon v. Trump*, No. 25-6268 (9th Cir. Oct. 5, 2025), Dkt. No. 11. On October 20, 2025, a split panel of the Ninth Circuit granted Defendants' motion and stayed the First TRO, finding that Defendants were entitled to a stay. *Oregon v. Trump*, No. 25-6268, 2025 WL 3008050, at *3 (9th Cir. Oct. 20, 2025), *vacated upon reh'g en banc*. The two-judge majority found that Defendants were likely to succeed in showing that the federalization and deployment of 200 members of the Oregon National Guard on September 28, 2025, was lawful. *Id.* at *10– 14.

The same day, on October 20, 2025, a judge on the Ninth Circuit "requested a vote on whether this case should be reheard en banc." Order, *Oregon v. Trump*, No. 25-6268 (9th Cir. Oct. 5, 2025), Dkt. No. 63. On October 23, 2025, Plaintiffs filed a declaration attaching Defendants' interrogatory response regarding the number of federal law enforcement officers at the Portland ICE building between June and September. Second Decl. of Marshall, Ex. 1, ECF 108. Among other information, the response suggested that the number of FPS officers diverted to the Portland ICE facility ranged from 20 to 31 between June 16, 2025, and October 5, 2025, *id.* Ex. 1 at 4–5, contrary to the Ninth Circuit majority's reliance on Defendants' earlier representation that "115 FPS officers—nearly 25% of FPS officers nationwide—were diverted to Portland," *Oregon v. Trump*, 2025 WL 3008050, at *12.

On October 28, 2025, a majority of nonrecused active judges of the Ninth Circuit voted to rehear this case en banc, vacating the panel's October 20, 2025 order. Order, *Oregon v. Trump*, No. 25-6268 (9th Cir. Oct. 28, 2025), Dkt. No. 89. Therefore, as of the start of trial on October 29, 2025, this Court's Second TRO remained in force, enjoining Defendants from "deploying federalized members of the National Guard in Oregon." Second TRO, ECF 68.

## D. Preliminary Injunction and Court Trial

From October 29, 2025, to October 31, 2025, this Court held a three-day consolidated preliminary injunction hearing and merits bench trial on Plaintiffs' two claims that Defendants' federalization and deployment of National Guardsmen from Oregon, California, and Texas to the Portland ICE building violated 10 U.S.C. § 12406 and the Tenth Amendment. ECF 125.

After hearing testimony from eight live witnesses, and receiving hundreds of exhibits, this Court granted a preliminary injunction pursuant to 28 U.S.C. § 65(a)(2) to expire on November 7, 2025 at 5:00 PM PT, ECF 134, so this Court could complete its review of the voluminous exhibits and consider post-trial briefing of counsel and draft an opinion. Based on the full trial record, this Court makes the below findings of fact and conclusions of law. To the extent that any findings of fact may be construed as conclusions of law, this Court adopts them as such. To the extent that any conclusions of law constitute findings of fact, this Court adopts them as such.

## FINDINGS OF FACT

### A.  National Guard Callout to Oregon

On June 7, 2025, President Trump issued a Memorandum, ("June 7 Memorandum"), that cited "numerous incidents of violence and disorder" in response to the enforcement and faithful execution of federal immigration laws. In the June 7 Memorandum, President Trump declared:

> I hereby call into Federal service members and units of the National Guard under 10 U.S.C. 12406 to temporarily protect ICE and other United States Government personnel who are performing Federal functions, including the enforcement of immigration law, and to protect Federal property, at locations where protests against these functions are occurring or are likely to occur based on current threat assessment and planned operations.

Ex. 1052. The memorandum broadly directed deployment of National Guardsman "for 60 days or at the discretion of the Secretary of Defense." *Id.* That same night Secretary Hegseth issued his own memorandum federalizing 2,000 California National Guard members, *Newsom v. Trump*, 786 F. Supp. 3d 1235, 1244 (N.D. Cal. 2025), *stayed pending appeal*, 141 F.4th 1032 (9th Cir. 2025), some of whom are still in federal service today. Ex. 2.

Months after the President's June 7 Memorandum, on September 26, 2025, the callout of the Oregon National Guard was set in motion. On September 26, 2025, the Department of Homeland Security ("DHS") issued a memorandum to the Department of War, requesting assistance for Federal Facility Protection Support to DHS in Oregon. Ex. 1050. The memorandum requested assistance "to safeguard federal personnel, facilities, and operations" in Oregon because "[f]ederal facilities, including those directly supporting [ICE] and [FPS], have come under coordinated assault by violent groups intent on obstructing lawful federal enforcement actions." *Id.* DHS requested "approximately 200 DoW personnel, trained and equipped for mission security in complex urban environments" and that "[t]hese personnel would

integrate with federal law enforcement operations, serving in direct support of federal facility

protection, access control, and crowd control measures." Ex. 1050.

The next day, September 27, 2025, President Trump posted a message on Truth Social,

stating:

> At the request of Secretary of Homeland Security, Kristi Noem, I am directing
> Secretary of War, Pete Hegseth, to provide all necessary Troops to protect War
> ravaged Portland, and any of our ICE Facilities under siege from attack by Antifa,
> and other domestic terrorists. I am also authorizing Full Force, if necessary. Thank
> you for your attention to this matter!

Ex. 1. After this post, Major General Timothy Rieger, the Vice Chief of the National Guard

Bureau, issued a memorandum to the Adjutant General of the Oregon National Guard at the

direction of the Office of the Secretary of War. Ex. 1048; Tr. 10/31/2025 612:17–18. Despite

issuing this memorandum, Major General Rieger had no personal knowledge of the situation on

the ground in Portland, tr. 10/31/2025 610:24–611:1; *id.* at 612:19–21, and the FPS Deputy

Regional Director in charge of protecting the Portland ICE facility, R.C., did not request the

National Guard's assistance. Tr. 10/30/25 466:10–467:15. Major General Rieger's

memorandum, signed the same day as President Trump's Truth Social post, proposed that

Governor Kotek agree to a 32 U.S.C. § 502(f) mobilization, where the activated guardsman serve

under the Governor's command and control and the mobilization is paid for by the federal

government. Tr. 10/31/2025 613:7–13. Governor Kotek rejected the proposal. Tr. 10/31/2025

615:13–14.

On September 28, 2025, Secretary of War Hegseth issued a memorandum authorizing the

deployment and federalization of 200 members of the Oregon National Guard under 10 U.S.C. §

12406:

> On June 7, 2025, the President of the United States called forth at least 2,000
> National Guard personnel into Federal service pursuant to section 12406 of title 10,

U.S. Code, to protect U.S. Immigration and Customs Enforcement and other U.S. Government personnel who are performing Federal functions, including the enforcement of Federal law, and to protect Federal property, at locations where protests against these functions are occurring or are likely to occur based on current threat assessments and planned operations. The President signed a copy of the attached memorandum to effectuate the calling forth of these Service members. This memorandum further implements the President's direction. 200 members of the Oregon National Guard will be called into Federal service effective immediately for a period of 60 days. The Chief of the National Guard Bureau will immediately coordinate the details of the mobilization with you, in coordination with the Chairman of the Joint Chiefs of Staff and Commander, U.S. Northern Command. The mobilized Service members will be under the command and control of the Commander, U.S. Northern Command.

Ex. 1051; Tr. 10/31/2025 616:5–24.

On October 1, 2025, President Trump posted a message on Truth Social stating:

As I determined on September 27th, when I activated and called into service the National Guard in Oregon, conditions continue to deteriorate into lawless mayhem. Our GREAT Federal Law Enforcement Officers have not been able to enforce the Laws in Oregon. ANTIFA and the Radical Left Anarchists have been viciously attacking our Federal Law Enforcement Officers, men and women who are simply doing their job, protecting Federal Property, and enforcing Federal Immigration Laws and the Rule of Law. We will never allow MOBS to take over our streets, burn our Cities, or destroy America. The National Guard is now in place, and has been dedicated to restoring LAW AND ORDER, and ending the Chaos, Death, and Destruction! We are a Nation of LAW, and we will PREVAIL. Thank you for your attention to this matter!

Ex. 194; Tr. 10/31/2025 626:23–627:10.

As described in the procedural history above, Defendants quickly pivoted to mobilizing

the National Guards of other states to deploy in Portland. The same day as this Court's TRO,

October 4, Defendants redirected members of the California National Guard to Portland despite

this Court's order blocking the use of the Oregon National Guard in Portland. Tr. 10/31/2025

634:25–635:3. These members of the California National Guard were already in federal status

under Section 12406 from when they were activated in June for deployment to Los Angeles. Tr.

10/31/2025 603:4–7; Tr. 10/31/2025 618:14–24. Additionally, the Secretary of War issued a

memorandum calling members of the Texas National Guard into federal service under § 12406 for deployment to Portland and other cities. Ex. 6. On October 5, 2025, this Court issued the second TRO in this case, which enjoined the deployment of any National Guard to Oregon. Almost two weeks later, on October 16, 2025, the Secretary of War issued a memorandum extending the prior federalization and deployment of 200 California National Guard to February 2, 2026, and 200 Texas National Guard to December 4, 2025. Ex. 2.

## B. The Law Enforcement Agencies

The 2025 ICE protests in Portland have largely been confined to the single city block surrounding the U.S. Immigration and Customs Enforcement (ICE) Facility, on the corner of Macadam and Bancroft Street in southwest Portland. Tr. 10/29/25 57:22–24; Tr. 10/30/25 389:10–22; Ex. 307. Numerous law enforcement agencies, described below, play a role in securing the ICE facility and the immediate city property surrounding it. The pertinent federal agencies are the Federal Protective Service and the U.S. Immigration and Customs Enforcement. The primary local agencies involved in this case are the Portland Police Bureau and the Oregon State Police.

### 1. Federal Protective Service

The Federal Protective Service (FPS) is the federal agency that "protect[s] all GSA federally leased or owned facilities," including the Portland ICE Facility. Tr. 10/30/2025 379:7–9. FPS officers are trained to "identify vulnerabilities in federal facilities, mitigate risks, present recommendations, and implement countermeasures." Tr. 10/30/2025 (R.C.) 379:14–380:10. FPS has "roughly 750 total FPS personnel and roughly about 500 inspectors" nationwide. Tr. 10/30/2025 386:5–8. Inspectors are the sworn law enforcement officers that are responsible for general patrol, investigations, and threat assessment at federal facilities. Tr. 10/30/2025 495:16–

20. There are four FPS officers permanently assigned to Oregon to cover 100 federal facilities. Tr. 10/30/2025 486:14–24.

### 2. Immigration and Customs Enforcement

Immigration and Customs Enforcement ("ICE") is the nation's primary immigration enforcement organization. Within ICE is the Enforcement and Removal Operations directorate, which is "responsible for interior enforcement of mostly administrative immigration law." Tr. 10/31/25 668:1–2. ICE operations in Oregon are managed from the organization's Seattle field office, which maintains subsidiary offices in Portland, Medford, and Eugene. *Id.* at 668:13–23. The Seattle field office manages approximately 220 full-time positions, 130 of which are currently filled, with 20 to 30 individuals currently employed in Portland. *Id.* at 668:24–669:15. The Seattle field office also employs a Special Response Team (SRT) of eight officers who perform high-risk duties like crowd control and execution of high-risk warrants. *Id.* at 684:18–685:24. Seven of those officers are currently deployed to Portland. *Id.* at 684:17–20.

### 3. Portland Police Bureau

The Portland Police Bureau (PPB) is the primary law enforcement agency with jurisdiction over the City of Portland. Tr. 10/29/2025 209:19–21. PPB is divided into three precincts: North Precinct, East Precinct, and Central Precinct. Tr. 10/29/2025 225:12–21. The ICE facility is within Central Precinct, which also covers Downtown Portland and over 200,000 people. Tr. 10/29/2025 225:12–24. Typically, an individual police precinct office responds to spontaneous protests or demonstrations within their precinct, tr. 10/29/2025 394:18–24s, but PPB also has specialized resources for crowd management like the Rapid Response Teams ("RRT") to respond to high-complexity events, including protests, that are either more complex or larger than a precinct can manage. Tr. 10/29/2025 39:25–40:4; Tr. 10/29/2025 143:19–24.

### 4. Oregon State Police

The Oregon State Police ("OSP") is the primary law enforcement agency for the State of Oregon, charged with enforcing the state's laws and regulations. Tr. 10/29/25 181:23–182:9. OSP employs roughly 700 to 800 troopers, anywhere between a quarter to a third of whom are located in the Portland area. Tr. 10/29/2025 182:10–18. The organization maintains a Mobile Response Team (MRT) of roughly 40 troopers to respond to exigencies including crowd management. Tr. 10/29/25 186:5–14.

## C. The National Guard

The National Guard is a militia and military reserve force organized primarily along state lines. Unless federalized, state National Guard organizations are under the command of their state's Governor. Nonetheless, the National Guard Bureau, a component of the Department of War, liaises between the Department and the state National Guard organizations, and provides support to state organizations. Tr. 10/31/25 588:18–589:5.

National Guardsmen may serve in three different statuses, and they serve under the command of a state governor for two of the three. Tr. 10/31/2025 594:8–14. First, members of the National Guard serve in "state active duty," when "the Governor calls out the Guard, and it's paid for by the State." Tr. 10/31/2025 594:9–10; see *Stirling*, 955 F.3d at 798 ("Such members act under state control for state purposes and . . . at state expense." (internal quotations omitted)). Second, they may be activated under Title 32 of the United States Code, where they are placed "under command and control by the Governor and paid for by the Federal Government." Tr. 10/31/2025 594:11–12; see *Stirling*, 955 F.3d at 798 ("[M]embers provide military support as state National Guard members under state control while also in the service of the federal government and funded by the federal government . . . .").

PAGE 18 – FINDINGS OF FACT & CONCLUSIONS OF LAW
A022

Finally, they may be activated under Title 10 of the United States Code, where they are "under the command control of the Federal Government and paid for by the Federal Government." Tr. 10/31/2025 594:13–14; *see Stirling*, 955 F.3d at 798 ("When members are called into federal active duty status, they serve pursuant to Title 10 of the United States Code ('Armed Forces'), which pertains to all active duty members of the armed services of the United States."). When federalized under Title 10, National Guardsman are considered part of the military and ultimately report to the Secretary of War, rather than the governor. Tr. 10/31/2025 636:12–21.

Major General Timothy Rieger, Vice Chief for the National Guard Bureau, testified that he had no prior experience with National Guard deployments in Title 10 status under Section 12406. Tr. 10/31/2025 632:2–25. Major General Rieger also acknowledged that, when deployed to assist with a civil disturbance or to protect law enforcement officers, National Guardsmen generally have no obligation to retreat or de-escalate and will skip "rungs of a ladder" of force escalation if need be, though rules for the use of force are ultimately determined by the commander. Tr. 10/31/2025 637:12–638:22.

## D.  The ICE Facility Protests

Five years ago, Portland faced sustained and violent civil unrest in response to the murder of George Floyd. For almost six months in 2020, the city was in a state of upheaval, with well-attended and peaceful daily protests turning violent at night. Ex. 31 at 14. The protests and riots shifted their focus to federal buildings, including Portland's Mark O. Hatfield United States Courthouse. Ex. 31 at 27. Protesters hurled rocks, bricks, and Molotov cocktails, and the protests resulted in 450 injuries to officers and over $15 million in damage. Ex. 31 at 14–15. Several witnesses at trial testified that as compared to the 2025 protests at the ICE facility, 2020 was "an

entirely different type of disorder." Tr. 10/29/2025 97:21–98:3. That level of civil unrest has not returned since.

The 2020 protest in Portland are not at issue in this case. What is at issue are the comparably small demonstrations at the Portland ICE building that began in mid-June 2025. The protests peaked on June 14 and diminished quickly thereafter, especially as law enforcement adjusted to facts on the ground. In July and August, the size and energy of the protests continued to decline, and any criminality associated with the protests became more isolated and manageable. While some protesters were intent on interfering with the ICE facility's driveway, FPS was able to disperse the crowds and much of any criminal activity at the protests pivoted away from being done at or towards the building or federal officers. Tr. 10/30/2025 364:15–365:2.

The decline in protest activity was not linear; there were occasional spikes in activity after June 14, but any crime was generally low-level. The protests would "generally bump up on the weekends," Tr. 10/30/2025 421:17–18, and protesters tended to engage in more unlawful activity on major holidays, like Independence Day or Labor Day, *see, e.g.*, Ex. 410; Ex. 792; Ex. 495; Ex. 847. The PPB witnesses, all of whom this Court found credible based on their experience on the ground in Portland, their demeanor while testifying, and the exhibits which corroborate their testimony, described generally peaceful crowds after June 14 up to September 27. By September, the energy of the protests reached its lowest point. To the extent that any minimal criminality remained, its focus shifted from federal property and personnel to conflict between protesters and counter-protesters. Tr. 10/30/2025 364:15–365:2. From September 19 to September 28, immediately before the National Guard callout, there was "[n]othing much" going on outside the ICE building. Tr. 10/29/2025 162: 9-19. Throughout the protests, PPB

Commander Schoening testified that protesters wore "inflatable costumes." *See* Tr. 10/29/2025 95:20–24. Similarly, PPB Assistant Chief Dobson described "folks in costumes" at the ICE Facility, as well as "other almost festive-type events going on down there," including "dance parties." Tr. 10/30/2025 365:4–11.

Any riotous activity affecting the Portland ICE building peaked in June and had subsided for months before the President's September 27, 2025 callout of the National Guard to Oregon. Regarding the nature of the crowd and its behavior, this Court finds the following. First, the size of the crowds decreased dramatically from June to September. Second, the number of officers briefly increased in response to the peak activity in mid-June, but it quickly subsided and remained at a low steady state until September 27, 2025. Third, the crowd was not directed by an organized group. Fourth, members of the crowd were rarely armed. Fifth and finally, the crowd's shift in focus from the ICE building and the federal personnel in June to counter-protester disputes in September demonstrates that much of the activity since mid-June had little to no effect on the ICE building and federal operations.

### 1. Decrease in Number of Protesters

The evidence and testimony that this Court received at trial show that, on average, the crowd size[1] flared up in mid-June, but decreased substantially thereafter, causing no more than minimal interference with federal law enforcement in July, August, and September. The number

---

[1] With respect to crowd size, there is occasional divergence between the federal law enforcement reporting and the local law enforcement reporting. *Compare* Ex. 657; *and* Ex. 658, *with* Ex. 775. Where this divergence occurs, the Court finds the PPB reporting more credible for two reasons. First, PPB has much more experience in managing—and therefore estimating the size of—large crowds. Second, PPB's estimates tended to be inclusive of the entire area of interest surrounding the ICE facility, whereas FPS estimates tended to be focused on the number of protesters in the immediate line of sight of the building. As a result, PPB tended to have higher crowd estimates than FPS. For days where PPB did not report crowd size, this Court cites crowd estimates from FPS's reports.

of protesters peaked on June 12, June 14, and June 18, with a maximum size of 450, 300, and 200 protesters respectively. Ex. 304-1. For the rest of June, the crowd size fluctuated significantly, but the greatest number of demonstrators on any given day generally stayed between 25 and 100 people. *See, e.g.*, Ex. 339; Ex. 350; Ex. 361; Ex. 375; Ex. 388; Ex. 396.

In July and August, the average number of protesters decreased further. The maximum crowd size typically hovered between 15 and 30 people, with limited exceptions. Tr. 10/29/25 230:15-22; Ex. 304-1; Ex. 400; Ex. 428; Ex. 459; Ex. 468; Ex. 493. Those exceptions included a 150-person crowd on Independence Day, as well as July 17 and August 23, which had maximums of 200 and 120 people, respectively, because of planned, peaceful marches. Ex. 410; Ex. 454; Ex. 840.[2]

On a regular basis in September, there were more federal law enforcement officers on duty than there were protesters outside the ICE facility. Tr. 10/30/25 558:18–21. The September 1 Labor Day holiday saw a spike in crowd size, with 125 people marching to the ICE facility from Caruthers Park. Ex. 495. The daily averages then settled back under a ceiling of 30 people for roughly two weeks, with the exception of a 60-person protest on September 6. *See, e.g.*, Ex. 496; Ex. 499; Ex. 504. Beginning on September 13, the number of protesters marginally swelled for about a week, reaching 50 on several days and 150 on a single day. *See, e.g.*, Ex. 506; Ex. 509; Ex. 510; Ex. 514. But by the week before the callout of the Oregon National Guard on September 27, the size of the protests was at its lowest point since before the protests began. There were 7–10 protesters on September 22, Ex. 516, "a few individuals" on September 23, Ex.

---

[2] While PPB reported 200 protesters on July 17, FPS reported 800-1,000. *Compare* Ex. 454 *with* Ex. 807. There is nothing in the record to explain FPS's large crowd estimate, and so the Court gives more weight to PPB's estimate.

Ex. 517; fewer than 10 on the 24th, Ex. 518; 20 on the 25th, Ex. 519; and 15 on the 26th. Ex. 520.

On September 27, following President Trump's Truth Social post regarding the deployment of the National Guard to Portland, the number increased to 60. Ex. 523. On September 28, it grew again to just under 200. Ex. 527. From then until the end of the record evidence on October 15, the maximum crowd size only dipped below 50 twice—on September 19 and October 1—and reached triple digits on six occasions. Ex. 532; Ex. 535; Ex. 542; Ex. 548; Ex. 553; Ex. 558; Ex. 562; Ex. 590. Two of those dates were the result of peaceful, organized protests that moved through the area, including a 1,000-person naked bike ride on October 12. Ex. 548; Ex. 590. With the return of larger crowds since the National Guard callout, local law enforcement has increased resources, as discussed below.

### 2. Number of Federal Officers

This Court received testimony and exhibits regarding the number of federal officers dedicated to protecting the Portland ICE facility throughout the period of interest from June to September 27. On June 11, the first day for which the record provides staffing numbers, there were five federal officers on duty. Ex. 773; Ex. 774. As the protests increased, additional personnel surged to the ICE facility. On June 16, the first FPS officers deployed from other locations around the country arrived in Portland. Ex. 773. For a week thereafter, the total number of federal officers on duty each day fluctuated around 70 to 90, split over multiple shifts. Ex. 773. But after this initial influx, the number of officers on duty hovered around 50 each day. Ex. 773. Notably, that number generally stayed constant throughout July and August even as the number of protesters dropped to an average of 15–30. Ex. 773. As protests decreased further in September, the number of federal officers on duty was reduced, averaging around 35 to 40. Ex. 773. On a regular basis in August and September, there were more federal law enforcement

officers on duty than there were protesters outside the ICE facility. Tr. 10/30/25 558:18–21. On

September 28, 120 law enforcement officers were on duty, which this Court finds was in

anticipation of a spike in protest activity following President Trump's National Guard

deployment announcement. Ex. 866. Following that date, personnel numbers at the ICE facility

continued to grow, topping 150 on October 3 and never again dipping below that threshold

during the time period that the record covers. Ex. 773. On October 13 and 14, the number of

federal officers reached 197, even as the number of protesters had settled at an average daily

maximum between 50 and 80. Ex. 874; Ex. 875.

### 3. Lack of Crowd Organization

Based on evidence received regarding the organization and intent of the protesters, the

Court finds that the protests were not, by and large, organized, with the limited exception of

peaceful, planned, isolated marches that occasionally ended at or passed by the ICE facility.

Additionally, the Court gives weight to PPB Commander Schoening's testimony that he has not

received any intelligence that the protesters are organized or intend to overthrow the government,

Tr. 10/29/2025 95:5–96:3, and therefore finds that no such organization or intent existed.

The Court received evidence about what protesters were wearing, in part to consider

whether commonality in dress indicated organization within the protest. From that evidence, this

Court finds as follows: Black bloc refers to all black clothing; a "black blocker" is someone

dressed in black bloc. *See* Tr. (Hughes) 257:25-258:3. Sometimes, "black bloc" "includes

padding [or] armor." 10/29/2025 (Bailey) Tr. 210:8–13. Although some ICE Facility protesters

wore black bloc, this Court finds that there was no uniform or common garb among protesters.

On June 13 and 14, approximately one-third to one-half the protesters wore black bloc. Ex. 36. But the number of black blockers generally declined thereafter. Tr. 10/30/2025 365:4-11.[3]

This Court also received limited evidence[4] about "Antifa." From that evidence, this Court finds as follows: At least as it relates to the protesters at the Portland ICE facility, Antifa is an "ideology" and is "shorthand for 'anti-fascists.'" Tr. 10/29/2025 160:8–10. This Court finds credible Commander Schoening's testimony that, at least in Portland, Antifa is not an "organized group where you have membership." Tr. 10/29/2025 160:18–23. He also testified that "Antifa" is a "common term" with "public order professionals," but often there is "overuse of the term incorrectly" and "overgeneralization of the term." Tr. 10/29/2025 160:13–17. Commander Schoening has 23 years of policing experience in Portland and at least 8 years of experience working for PPB's Rapid Response Team. Tr. 10/29/2025 33:25–39:3. Commander Schoening has unique familiarity with organized protest groups and political activists in Portland. In fact, Commander Schoening identified by name several "organized protest groups" in charge of "large marches and demonstrations in the downtown area", including "50501," "PDX," and "Indivisible." Tr. 10/29/2025 95:13–16. Commander Schoening testified that "Antifa" is not an

---

[3] On August 5, 2025, ICE officers circulated internally a digital flyer advertising an "ICE Out of PDX Ongoing Protest" at the ICE facility, which depicted an individual in black bloc and said, "wear PPE." Ex. 1090. This Court heard no testimony about where ICE agents obtained the flyer or whether it was distributed among protesters. Because the documentary and testimonial evidence demonstrates that protesters wearing black bloc diminished after June 14, the Court does not give significant weight to this evidence.

[4] This Court also considers the documentary evidence that it received discussing "Antifa." In an intra-agency email on September 13, for example, ICE officers discuss how a reporter on X (previously Twitter) said that she "has heard ANTIFA talking that ICE agents are the Nazi gestapo who need to be killed." Ex. 1077. This post was not introduced into evidence or discussed at trial. This Court accordingly gives it little weight in its factual findings about the existence of Antifa or its connection to the issues in this case. As discussed, other documentary evidence mentioning Antifa was similarly not relied on at trial.

organized group in Portland; although the city "did have a brief period of time . . . where [it] had a specific group named 'Rose City Antifa.'" Tr. 10/29/2025 160:18–23. Commander Schoening testified that he is "not aware of" Rose City Antifa's "continued existence." *Id.*

For the same reasons, this Court also finds credible Commander Schoening's testimony that "there hasn't been any structured organization or any group in charge of the protest activity down at the ICE facility," including Antifa. Tr. 10/29/2025 95:13-16. Commander Schoening's experience serving in PPB's Rapid Response Team gives him additional expertise in identifying the extent of the organization among Portland protesters.[5] Despite that specialized knowledge, Commander Schoening still testified that there was "some level of organic organization," at the ICE facility protests, but that there was "no organized group dictating everyone's activity or behavior." Tr. 10/29/2025 95:20-24. Assistant Chief Dobson echoed that testimony, particularly in the month of September, when there were "almost festive-type events" occurring at the ICE facility, like "dance parties" and "the naked bike ride." Tr. 10/30/2025 365:4-:11. Accordingly, this Court finds that there was no credible evidence that an organization coordinated the movement or actions of ICE facility protesters.[6]

---

[5] Also relevant to Commander Schoening's ability to determine organized crowd activity is his extensive public order training, including trainings from the national Incident Command System and the Public Order Management Academy. Tr. 10/29/2025 35:23–36:15. He has also attended international conferences on public order policing best practices. Tr. 10/29/2025 36:16–18.

[6] The Court heard brief testimony about radio communication between protesters that it does not find to be reliable evidence of coordination. R.C. testified that FPS could "see [protesters'] communications with radios," and that FPS was "hoping to catch crosstalk" with a "walkie-talkie" in the "Emergency Operations Center." Tr. 10/30/2025 425:5–8. But the only documentary evidence this Court received about those communications postdate the President's federalization of the National Guard, so the Court does not find this communication or testimony relevant to the federalization. *See* Ex. 872; Ex. 873 (duplicate reports from October 2, 2025).

PAGE 26 – FINDINGS OF FACT & CONCLUSIONS OF LAW
**A030**

### 4. Minimal Presence of Weapons

The trial testimony and exhibits revealed that during the period of interest, law enforcement confirmed the presence of firearms only three times, excluding times when media personalities showed up with armed security. Ex. 792; Ex. 479; Ex. 496. At no point during the entirety of the protests did a demonstrator point a firearm at a law enforcement officer or use one against any individual. Judging from the record, the Court finds that the presence of firearms was not a material feature of the protests. Reports of firearms were sporadic and isolated, confirmation of them even more so, and use of them nonexistent.

On rare occasions, protesters were observed carrying an assortment of bladed weapons, but only once did FPS report that an individual actually drew a knife on a federal officer. *See, e.g.*, Tr. 10/30/25 526:23-24; Ex. 859; Ex. 1136. On June 24, while an officer was in the process of detaining one protester, another protester threatened the officer with a knife. Ex. 783. The knife-wielding protester was subdued using a taser. Ex. 783. More frequently, the exhibits showed that protesters were observed carrying pepper spray. *See, e.g.*, Ex. 653; Ex. 1131; Ex. 318; Ex. 673. When demonstrators used pepper spray, it was most often used against other demonstrators. *See, e.g.*, Ex. 808. Only once does it appear that a protester deliberately and successfully used pepper spray against a federal officer: on June 10. Ex. 1131. Based on this evidence, the Court finds that the vast majority of protesters did not carry these types of weapons. The Court also finds that these weapons were used so infrequently against federal officers that their impact on the federal government's ability to secure the ICE facility or interference with ICE's ability to perform its law enforcement mission was negligible.

This Court also received evidence about sticks and bats. Commander W.T., who worked on seven-day assignments at the ICE Facility from mid-July to September 21, 2025, testified that that it was "typical" to see protesters at the ICE facility carry bats, improvised weapons, shields,

or ballistic vests.[7] Tr. 10/30/2025 500:22–501:5; Tr. 10/30/2025 Tr. 521:24–522:6. In general,

daily law enforcement reports and communications indicate that sticks, bats, and clubs were

present at the protests from mid-June through the entire period of interest. *See, e.g.*, Ex. 810; Ex.

848. But there is only a single report of such items being used against law enforcement

personnel. On July 20, while an SRT agent was arresting an unruly protester, a second protester

struck him in the head with a stick. Ex. 810. Importantly, the FPS 209 form for the day does not

record any injuries to law enforcement officers, suggesting that the assault, while unacceptable,

did not injure the SRT agent. Ex. 810. Given the extraordinarily minimal frequency with which

protesters employed bats, clubs, or sticks as weapons, the Court finds that, while these items may

have been intended to intimidate law enforcement, they were generally not intended for use as

weapons against federal agents.

Considering the full body of evidence described above regarding the presence and use of

weapons by protesters at the ICE facility from early June through late September, this Court

finds the following: The vast majority of protesters were peaceful and did not carry weapons. To

the extent that weapons were present, they were so rarely used against federal personnel that they

constituted no more than a minimal interference with law enforcement operations.

### 5.  Decreased Interference with the ICE Building

The Court received evidence at trial concerning damage to and interference with the ICE

---

[7] For example, Commander W.T. testified that "[a]t approximately 1849 hours, a group of 200 to
250 peaceful protesters were observed in front of the building and scattered around the area.
Some protesters were seen carrying bats, improvised weapons, shields, or what appeared to be
ballistic vests." Tr. 10/30/2025 521:22–522:1. He also testified that he typically saw bats and
sticks outside the ICE facility. Tr. 10/30/2025 526:15–17. He testified that the officers always
see people that are armed. Tr. 10/30/2025 526:21. Specifically, he recalled some individuals
carrying katanas or firearms. Tr. 10/30/2025 526:23–25.

facility resulting from the protests, from which the Court concludes that, following the initial flare-up of protests in June, protester interference with the ICE facility did not meaningfully disrupt the execution of federal law enforcement operations.

The most substantial instance of damage to the facility came in mid-June. Protesters broke a second-floor window at the ICE facility on June 12, and broke several first-floor windows, including the glass on the facility doors, during the period from June 11 to June 15. Tr. 10/29/25 59:13–17, 130:9–16, 216:25–217:3, 10/30/25 406:9–11; Ex. 775. During the same period, protesters threw bottles and bricks at the vehicle gate, temporarily disabling its automated open and close functions. Tr. 10/29/31 55:11–18, 10/31/25 674:1–3; Ex. 657. Similarly, protesters disabled some of the card readers that allowed employees to enter and exit the building. Tr. 10/31/25 674:3–4. On June 12, a small number of protesters lit a fire near the vehicle gate, including inside a large, rolling garbage can, which they then pushed into a large debris pile against the gate. Ex. 657; Ex. 658. They also targeted the building's doors, temporarily barricading some of them closed, even going so far as to put chains on one door on June 14. Tr. 10/29/25 55:15–16, 10/30/25 408:5–6.

To the extent that it lacks corroboration from other sources of evidence, the Court does not find reliable ICE/ERO Field Office Director Wamsley's characterization of the damage to the Portland ICE Facility, which suggested damage was more extensive than that which is reflected in the rest of the record. Director Wamsley testified that she visited the building in July to "survey the damage." Tr. 10/31/2025 672:24–673:7. She described the damage at trial as follows: "all of the windows on the first floor and some on the second and third floor were broken," "[a]ll the doors were broken, the entry doors," and "[t]he gates -- we have these large 15-, 20-foot high, like, steel gates that were broken. They were inoperable." Tr. 10/31/2025

673:20–674:3. There is no credible evidence, however, that all the doors and windows of the ICE facility were broken. No other witness described damage to this degree, including Commander W.T., who was at the Portland ICE Facility every other week the entire summer. Additionally, Director Wamsley testified that she did not know whether there would be any photos of this damage or whether there was any documentation of the repair estimates. Tr. 10/31/2025 711:24–712:4. Director Wamsley also testified that she would "defer to the FPS incident commanders that worked that facility" about the extent of the damage to the building. 10/31/2025 Tr. 712:2–7. FPS's internal records mention only one broken door and two broken windows prior to Director Wamsley's arrival at the ICE Facility. *See* Ex. 918 (summary of ICS 209 exhibits); Exs. 774–78 (ICS 209 exhibits from June 11 to June 15).

A key area of inconsistency at trial was whether protesters ever breached the ICE facility during the height of the protests on June 14. Director R.C. described an *attempted* breach of the building on that date, and Commander W.T. indicated generally that there had been *attempted* breaches at the facility during the period of interest. Tr. 10/30/25 390:22-25; 528:6-7. In contrast, Director Wamsley stated that "[p]rotesters had gotten into our lobby" on an unspecified date on or around June 14. Tr. 10/31/25 673:25. But Defendants themselves disagreed with this assertion, noting in their closing arguments that "there was an *attempted* breach of the facility." Tr. 10/31/25 817:17–18 (emphasis added). FPS reporting from June 14 confirms this conclusion, indicating that protesters broke the front door glass with a barbell and stop sign pole, but including no indication that protesters entered the building. Ex. 777. The Court has already discussed the reasons it does not find reliable Director Wamsley's testimony on damage to the ICE facility. The Court extends that finding to Director Wamsley's testimony on breach of the

facility because it is inconsistent with every other piece of evidence received on the subject. The Court therefore finds that protesters never breached the ICE facility.

In response to the damage to the building, Director Wamsley made the decision to close the facility from roughly June 11 through July 8. Tr. 10/31/25 673:5–674:7. She stated that the non-detained and Alternatives to Detention programs were disrupted, with several appointments cancelled or rescheduled. *Id*. 674:10–17. But especially after staff learned how to open and close the front gate manually, Director Wamsley acknowledged that ICE was able to "process people." *Id*. 676:12-17. Administrative functions continued at an alternate location. *Id*. 677:8–15. Most importantly, by early July, the ICE facility reopened, with its windows and doors boarded shut.

Given Director Wamsley's general lack of reliability on other issues related to the protests, the Court is hesitant to lean too heavily on her testimony here. However, the Court does conclude that partial building closures likely caused a moderate disruption to law enforcement operations during the period of the partial closure, and notes that this period ended nearly three months before the National Guard callout.

Incidents of damage to the ICE facility diminished rapidly and substantially after the flare-up in June. Those incidents were largely limited to graffiti and occasional attempts to again damage the card reader. *See, e.g.*, Ex. 785; Ex. 788; Ex. 792; Ex. 802; Ex. 825. The most notable incidents of protester interference with use of the building after June 14 was on June 24 and 25. On June 24, an individual protester attempted to chain the front gate closed but was chased away by federal officers. Ex. 783; Ex. 1011. On June 25, an individual protester tried unsuccessfully to block the gate "with a chain link fence panel but other demonstrators self-policed the subject and removed the panel." Ex. 784.

Additionally, in the period from July to September 27, protesters routinely walked, stood, and sat in the driveway, often in an attempt to prevent vehicles from passing. *See, e.g.*, Tr. 10/30/25 507:6-10; Ex. 361; Ex. 780; Ex. 789; Ex. 826; Ex. 1029. Sometimes, they would hit passing cars with their hands, feet, or other objects. *See, e.g.*, Tr. 10/30/15 511:25–512:1 Ex. 827. Less often, but still on a regular basis, they threw debris on the driveway, occasionally including sharp objects that they hoped might puncture a vehicle's tires. *See, e.g.*, Ex. 357; Ex. 807; Ex. 814; Ex. 815. Despite this conduct, federal officers were regularly able to move vehicles in and out of the facility, clearing protesters through the use of verbal warnings, physical "push-outs" and, when necessary, chemical agents. *See, e.g.*, Tr. 10/30/25 507:6–10, 510:2–511:12; Ex. 827; Ex. 847. Indeed, Commander W.T. testified that, in every instance of which he was aware, federal law enforcement was sufficient to allow vehicles to come and go from the building. Tr. 10/31/25 584:17–20.

Given the steady decline in obstructive conduct, its sporadic nature throughout the months of July through September, and the federal government's ability to continue operations, the Court concludes that Protesters' efforts to damage or obstruct access to the building caused, at most, minimal interference with the federal government's ability to carry out immigration and removal operations over the months preceding September 27, 2025.

### 6.  Lack of Violence Towards Federal Officers

The level of violence directed towards federal personnel during the ICE facility protests ranged from offensive verbal attacks to occasions of physical violence involving concerning conduct, which were generally resolved quickly and without significant injury. Such violence towards federal officers began around June 11, peaking between June 12 and June 15 before beginning to gradually decline. *See, e.g.*, Ex. 775; Ex. 777. Much of that violence came in the form of thrown objects, particularly rocks. Tr. 10/29/25 133:23-134:1; Tr. 10/30/25 390:18-20;

Ex. 669; Ex. 777; Ex. 778. Some of that violence resulted in physical injury, with FPS reporting

in block 15 of their daily incident summaries (form 209) that there were three injuries to federal

officers on June 11, three injuries on June 12, three injuries on June 13, and one injury on June

16. Ex. 774; Ex. 775; Ex. 776; Ex. 779.

Defendants' witnesses and the contemporaneous reports of federal agencies paint an

uneven picture with respect to the fact and severity of injuries to federal officers during this time.

Commander W.T.'s testimony was internally inconsistent. *Compare* 10/30/2025 Tr. 553:13–16,

with 10/30/2025 Tr. 553:21–554:3. He did not testify about the nature of physical injuries that

required medical attention, and the defense did not provide any photos or videos depicting such

injuries to officers, despite the fact that the ICE facility had working security cameras that

captured the relevant protest and criminal activity in the relevant time period. 10/30/2025 Tr.

554:17–20. Additionally, Director R.C. testified that, on June 14, two officers were injured by

fireworks that protesters threw at the facility, and a third officer was hit in the head with a

thrown object – presumably a rock. Tr. 10/30/25 408:10-18. But the FPS 209 report from that

day indicates no injuries, which suggests none of these three injuries were significant. Ex. 777.

Furthermore, PPB reporting from June 14 show additional inconsistencies in the federal

government's version of events. PPB Captain Schoening's activity log documented: "ICE calling

saying they are barricaded in the building and fire lit. Difficult to get accurate information from

them. What they say is happening is frequently contradicted by video feeds and subsequent

activity. Air 1 shows no fire." Ex. 327. Also, shortly after they reported being barricaded, PPB

observed an FPS employee exit a door and noted that FPS "ha[d] been using th[at] door regularly

for employee ingress/egress. Th[at] door was reported earlier to be barricaded." Ex. 327. FPS

reported a fire to PPB, Ex. 376, but the "fire" turned out to be candles lit for a vigil set up by

demonstrators, Ex. 376; Ex. 377. Again, Defendants offered no photo or video evidence from the

ICE Facility on June 14, despite R.C.'s testimony that the Facility has security cameras. Because

of these contradictions, and because of PPB's deep experience in managing crowds and protests

in the City of Portland, as well as this Court's ability to observe and evaluate the demeanor of

witnesses, this Court finds PPB's version of events more credible.

After the mid-June peak, physical violence directed at federal officers declined rapidly

and substantially. Indeed, by the end of June, most of this violence was rhetorical. Protesters

persistently made verbal threats to FPS and ICE personnel. R.C. testified that "threats from the

crowd in terms of the verbal threats" played a role in determining when federal agents used

chemical agents to control the protests, while W.T. testified to ongoing threats of physical

violence. Tr. 10/30/25 451:14–24, 525:15–23.

The 209 reports detail threatening comments directed at federal personnel on an isolated

and sporadic basis throughout July and early August, with the frequency of such comments

slowing even further in September. *See, e.g.*, Ex. 815; Ex. 817; Ex. 855. None of these threats

ever matured into action. For example, on August 7, a woman who had earlier that day

complained to FPS that the people running her son's assisted living facility were smuggling

dynamite reapproached FPS to state that "[t]here is a Bomb in this building!" Ex. 825. Though

the woman's comments suggested that she was mentally unwell, out of an abundance of caution,

FPS requested PPB assistance in searching the facility for any explosives. Ex. 466. PPB

performed a sweep of the facility with a bomb-sniffing canine, while FPS checked security

cameras to ensure the woman had not placed anything in close proximity to the building. Ex.

825. No explosives were found in or around the building. FPS again felt the need to request

assistance from the PPB's bomb squad on August 18 when a female protester abandoned her car

in the driveway, despite no indication that the vehicle contained explosives. Tr. 10/30/25 516:5–25; Ex. 835; Ex. 479. Again, out of an abundance of caution, PPB responded, searched the car, and subsequently removed it, finding no explosives. Tr. 10/29/25 161:8–18; Ex. 835.[8]

Consistent with the overall trend of increases in protester activity on holidays, on Labor Day, protesters set up a prop guillotine in front of the ICE facility, which was alarming given previous protester statements that federal officers "deserve[d] to be decapitated." Tr. 10/30/25 524:12-525:23; Ex. 827; Ex. 847. But this incident, too, never evolved into physical violence.

In mid-September, there were two tips that suggested additional threats of potential violence. On September 13, a caller contacted PPB about an email they had received with social media screenshots about a shooting that was going to happen that night. Ex. 506. On the same day, they received a call expressing concern that a known instigator was planning to pick a fight with protesters in order to shoot them. *Id.* PPB informed FPS and investigated. Ex. 859. In a little over an hour, the social media post had been taken down, and no shooting occurred at the protest. *Id.* On September 19, HSI Portland reported that they had received a tip from the HSI tipline about a potential bomb threat to the ICE facility. Tr. 10/31/25 681:17–682:8; Ex. 1072. But while ICE reports indicated that the tip was passed to FPS, the FPS reports from that day include no mention of a bomb threat. Ex. 864; Ex. 1072. Additionally, PPB was similarly not informed. Tr. 10/29/25 74:2–4. Given that neither the agency charged with protecting the facility nor the

---

[8] On one other occasion, law enforcement officials had to remove an abandoned vehicle. On June 15, during the height of the protests, a green van was abandoned in the driveway and subsequently searched for explosives. Ex. 1064. There is no reporting to indicate that there was a specific reason to believe that the van contained explosives, and the record does not reflect that explosives were found, so the Court assumes that the search was conducted out of an abundance of caution.

PAGE 35 – FINDINGS OF FACT & CONCLUSIONS OF LAW
**A039**

agency charged with policing the surrounding area took note of the tip, this Court finds that FPS determined that the tip was not credible.

Lower-level violence decreased over the period from mid-June to late September. FPS reported eleven injuries in June, four in July, six in August, and none in September. Ex. 918. The most egregious physical assaults on federal personnel after June occurred on Independence Day. On that date, a protester kicked an SRT agent, which the agent described as a "10 out of 10" on the pain scale. Ex. 1023; Ex. 1024. The physical violence discussed in law enforcement reports, including incidents that resulted in injury and those that did not, often revealed that violence to be of low intensity. For example, on July 13, an FPS officer pulled a groin muscle while taking a resisting suspect into custody. Ex. 803; Ex. 1129. On September 18, an FPS officer and a protester pushed against each other while the FPS officer was conducting a push-out to clear the driveway, causing the officer's shield to hit the officer in the face. Ex. 863. In some cases, FPS recorded an injury to a federal officer in its daily report but provided no additional detail as to its nature. *See, e.g.*, Ex. 822; Ex. 845. Additionally, protesters intermittently shined high-powered lights in the eyes of federal officers, causing disorientation and temporary blindness, but no lasting injury. *See, e.g.*, Tr. 10/30/25 532:1-12; Ex. 826; Ex. 850.

The Court also received evidence that federal officers in Portland were victims of doxing and online harassment. Commander Hughes testified that he "heard" that federal officers at the ICE Facility were doxed. 10/29/2025 Tr. 251:4–15. R.C. testified that it was "not uncommon to be filmed going in [and] going out" of the ICE Facility, and for protesters to "get[ ] license plate numbers, to the point that we see flyers coming out, saying, you know, 'Let's organize at such a hotel'—hotels where FPS or supporting agencies are staying." 10/30/2025 Tr. 425:13–17. On rare occasions, federal personnel were followed when leaving the building. For example, on July

26, a protester followed an ICE SRT officer to the Hilton Garden Inn. Ex. 816. On September 13, a "vehicle beg[an] following" an ICE Deportation Officer "at some point from leaving the Portland, OR [ICE] office and crossed state lines following him honking and swearing at him." Ex. 1073.[9] In addition to the evidence about demonstrators photographing and occasionally following federal personnel, the Court received documentary evidence referencing "doxing flyers," although importantly, no doxing flyer[10] was ever entered into evidence. *See, e.g.*, 10/30/2025 Tr. 425:13–17; Ex. 1066; Ex. 1071. The Court also received documentary evidence of doxing social media activity.[11] *See, e.g.*, Ex. 1065. In consideration of this evidence, the Court finds that, while the instances of doxing were among the only categories of threat to federal officers that continued after June, there is insufficient evidence to credibly link these instances of violence to protesters at the ICE Facility.

In total, the above-described events illustrate isolated instances of real and threatened violence towards federal officers. The Court finds that those instances peaked in mid-June and declined rapidly, remaining at a low level throughout July, August, and September, with sporadic

---

[9] The Oregon-Washington state line is over nine miles north of the ICE Facility.

[10] The Court did receive flyers opposing ICE or immigration policies in general. *See* Ex. 1068 ("No peace for ICE!" and "From Palestine to Mexico, border walls must go."); and Ex. 1081 ("Families belong together! End the Separations!" advertising a "Latin Dance Fundraiser" for "families impacted by ICE" at a park approximately half a mile from the ICE Facility).

[11] The Court received one copy of a social media post in evidence. It is an Instagram post depicting two photos. Ex. 1074. The first is a car with a visible license plate. *Id.* at 5. Text overlaying the photo lists the car's make, model, and license plate number, and the text: "Keep an eye out for this van as it has been seen on multiple occasions. Carrying kidnapped people and outside of PDX ICE". The second photo depicts an officer driving the car. *Id.* at 4. He is wearing a face mask and plain clothes. *Id.* Text overlaying the photo says: "Hi! I 'allegedly' LIKE to detain and kidnap PEOPLE and have been seen on multiple occasions kidnapping them in this van." *Id.* Commentors are depicted identifying the officer's location ("He's in Salem") and making threats towards the officer ("Kill it"). *Id.* at 6-7. This Court heard no testimony about the post, the poster, or the commenters.

but manageable threats and incidents of non-life-threatening violence typical to public protest events.

Taken together, these events caused no more than a minimal interference with the federal government's ability to carry out immigration and removal operations over the months preceding September 27, 2025. After the callout, while the size of the protests did briefly flare, the violence directed at federal officers did not substantially increase. The 209 reports indicate only two dates after the 27th where federal officers were injured. On September 30, the block 10 narrative indicates one injury, though that is not reflected in the block 15 injury total. Ex. 869. On October 13, FPS reported that an inspector had been injured the previous day but gave no further information. Ex. 874.

### 7. Protestor-on-Protestor Confrontations

This Court finds that many reported disturbances at the ICE Facility after July 4 did not involve law enforcement at all. This Court also received evidence regarding disruptive behavior between individuals within the vicinity of the ICE building since June. Specifically, this Court received evidence regarding altercations between protesters and counter-protesters. Based on that evidence, this Court finds the following: Violence between protesters and counter-protesters occurred outside the Portland ICE building from June to September 27, 2025, but had, at most, a minimal effect on federal law enforcement's protection of the building and federal personnel.

Trial evidence reflects occasional skirmishes between protesters and counter-protesters in the vicinity of the ICE facility. These altercations were not targeted at ICE personnel or staff. FPS did not document any officer injury or building damage that occurred as a result of protester-counter-protester altercations. Defendants called attention to two incidents in September that warrant further explanation. FPS Commander W.T. testified that on September 6, 2025, "officers observed a confrontation between demonstrator and counter-demonstrator." Tr.

10/30/2025 529:19–530:4; Ex. 852 at 5. The confrontation occurred on city property. Tr.

10/30/2025 530:3–11; *see* Ex. 852 at 5. The contemporaneous FPS report does not detail if FPS

attempted to intervene or about how this incident affected security of the building.

The only example Defendants highlight of an altercation between protesters and counter-

protesters which even marginally affected FPS operations took place on September 9, 2025. Just

after midnight, approximately ten protesters surrounded a counter-protester. Tr. 10/29/2025

262:8–10; Tr. 10/30/2025 534:14–22. One protester "physically harassed" the counter-protester,

and "another used a high-powered flashlight to shine into [the counter-protester's] eyes." Tr.

10/30/2025 534:21–25; Ex. 855 at 4. FPS called PPB multiple times. Ex. 855 at 4–5; Tr.

10/30/2025 535:2–17. Within thirty minutes of the first call, PPB drove by and "did not perceive

the counter-demonstrator to be in distress or at risk of bodily harm." Ex. 855 at 5. The altercation

continued, and FPS called for PPB's help multiple times. *Id.* FPS eventually pushed protesters

back to allow the counter-protester to exit the area. *Id.* This altercation occurred off federal

property, Tr. 10/30/2025 535:18–22, and FPS reported no injuries, *see* Ex. 855. Defendants have

presented no credible evidence to suggest this altercation affected federal law enforcement's

ability to protect the ICE building. Taken together, these and like events caused, at most,

minimal interference with federal law enforcement's ability to protect the ICE building from

June to September 27, 2025 or perform their law enforcement mission.

**E.  Portland Police Bureau's Response**

From June to October 2025, PPB's response to the protests has evolved in two respects.

First, PPB has repeatedly dedicated increased resources to the block around the ICE facility

during expected or actual spikes of activity. The timeline of how PPB implemented these models

over the summer show PPB's determination of the intensity and risk of unlawful protester

activity in the block around the ICE facility at a given time period. PPB's response shows that

the protest activity peaked in mid-June and was manageable with only precinct-level resources

from mid-July to September. Second, PPB's response shows that PPB carried out its duties to

enforce law and order on public property around the ICE Facility, even within the limitations of

the Oregon's Sanctuary Promise Act. PPB has been responsive to ICE's calls for serious criminal

activity. PPB has made arrests for even minor criminal violations, and PPB's refusal to clear the

ICE Facility's driveway does not demonstrate that PPB is unable to manage potentially large

crowds or violent conduct.

### 1. First Weeks of the Response: Mid-June

PPB began monitoring protest activity around the ICE facility no later than June 8, 2025.

Ex. 310. By June 11, PPB determined that criminal activity in the block around the ICE facility

required a dedicated Crowd Management Incident Commander (CMIC) and an activated

Incident Management Team. Tr. 10/29/2025 49:6–21; Tr. 10/29/2025 51:20–52:10; Tr.

10/29/2025 54:6–14. The CMIC is a commander with extensive experience in public order

policing and crowd management, and one of the CMIC's role is to tailor PPB's response to the

evolving situation on the ground. Tr. 10/30/2025 315:7–16. The CMICs are trained to take "a

layered approach" to public order by using dialogue officers, bike officers, undercover officers,

and a dedicated "hard squad" as needed to de-escalate crowd tension. Tr. 10/29/2025 277:8-

278:18.

PPB utilized this "Crowd Management Model" to respond to the activity at the ICE

Facility from June 11, 2025 to June 25, 2025, Tr. 10/29/2025 49:24–50:5; *see* Tr. 10/29/2025

50:17–25, and when the situation called for more resources, PPB activated additional resources.

On the worst day of the protests, June 14, 2025, PPB called on the Oregon State Police's Mobile

Response Team for mutual aid assistance that day to bolster PPB's response to the events on the

ground. Tr. 10/29/2025 190:15–191:5. By June 25, however, the "nightly events had calmed

PAGE 40 – FINDINGS OF FACT & CONCLUSIONS OF LAW
**A044**

significantly," and the facility no longer required those dedicated resources. Tr. 10/29/2025 274:18–25; Tr. 10/29/2025 50:19–25.

In the first month or so of the response, PPB and FPS communication was sporadic, resulting in clear communication on some days, and miscommunication on others. For example, on June 14, 2025, the day of the declared riot, PPB was not able to corroborate the reports from federal officers or collect enough information from them to appropriately respond. PPB Commander Schoening testified that communication with FPS that day was "challenging," because federal officers "were providing information that wasn't really actionable or specific enough for us to find a way to intervene right away." Tr. 10/29/2025 59:18–24. Additionally, the officers were giving PPB "inaccurate" information, "based on things [PPB was] able to corroborate through different sources, including [its] airplane." Tr. 10/29/2025 59:25–60:5. The federal officers communicating with PPB were officers "who were clearly operationally deployed or tactically deployed" and some "with limited situational awareness." Tr. 10/29/2025 59:18–21. Some of these officers were wearing gas masks. Tr. 10/29/2025 59:18–21. Even on the FPS side, Director R.C. explained that those masks made it difficult to hear and understand the officers. Tr. 10/30/2025 407:14–19. This Court finds that the lack of communication between the command posts hurt PPB's ability to assist FPS with identifying and intercepting criminal behavior in the crowd on June 14.

However, PPB made immediate efforts to resolve this issue. On June 15, 2025, PPB Assistant Chief Dobson instructed officers that "[i]t is imperative we maintain direct communication with the FPS at all times." Ex. 770 at 2. PPB's policy change plays out in the record evidence. On June 17, 2025, a PPB report states, "Tonight we had a much more deliberate approach to maintaining an open line of communication with [federal officers], which resulted in

no miscommunications about activity occurring inside and outside the facility." Ex. 344 at 3. The next day, June 18, 2025, PPB was in communication with FPS. The PPB commander on duty received a text from an FPS officer that someone was throwing cans at the federal officers. Ex. 347 at 1.[12] PPB investigated the matter and found that the cans "may not be full" and were landing 10-15' away from the officers. *Id.* PPB determined there was only probably cause for Offensive Littering. *Id.*

During this time period, PPB also first began navigating constraints on its response under Oregon's Sanctuary Promise Act. PPB interprets Oregon's sanctuary laws to "prohibit police activities related to immigration enforcement." Ex. 326 at 3. In the first week or so of PPB's response, it set an abnormally high threshold for police intervention. Officers were instructed to respond to "life safety" situations, as in situations where there is a means for and immediate likelihood of serious physical injury or death. Tr. 10/29/2025 44:23–45:12; Tr. 10/29/2025 256:25–257:4.

After the riotous activity on June 14, 2025, PPB revised its guidance on the appropriate arrest threshold. In an internal email on June 15, 2025, Assistant Chief Dobson provided guidance to officers that "criminal activity must be addressed appropriately and in a targeted manner." Ex. 770 at 1. Officers were instructed to address "both misdemeanor and felony-level crimes on and near the ICE facility." *Id.* at 2–3. PPB also met with FPS incident command on June 15, 2025 to make the commitment that PPB would arrest for all person and property crimes. Tr. 10/29/2025 63:1–17. PPB made several arrests from June 15 to June 18 as the protest and

---

[12] The Court finds that Exhibit 347 is a report for the events on June 18, 2025 even though it is dated June 11, 2025. The events described and the command officers named in Exhibit 347 match other reports from June 18, 2025, *see* Ex. 346, 349, and does not match other reports from June 11, 2025, *see* Ex. 313; Ex. 314. Exhibit 301-2 also dates Exhibit 347 to June 18, 2025. Ex. 301-2 at 1.

criminal activity subsided, including for arson, attempted assault, reckless driving, criminal mischief, and criminal trespass. Ex. 306 at 3–4.

### 2. Refining the Approach: Mid-June to Late September

From roughly June 26 to July 17, 2025, PPB implemented a new model (the "Watch Command Model") to demobilize some resources in response to the slowing activity. *See* Tr. 10/29/2025 68:1–4. The Watch Command Model ensured that someone of sufficient rank monitored activity around the ICE facility each day to assess whether or not PPB needed to activate additional resources. Tr. 10/29/2025 51:17–52:10; Tr. 10/29/2025 52:17–20; Tr. 10/28/2025 66:7–15; Tr. 10/29/2025 69:25–70:6. To this end, the Watch Commander on duty was expected to reach out to FPS at the beginning of the commander's shift each night. Tr. 10/29/2025 68:23–69:24.

During this period, PPB only escalated its resources to the Crowd Management Model once, on July 4, 2025. Tr. 10/29/2025 70:7–11. On July 4, PPB was in contact with FPS but reported that communication was still limited. Ex. 410 at 1. PPB reported that it did not receive specific enough information from FPS related to crimes occurring or suspect descriptions. *Id.* Therefore, PPB was less able to provide support for federal officers or arrest those committing crimes. *See id.* By July 17, PPB determined that even the Watch Command Model was not required to manage the incidents around the ICE facility. Tr. 10/29/2025 72:14–23. Responsibility for monitoring events around the ICE facility was transferred to Central Precinct, the PPB precinct that covers the ICE facility. Tr. 10/29/2025 72:14–23.

From July 17 to September 27, PPB utilized the third model (the "Precinct Model") to demobilize the watch commander and delegate nightly monitoring to Central Precinct sergeants. *See* Tr. 10/29/2025 134:18–135:6. Under the Precinct Model, PPB Commander Hughes testified that he directed the sergeants monitoring the ICE facility to contact a federal officer in charge

during the sergeants' shift every night. Tr. 10/29/2025 231:6–13. FPS Commander W.T., who

was at the ICE facility roughly every other week from mid-July to September 20, corroborated

this testimony. Tr. 10/30/2025 501:6–8; Tr. 10/30/2025 548:1–6. Commander W.T. testified that

nightly communications were instigated by the PPB sergeants to ensure that FPS had a point of

contact with PPB if anything were to arise. Tr. 10/30/2025 548:1–6. From July 17 to September

27, Central Precinct never escalated resources for the ICE facility back up to either the Watch

Command or Crowd Management Model.

　　As related to the time period immediately before the President's callout of the National

Guard, this Court heard testimony from FPS officers that PPB does not respond to their requests

and that FPS stopped calling PPB altogether.[13] The Court does not find this testimony to be

credible. FPS did call PPB for help, and PPB routinely responded to these calls for help. One

example is PPB's response to the suspicious abandoned vehicle left near the ICE facility on

August 16, 2025. FPS Commander W.T. testified that the Portland Metro Explosive Disposal

unit responded "really fast." Tr. 10/30/2025 549:2–6. The FPS report from that day shows that

the response included an Explosives Detection Canine Team responding on scene roughly half

an hour after the vehicle was abandoned. Ex. 835 at 5. No bomb was discovered, and the vehicle

was later towed. *Id.*

　　The Court recognizes that in regard to some minor calls for assistance, PPB did not

respond as quickly, forcefully, or at all. For example, PPB officers have been instructed not to

---

[13] *See* Tr. 10/30/2025 387:25–388:17 (FPS Director R.C. suggesting that he would not get the
same kind of support in Portland as he received in Spokane, Washington, where Spokane Police
Department and "eight other neighboring agencies came up" when there was "a sporadic but
very large protest at the ICE Facility"); Tr. 10/31/2025 586:5–18 (FPS Commander W.T. stating:
"It has become common knowledge that Portland Police Bureau is not going to respond to assist
us with the protest activity at the ICE facility.").

remove debris from ICE property and not to facilitate federal vehicles coming or going to the ICE facility because "PPB involvement may be construed as assisting federal immigration enforcement." Ex. 770 at 3; *see* Tr. 10/29/2025 110:5–111:4. Without PPB's direct assistance, federal law enforcement has successfully facilitated vehicles coming and going from the ICE facility.[14]

Even though PPB will not support immigration enforcement, PPB can directly assist federal officials at the ICE facility when there is a life-threatening situation, an actual physical injury, or something similar. Tr. 10/30/2025 369:1–5. There is no basis to conclude the PPB will not assist federal officers in danger just because PPB does not assist FPS in clearing the driveway for vehicles routinely entering and exiting the ICE facility.

Apart from clearing the driveway, in another example, FPS frequently called PPB about disputes between protesters and counter-protesters that were occurring on public property, and PPB could not always prioritize responding to those disputes immediately. *See, e.g.*, Ex. 809 at 5–6; Ex. 855 at 4–5; Ex. 864 at 5–6. For example, on September 9, 2025, when federal officers reported a counter-protester in distress surrounded by 10 protesters, PPB drove by within 30 minutes and "did not perceive the counter-demonstrator to be in distress or at risk of bodily harm." Ex. 855 at 4–5. FPS called PPB approximately 6 times that night for the counter-protester. *Id.* If the counter-protester was ever injured by the events occurring that night, FPS did not report it.

---

[14] FPS Commander W.T. testified that in every instance he is aware of, federal law enforcement present at the facility has been sufficient to allow vehicles to come and go. Tr. 10/31/2025 584:11–20. He testified that he is not aware of any instance of federal vehicles actually being blocked from entering and exiting the ICE facility. Tr. 10/29/2025 116:13–18.

PAGE 45 – FINDINGS OF FACT & CONCLUSIONS OF LAW
**A049**

### 3. Post-Callout PPB Response

PPB's response since the President's callout further underscores that PPB can and does fulfill its role of enforcing state and local law on public property. When crowds began to increase in the weeks immediately following the President's callout of the National Guard, PPB escalated its response. From September 28 to October 23, 2025, the last day for which PPB's police reports are in the record, s*ee* Ex. 301-2 at 3, PPB has used the Watch Command Model to respond to the ICE facility, as needed, to manage any swells in crowd size or illegal activity. Tr. 10/29/2025 75:5–13 (days following September 28); Tr. 10/29/2025 108:11–2 (October 8).

Since September 28, PPB has continued to reach out to federal officers each night to make sure that federal officers have a point of contact with a liaison officer in the command post. Tr. 10/29/2025 79:16–23; Tr. 10/29/2025 547:25–548:6. To sustain this heightened surveillance since September 29, PPB has called on the Oregon State Police's Mobile Response Team for the first time since June and requested support for anticipated large events in October or to alleviate staffing shortages within PPB. Tr. 10/20/2025 192:11–193:8; (staffing relief for October 6 to October 11, 2025); Ex. 38 (coverage for second No Kings Protest on October 18); *Id.* (staffing relief for October 23 to November 5, 2025).

PPB has made several more arrests since the protest and criminal activity has flared back up somewhat in October, including for disorderly conduct, harassment, and offensive physical contact spitting. Ex. 306 at 4, 5. Even FPS Director R.C, who was skeptical of PPB's willingness or ability to respond,[15] recognized that PPB came out "in force" to the ICE facility around

---

[15] FPS Director R.C. speculated that he would not get the same kind of support in Portland as he received in Spokane, Washington, where Spokane Police Department and "eight other [local law enforcement] agencies came up" when there was a "sporadic but very large protest at the ICE Facility." Tr. 10/30/2025 387:25-88:17. The Court finds this testimony regarding how PPB will respond to very large protests in the future speculative and inconsistent with the evidence presented at trial.

October 25 and "did a phenomenal job" clearing camps and enforcing all laws, even the minor

violations like blocking the sidewalks and jaywalking. Tr. 10/30/2025 426:20–427:2. It is not

clear if Director R.C. is aware that PPB has repeatedly cleared out these camps throughout the

summer. Ex. 337 (June 16); Ex. 403 (shortly before July 3); Ex. 813 (July 23); *see also* Tr.

10/29/2025 228:14–19; Tr. 10/29/2025 237:3–7.

**F. Federal Protection of the ICE Building**

      This Court received evidence regarding federal law enforcement's ability to protect the

ICE Facility and its personnel. Specifically, this Court received evidence regarding how FPS and

other relevant federal law enforcement agencies receive assistance from additional officers, how

officers secured the Portland ICE building prior to the callout, and how the federal government

deployed the Oregon National Guard when there were untapped federal law enforcement

resources.

      Trial evidence showed that FPS reassigns officers as needed and has support from other

law enforcement agencies. Generally, FPS sources additional support "from within" the agency.

Tr. 10/30/2025 386:24–387:4. R.C. testified that he could "source . . . from areas within [his]

region that are not affected by any kind of civil unrest, and . . . bring officers in." Tr. 10/30/2025

387:5–8. If the exigency is larger than the region can handle, FPS can request inspectors from

other parts of the country. Tr. 10/30/2025 387:9–16. Some federal agencies also assist with

protecting federal buildings with which they have some connection—for example, ICE officers

can be called on to protect an ICE facility. *See* Tr. 10/30/2025 388:18–389:9. FPS also relies "a

lot on [its] partnerships" with "local law enforcement." Tr. 10/30/2025 387:17–24.

      R.C. testified that staffing issues at FPS are a nationwide problem. Tr. 10/30/2025

440:22–441:2. R.C. testified that FPS has had chronic staffing issues and challenges in Oregon

since 2020. Tr. 10/30/2025 487–88. Federal agents may be cross designated for FPS operations

under 40 U.S.C. § 1315. R.C. testified that this is the statutory authority used for ICE and U.S.

Customs and Border Protection ("CPB") officers to participate in Operation Skipjack. Tr.

10/30/2025 474:23–475:6. The federal government has 80,000 DHS law enforcement officers.

Ex. 27. Over 4,500 are already authorized to perform the duties of FPS officers as of 2020. Ex 30

at 21; *see also* Tr. 10/30/2025 477:15–19. And 576 were cross designated to deploy in Portland

in 2020. Ex 30 at 10.

Additional federal officers were deployed to Portland starting in June of 2025. Ex. 773.

The number of federal officers first increased from June 14 to June 15, and more than doubled

between September 27 and September 29, 2025. *Id.* R.C. testified that he does not "know how

the surge" of federal officers to Portland "happened, in terms of the planning process for that,"

because he "just receive[s] the information" about the number of officers coming to him and

from which agency they will be deployed (e.g., from CBP, Bureau of Prisons, etc.). Tr.

10/30/2025 395:15–396:4. The officers used to come for 30-day rotations, but FPS "started

changing the duration of the deployments down to 20 days . . . [m]ostly for the mental health of

the officers." Tr. 10/30/2025 396:8–397:8. R.C. does not remember when the length of the

rotations changed, however, nor does he remember the month. Tr. 10/30/2025 397:19–398:4.

However, FPS changed the timeframe because officers were experiencing "fatigue and . . .

stress" from being "in close proximity with participants outside of the federal facilities daily,"

and "working overtime." Tr. 10/30/2025 386:5–8. R.C. testified that based on officers' longer

10-hour and 12-hour shifts, as opposed to the usual 8-hour shifts, and the mental toll of

protesters' using "racial slurs," he did not believe that it was "sustainable to surge this many FPS

officers to Portland." Tr. 10/30/2025 397:9–398:9. "[R]ight around June 14," FPS decided that it

would have a 24-hour law enforcement presence at the ICE Facility. Tr. 10/30/2025 399:4–16.

ICE decided to shift resources from the larger Seattle ICE ERO office to the Portland ICE facility. Director Wamsley testified that the ICE ERO Seattle field office diverted resources to support the protective mission at the Portland ICE Facility. Tr. 10/31/2025 684:14–16. The Seattle office sent seven out of eight of its Special Response Team ("SRT") members to "conduct FPS appended duties" at the Portland ICE Facility. Tr. 10/31/2025 684:7–20.

Trial evidence demonstrates that federal officers were able to keep the ICE building secure despite resource strain. Commander W.T. testified that, "[i]n every instance" he is aware of between mid-July and September 20, "federal law enforcement present at the facility has been sufficient to allow vehicles to come and go" from the ICE Facility. Tr. 10/31/2025 584:11–20. Additionally, "despite having [a] point of contact" at PPB, Commander W.T. "did not typically call these sergeants to request help" at the ICE Facility. Tr. 10/30/2025 548:4–9; *see also* Tr. 10/31/2025 586:5–10. Finally, Director Wamsley testified that she didn't "know of any criminal activity that federal officers couldn't manage" at the ICE Facility. Tr. 10/31/2025 712:25–713:2. To that end, Director Wamsley also testified that she didn't "know if there's any correlation between an increase in staff and a decrease in protest activity." Tr. 10/31/2025 711:1–4.

In fact, on June 15, 2025—the day after the most violent protests at the ICE Facility—the FPS District Commander for Region 10 sent an email to the Portland ICE office's Assistant Field Manager and several ICE, DHS, and FPS personnel, stating: "FPS and partner agencies anticipate having sufficient law enforcement personnel to respond to criminal activity from this point forward." Ex. 63 at 3. Both FPS Deputy Director R.C. and Director Wamsley received that email. *Id.* FPS explained that it was "establishing LE [law enforcement] coverage plans to provide onsite and offsite response elements to meet the current threats." *Id.* Notably, FPS said that it had "sufficient law enforcement personnel" while explicitly acknowledging the additional

strain on resources caused by the vehicle gate being broken. *See id.* ("In its current state, [the vehicle gate] is requiring large numbers of personnel to open and close the gate, while also providing security to complete this task").

Trial testimony revealed that federal officials who were in charge of protecting the ICE facility were not consulted about calling up the National Guard and did not request the Guard. FPS Deputy Director R.C. testified that he was "surprised" to hear that the guard had been federalized. Tr. 10/30/2025 466:14–467:9.[16] R.C. never requested National Guard to be deployed to Portland. Tr. 10/30/2025 467:13–15. R.C. testified that he did not know what he would do with 200 members of the Guard. Tr. 10/30/2025 467:–12. Commander W.T., however, testified that calling out the National Guard to assist FPS with securing the ICE facility would be helpful. Tr. 10/30/2025 545:6–17. He explained that when FPS officers are deployed at the ICE facility, they're not fulfilling the mission of their typical assignments. Tr. 10/31/2025 Tr. 545:21–25. Commander W.T. testified that to him, "it's a manpower and resource issue." Tr. 10/31/2025 546:3-4.

Other evidence presented showed that the federal government has law enforcement untapped capacity that can be directed to Portland in response to conditions. For example, DHS Secretary Kristi Noem recounted on Fox News that she met with Portland Mayor Keith Wilson

---

[16] The federal officials involved with the federalization of the National Guard had little, if any, familiarity with the situation on the ground in Portland. As explained, Major General Rieger was directed to write the memorandum requesting federalization (Ex. 1048) by the office of the Secretary of War, Tr. 10/31/2025 612:11–18, but he has never worked in Oregon, has never been to the ICE facility in Portland, Tr. 10/31/2025 620:12–14, and therefore had no personal knowledge of the situation on ground when he wrote the memorandum, Tr. 10/31/2025 610:24–611:1; Tr. 10/31/2025 612:19–21. On cross-examination, Major General Rieger testified that he was not briefed on conditions at the ICE Facility before he wrote the memorandum, Tr. 10/31/2025 620:23–621:3, and that the only information he had about conditions at the ICE Facility were from news and social media, President Trump's Truth Social post, and reading this Court's TRO Opinion and Order, ECF 54. Tr. 10/31/2025 611:13–612:4; Tr. 10/31/2025 621:4–7.

on October 7, 2025 and said that "if he did not follow through on some of these security measures for our officers, we [are] going to cover him up with more federal resources and that we [are] going to send four times the amount of federal officers here so that the people of Portland could have some safety, they could have some security." Ex. 59. Secretary Noem told commentator Jesse Waters that "it is our federal CBP and ICE officers that are cleaning up this city, and every single day they're going to stay dedicated to doing that." *Id.* R.C. also testified that he was not aware of any agencies that have declined to provide help to the ICE Facility. Tr. 10/30/2025 445:8–13.

### G.  ICE's Ability to Enforce Immigration Law

The Court finds that there is no credible evidence that protest activities at the ICE facility created more than a minimal interference with Defendants' ability to enforce Title 8 immigration laws in Portland. Director Wamsley testified herself that "altercations between protesters" do not "inhibit the execution of federal immigration law." Tr. 10/31/2025 702:15–18. Nor did the closure of the ICE Facility in June more than minimally impede enforcement of Title 8 immigration laws. When the ICE Facility was closed, it was not "completely inaccessible during the entire time of the closure." Tr. 10/31/2025 676:6–677:1. As described above, the minimal damage to the building allowed ingress and egress from the facility to continue.

Director Wamsley testified that Portland ERO, which carries out Title 8 immigration enforcement and removal, continued to enforce immigration law in Portland while the ICE Facility was closed to the public. In fact, Director Wamsley relocated ICE ERO operations to another building before June 14 because ICE received credible information that protest activity might escalate. Tr. 10/31/2025 672:17–23. Accordingly, there was no ERO staff in the ICE Facility during the June 14 riot—no operations interfered with, and no employees endangered. Tr. 10/31/2025 689:16–690:23. During the building closure, ERO Portland staff would either

report to the temporary location or would meet off-site to conduct operations. Tr. 10/31/2025 690:2–15. Director Wamsley did not know how many ERO immigration arrests were made in Portland while the building was closed, Tr. 10/31/2025 691:13–15, nor was there any evidence submitted of Title 8 arrest statistics in the Portland area. Instead, Director Wamsley testified that she set a field office-wide "goal of 30 arrests a day," and that there are days when the office "meet[s] or exceed[s]" that goal. Tr. 10/31/2025 670:8–13. This Court received no evidence that the closure of the ICE Facility in June more than minimally affected the enforcement of Title 8 immigration in Portland.

The trial evidence also suggests that general staffing problems are minimally impeding ICE's enforcement of Title 8 immigration law. Director Wamsley testified that there are approximately 220 full-time positions in the ICRO Seattle field office, but because ICE has "a lot of vacancies," only approximately 130 are filled. Tr. 10/31/2025 668:24–669:12. On top of that shortage, Director Wamsley has been urged to increase her goal of 30 arrests per day to 50 arrests per day. Tr. 10/31/2025 707:14–17. She was "told to double [her] numbers" in a performance work plan. Tr. 10/31/2025 719:5–14; Tr. 10/31/2025 706:22–707:7 ("My PWP called for a doubling of the fiscal year '24 arrests."). After receiving her performance work plan, Director Wamsley requested an additional 50 to 75 members of her staff "to effectuate immigration work." Tr. 10/31/2025 709:1–710:1. Director Wamsley testified that she could not remember when she made this request, and it was either in June after the office closed or in July after the "Big Beautiful Bill" passed. Tr. 10/31/2025 710:10–20 (June); 709:1–710:1 (July). Director Wamsley's new goal of 50 arrests per day came with no additional staffing or budget, however, so she is expected to double her office's output with no additional resources. Tr. 10/31/2025 707:5–20. Director Wamsley also testified that she has no idea what the numbers are

with regards to actual arrests since May due to the government shutdown. Tr. 10/31/2025 708:2–25. Director Wamsley "support[s] the decision to federalize the Guard for a protective mission in Oregon" because she will "struggle" less with "staffing locations." Tr. 10/31/2025 686:9-20.

## H. Post-Callout

After the federalization order on September 28, 2025, protest activity outside the ICE building increased but did not become unmanageable. This Court finds credible Commander Schoening's testimony that "activity dropped off significantly" within a few nights of the order. Tr. 10/29/2025 75:10–13. As discussed above, the time period was marked by some large, mostly lawful demonstrations, and PPB increased its presence in kind. After September 28, 2025, more federal law enforcement officers were assigned to the Portland ICE building. Ex. 773. From September 28, 2025 to October 16, 2025, only one injury was reported, and there was no evidence of building damage during this time. *See* Ex. 918 at 4 (noting that there was not damage noted in FPS' ICS 209 reports from September 28 through October 16, 2025).

On the night of Saturday, October 4, 2025, activity outside the ICE building did briefly spike, but federal law enforcement's crowd control tactics limited the ability of PPB to help. This Court finds credible Commander Schoening's testimony that on October 4, 2025, "the situation on the ground" was "a little startling" because of federal law enforcement's crowd control measures. Tr. 10/29/2025 83:3–19. PPB was "deployed, prepared to intervene . . . [and to] take enforcement action for any safety risks that came up." Tr. 10/29/2025 81:23–82:1. Federal law enforcement "c[a]me out in significant numbers, and they began to push the crowd . . . quite a distance up [the street], which was again a significant departure from the established practice that we had seen where we had officers on the ground observing." Tr. 10/29/2025 83:3–19. Commander Schoening testified that he talked to the FPS incident commander to try and figure out what was going on. Tr. 10/29/2025 83:20–23. When Commander Schoening asked the

incident commander the reason for the departure in practice, the incident commander told him, "I don't know why." Tr. 10/29/2025 83:24–84:3.

## CONCLUSIONS OF LAW

First, this Court provides background on the National Guard as the modern militia. Second, this Court determines that Plaintiffs have Article III standing for injunctive relief on their *ultra vires*[17] and Tenth Amendment claims. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021), ("[P]laintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek . . . ."). Third, this Court concludes that Defendants' federalization and deployment of the National Guard to the Portland ICE facility in Oregon was unlawful under 10 U.S.C. § 12406 and violated the Tenth Amendment. Fourth, this Court finds that Plaintiffs have met the remaining requirements for a permanent injunction enjoining Secretary Hegseth's and Secretary's implementation of (1) the September 28, 2025 Memorandum federalizing and deploying the Oregon National Guard, Ex. 1051; (2) the October 5, 2025 Memorandum federalizing and deploying the Texas National Guard, to the extent that it authorizes the deployment of members of the Texas National Guard in Oregon, Ex. 6; and (3) the October 16, 2025 Memorandum deploying members of the California and Texas National Guards in Oregon, Ex. 2.

## A.  The National Guard

The National Guard is descended from the Founding-era militia and today maintains its character as a state-based reserve military force distinct from the active duty and regular reserve branches of the U.S. military. "The Constitution vests in Congress the power 'to raise and

---

[17] This Court has jurisdiction to adjudicate "constitutional challenges to presidential acts" and "actions by subordinate Executive Branch officials that extend beyond delegated statutory authority," i.e. *ultra vires* actions. *Murphy Co. v. Biden*, 65 F.4th 1122, 1128–29 (9th Cir. 2023).

support Armies' and 'to provide and maintain a Navy.'" *Torres v. Tx. Dep't of Pub. Safety*, 597

U.S. 580, 584 (2022) (brackets omitted) (quoting Art. I, § 8, cl. 1). But "[u]nlike armies and

navies, which Congress is given the power to create . . . , the militia is assumed by Article I

already to be *in existence*" at the Founding, comprised of "'all males physically capable of acting

in concert for the common defense.'" *District of Columbia v. Heller*, 554 U.S. 570, 595–96

(2008) (quoting *United States v. Miller*, 307 U.S. 174, 179 (1939)).

The Founders maintained this distinction between the militia and the army and navy in

the Constitution's Militia Clauses, which empowered Congress "[t]o provide for calling forth the

Militia to execute the Laws of the Union, suppress Insurrections, and repel Invasions," U.S.

Const. art. I, § 8, cl. 15; and "[t]o provide for organizing, arming, and disciplining, the Militia,

and for governing such Part of them as may be employed in the Service of the United States,

reserving to the States respectively, the Appointment of the Officers, and the Authority of

training the Militia according to the discipline prescribed by Congress," U.S. Const. art. I, § 8, cl.

16.

As the Supreme Court explained over a century ago, "[t]he line which separates [the

militia power] from the army power is . . . inherently plainly marked by the text of the two

clauses." *Arver v. United States*, 245 U.S. 366, 382 (1918). In contrast to Congress's "'broad and

sweeping power' power 'to raise and support armies,'" *Torres*, 597 U.S. at 585, the Constitution

reserved to the States "the control of the militia to the extent that such control was not taken

away by the exercise by Congress of its power to raise armies." *Arver*, 245 U.S. at 383. And the

exercise of this power to call forth the Militia "was wisely left to depend upon the discretion of

Congress as to the arising of the exigencies which would call it in part or in whole into play." *Id.*

In short, the Constitution "delegat[ed] to Congress the right to call on occasions which were

specified for the militia force," *id.*, while empowering the President to "be Commander in Chief of the Army and Navy of the United States, and of the Militia of the several States, *when called into the actual Service of the United States*." U.S. Const. art. II, § 2, cl. 1 (emphasis added).

In 1792, Congress exercised its powers under the Militia Clauses to enact a statute that "purported to establish 'an Uniform Militia throughout the United States.'" *Perpich v. Dep't of Def.*, 496 U.S. 334, 341 (1990) (quoting Act of May 8, 1792, ch. 33, 1 Stat. 271, 271). But it was not until 1903 that Congress enacted the Dick Act, which established "an 'organized militia' to be known as the National Guard of the several States." *Id.* at 342 (quoting Militia Act of 1903, ch. 196, § 1, 57 Stat. 775, 775); *see id.* ("It is undisputed that Congress was acting pursuant to the Militia Clauses of the Constitution in passing the Dick Act.").

In 1933, Congress created the National Guard system that persists to the present day, composed of "two overlapping but distinct organizations . . . the National Guard of the various States and the National Guard of the United States." *Id.* (internal quotations omitted). "Since 1933 all persons who have enlisted in a State National Guard unit have simultaneously enlisted in the National Guard of the United States." *Id.* "In the latter capacity they became a part of the Enlisted Reserve Corps of the Army, but unless and until ordered to active duty in the Army, they retained their status as members of a separate State Guard unit." *Id.* Under this "dual enlistment system," *id.* at 347, "[m]embers of the National Guard only serve the federal military when they are formally called into the military service of the United States." *Stirling v. Minasian*, 955 F.3d 795, 799 (9th Cir. 2020) (internal quotations omitted). "At all other times, National Guard members serve solely as members of the State militia under the command of a state governor." *Id.* (internal quotations omitted).

## B. Article III Standing

Before addressing the legality of Defendants' federalization of the National Guard, this Court "must first ensure that the States have standing to challenge it." *Biden v. Nebraska*, 600 U.S. 477, 489 (2023). "Under Article III of the Constitution, a plaintiff needs a 'personal stake' in the case." *Id.* (quoting *TransUnion*, 594 U.S. at 431). In this case, "Plaintiffs seek injunctive relief, not damages, and '[a]s a general rule, in an injunctive case this court need not address standing of each plaintiff if it concludes that one plaintiff has standing.'" *Townley v. Miller*, 722 F.3d 1128, 1133 (9th Cir. 2013) (brackets in original) (quoting *Nat'l Ass'n of Optometrists & Opticians LensCrafters, Inc. v. Brown*, 567 F.3d 521, 522 (9th Cir. 2009)). In addition, "[a] plaintiff must demonstrate standing 'with the manner and degree of evidence required at the successive stages of the litigation.'" *TransUnion*, 594 U.S. at 431 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)). Therefore, "in a case like this that proceeds to trial, the specific facts set forth by the plaintiff to support standing 'must be supported adequately by the evidence adduced at trial.'" *Id.* (quoting *Lujan*, 504 U.S. at 561).

Here, the evidence adduced at trial establishes that, at the very least, the State of Oregon satisfies Article III standing for injunctive relief on Plaintiffs' *ultra vires* and Tenth Amendment claims. To establish standing, Oregon must demonstrate that the State "has suffered, or will suffer, an injury that is 'concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling.'" *Murthy v. Missouri*, 603 U.S. 43, 57 (2024) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)). Defendants only challenge Plaintiffs' failure to demonstrate an injury in fact. *See* Defs. Pre-Trial Mem., ECF 115 at 31–32. Regardless, Oregon has demonstrated that all three requirements for standing are met.

First, Oregon has suffered a concrete and particularized injury based on the unlawful federalization of 200 members of the State's National Guard, who otherwise, by default, "serve

solely as members of the State militia under the command of a state governor." *Stirling v. Minasian*, 955 F.3d 795, 799 (9th Cir. 2020) (internal quotations omitted). Because Defendants had no lawful basis to federalize these Oregon National Guardsmen under 10 U.S.C. § 12406, Defendants commandeered these State officers to "enforce a federal [law enforcement] program" at the Portland ICE facility, in violation of the Tenth Amendment. *Printz v. United States*, 521 U.S. 898, 935 (1997); *see TransUnion*, 594 U.S. at 425 (noting that cognizable injuries for standing purposes include "traditional harms . . . specified by the Constitution itself").

Defendants argue that this injury does not suffice to establish a concrete injury because "the federalization of the Oregon National Guard involves approximately three percent of the [State] Guard, for a limited period." Defs. Pre-Trial Mem., ECF 115 at 31. Their argument overlooks that these 200 members of the Oregon National Guard constitute 60% of the State's Guardsmen "who are trained to quickly to respond to emergencies, including national disasters." Decl. of Brigadier Gen. Alan R. Gronewold, ECF 34 ¶ 3. More broadly, Defendants' argument fails because the relevant injury is not the "adverse impacts to existing state operations" resulting from the Governor's loss of control of 200 Oregon National Guardsmen. Defs. Pre-Trial Mem., ECF 115 at 31. Rather, the relevant injury is the "sovereign injury" inflicted upon the State when the federal government unlawfully commandeers State officers in violation of the Constitution. *Arizona v. Yellen*, 34 F.4th 841, 851–52 (9th Cir. 2022); *see Illinois v. Trump*, No. 25-cv-12174, 2025 WL 2886645, at *11 (N.D. Ill. Oct. 10, 2025) ("Plaintiffs' claimed injury is not loss of an ability to control or command, but the loss of its own sovereign rights.").

This clarification disposes of Defendants' additional argument that their "conduct does not inflict a sovereign injury" because "[t]he protection of federal personnel and property is a federal interest." Defs. Pre-Trial Mem., ECF 115 at 32. Defendants assert that "State sovereignty

interests are not offended when the federal government locates its personnel in a state regardless of whether those personnel are federalized Guardsmen, federal prosecutors, or USDA inspectors." *Id.* Unlike federal prosecutors and USDA inspectors, the 200 Oregon National Guardsmen were not legally federalized under 10 U.S.C. § 12406, as discussed below. Therefore, they remain in "state active duty" status "under state control for state purposes." *Stirling*, 955 F.3d at 798 (internal quotations omitted). And the sovereign injury to Oregon under the Tenth Amendment does not dissipate due to any "federal interest" that the commandeered National Guardsmen serve. Indeed, that is the essence of the anti-commandeering doctrine. *See Printz*, 521 U.S. at 935 ("The Federal Government may . . . no[t] command the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program.").

Second, Oregon suffers—and "is under threat of suffering," *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009)—an injury in fact from the unlawful deployment of members of the California and Texas National Guards. As discussed below, no factual predicate existed under 10 U.S.C. § 12406 to justify the President's federalization of *any* State's National Guard for deployment in Oregon. Defendants are thus incorrect that the deployment of 200 California National Guardsmen and the threatened deployment of up to 400 Texas National Guardsmen involve "federal soldiers," Defs. Pre-Trial Mem., ECF 115 at 35, who have "los[t] their status as members of the state militia," *Perpich v. Dep't of Def.*, 496 U.S. 334, 347 (1990).

Instead, these deployments involve the intrusion of California and Texas National Guardsmen in their capacity as militiamen of those States, which constitutes an injury to Oregon's "sovereignty under the Constitution," let alone to Oregon's "*equal* sovereignty among the States." *Shelby County v. Holder*, 570 U.S. 529, 544 (2013) (internal quotations omitted) (emphasis in original). At the Founding, "there was a widespread fear that a national standing

Army posed an intolerable threat to individual liberty and to the sovereignty of the separate

States." *Perpich*, 496 U.S. at 340; *see Illinois v. Trump*, No. 25-cv-12174, 2025 WL 2886645, at

*6–8 (N.D. Ill. Oct. 10, 2025) (detailing such sentiments among the Founders, including James

Madison, Patrick Henry, and Alexander Hamilton). In light of this recognized threat to State

sovereignty, an incursion of a State's militiamen into a sister State is a "traditional harm[]"

recognized in the Constitution. *TransUnion*, 594 U.S. at 425; *see Printz*, 521 U.S. at 918–19

(recognizing that "[a]lthough the States surrendered many of their powers to the new Federal

Government, they retained a 'residuary and inviolable sovereignty,'" as "reflected throughout the

Constitution's text") (quoting The Federalist No. 39 (James Madison)); *see also Illinois v.

Trump*, No. 25-2798, 2025 WL 2937065, at *7 (7th Cir. Oct. 16, 2025) ("And the deployment of

National Guard members from Texas—an incursion on Illinois's sovereignty—makes the

constitutional injury especially significant."); *cf.* U.S. Const. art. IV, § 4 (providing in the

Guarantee Clause that the federal government "shall protect each of [the states] against

Invasion").

　　　　Next, there is no dispute that Oregon's sovereign injury is fairly traceable to, and

therefore would be redressable by, an order enjoining (1) the September 28, 2025 Memorandum

federalizing and deploying the Oregon National Guard, Ex. 1051; (2) the October 5, 2025

Memorandum federalizing and deploying the Texas National Guard, to the extent that it deploys

members of the Texas National Guard in Oregon, Ex. 6; (3) the October 16, 2025 Memorandum

deploying members of the California and Texas National Guards in Oregon, Ex. 2; and (4) any

memoranda deploying members of any other State's National Guard to Oregon based on the

same predicate conditions that were relied upon to authorize the above orders. *See Murthy*, 603

U.S. at 57 ("'[P]laintiffs must demonstrate standing for each claim that they press' against each

defendant, 'and for each form of relief that they seek.'" (quoting *TransUnion*, 594 U.S. at 431)). In sum, Plaintiffs have standing to seek injunctive relief based on their *ultra vires* and Tenth Amendment claims. Therefore, this Court proceeds to the merits of Plaintiffs' claims.[18]

## C. Permanent Injunction

The trial record demonstrates that Plaintiffs are entitled to a permanent injunction based on both their *ultra vires* claim that Defendants violated 10 U.S.C. § 12406 and their constitutional claim that Defendants violated the Tenth Amendment. "To be entitled to a permanent injunction, a plaintiff must demonstrate: (1) actual success on the merits; (2) that it has suffered an irreparable injury; (3) that remedies available at law are inadequate; (4) that the balance of hardships justify a remedy in equity; and (5) that the public interest would not be disserved by a permanent injunction." *Indep. Training & Apprenticeship Program v. Cal. Dep't of Indus. Rels.*, 730 F.3d 1024, 1032 (9th Cir. 2013). This Court concludes that Plaintiffs have demonstrated actual success on both claims. This Court also finds that Oregon has suffered irreparable injury from the unlawful federalization and deployment of both its own National Guard and the National Guards of other states. Lastly, there are no adequate remedies available at law, and the balance of hardships and the public interest favor Plaintiffs.

---

[18] Defendants also argue that "[e]ven if Plaintiffs had Article III standing to challenge the out-of-state Guard members' federalization and deployment, their claim is still outside Section 12406's zone of interest." Defs. Pre-Trial Mem., ECF 115 at 34. But "the zone-of-interests test . . . is not one of standing, but of 'whether the statute grants the plaintiff the cause of action that he asserts.'" *FDA v. R. J. Reynolds Vapor Co.*, 606 U.S. 226, 232 n.3 (2025) (quoting *Bank of Am. Corp. v. Miami*, 581 U.S. 189, 196–97 (2017)). Here, Plaintiffs do not claim that 10 U.S.C. § 12406 confers a private right of action. Rather, they bring a "nonstatutory ultra vires" claim, *Nuclear Reg. Comm'n v. Texas*, 605 U.S. 665, 680–81 (2025), and therefore, the zone-of-interests test is not relevant to Plaintiffs' ability to bring *ultra vires* or Tenth Amendment claims.

### 1. Actual Success on the Merits

At the heart of this case is whether the President's federalization and deployment of the Oregon, California, and Texas National Guards, to Portland, Oregon, without the consent of the Governor of Oregon, was unlawful under 10 U.S.C § 12406. Section 12406 provides in full:

> Whenever—
>
> (1) the United States, or any of the Commonwealths or possessions, is invaded or is in danger of invasion by a foreign nation;
>
> (2) there is a rebellion or danger of a rebellion against the authority of the Government of the United States; or
>
> (3) the President is unable with the regular forces to execute the laws of the United States;
>
> the President may call into Federal service members and units of the National Guard of any State in such numbers as he considers necessary to repel the invasion, suppress the rebellion, or execute those laws. Orders for these purposes shall be issued through the governors of the States or, in the case of the District of Columbia, through the commanding general of the National Guard of the District of Columbia.

10 U.S.C. § 12406. In *Newsom v. Trump*, the Ninth Circuit held that the President's decision to federalize the National Guard under Section 12406 is judicially reviewable.[19] 141 F.4th at 1046–47. A reviewing court must give "a great level of deference to the President's determination that

---

[19] Defendants acknowledge that the President's determination is reviewable under *Newsom*, but "Defendants preserve for further review their argument that the President's decision to federalize the National Guard under Section 12406 is not judicially reviewable." Defs. Post-Trial Mem., ECF 131 at 2 (citing *Martin v. Mott*, 25 U.S. (12 Wheat.) 19, 29–30 (1827)). As *Newsom* explained, the Supreme Court's decision in *Martin* does not establish that the President's invocation of Section 12406 is unreviewable. 141 F.4th at 1050–51. "After all, it remains 'emphatically the province and duty of the judicial department to say what the law is.'" *Id.* at 1046 (quoting *Marbury v. Madison*, 5 U.S. 137, 177 (1803)). This duty "includes 'determining the limits of statutory grants of authority' and 'determining whether a government official did exceed his powers' granted by the statute." *Id.* (first quoting *Stark v. Wickard*, 321 U.S. 288, 310 (1944); and then quoting *Harmon v. Brucker*, 355 U.S. 579, 582 (1958) (per curiam)).

a predicate condition exists." *Id.* at 1048. However, the court may "review the President's determination to ensure that it reflects a colorable assessment of the facts and law within a 'range of honest judgment.'" *Id.* at 1051 (quoting *Sterling v. Constantin*, 278 U.S. 378, 399 (1932)). The President's "exercise of his authority to maintain peace" must be "*in the face of the emergency* and directly related to the quelling of the disorder or the prevention of its continuance." *Id.* (emphasis added) (quoting *Sterling*, 278 U.S. at 399–400). The Ninth Circuit did caveat that "[a]t this preliminary stage of the litigation," it "need not further specify the precise standard that governs [judicial] review" of the President's determination. *Id.*

Defendants contend that the President federalized the National Guard pursuant to Section 12406(3) and Section 12406(2). Defs. Pre-Trial Mem., ECF 115 at 21–29. This Court concludes that even applying *Newsom*'s "highly deferential standard of review," the President did not have a "colorable basis for invoking" either subsection. *Newsom*, 141 F.4th at 1052. First, this Court finds that based on the trial evidence, in the months "leading up to the President's federalization of the National Guard" on September 27, 2025, that the credible evidence presented at trial showed at most only "minimal interference with the execution of laws" insufficient to invoke Section 12406(3). *See id.* at 1051–52. Second, this Court finds that the trial evidence established that there was neither "a rebellion [n]or a danger of a rebellion against the authority of the Government of the United States" at the Portland ICE facility when the President federalized the National Guard. 10 U.S.C. § 12406(2). Plaintiffs therefore prevail on their claim that Defendants' federalization of the National Guard was *ultra vires*. And since Defendants' deployment of the National Guard involves commandeering of the Oregon militia or intrusion on Oregon's sovereignty by the militias of California and Texas, Plaintiffs also prevail on their claim that Defendants violated the Tenth Amendment.

a. **Section 12406(3)**

i. *Newsom v. Trump*

This Court begins with the Ninth Circuit's published motions panel order in *Newsom v. Trump*, 141 F.4th 1032 (9th Cir. 2025), which is "binding" with respect to its statutory interpretation of 10 U.S.C. § 12406(3), a "pure question of law." *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 660–61 & n.3 (9th Cir. 2021). In June 2025, the President invoked 10 U.S.C. § 12406 "to order 4,000 members of the National Guard into federal service" "[i]n response to disturbances in Los Angeles stemming from federal enforcement of immigration laws." *Newsom*, 141 F.4th at 1040. The Ninth Circuit recounted the following two days of unlawful conduct, which this Court recounts in full given its central relevance to the application of *Newsom* to the facts of this case:

> On June 6, 2025, a group of protesters tried to prevent Immigration and Customs Enforcement (ICE) officials from operating in Los Angeles by throwing objects at ICE vehicles. Later that evening, protesters gathered at ICE's Enforcement and Removal Operations (ERO) building in downtown Los Angeles. Protesters "pinned down" several Federal Protective Service (FPS) officers and threw "concrete chunks, bottles of liquid, and other objects" at the officers. The protesters used "large rolling commercial dumpsters as a battering ram to breach the parking garage gate and damage[ ] federal property." The Los Angeles Police Department arrived on the scene about an hour after being called by federal officers. The protesters eventually dispersed at law enforcement's direction, but the federal building had been heavily vandalized.

> The next day, on June 7, protesters continued to interfere with federal enforcement operations by a Homeland Security Investigations Office in Paramount, California, and continued to damage federal property. In a confrontation that lasted over seven hours, the protesters blocked traffic and used shopping carts to barricade the street. Some attacked ERO and Customs and Border Patrol (CBP) officers by "box[ing] in" the officers and "throwing mortar-style fireworks with multiple explosions" at them. Other

protesters "engage[d] in dangerous behavior such as throwing rocks and other objects, including a Molotov Cocktail at deputies," "burning a vehicle," and "vandalizing property." One ERO officer was trapped in her law enforcement vehicle while protesters surrounded it, violently pounded and shook it, and threw stones at it. One CBP officer suffered a shattered wrist caused by a thrown object. Protesters also damaged the perimeter fence of a federal building and three government vehicles.

. . .

Protests against federal officers continued into the following days. For example, during the night of June 8, protesters in downtown Los Angeles "set[ ] off commercial-grade fireworks toward federal officers and thr[ew] objects at passing law enforcement vehicles." They lit fires in dumpsters and "vandalized dozens of buildings with graffiti, including the Federal Courthouse." On June 9, a crowd of 1,000 protesters gathered near a federal building. One protester drove by the building and fired paintballs at FPS officers, hitting at least one in the head and neck. At another federal building, protesters attacked a federal van carrying multiple non-citizens and officers, rocking the vehicle and smashing its windows. The building had to be closed for most of the day and remained closed the next day, disrupting the operations of many federal agencies working in the building.

*Id.* at 1041–42 (brackets in original). Amidst this violence, on June 7, 2025, and on June 9, 2025, the President called up a total of 4,000 members of the National Guard under Section 12406 "to temporarily protect ICE and other United States Government personnel who are performing Federal functions, including the enforcement of Federal law, and to protect Federal property." *Id.* (internal quotations omitted).

As relevant here, the Ninth Circuit held in *Newsom* that Section 12406(3) "does not have as a prerequisite that the President be completely precluded from executing the relevant laws of the United States." *Id.* at 1051. Rather, as long as "activities significantly impeded the ability of federal officers to execute the laws," a court may not second guess the President's invocation of

Section 12406(3). *Id.* at 1052. However, *Newsom* also made clear that "minimal interference

with the execution of laws is, by itself," insufficient "to justify invoking § 12406(3)." *Id.* at 1051.

The pertinent question, therefore, is whether the President had a "colorable basis" to conclude

that federal officers were "significantly impeded" in their execution of the laws. *Id.* at 1052. On

the facts recited above, *Newsom* found that, "protesters' interference with the ability of federal

officers to execute the laws, leading up to the President's federalization of the National Guard"

qualified as a significant impediment. *Id.* Specifically, there was evidence that on the day before

and the day of the National Guard callout, "protesters threw objects at ICE vehicles trying to

complete a law enforcement operation, 'pinned down' several FPS officers defending federal

property by throwing 'concrete chunks, bottles of liquid, and other objects,' and used 'large

rolling commercial dumpsters as a battering ram' in an attempt to breach the parking garage of a

federal building." *Id.* "Affording appropriate deference to the President's determination,"

*Newsom* "conclude[d] that he likely acted within his authority in federalizing the National Guard

under 10 U.S.C. § 12406(3)." *Id.*

But what *Newsom* did not answer are two questions that complicate application of its test

to the facts of this case. Principally, what if at some point in time months prior to the President's

federalization of the National Guard, federal officers were "significantly impeded" by unlawful

conduct that resembles some of the conduct described in *Newsom*, but in the subsequent months,

federal officers no longer faced such significant impediments? Secondarily, how does the ability

of federal officers to execute federal law with the aid of additional federal civilian law

enforcement inform whether the President had a colorable basis to invoke Section 12406(3)?

The answers to these questions drive this Court's analysis of whether the President had a

"colorable basis" to invoke 10 U.S.C. § 12406(3). *Id.* Resolving them requires consulting not

only *Newsom* but also further deciphering the meaning of "to execute the laws of the United States" in 10 U.S.C. § 12406(3).[20] Although *Newsom* relied on history and Supreme Court precedent interpreting that history to find that the President's determination is reviewable "[u]nder a highly deferential standard of review," *see id.* at 1047–52, the court did not interrogate the historical understanding of the statutory language "unable with the regular forces to execute the laws of the United States." As discussed below, this language mirrors and directly descends from the Militia Clauses themselves, specifically Congress's power "[t]o provide for calling forth the Militia to execute the Laws of the Union" U.S. Const. Art. I, § 8, cl. 15. Therefore, to the extent this clause constrains Congress's power to call forth the militia, it also constrains Congress's delegation to the President, since Congress cannot delegate power that it lacks. Applying this history and tradition, in conjunction with *Newsom*, this Court can answer the two key questions that go to whether the President had a colorable basis to invoke Section 12406(3).

### i. History and Tradition

As the following examination of historical sources reveals, the meaning of "unable . . . to execute the laws of the United States" in 10 U.S.C. § 12406(3) carries a consistent meaning from the Founding through to the present that suggests this precondition arises when federal courts or federal law enforcement cannot function without the intervention of the militia. Again, the

---

[20] Another interpretive question is the meaning of "regular forces" in 10 U.S.C. § 12406(3). In *Illinois v. Trump*, No. 25-cv-12174, 2025 WL 2886645, at *16–18 (N.D. Ill. Oct. 10, 2025), the district court provided compelling reasons why "the phrase 'regular forces' was understood at the time of enactment to mean the soldiers and officers regularly enlisted with the Army and Navy, as opposed to militiamen." The Supreme Court awaits supplemental briefing on this issue, but Defendants have provided this Court with arguments why "regular forces" refers to federal civil officers and not the standing army. Defs. Post-Trial Br., ECF 131 at 6–10. In any event, this Court need not resolve this "thorny and complex issue[] of statutory interpretation." *Illinois v. Trump*, No. 25-2798, 2025 WL 2937065, at *7 (7th Cir. Oct. 16, 2025). In *Newsom*, the Ninth Circuit implicitly resolved this question by equating "regular forces" with "federal officers," i.e. federal civilian law enforcement, which is binding on this Court. 141 F.4th at 1051–52.

Constitution allows Congress "[t]o provide for calling forth the Militia to execute the Laws of the Union, suppress Insurrections, and repel invasions." U.S. Const. art. I, § 8, cl. 15. However, soon after the Founding, "Congress first delegated its constitutional calling forth power to the President in the Militia Act of 1792." *Newsom*, 141 F.4th at 1047 (citing Militia Act of 1792, ch. 28, §§ 1–2, 1 Stat. 264, 264). This "early congressional enactment[] 'provide[s] contemporaneous and weighty evidence of the Constitution's meaning.'" *Haaland v. Brackeen*, 599 U.S. 255, 290 (2023) (quoting *Bowsher v. Synar*, 478 U.S. 714, 723 (1986) (brackets and internal quotations omitted)). Indeed, Congress's 1792 delegation of its calling forth power mapped onto the clause's three enumerated conditions: (1) "to execute the Laws of the Union"; (2) "suppress Insurrections"; and (3) "repel Invasions." U.S. Const. art. I, § 8, cl. 15; *see* Militia Act of 1792, ch. 28, §§ 1–2, 1 Stat. 264, 264 (allowing the President to call forth the militia (1) "whenever the laws of the United States shall be opposed, or the execution thereof obstructed"; (2) "in case of an insurrection in any state"; and (3) "whenever the United States shall be invaded, or be in imminent danger of invasion from any foreign nation or Indian tribe").

Corresponding to Section 12406(3), the Militia Act of 1792 provided in subsection two:

> That whenever the laws of the United States shall be opposed, or the execution thereof obstructed, in any state, by combinations too powerful to be suppressed by the ordinary course of judicial proceedings, or by the powers vested in the marshals by this act, the same being notified to the President of the United States, by an associate justice or the district judge, it shall be lawful for the President of the United States to call forth the militia of such state to suppress each combinations, and to cause the laws to be duly executed.

Militia Act of 1792, ch. 28, § 2, 1 Stat. 264, 264. Notably, Congress specified that such an exigency arises only when the laws can no longer be executed "by the ordinary course of judicial proceedings, or by the powers vested in the marshals by this act." *Id.* The former points to an

inoperative federal court, and the latter points to overwhelmed federal law enforcement, since the statute elsewhere gave marshals "the same powers in executing the laws of the United States, as sheriffs and their deputies in the several states have by law, in executing the laws of their respective states." *Id.*, § 9, 1 Stat. 264, 265; *see also* Judiciary Act of 1789, ch. 20, § 27, 1 Stat. 73, 87 (specifying the duties of a marshal, including "to execute throughout the district, all lawful precepts directed to him, and issued under the authority of the United States").

These limitations reflect the Founders' understanding of the scope of the calling forth power "to execute the Laws of the Union," U.S. Const. art. I, § 8, cl. 15. At the Virginia Ratifying Convention in 1788, a delegate "thought the word *insurrection* included every opposition to the laws" and therefore asked whether the Militia Clauses could omit the phrase, "to execute the laws of the Union." Jonathan Elliot, *The Debates in the Convention of the Commonwealth of Virginia*, 3 THE DEBATES IN THE SEVERAL STATE CONVENTIONS ON THE ADOPTION OF THE FEDERAL CONSTITUTION 407 (2d ed. 1836) ("Elliot, *Virginia Ratification Debates*") (emphasis in original). In response, James Madison clarified that "a riot did not come within the legal definition of an insurrection[,]" and "[t]here might be riots, to oppose the execution of the laws, *which the civil power might not be sufficient to quell*." *Id.* at 410 (emphasis added); *see Ex parte Milligan*, 71 U.S. 2, 37–38 (1866) (noting that the Founders "always asserted and enforced the subordination of the military to the civil arm" of government, i.e., "the civil power"). Alexander Hamilton similarly understood the clause as allowing "the federal government [to] command the aid of the militia in those emergencies which call for the military arm in support of the civil magistrate." THE FEDERALIST NO. 29 (Alexander Hamilton).

This circumscribed meaning of "to execute the Laws of the Union," U.S. Const. art. I, § 8, cl. 15, finds further support from the Founding era. George Mason cautioned at the Virginia

Ratifying Convention that "unless there be some restrictions on the power of calling forth the militia, to execute the laws of the Union, suppress insurrections, and repel invasions, we may very easily see that it will produce dreadful oppressions." Elliot, *Virginia Ratification Debates*, at 378. Madison responded that "it was obvious to him, that, *when the civil power was sufficient*, this mode would never be put in practice." *Id.* at 384 (emphasis added). And another delegate seconded Madison's sentiment that "[t]he civil officer is to execute the laws on all occasions; and, if he be resisted, this auxiliary power is given to Congress of calling forth the militia to execute them, *when it shall be found absolutely necessary*." *Id.* at 392 (emphasis added).

Perhaps most illuminating from the Virginia Ratifying Convention is Governor Edmund Randolph's response to Patrick Henry's warning of the apparent wide breadth of circumstances in which the militia could be "called forth to execute the laws." *Id.* at 387. Randolph stated:

> It is supposed . . . that the clause for calling forth the militia to suppress insurrections, repel invasions, and execute the laws of the Union, implies that, instead of using civil force in the first instance, the militia are to be called forth to arrest petty offenders against the laws. *Ought not common sense to be the rule of interpreting this Constitution?* Is there an exclusion of the civil power? Does it provide that the laws are to be enforced by military coercion in all cases? No, sir. *All that we are to infer is, that when the civil power is not sufficient, the militia must be drawn out.*

*Id.* at 400 (emphasis added). As Madison further explained, "[t]here is a great deal of difference between calling forth the militia, when a combination is formed to prevent the execution of the laws, and the sheriff or constable carrying with him a body of militia to execute them in the first instance." *Id.* at 415. To Madison, the latter was "a construction not warranted by the clause." *Id.* All this to say, when Congress enacted the Militia Act of 1792, it codified this "common sense" understanding of the scope of the calling forth power, linking an inability to execute the laws to a failure of the "civil power," i.e. the civil government, to execute the laws of the United States.

Subsequent Congressional enactments and amendments delegating the calling forth power to the President shed additional light on the meaning of 10 U.S.C. § 12406(3). *See FAA v. Cooper*, 566 U.S. 284, 292 (2012) ("[I]t is a cardinal rule of statutory construction that, when Congress employs a term of art, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken." (internal quotations omitted)). Just three years later, in 1795, Congress "renewed" its 1792 delegation to the President. *Newsom*, 141 F.4th at 1047. Although the statute expunged the requirement that the President receive preclearance from a federal judge, the provisions otherwise remained the same. Militia Act of 1795, ch. 36, §§ 1–2, 1 Stat. 424, 424. An obstruction to the execution of the laws of the United States continued to require "combinations too powerful to be suppressed by the ordinary course of judicial proceedings, or by the powers vested in the marshals," and the same other two predicate conditions of "insurrection" and "invasion" remained unchanged. *Id.*

"The 1795 Act was a precursor to the Militia Act of 1903, which is a precursor to § 12406." *Newsom*, 141 F.4th at 1047 (internal citation omitted). The Militia Act of 1903 introduced much of the modern language contained in 10 U.S.C. § 12406(3), enabling the President to call forth the militia when "unable, with the other forces at his command, to execute the laws of the Union." Militia Act of 1903, ch. 196, § 4, 57 Stat. 775, 776. Without analyzing the language of the Militia Act of 1903 in the context of its historical precursors and the Founders' understanding of the scope of this power, one may overlook that "Congress employ[ed] a term of art obviously transplanted from another legal source," which therefore "brings the old soil with it." *George v. McDonough*, 596 U.S. 740, 746 (2022) (internal quotations omitted). But when properly considering the historical and constitutional context, a better reading emerges that the words "unable . . . to execute the laws of the Union" continued to

encapsulate the *degree* of "oppos[ition]" or "obstruct[ion]" contained in its statutory precursors and reflected in the Founders' understanding of the term. Militia Act of 1792, ch. 28, § 2, 1 Stat. 264, 264; Militia Act of 1795, ch. 36, §§ 1–2, 1 Stat. 424, 424. And thus, the necessary degree of opposition, obstruction, and now inability, has always been measured against the ability of the civil power, executive and judicial, to execute the laws.

The same is true of subsequent twentieth-century amendments to this statutory provision, which repeatedly imported the same language of the President being "unable . . . to execute the laws of the Union," or "the United States." *See Clark v. Martinez*, 543 U.S. 371, 378 (2005) ("To give these same words a different meaning for each [version] would be to invent a statute rather than interpret one."). In the Militia Act of 1908, Congress replaced "the other forces" with "the regular forces," and required the President to issue his federalization order "through the governor of the respective State . . . from which . . . such troops may be called." *Compare* Militia Act of 1903, ch. 196, § 4, 57 Stat. 775, 776 *with* Militia Act of 1908, ch. 204, § 3, 60 Stat. 399, 400. But otherwise, the statute kept the language "to execute the laws of the Union." Militia Act of 1908, ch. 204, § 4, 60 Stat. 399, 400. And in 1956, Congress updated this language to its present-day form contained in 10 U.S.C. § 12406: "the President is unable with the regular forces to execute the laws of the United States." *See* Act of August 10, 1956, ch. 1041, § 3500, 70A Stat. 199 (providing for federalization of the "Army National Guard"); *id.*, § 8500, 70A Stat. 525 (providing for federalization of the "Air National Guard"). In 1996, Congress repealed and consolidated these two separate provisions for the Army National Guard and the Air National Guard into 10 U.S.C. § 12406. National Defense Authorization Act for Fiscal Year 1995, Pub. L. No. 103-337, 108 Stat. 2663, 2994 (codified at 10 U.S.C. § 12406).

Historical practice further confirms that the President's power to call forth the militia "to execute the Laws of the Union," U.S. Const. art. I, § 8, cl. 15, is limited to situations when the civil power is unable to do so. Although discussed in further detail below, it is notable that when President Washington invoked the Militia Act of 1792 to respond to the Whiskey Rebellion in 1794, he did not cite the statutory provision addressing an "insurrection," but rather he invoked the statutory precursor to Section 12406(3), citing his need "to cause the Laws to be duly executed." Proclamation of Aug. 7, 1794. And likewise, when President John Adams invoked the Militia Act of 1795 to respond to the Fries's Rebellion in 1799, he again cited this provision, finding that "combinations to defeat the execution of the laws for the valuation of lands and dwelling houses within the United States have existed in the counties of Northampton, Montgomery, and Bucks, in the State of Pennsylvania." Proclamation No. 9 (Mar. 12, 1799).

## ii. Application

Based on the facts on the ground outside the Portland ICE building throughout the relevant time period between the outbreak of protests in June and the President's federalization order on September 27, 2025, this Court holds that the President did not have a colorable basis to invoke 10 U.S.C. § 12406(3) when he ordered the federalization of the Oregon National Guard. The starting point is *Newsom*, which rejected Defendants' argument that "minimal interference with the execution of laws is, by itself, enough to justify invoking § 12406(3)." 141 F.4th at 1051. *Newsom* reached this conclusion based on "[t]he statutory context." *Id.* Sections 12406(1) and 12406(2) "discuss unusual and extreme exigencies—invasions and rebellions—that threaten the normal operations of civil government." *Id.* So if "minimal interference with the execution of laws" could justify the President's callout under Section 12406(3), then this subsection "would swallow subsections one and two, because any invasion or rebellion renders the President unable to exercise *some* federal laws." *Id.* (emphasis in original). The question then is whether "leading

up to the President's federalization of the National Guard on" September 27, 2025, did federal officers face more than "minimal interference with the execution of laws"? *Id.* at 1051–52.

The answer is no. The facts on the ground show that since a high watermark of unlawful activity in mid-June, the protests outside the Portland ICE facility did not "significantly impede[] the ability of federal officers to execute the [immigration] laws." *See id.* at 1052. The evidence at trial showed that during a few days on or around June 12, 2025, the unlawful activities of protesters outside the Portland ICE building, at least on a superficial analysis of discrete acts, resembled some of the unlawful activities that *Newsom* discussed as "significantly imped[ing] the ability of federal officers to execute the laws." *Id.* For example, protesters at the Portland ICE facility threw objects, including bricks and rocks, at federal officers. *See id.* at 1041 (describing protesters in Los Angeles throwing concrete chunks and other objects at officers). On June 12, protesters in Portland vandalized the electrical components of the vehicle gate and card readers, rendering them inoperable. *See id.* (stating that in Los Angeles "the federal building had been heavily vandalized"). On June 14, protesters in Portland broke several windows with a barbell and stop sign pole in an attempt to breach the building. *See id.* (describing protesters in Los Angeles using "large rolling commercial dumpsters as a battering ram to breach the parking garage gate"). The same day, protesters put chains on one door in an attempt to barricade federal employees inside the building. *See id.* (describing a seven-hour confrontation in Los Angeles during which "protesters blocked traffic and used shopping carts to barricade the street"). And due to property damage, the Portland ICE building was closed for three weeks. *See id.* at 1042 (describing the closure of a federal building in Los Angeles on June 9 "for most of the day" and "the next day").

At the same time, this mid-June peak of violence outside the Portland ICE building did not rise anywhere close to the level of disruption that occurred in Los Angeles between June 6 and June 9 in many significant respects. Whereas the criminal activity in Los Angeles took place across at least "dozens" of locations around the city, the criminal activity in Portland, even at its peak in June, was contained to a single city block outside of a single federal building. *Id.* Unlike in Los Angeles, no evidence was presented of protesters impeding "ICE vehicles trying to complete a law enforcement operation" in Portland. *Id.* at 1052. While in Los Angeles "protesters attacked a federal van carrying multiple non-citizens and officers, rocking the vehicle and smashing its windows," *id.* at 1042, no evidence was presented that anything of this sort occurred anywhere or anytime in Portland. And the crowd of 1,000 people that gathered near just one of the dozens of federal buildings vandalized in Los Angeles dwarfs the size of the crowd of protesters outside the Portland ICE building at any point in time.

But even setting aside these and more stark differences, the bottom line is that the President did not call out the National Guard in response to the disturbances outside the Portland ICE facility in June. Rather, he federalized the Oregon National Guard on September 27, 2025, three months after any exigency that may have existed in June had long subsided. As chronicled in this Court's factual findings, the protests outside the Portland ICE facility between June 15, 2025, and September 27, 2025, involved minimal interference, if any, to the execution of federal immigration laws.

Physical violence toward federal officers declined rapidly and substantially following the few worst days in June. During those worst days, FPS reported three injuries to federal officers each day between June 11 and June 13 and one injury to a federal officer on June 16. But by the end of June, most of this violence was rhetorical. Protesters frequently made verbal threats to

PAGE 75 – FINDINGS OF FACT & CONCLUSIONS OF LAW
**A079**

FPS and ICE personnel, and in this vein, protesters set up a prop guillotine in front of the

Portland ICE facility on Labor Day. However, there is slight evidence of any actual violence

following those mid-June days. While FPS reported 11 total injuries in June, it reported only 4 in

July; 6 in August; and *none* in September.

During this post-June time period, the low-level physical violence discussed in law

enforcement reports did not "significantly impede[] the ability of federal officers to execute the

laws." *Newsom*, 141 F.4th at 1052. None of the isolated instances of violence resulted in serious,

let alone life-threatening, injuries. For example, on July 13, an FPS officer pulled a groin muscle

while taking a resisting suspect into custody. On September 18, an FPS officer and a protester

pushed against each other while the FPS officer was conducting a push-out to clear the driveway,

causing the officer's shield to hit the officer in the face.

On a few occasions, federal personnel endured more serious acts of violence. But there is

no indication that these acts, while unacceptable, ever resulted in serious injuries. On June 29, a

suspect bit and kicked an FPS inspector while being detained, but the inspector was uninjured.

Similarly, on July 20, an unruly protester struck an ICE/SRT agent on the head with a stick, but

FPS did not report any injuries. The most egregious physical assaults on federal personnel after

mid-June occurred on Independence Day. On that day, a protester kicked an SRT agent, which

the agent described as a "10 out of 10" on the pain scale. Protesters also threw rocks and

fireworks, and one attempted to trip an officer. FPS reported two injuries that day, but the

incident report does not provide further details and emergency medical services were only called

to transport a detained protester who was having trouble breathing. Taken together, even on the

most active day since mid-June, these acts minimally interfered with federal law enforcement.

Property damage in June caused the building to close for three weeks, but ICE operations did not abate during the closure. Administrative functions continued at a different site, and there is no evidence of impeded ERO field operations. Although the closure required immigration appointments to be cancelled or rescheduled, such inconveniences "minimal[ly] interfer[ed]" with the execution of immigration laws. *Newsom*, 141 F.4th at 1051. It is true that throughout the period between June and September, protesters often attempted to interfere with federal officers' use of the Portland ICE building's driveway. But this interference was "minimal," *id.*, since federal officers were able to move vehicles in and out of the facility, clearing protesters through the use of verbal warnings, physical "push-outs" and, when necessary, chemical agents. FPS Commander W.T. testified, in every instance of which he was aware, federal law enforcement were successful in allowing vehicles to enter and exit from the building.

During the time period between June and October 2025, federal officers at the Portland ICE facility, with PPB's assistance, investigated some acts of doxing, as well as some concerning tips or perceived threats that turned out to be unfounded, but these nonphysical nuisances did not "significantly impede[] the ability of federal officers to execute the laws" in any concrete respect. *Id.* at 1052. For example, on two occasions, people apparently abandoned cars in front of the ICE building, and FPS called PPB to determine if, out of an abundance of caution, the cars contained explosive devices, which they did not. On another day, a woman who appeared to be suffering from mental illness told FPS that there was a bomb in the building. However, earlier that day, that same woman told FPS that someone had smuggled dynamite into her son's assisted living facility.  FPS did not take any action in response to this woman's claim—leading to the conclusion that this "bomb threat" was not taken seriously. PPB also alerted FPS of a social media post that suggested a protester was going to shoot someone, but

soon after contacted FPS to inform the agency that the post had been taken down. This Court also received evidence of doxing of federal officers, through both physical flyers and online social media posts. As distasteful as this conduct is, there is no evidence that these threats and harms impeded federal immigration efforts in any significant way.

In sum, the trial record showed that although protests outside the Portland ICE building occurred nightly between June and October 2025, ever since a few particularly disruptive days in mid-June, protests have remained peaceful with only isolated and sporadic instances of violence. The occasional interference to federal officers has been minimal, and there is no evidence that these small-scale protests have significantly impeded the execution of any immigration laws.

Defendants raise various arguments for why, despite this minimal disruption in the preceding weeks and months before the President's September 27, 2025 federalization order, the President's determination under Section 12406(3) nevertheless "reflects a colorable assessment of the facts and law within a 'range of honest judgment.'" *Newsom*, 141 F.4th at 1051 (quoting *Sterling*, 287 U.S. at 399). But none of Defendants' arguments, even when considered in aggregate, demonstrate that the President had a colorable basis to deploy the National Guard to Oregon.

*First*, regarding the relevant timeframe of events, this Court agrees that the President, and likewise this Court, should "evaluate the entire context of events leading up [to] a decision to invoke § 12406." *Oregon v. Trump*, 2025 WL 3008050, at *12 (per curiam). But that does not mean all events that took place outside the Portland ICE building are equally relevant to whether the President had a colorable basis to invoke Section 12406(3). To illustrate, could the President rely solely on the civil unrest in Portland, Oregon, *in 2020*, to justify his deployment of military troops to the Portland ICE facility *in 2025*? Even under *Newsom*'s "especially deferential"

standard, such a decision would be "obviously absurd or made in bad faith." 141 F.4th 1047,

1050. If the vacated panel majority were correct that it is up to the President "to identify and

weigh the relevant facts under § 12406(3)" and courts may "not limit the facts and circumstances

that the President may consider in doing so," then the President's determination under Section

12406 is reviewable in name only and would amount to giving the President absolute deference.

*Oregon v. Trump*, 2025 WL 30008050, at *11 (per curiam). If the President's determination is in

substance reviewable, however, this Court's "judicial duty is to apply the law to the facts of the

case." *Gamble v. United States*, 587 U.S. 678, 723 (2019) (Thomas, J., concurring). To fulfill

this duty here, this Court must determine the *relative* importance of the facts that go toward

whether the President violated 10 U.S.C. § 12406(3).

　　The text of 10 U.S.C. § 12406(3) suggests that the timing of the facts is central to

determining that weight.  Section 12406(3) asks whether "the President *is* unable with the regular

forces to execute the laws," not whether the President was at some point in the past unable to do

so. 10 U.S.C. § 12406 (emphasis added). The statute's "use of the present tense clearly conveys

congressional intent that the present state of affairs is the relevant time." *Oregon v. Trump*, 2025

WL 3008050, at *26 (Graber, J., dissenting). Of course, an exigency does not exist only at a

discrete point in time, but nor is it a ghost that continues to persist once it has passed. Thus, "the

present state of affairs" is not necessarily governed by how much time passed between June and

September but rather how much the *events* themselves qualitatively changed from June. *Id.*  To

the extent the concentrated bouts of criminal activity in mid-June are an anomaly—which they

were as described above—they have little relevance to the existence of any exigency at the time

of the federalization order on September 27, 2025. What they instead show is, at most, an

emergency in the past.

Further supporting this interpretation is how the text of Section 12406(3) "contrasts with the text of the other two subsections in a way that removes any doubt about the relevant time frame." *Id.* at *27. Whereas these other two subsections "permit deployment whenever there is an invasion or rebellion *or a danger of those events*," *id.* (emphasis in original) (citing 10 U.S.C. § 12406(1)–(2)), subsection three "asks only whether the President is presently unable to execute the laws; the subsection does not ask in the alternative whether the President is in danger of being unable to execute the laws." *Id.* Consequently, Defendants' attempt to rely on aberrational violence in June to establish the existence of an emergency in September "runs aground on the so-called surplusage canon—the presumption that each word Congress uses is there for a reason." *Advocate Health Care Network v. Stapleton*, 581 U.S. 468, 477 (2017).

Defendants argue that "it would be perverse to effectively fault the President for *waiting* to authorize the Guard's deployment until late September . . . , rather than deploying the Guard immediately in June or July." Defs. Pre-Trial Mem., ECF 115 at 24 (emphasis in original). But Defendants ignore the nature of the calling forth power. It is not simply another tool in the executive's federal law enforcement toolbox that he may pull out at any time to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3. It is the wielding of an entirely different kind of power, the military power, of which the Founders "always asserted and enforced the subordination . . . to the civil arm." *Ex parte Milligan*, 71 U.S. at 37. Indeed, since the Founding, Americans have had a "traditional insistence on limitations on military operations in peacetime." *Laird*, 408 U.S. at 15. This tradition runs through 10 U.S.C. § 12406, through which Congress delegated to the President a power reserved for "unusual and extreme exigencies." *Newsom*, 141 F.4th at 1051. In the absence of such an exigency, the President lacks statutory authority.

PAGE 80 – FINDINGS OF FACT & CONCLUSIONS OF LAW
**A084**

*Second*, regarding the "surge" of federal law enforcement officers to the Portland ICE facility following the outbreak of violence in June, the success of federal law enforcement officers from FPS, ICE, and Customs and Border Patrol in "quelling . . . the disorder" and "prevent[ing] . . . its continuance" in the subsequent three months, *id.* (internal quotations omitted), further supports this Court's conclusion that the President was *able* "with the regular forces to execute the laws of the United States," 10 U.S.C. § 12406(3). The following observation that this Court made at the preliminary stage rings even truer now in light of Defendants' downward correction of the number of federal law enforcement officers actually deployed at the Portland ICE building on any given day: allowing any reallocation of federal personnel, "which is a routine aspect of law enforcement activity," to justify a callout under Section 12406(3) would permit "the President [to] send military troops virtually anywhere at any time." *Oregon v. Trump*, No. 25-cv-1756, 2025 WL 2817646, at *11 (D. Or. Oct. 4, 2025).

Certainly, there is a point at which an influx of federal law enforcement officers is no longer feasible or sustainable, but as the above discussion of the original meaning of the calling forth power reveals, reaching this point requires more than simply finding that military aid "would be helpful," which would seem to be the case always. 10/30/25 Tr. 545:13–17. Instead, as the Founders understood it, the power "[t]o provide for calling forth the Militia to execute the Laws of the Union," U.S. Const. art. I, § 8, cl. 15, did not permit domestic military deployment as long as "the civil power was sufficient." Elliot, *Virginia Ratification Debates*, at 384 (statement of James Madison); *see also id.* at 400 (statement of Edmund Randolph) ("Does [this clause] provide that the laws are to be enforced by military coercion in all cases? No, sir. All that we are to infer is, that when the civil power is not sufficient, the militia must be drawn out."). This historical understanding is bolstered by Congress's earliest delegations of this power to the

President, which required opposition to federal law "too powerful to be suppressed by the ordinary course of judicial proceedings, or by the powers vested in the marshals." Militia Act of 1792, ch. 28, § 2, 1 Stat. 264, 264; Militia Act of 1795, ch. 36, § 2, 1 Stat. 424, 424.

And here, the temporary surge of approximately 80 federal officers in response to the violence in June, which quickly tapered off to a steady state of around 30 additional officers— and which further tapered off to generally 20 additional officers in September prior to the President's September 27, 2025 federalization order, *see* Ex. 773—does not begin to approach a situation in which "the civil power is not sufficient." Elliot, *Virginia Ratification Debates*, at 384 (statement of James Madison). FPS Deputy Regional Director R.C. testified that based on officers' longer 10-hour and 12-hour shifts, as opposed to the usual 8-hour shifts, and the mental toll of protesters' using "racial slurs," he did not believe that it was "sustainable to surge this many FPS officers to Portland." 10/30/2025 Tr. 396:5–398:9. But even accepting R.C.'s testimony that the *FPS* deployment was unsustainable, the subsequent deployment of over a hundred federal law enforcement officers from other agencies in the days after the President's September 27, 2025 federalization order show that law enforcement resources from Customs and Border Patrol, the Bureau of Prisons, and other law enforcement agencies were available between June and September 27, 2025. In short, the civil power was more than sufficient.

The one historical example of the President explicitly invoking 10 U.S.C. § 12406(3)—or technically, its predecessor statutes with identical language—provides further support for the magnitude of "staffing difficulties" required before the President may invoke Section 12406(3). *Oregon v. Trump*, 2025 WL 3008050, at *29–31 (Graber, J., dissenting); *see Noel Canning*, 573 U.S. at 525 ("[The Supreme] Court has treated practice as an important interpretive factor even when the nature or longevity of that practice is subject to dispute, and even when that practice

began after the founding era."). Defendants note that in this singular invocation of Section

12406(3) in the twentieth century, President Nixon "called forth the National Guard to ensure the

mail was delivered when postal workers went on strike." Defs. Post-Trial Br., ECF 131 at 8. But

Defendants do not mention that this strike involved "over a quarter of all national postal

workers," which "caused the whole postal system to become inoperable." *Newsom v. Trump*, No.

25-3727, 2025 WL 2977104, at *13 (9th Cir. Oct. 22, 2025) (Berzon, J., regarding the denial of

rehearing en banc) (internal quotations omitted); *see* Exec. Order No. 11,519, 35 Fed. Reg. 5003

(Mar. 24, 1970) ("[T]he breakdown of the postal service in the numerous areas affected by the

said unlawful work stoppage is a matter of grave national concern"); *see Oregon v. Trump*, 2025

WL 3008050, at *27 (Graber, J., dissenting) ("akin to a modern-day shutdown of the internet").

*Third*, at trial, the parties hotly contested to what extent local law enforcement, namely

the PPB, has responded to criminal conduct outside the Portland ICE facility. As an initial

matter, Defendants do not dispute that under the Tenth Amendment, Oregon "has the right,

pursuant to the anticommandeering rule, to refrain from assisting with" "the federal

government's immigration enforcement efforts." *United States v. California*, 921 F.3d 865, 876,

890–91 (9th Cir. 2019) (upholding California's sanctuary law "limit[ing] law enforcement's

'discretion to cooperate with immigration authorities,'" including "'[a]ssisting immigration

authorities' in certain activities" (first quoting Cal. Gov't Code § 7282.5(a); and then quoting *id.*

§ 7284.6(a)(1))). Rather, they contend that PPB's implementation of Oregon's sanctuary law

hamstrung federal officers' ability to execute federal law. But the trial evidence demonstrated

just the opposite. PPB established policies that allowed them to be a helpful partner in addressing

crime that occurred at the protests. For example, from June 17 to September 27, 2025, PPB

maintained an open line of communication with federal law enforcement and consistently

responded to requests for assistance when PPB resources permitted. On June 15, 2025, PPB

Assistant Chief Dobson instructed officers to address "both misdemeanor and felony-level

crimes on and near the ICE facility," and PPB officers made several such arrests in the ensuing

days. Ex. 770 at 2–3. It is true that PPB has not removed debris from the Portland ICE driveway

because it has interpreted such activity as prohibited by Oregon's sanctuary law, but such

inaction by PPB is, at most, "minimal interference with the execution of [federal] laws."

*Newsom*, 141 F.4th at 1051.[21]

    *Fourth*, Defendants rely on a generalized "prevention of violence" that "will be enhanced

through the federalization of Guardsmen," without distinguishing between violence toward

federal personnel and violence between protesters and counter-protesters. Defs. Pre-Trial Br.,

ECF 115 at 23. As discussed above, the former seldom occurred after mid-June, and after that

time, the latter constituted the majority of violent incidents outside the Portland ICE building.

Such violence between protesters and counter-protesters has little to no bearing on whether

federal officers were able to execute federal immigration laws in Portland, Oregon. Defendants

are correct that *Newsom* relied on "common sense," *id.* at 26, in finding that violence directed

toward federal officers was evidence of "protesters' interference with the ability of federal

officers to execute the laws." 141 F.4th at 1052. But the same common sense does not apply to

---

[21] The occasional friction between PPB and federal law enforcement due to Oregon's sanctuary law stands in stark contrast to Civil Rights era examples of National Guard deployments to respond to state defiance of federal Civil Rights laws. *See Newsom v. Trump*, 2025 WL 2977104, at *12 (Berzon, J., regarding the denial of rehearing en banc) (describing how "Presidents Eisenhower, Kennedy, and Johnson federalized the National Guard at various points during the civil rights era when state law enforcement made clear that it would not enforce federal orders, and, in some cases, openly tried to prevent enforcement"). Although these federalizations occurred under the Insurrection Act, "[i]n each of these cases, because regular law enforcement refused to perform their duties, federalization of the National Guard was necessary to execute federal law." *Id.* PPB's failure to clear debris does not approach this level of obstruction.

assaults between protesters that do not involve federal officers. It is unclear how such violence obstructs federal officers in any way, aside from the occasional minimal encroachment on their time and attention, especially when considering such crimes fall under the purview of "general police power of the sort retained by the States." *United States v. Lopez*, 514 U.S. 549, 567 (1995).

Such a scenario of sending the National Guard as a response to commonplace crimes was precisely what the Founders feared would be misread in the Militia Clauses' "to execute the Laws of the Union." When Patrick Henry stoked fear that if "the militia were to be called forth to execute the laws," then "[t]he sheriff will be aided by military force," Elliot, *Virginia Ratification Debates*, at 387, James Madison assured him that "[t]he civil officer is to execute the laws on all occasions; and, if he be resisted, this auxiliary power is given to Congress of calling forth the militia to execute them, when it shall be found absolutely necessary," *id.* at 392. Edmund Randolph made the point even more explicit, that as to Patrick Henry's suggestion that "the militia are to be called forth to arrest petty offenders against the laws[,] [o]ught not common sense to be the rule of interpreting this Constitution?" *Id.* at 400. Again, the statutory progenitors to Section 12406(3) mandated that the exigency overcome "the marshals." Militia Act of 1792, ch. 28, § 2, 1 Stat. 264, 264; Militia Act of 1795, ch. 36, § 2, 1 Stat. 424, 424.

*Fifth*, Defendants cite violence that occurred after the President's September 27, 2025 federalization order and events that occurred in other states, such as in Texas and Illinois, to justify the President's callout. Defs. Pre-Trial Br., ECF 115 at 27. Whatever modicum of relevance these events have to whether the President had a colorable basis to deploy the National Guard to Portland, Oregon, on September 27, 2025, they do not move the needle. *Henderson v.*

*Kennedy*, 253 F.3d 12, 19 (D.C. Cir. 2001) (noting that adding together "two untenable claims" does not make "a tenable one" because "in law as in mathematics zero plus zero equals zero").

In summary, this Court concludes that the President did not have a colorable basis to invoke 10 U.S.C. § 12406(3) when he federalized the National Guard on September 27, 2025.[22]

### b. Section 12406(2)

Defendants also argue that the President's federalization of the National Guard on September 27, 2025 was valid under 10 U.S.C. § 12406(2). Although this Court is bound by *Newsom* with respect to subsection three, the Ninth Circuit expressly did "not reach the other condition invoked by the President . . . concerning 'rebellion.'" 141 F.4th at 1051. This Court therefore must interpret subsection two to resolve this claim. The statute provides:

> Whenever . . . there is a rebellion or danger of a rebellion against the authority of the Government of the United States . . . the President may call into Federal service members and units of the National Guard of any State in such numbers as he considers necessary to . . . suppress the rebellion.

10 U.S.C. § 12406(2).

"[S]tatutory interpretation must 'begi[n] with,' and ultimately heed, what a statute actually says." *Groff v. DeJoy*, 600 U.S. 447, 468 (2023) (quoting *Nat'l Assn. of Mfrs. v. Dep't of Def.*, 583 U.S. 109, 127 (2018)) (second alteration in *Groff*); *see also Eleri v. Sessions*, 852 F.3d 879, 882 (9th Cir. 2017) ("A question of statutory interpretation begins with the plain language

---

[22] The parties do not distinguish between the deployment of the already federalized California National Guardsmen from the federalization of the Oregon and Texas National Guardsmen in discussing the legality of the President's deployments to Oregon. However, the statute is clear that even if the California National Guardsmen may currently be validly federalized under 10 U.S.C. § 12406(3) for deployment *in California*, the plain text of the statute only permits them to be deployed to "execute those laws" that the President was "unable with the regular forces to execute." Therefore, these Guardsmen cannot proceed to enforce other laws in other states that have no connection to their initial federalization. And thus, the parties are correct to assume that if the President violated Section 12406(3) when he federalized the Oregon and Texas National Guards, he also violated the statute when he deployed the California National Guard to Oregon.

of the statute." (internal quotations omitted)). Rebellion is not defined in the statute, however, so this Court must "look to the language's ordinary meaning" to determine what the statute says.[23] *Tomczyk v. Garland*, 25 F.4th 638, 644 (9th Cir. 2022). However, "statutory terms can carry meanings that depart from their ordinary ones." *Feliciano v. Dep't of Transportation*, 605 U.S. 38, 45 (2025). "Congress may, for example, . . . employ a term of art with long-encrusted connotations in a given field." *Id.* As explained further below, the ordinary meaning of rebellion is an organized group engaged in sustained, armed hostilities for the purpose of overtaking an instrumentality of government by unlawful or antidemocratic means. That ordinary meaning is only buttressed by the term's "historical and governmental contexts" in the late 1800s and early 1900s. *Biden v. Nebraska*, 600 U.S. 477, 512 (2023) (Barrett, J., concurring) (quotation omitted); *see also Waetzig v. Halliburton Energy Servs., Inc.*, 604 U.S. 305, 318 (2025) ("[O]ur reading . . . is buttressed by the historical context in which the [law] was enacted.").

### i. Ordinary Meaning

"To determine ordinary meaning," courts "consider dictionary definitions." *United States v. Cox*, 963 F.3d 915, 920 (9th Cir. 2020). However, "words generally should be 'interpreted as taking their ordinary, contemporary, common meaning . . . at the time Congress enacted the statute,'" *Wis. Cent. Ltd. v. United States*, 585 U.S. 274, 284 (2018) (quoting *Perrin v. United*

---

[23] This Court's prior definitions of rebellion from its October 4 TRO opinion and its November 11 preliminary injunction opinion are not the law of the case. The "general rule" is that "decisions at the preliminary injunction phase do not constitute the law of the case." *Ranchers Cattlemen Action L. Fund United Stockgrowers of Am. v. U.S. Dep't of Agr.*, 499 F.3d 1108, 1114 (9th Cir. 2007); *see also* Wright & Miller Fed. Prac. & Proc. § 4478.5 ("Preliminary or tentative rulings do not establish law of the case."). The law of the case doctrine also "does not preclude a court from reassessing its own legal rulings in the same case." *Askins v. U.S. Dep't of Homeland Sec.*, 899 F.3d 1035, 1042 (9th Cir. 2018). The doctrine instead applies "most clearly where an issue has been decided by a higher court," *id.*, which has not occurred here. Since this Court's prior rulings, other federal courts have weighed in on what subsection two means. As such, this Court finds it both appropriate and advantageous to reexamine the definition of the term rebellion.

*States*, 444 U.S. 37, 42 (1979)). As explained above, Section 12406 was not enacted "on a blank

slate." *See Newsom*, 141 F.4th at 1047 (describing precursor statutes). The first time the phrase

"rebellion against the authority of the Government of the United States" appears in a delegation

of Congress's constitutional calling forth power is in the Militia Act of 1903. *See* Pub. L. No. 57-

33, §§ 1, 4, 32 Stat. 775, 775–76. Therefore, this Court consults dictionary definitions from the

late 1800s and early 1900s to discern ordinary meaning.

Legal dictionaries from the relevant period define rebellion as:

> Deliberate, organized resistance, by force and arms, to the laws and operations of the government, committed by a subject.

> Rebellion, Black's Law Dictionary (1st ed. 1891).

> The taking up of arms traitorously against the government; the forcible opposition and resistance to the laws and process lawfully installed. If the rebellion amounts to treason, it is punished by the laws of the United States with death. If it be a mere resistance of process, it is generally punished by fine and imprisonment.

> Rebellion, The Cyclopedic Dictionary of Law (1901).

Common-use dictionaries share several attributes with these legal definitions:

> 1.    An open and avowed renunciation of the authority of the government to which one owes allegiance; or the taking of arms traitorously to resist the authority of lawful government; revolt. Rebellion differs from insurrection . . . . Insurrection may be a rising in opposition to a particular act or law, without a design to renounce wholly all subjection to the government. Insurrection may be, but is not necessarily, rebellion.

> 2.    Open resistance to lawful authority.

> Rebellion, American Dictionary of the English Language (1900).

> 1.    The act of rebelling; open and avowed renunciation of the authority of the government to which one owes obedience, and resistance to its officers and laws, either by levying war, or by aiding others to so; an organized uprising of subjects for the purpose of coercing or overthrowing their lawful rule or government by force; revolt; insurrection.

2.  Open resistance to, or defiance of, lawful authority.

Rebellion, Webster's International Dictionary of the English Language (1903).

From these definitions, Defendants add that rebellions include "open resistance or opposition to an authority or tradition" and "disobedience of a legal command or summons." *See* ECF 131 at 4 (quoting Black's Law Dictionary (12th ed. 2024) (brackets omitted)). However, "[a] word in a statute may or may not extend to the outer limits of its definitional possibilities." *Dolan v. U.S. Postal Serv.*, 546 U.S. 481, 486 (2006). Rebellion does not so far extend in Section 12406, because "the Government's literal sweep . . . sits uncomfortably with common usage." *See Abuelhawa v. United States*, 556 U.S. 816, 820 (2009). We do not call the 300,000 Americans who participated in the March on Washington rebels, even though they openly opposed the tradition of legal segregation. *See* JILL LEPORE, THESE TRUTHS 609–10 (2018) (hereinafter "LEPORE"). Nor do we refer to the movement in high schools to don black armbands in opposition to the Vietnam War a rebellion. *See Tinker v. Des Moines Indep. Comm. Sch. Dist.*, 393 U.S. 503, 504 (1969); *see also id.* at 513 ("Freedom of expression would not truly exist if the right could be exercised only in an area that a benevolent government has provided as a safe haven."). And when Congress passed the Militia Act of 1903, it certainly did not have in its sights Elizabeth Cady Stanton and attendees of the 1848 Seneca Falls Convention, even though their Declaration of Sentiments, which demanded women's right to vote, "echoed the Declaration of Independence" by "declar[ing] the causes which impel[led] them to the separation." *See* LEPORE at 257 (quotations omitted). In the ordinary meaning, a rebellion is something more than these mere shows of discontent with law, policy, or government. Four additional features are common among the contemporaneous dictionary definitions above:

*First*, a rebellion is organized. *See* Rebellion, Webster's International Dictionary of the English Language (1903) ("an organized uprising of subjects"); Black's Law Dictionary (1st ed. 1891) ("organized resistance"). To be organized is to be "arrange[d] or constitute[d] in parts, each having a special function." Organize, Webster's Revised Unabridged Dictionary (1913); *see also* Organize, American Dictionary of the English Language (1900) ("to form, as an organized body: to arrange").

*Second*, and relatedly, because a single person cannot be arranged or constituted in parts, a rebellion must be made up of multiple people. Defendants' definition ("open resistance or opposition") stretches beyond ordinary meaning because under it, a single protester could, by herself, constitute a rebellion. In context, "organization" refers to coordination, whether in physical movement or ideological cause.

*Third*, the group must take up arms collectively. *See* The Cyclopedic Dictionary of Law (1901) ("taking up of arms traitorously"); American Dictionary of the English Language (1900) ("taking of arms traitorously"); Black's Law Dictionary (1st ed. 1891) ("by force and arms"). As explained, a rebellion's "organization" requires collective movement. Thus, the group must be *collectively* armed. A protest therefore does not "become a rebellion merely because of sporadic and isolated incidents of unlawful activity or even violence committed by rogue participants in the protest." *Illinois v. Trump*, 2025 WL 2937065, at *6. Nor does a protest become a rebellion when individual protesters "exercise their Second Amendment right to carry firearms as the law currently allows." *Id.* Rather, a rebellion occurs when the group itself takes up arms in some sort of collective or organized fashion.

That taking up of arms must also be aggravated and not easily quelled. It must be sustained. Indeed, some definitions explicitly recognize that a rebellion is the equivalent of

"levying war." *See* Rebellion, Webster's International Dictionary of the English Language

(1903). It would belie common usage to call a violence that can be immediately quelled by

authorities, war. War is "to carry on hostilities; to be in a state of violence." Webster's Revised

Unabridged Dictionary (1913); *see also* War, American Dictionary of the English Language ("a

state of opposition or contest").

 *Fourth*, the common purpose of a rebellion is to overtake an instrumentality of

government by unlawful or antidemocratic means. *See* Rebellion, Webster's International

Dictionary of the English Language (1903) ("an organized uprising of subjects for the purpose of

coercing or overthrowing their lawful rule or government by force; revolt; insurrection"); The

Cyclopedic Dictionary of Law (1901) ("taking up of arms traitorously against the government;

the forcible opposition and resistance to the laws and process lawfully installed"); American

Dictionary of the English Language (1900) ("open and avowed renunciation of the authority of

the government to which one owes allegiance . . . ; revolt."). That specific objective separates

rebellion from mere protests that resort to "civil disobedience." *See Illinois v. Trump*, 2025 WL

2937065, at *6.

 This characteristic is confirmed by the "specific context in which that language is used."

*See Yates v. United States*, 574 U.S. 528, 537 (2015). When it drafted Section 12406(2),

Congress did not use the word rebellion in isolation. Rather, rebellion is immediately followed,

and thus informed, by the phrase "against the authority of the Government of the United States."

10 U.S.C. § 12406(2). Turning again to ordinary meaning, authority is:

> 1. Legal or rightful power; a right to command or to act; power
> exercised [by] a person in virtue of his office or trust; dominion;
> jurisdiction; authorization; as, the authority of a prince over
> subjects, and of parents over children; the authority of a court.

2. Government; the persons or the body exercising power or command; as, the local authorities of the States; the military authorities.

Authority, Webster's Revised Unabridged Dictionary (1913).

In governmental law. Legal power; a right to command or to act; the right and power of public officers to require obedience to their orders lawfully issued in the scope of their public duties.

Authority, Rebellion, Black's Law Dictionary (1st ed. 1891).

In Governmental Law. The right and power which an officer has, in the exercise of a public function, to compel obedience to his lawful commands. A judge, for example, has authority to enforce obedience to his lawful orders.

Authority, The Cyclopedic Dictionary of Law (1901).

From these definitions, authority of the Government of the United States is the right of the government to require obedience to the law (and therefore, the lawful orders of public officers). A rebellion against the right of a governmental entity to enforce law is, put another way, a rebellion for the purpose of overtaking an instrumentality of government. *See Illinois v. Trump*, 2025 WL 2886645, at *15 (N.D. Ill. Oct. 10, 2025) ("[S]hould the dictionary definitions leave any doubt, the text of subsection (2) itself requires that the rebellion be against the authority of the Government of the United States." (quotation omitted)).

Accordingly, a rebellion is an organized group engaged in sustained, armed hostilities for the purpose of overtaking an instrumentality of government by unlawful or antidemocratic means. Section 12406(2) also discusses a "danger of rebellion." In 1903, a danger included

1.  Exposure to injury, loss, pain, or other evil.
2.  Domain; reach or power for harm.
3.  Hesitation; coyness; caution.

Danger, Webster's Unabridged (1865).

1.  Authority; jurisdiction; control.
2.  Power to harm; subjection or liability to penalty.
3.  Exposure to injury, loss, pain, or other evil; peril; risk;

insecurity.

4.        Difficulty; sparingness.

5.        Coyness; disdainful behavior.

Danger, Webster's Revised Unabridged Dictionary (1913).

A [hazard] or risk; insecurity; hence, power to hurt.

Danger, American Dictionary of the English Language (1900).

The ordinary meaning of danger is a hazard or risk. But "unquestionably the courts, in interpreting a statute, have some scope for adopting a restricted rather than a literal or usual meaning of its words where acceptance of that meaning would lead to absurd results or would thwart the obvious purpose of the statute." *C.I.R. v. Brown*, 380 U.S. 563, 571 (1965) (citation modified). Danger cannot have a meaning "so broad that it [becomes] inconsistent with" the other sections of the statute. *See Gustafson v. Alloyd Co.*, 513 U.S. 561, 575 (1995). The *Newsom* court called subsection (1) ("invasion") an "unusual and extreme exigenc[y]." *See* 141 F.4th at 1051. Without some limiting principle to "danger," subsection (2) would embrace ordinary criminal conspiracies and mine-run political unrest. It would also render subsection three superfluous: interpreting "danger of rebellion" to mean any remote risk would permit the President to federalize the National Guard upon an inkling of discontent expressed by lawful First Amendment activity that does not at all impede the execution of federal law. Such a broad reading of danger would "swallow subsection" three. *See Newsom*, 141 F.4th at 1051; *accord id.* at 1052 ("Congress would not go to the trouble of spelling out a list of terms if a neighboring term swallowed it up." (quoting *Fischer v. United States*, 603 U.S. 480, 490 (2024) (adopting alterations)).

The contextually appropriate definition of danger, then, must include some limiting principle. Here, that limit is temporal: a hazard is a "peril," *see* Hazard, Webster's Revised Unabridged Dictionary (1913), and "falls or comes suddenly," Webster's American Dictionary

of the English Language (1828). So too is a risk "an abrupt precipice, hence danger." *See* Risk,

American Dictionary of the English Language (1900). Accordingly, there is a "danger" for

purposes of subsection (2) when there is an impending threat of a rebellion.

### ii. History and Tradition

History confirms this definition and the scope of Congress's delegation in

Section 12406(2). Defendants argue that a rebellion for purposes of Section 12406(2)

"encompasses . . . violent resistance to lawful enforcement of federal immigration law," and that

any definition of rebellion must embrace this "original historical precedent of violent opposition

limited to a particular federal law." Defs. Post-Trial Br., ECF 131 at 34, 5. But history does not

reflect Defendants' definition. As then-Judge Barrett observed on the Seventh Circuit, "rebellion

was a very specific crime" in the colonies. *See Kanter v. Barr*, 919 F.3d 437, 455 (7th Cir. 2019)

(Barrett, J., dissenting). It was "a traiterous taking up arms, or a tumultuous oppos[ition to] the

authority of the king . . . or supreme power in a nation" by individuals "bent on overthrowing"

the government. *Id.* (first quoting Rebellion, 2 New Universal Etymological English Dictionary

(4th ed. 1756)).

Rebellion remained a specific crime in the nineteenth century. Roughly forty years before

the term was incorporated into the Militia Act of 1903, delegates from South Carolina sparked

the largest rebellion in American history when it repealed the State's ratification of the

Constitution. LEPORE at 289. In February of 1861, Mississippi, Florida, Alabama, Georgia,

Louisiana, and Texas joined South Carolina and formed the Confederate States of America. *Id.*

The delegates of the seven seceding states adopted a new constitution "disavow[ing] the truths of

the Union," and founded their "new government." *Id.* at 290 (quotations omitted). The American

Civil War marked "four brutal, wretched years of misery," with casualties "on a scale never

before seen." *Id.* at 293. Addressing Congress in 1862, President Lincoln remarked: "Without

slavery the *rebellion* could never have existed; without slavery it could not continue." Abraham

Lincoln, Second Annual Address (Dec. 1, 1862).

In the aftermath, each branch of government referred to the Civil War as "the rebellion."

President Andrew Johnson, for example, granted a full pardon and amnesty for the offense of

treason "to persons who had been or were concerned in the late rebellion against the lawful

authority of the Government of the United States." Proclamation No. 179, Granting Full Pardon

and Amnesty for the Offense of Treason Against the United States During the Late Civil War,

December 25, 1868. The Supreme Court described confederate soldiers as "insurgents who have

risen in rebellion against their sovereign, expelled her Courts, established a revolutionary

government, organized armies, and commenced hostilities." *The Prize Cases*, 67 U.S. 635, 670

(1862); *see also Young v. United States*, 97 U.S. 39, 58 (1877) ("Beyond all doubt, the late

rebellion against the government of the United States was a sectional civil war."). Congress was

certainly aware of those "pre-existing judicial interpretations" of the term rebellion when it put

the word in the Militia Act of 1903. *Cf. United States v. Novak*, 476 F.3d 1041, 1051 (9th Cir.

2007) (en banc).

The next time Congress delegated its constitutional calling forth power, in the Militia Act

of 1903, it introduced the phrase "rebellion against the authority of the Government of the United

States." *See* Pub. L. No. 57-33, § 4, 32 Stat. 775, 775–76. Where Congress borrows a term of art

that has "accumulated the legal tradition and meaning of centuries of practice, it presumably

knows and adopts the cluster of ideas that were attached to [the] borrowed word in the body of

learning from which it was taken and the meaning its use will convey to the judicial mind."

*Morissette v. United States*, 342 U.S. 246, 263 (1952); *accord Sekhar v. United States*, 570 U.S.

729, 73233 (2013).

This does not mean that rebellion is synonymous with the Civil War. Congress surely reflected other historical rebellions in the definition, too. *Contra* Defs. Post-Trial Br., ECF 131. Start with the Whiskey Rebellion. Defendants characterize the Whiskey Rebellion as a "violent opposition limited to a particular federal law," and "civil disorder[ ]." ECF 131 at 5. But the Whiskey Rebellion was the "[s]ingle largest example of armed resistance to a law of the United States between the ratification of the Constitution and the Civil War." THOMAS P. SLAUGHTER, THE WHISKEY REBELLION 5 (1986). Opposition to a federal whiskey tax imposed in the wake of the Revolutionary War caused escalating violence in western Pennsylvania until excise officers were unable to collect taxes. ROBERT W. COAKLEY, THE ROLE OF FEDERAL MILITARY FORCES IN DOMESTIC DISORDERS 1789–1878, 28–33 (1988) (hereinafter COAKLEY). "The federal district court in the insurgent district was unable to sit, so that afterwards it was necessary for Congress to enact special legislation reviving suits and process which had been pending but were discontinued when the court was unable to sit." David E. Engdahl, *Soldiers, Riots, and Revolution: The Law and History of Military Troops in Civil Disorders*, 57 IOWA L. REV. 1, 49 n.237 (1971). The "judiciary was 'stripped of its capacity to enforce the laws.'" *Id.* (quoting Washington's Sixth Annual Address to Congress, Nov. 19, 1794, 1 Richardson, Messages Papers of the Presidents 162, 164 (1896)); *see also Duncan v. Kahanamoku*, 327 U.S. 304, 321 (1946) (recounting President Washington's address to the Commanding General that "the judge can not be controlled in his functions"). The conflict reached a boiling point when a group of 7,000 to 15,000 armed men gathered to resist the law. COAKLEY at 35–36. President Washington called forth the militia to put down the resistance. *Id.* In President Washington's view, the insurgents were committing "treason, . . . overt acts of levying war against the United States." Engdahl,

*Soldiers, Riots, and Revolution*, 57 Iowa L. Rev. at 49 n.237 (quoting Presidential Proclamation, Aug. 7, 1794, 4 Ann. of Cong. 1412).

Shays's Rebellion also fits this Court's definition of rebellion. In 1786, Daniel Shays organized 15,000 rebels (or "Shaysites," as they called themselves) around the common purpose of "annihilat[ing] all debts public and private." *See* Akhil Amar, The Words that Made Us 298300 (2021) (hereinafter "Amar"). The Shaysites resorted to mob violence to shut down colonial courts and advance a scheme of "unfunded paper money." *Id.* 300. They "blockad[ed] courthouses and seiz[ed] a federal armory." *See* Lepore at 116. "If the Shaysites prevailed, creditors who had lent out hard currency and bargained for repayment in the same coin would be forced to accept worthless paper" and the colonial courts would be incapable of collecting real currency. Amar at 30001. When the Governor of Massachusetts deployed the militia to quell the rebellion, the "great objects" of their mission were to "protect the judicial courts, to assist the civil magistrates in executing the laws, and to aid them in apprehending the disturbers of the public peace." *Duncan*, 327 U.S. at 320 (citation modified).

In 1799, John Fries advanced a similar scheme to seize tax collectors. *See generally* W.W.H. Davis, The Fries Rebellion 15 (1899). Fries organized regular meetings of farmers discontent with a tax levied during the Quasi-War between the United States and France. *Id.* at 1424. Fries convinced the federal-appointed tax assessor to resign while his insurgents marched towards Quakertown, Pennsylvania. *Id.* at 2937. The U.S. Marshal began issuing arrests for tax resistance. *Id.* at 4856. Then, two groups of rebels hijacked the Marshal's prisoners and freed the tax resisters. *Id.* at 5766. Calling forth the militia, President Adams called the rebellion a "combination[ ] to defeat the execution of the laws" amounting to "overt acts of levying war against the United States" of which "well-affected citizens" and "executive officers" could not

quell. John Adams, Proclamation No. 9, Law and Order in the Counties of Northampton,

Montgomery, and Bucks, in the State of Pennsylvania (March 12, 1799). Just as with the

perpetrators of the Whiskey Rebellion, the Shaysites and Fries's cadre were organized groups

engaged in armed hostilities for the common purpose of overtaking an instrumentality of

government (federal courts and the system of national currency) by violent, antidemocratic

means.

　　　　Describing the three tax rebellions to Thomas Jefferson, John Adams said:

> [Y]ou never felt the Terrorism of Chaises [Shays] Rebellion in
> Massachusetts. I believe you never felt the Terrorism of Gallatins
> Insurrection [the Whiskey Rebellion] in Pensilvania: you certainly
> never reallized the Terrorism of Fries's, most outragious Riot and
> Rescue, as I call it, Treason, Rebellion as the World and great Judges
> and two Juries pronounced it. you certainly never felt the Terrorism,
> excited by Genet, in 1793. when ten thousand People in the Streets
> of Philadelphia, day after day, threatened to drag Washington out of
> his House, and effect a Revolution in the Government, or compell it
> to declare War in favour of the French Revolution, and against
> England. The coolest and the firmest Minds, even among the
> Quakers in Philadelphia, have given their opinions to me, that
> nothing but the yellow Fever . . . could have Saved the United States
> from a total Revolution of Government.

Letter from John Adams to Thomas Jefferson (June 30, 1813). Defendants' characterization of

these historical rebellions as violent oppositions limited to a particular federal law minimizes

grossly the level of coordination between the participants and ignores entirely their common

purpose to seize an instrumentality of the federal government. Founding-era Presidents did not

call forth the National Guard because the tax rebellions were violent protests against one federal

law. They called forth the National Guard because the tax rebellions were sustained, organized,

armed hostilities aimed at—and capable of—overthrowing the new Government.

　　　　For purposes of Section 12406(2), a rebellion is an organized group engaged in sustained,

armed hostilities for the purpose of overtaking an instrumentality of government by unlawful or

antidemocratic means. There is a danger of rebellion where an armed group organized for the purpose of overtaking an instrumentality of government by unlawful or antidemocratic means has the actual power to harm the government by waging armed warfare.

### iii. Application

Based on the facts on the ground outside the Portland ICE building throughout the relevant time period between the outbreak of protests in June and the President's federalization order on September 27, 2025, this Court holds that the President did not have a colorable basis to invoke Section 12406(2) when he ordered the federalization of the Oregon National Guard. Because the statute permits the President to federalize the Guard upon either a rebellion or a danger of rebellion, the question here is whether the conditions predating the President's September 27th federalization constituted at least a danger of a rebellion.

Again, the answer is no. The protesters at the ICE Facility were not organized. Further, evidence at trial does not support that the protesters acted with the common purpose of overtaking the Portland ICE facility by unlawful or antidemocratic means. Nor did the trial evidence demonstrate that the protesters ever had the actual power to harm the government by waging armed warfare—on June 14 or otherwise. Defendants point to Commander Schoening's riot declaration on June 14, two PPB reports from June 12 and 13, and one PPB incident report from July 4 to argue that violent agitators, many of whom were organized, specifically targeted federal personnel and buildings to impede enforcement.

But none of these days satisfied the features of a "rebellion." Start with whether the protesters were organized. Commander Schoening testified that, unlike the marches downtown opposing immigration, there was no group in charge of the protest activity at the Portland ICE facility. With thirteen years of experience policing in Portland and at least eight working for PPB's Rapid Response Team, Commander Schoening also testified that, at least in Portland,

"Antifa" is not an organized group and is a term frequently misused. Although passing references to "Antifa" ascribe ideology to a few protesters at the ICE facility, there is no evidence corroborating that ideology, or demonstrating leadership or differentiation among protesters based on this label. Similarly, this Court does not give considerable weight to what Commander Schoening called organic organization, from which an observer could infer de minimis organization among protestors, such as protestors wearing black bloc. This Court had the opportunity to evaluate Commander Schoening's demeanor and testimony and found it to be highly credible and affords it great weight.

Further, this Court heard no testimony that protesters were collectively armed. In the three months of ICE Facility protests, law enforcement confirmed the presence of only six projectile weapons, four of which were guns. The individuals who brought these weapons to the protests never brandished or used their weapons in any way, spare one incident in October post-dating the President's federalization of the National Guard. Each of these protesters brought their weapons on different days, suggesting a lack of organization or common plan to brandish the weapons in a collective manner. Although short-range weapons, such as knives and pepper spray, were occasionally present at the protests, a very small minority of protesters carried these kinds of weapons and there is similarly no evidence that protesters brandished these weapons in a unified front. The same is true with respect to the "sticks and bats" this Court heard brief testimony about. There is only evidence of one incident involving a protester using a stick to hit a federal officer. Otherwise, no evidence was presented that they were brandished or used in any sort of menacing way. Indeed, none of the witnesses seemed to have any idea what happened to the sticks or bats.

June 14, the day PPB declared a riot, is the closest protesters got to "levying war" on the
ICE Facility. Some protesters threw rocks at the facility, which struck ICE officers. There is no
evidence that June 14 was anything more than a spontaneous event, and moreover it appears that
a majority of protesters that day were nonetheless nonviolent. In that way, June 14 similarly
lacks the organization and collective arming required to constitute a rebellion. Setting those
defects aside, though, there is no evidence in the record that the chaos of June 14 ever occurred
again. PPB, FPS, and other law enforcement arrested protesters who broke the law that day, and
they continued to do so throughout the summer of 2025. Unlike the historical rebellions where
the President federalized the National Guard, local and federal law enforcement quelled the
violence of mid-June.

Even more detrimental to Defendants' argument for rebellion is that there is no evidence
that the protesters outside the Portland ICE building acted with a purpose to overtake an
instrumentality of government by unlawful or antidemocratic means. To be sure, the sporadic
incidents of violence and crime at the Portland ICE facility are unlawful. But the Court received
no evidence that there was a collective purpose animating that criminality—e.g., to supplant
federal authority in any manner.

Defendants also argue that creating life-threatening dangers for federal officers enforcing
federal law (as well as bystanders) and targeting federal employees for their work performing
federal functions surely amounts to a dangerous risk of rebellion. The first half of that argument
goes too far. If a life-threatening danger to a federal officer alone created the risk of rebellion,
then it would seem the President could call up the National Guard every day. Officers in the FBI,
DHS, HSI, TSA, and countless other agencies encounter life-threatening dangers by trade. In any
event, Defendants overstate the degree of physical danger they faced at the ICE facility. In the

months preceding the President's federalization, there were sporadic and isolated incidents of violence that did not cause serious injuries to federal officers.

Neither does the online targeting of federal employees—doxing and harassment, although reprehensible—cannot alone create a danger of rebellion in this case. First, rebellion is an inherently physical action. Purely online action might constitute a danger of rebellion, but it ought to demonstrate clearly evidence of preparation, coordination, or other planning. The online "doxers" did some coordination by circulating a post discussing the location of federal officers. And one "doxer" also honked and jeered at an ICE officer by the Oregon and Washington border, around nine miles North of the ICE Facility. Even assuming that this real-life activity is sufficient evidence of danger, however, Defendants presented no credible evidence that this danger is connected to the demonstrators at the ICE Facility. The doxing posters Defendants mention in evidence (and did not testify about at trial) were put up in locations around the city far from the ICE Facility, and Defendants put forth no evidence connecting any single demonstrator to those posters.

Finally, it is telling that all of Defendants' evidence of danger predates July 5—more than two months prior to the President's federalization of the National Guard. To be sure, more evidence of coordination existed in June, such as protesters donning black bloc. But that evidence, nonetheless scant, dissipated after July 4. And the President did not call out the National Guard in response to the disturbances outside the Portland ICE facility in June or July. He federalized the Oregon National Guard on September 27. In short, this Court concludes that the President did not have a colorable basis to invoke 10 U.S.C. § 12406(2) when he federalized and deployed the National Guard to the Portland ICE building in Oregon.

### c. Tenth Amendment

Defendants' deployment of unlawfully federalized National Guard troops to Oregon also violated the Tenth Amendment. Under the Tenth Amendment, "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." As discussed above with respect to standing, Defendants' federalization and deployment of the Oregon National Guard commandeered these state officers to enforce a federal law enforcement program at the Portland ICE facility, in violation of the Tenth Amendment. *Printz*, 521 U.S. at 935. And as to the federalized California and Texas National Guards, these deployments involve the intrusion of California and Texas National Guardsmen in their capacity as militiamen of those States, in violation of Oregon's "sovereignty under the Constitution," and Oregon's "*equal* sovereignty among the States." *Shelby County*, 570 U.S. at 544 (internal quotations omitted) (emphasis in original). *See Alden v. Maine*, 527 U.S. 706, 748 (1999) ("Although the Constitution grants broad powers to Congress, our federalism requires that Congress treat the States in a manner consistent with their status as residuary sovereigns and joint participants in the governance of the Nation.").

### 2. Remaining Permanent Injunction Factors

In addition to actual success on the merits, to obtain a permanent injunction, Plaintiffs must show "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Oppenheimer & Co. Inc. v. Mitchell*, 135 F.4th 837, 850 (9th Cir. 2025) (quoting *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)). Where the party opposing injunctive relief is the government,

"the third and fourth factors—the balance of equities and the public interest—merge." *Garcia v. County of Alameda*, 150 F.4th 1224, 1234 (9th Cir. 2025) (internal quotations omitted).

Plaintiffs have demonstrated each of these remaining requirements. Plaintiffs have shown irreparable harm because prevailing on a constitutional claim "will almost always demonstrate [the plaintiff] is suffering irreparable harm as well." *Baird v. Bonta*, 81 F.4th 1036, 1042 (9th Cir. 2023). For both constitutional harms that Oregon suffers from the deployment of its own National Guardsmen and the Guardsmen of other states, "there is no adequate legal remedy, such as an award of damages." *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014); *see also id.* ("Because intangible injuries generally lack an adequate legal remedy, intangible injuries may qualify as irreparable harm." (brackets and internal quotations omitted)). And Plaintiffs' "success on the merits of a constitutional claim also tips the merged third and fourth factors decisively in [their] favor." *Baird*, 81 F.4th at 1042; *see also id.* ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights." (quoting *Riley's Am. Heritage Farms v. Elsasser*, 32 F.4th 707, 731 (9th Cir. 2022))). "The government also 'cannot reasonably assert that it is harmed in any legal cognizable sense by being enjoined from constitutional violations.'" *Id.* (quoting *Zepeda v. INS*, 753 F.2d 719, 727 (9th Cir. 1983)).

## CONCLUSION

For the above reasons, this Court concludes that Plaintiffs have demonstrated that Defendants violated 10 U.S.C. § 12406 and the Tenth Amendment and satisfy the requirements for a permanent injunction. Therefore, this Court **PERMANENTLY ENJOINS** Defendants[24] Pete Hegseth, the U.S. Department of Defense, Kristi Noem, and the U.S. Department of

---

[24] As this Court may lack jurisdiction to enjoin President Trump in the performance of his official duties, *see Franklin v. Massachusetts*, 505 U.S. 788, 802–03 (1992) (plurality opinion); *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 501 (1866), this injunction applies only against the other Defendants.

Homeland Security from implementing the following memoranda federalizing and deploying members of the National Guard in Oregon:

1. Defendant Secretary Hegseth's September 28, 2025 Memorandum federalizing and deploying the Oregon National Guard, Ex. 1051;

2. Defendant Secretary Hegseth's October 5, 2025 Memorandum federalizing and deploying the Texas National Guard, to the extent that it deploys members of the Texas National Guard in Oregon, Ex. 6;

3. Defendant Secretary Hegseth's October 16, 2025 Memorandum to the extent that it authorizes the deployment of federalized members of the California and Texas National Guards to Oregon, Ex. 2; and

4. any memoranda deploying members of any other State's National Guard to Oregon based on the same predicate conditions that were relied upon to authorize the above orders.

This Court retains jurisdiction pursuant to the All Writs Act, 28 U.S.C. § 1651, to enforce the terms of this permanent injunction against any party.

This Court **STAYS IN PART** this Partial Final Judgment to the extent that it enjoins the federalization of members of any State's National Guard. With respect to the federalization of the Oregon National Guard, that **STAY** will be in effect for a period of 14 days. This partial administrative stay "preserves the status quo in which National Guard members have been federalized but not deployed." Order at 6, *Oregon v. Trump*, No. 25-6268, ECF 90 (9th Cir. Oct. 30, 2025). However, with respect to the deployment of any state's National Guard to Oregon, based on any of the above orders, **THIS PERMANENT INJUNCTION ORDER IS IN FULL FORCE AND EFFECT.**

**IT IS SO ORDERED.**


DATED this 7th day of November, 2025.


                              /s/ Karin J. Immergut
                              Karin J. Immergut
                              United States District Judge

**FOR PUBLICATION**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

---

STATE OF OREGON; CITY OF
PORTLAND,

        Plaintiffs - Appellees,

  v.

DONALD J. TRUMP, In his official
capacity as President of the United States;
PETER HEGSETH, In his official capacity
as Secretary of Defense; UNITED STATES
DEPARTMENT OF DEFENSE; KRISTI
NOEM, In her official capacity as Secretary
of Homeland Security; UNITED STATES
DEPARTMENT OF HOMELAND
SECURITY,

        Defendants - Appellants,

----------------------------------------

STATE OF CALIFORNIA,

        Intervenor - Pending.

No. 25-6268

D.C. No.
3:25-cv-01756-IM
District of Oregon,
Portland

**ORDER**

---

MURGUIA, Chief Judge:

The three-judge panel's administrative stay order entered on October 8,

2025, remains in effect pending further order of the en banc court. A copy of the

**A111**

administrative stay order is attached to this order.

**FOR PUBLICATION**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

**FILED**

OCT 8 2025

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| STATE OF OREGON and CITY OF PORTLAND, | No. 25-6268 |
| Plaintiffs - Appellees, | D.C. No. 3:25-cv-01756-IM District of Oregon, Portland |
| v. | |
| DONALD J. TRUMP, In his official capacity as President of the United States; et al., | ORDER |
| Defendants - Appellants. | |

Before: GRABER, R. NELSON, and BADE, Circuit Judges.

On September 28, 2025, Secretary Hegseth issued a memorandum authorizing the federalization and deployment of 200 Oregon National Guard service members (Memorandum). Plaintiffs, the City of Portland and the State of Oregon, filed a complaint seeking declaratory and injunctive relief, and moved for a temporary restraining order to enjoin the implementation of the Memorandum. *State of Oregon v. Trump*, No. 3:25-CV-1756, Dkt. 6 (D. Or. Sept. 29, 2025) (Dist. Ct. Dkt.). On October 4, the district court granted Plaintiffs' motion and issued a temporary restraining order enjoining implementation of the Memorandum. *Id.* at

Dkt. 56.  That same day, Defendants filed a notice of appeal, *id*. at Dkt. 57, and an

emergency motion under Circuit Rule 27-3, seeking an administrative stay of the

district court's October 4 order, and a stay of that order pending appeal.  Dkt. 11-

12.

On October 5, Plaintiffs filed an amended complaint and a second motion

seeking a temporary restraining order to enjoin Defendants from deploying

members of the California National Guard to Oregon.  Dist. Ct. Dkt. 58, 59.  The

district court granted Plaintiffs' motion and entered a second temporary restraining

order enjoining the "deploy[ment] [of] federalized members of the National Guard

in Oregon."  *Id*. at Dkt. 68.  Defendants have not appealed or challenged the

second temporary restraining order, and it is not before us.

In this order, we address only the emergency motion for an administrative

stay of the district court's October 4 temporary restraining order.  In a separate

order we have set argument on the motion for a stay pending appeal for October 9,

2025.  Dkt. 18.

An administrative stay is intended to "minimize harm while an appellate

court deliberates" and lasts "no longer than necessary to make an intelligent

decision on the motion for stay pending appeal."  *United States v. Texas*, 144 S. Ct.

797, 798-99 (2024) (Barrett, J., concurring); *see also Nken v. Holder*, 556 U.S. 418,

427 (2009) (explaining that the authority to enter an administrative stay "allows an

appellate court to act responsibly"). Given its limited nature, an administrative

stay "does not constitute in any way a decision as to the merits of the motion for a

stay pending appeal." *Doe #1 v. Trump*, 944 F.3d 1222, 1223 (9th Cir. 2019). And

we "defer weighing the *Nken* factors until the motion for stay pending appeal is

considered." *Nat'l Urb. League v. Ross*, 977 F.3d 698, 702 (9th Cir. 2020)

(footnote omitted).

"When considering the request for an administrative stay, our touchstone is

the need to preserve the status quo." *Id*. That inquiry necessarily depends "on the

facts of this case." *Id.* at 701. We ask what real-world effects would result "if an

administrative stay is put in place." *Id.*; *accord Doe #1*, 944 F.3d at 1223

(examining the practical effects of "granting the temporary stay request").

In the circumstances here, granting an administrative stay will best preserve

the status quo. Prior to the October 4 temporary restraining order, Oregon National

Guard members had been federalized but not deployed. The Memorandum

authorized federalization of the Oregon National Guard members. An

administrative stay of the October 4 temporary restraining order will maintain the

federalization of Oregon National Guard members, because that order prohibits

implementation of the Memorandum. Additionally, the second temporary

restraining order has not been challenged or appealed, and it prohibits the

deployment of National Guard members in Oregon. Thus, the effect of granting an

**A115**

administrative stay preserves the status quo in which National Guard members

have been federalized but not deployed.

**Administrative Stay GRANTED.**

1     IN THE UNITED STATES DISTRICT COURT

2      FOR THE DISTRICT OF OREGON

3       PORTLAND DIVISION

4

5 STATE OF OREGON, the CITY OF  )
PORTLAND, and the STATE OF   )
CALIFORNIA,        )

6              )
        Plaintiffs, ) Case No. 3:25-cv-01756-IM

7              )
        v.    )

8              ) October 29, 2025
DONALD TRUMP, in his official )

9 capacity as President of the )
United States; PETE HEGSETH,  )

10 in his official capacity as  )
Secretary of Defense; U.S.   )

11 DEPARTMENT OF DEFENSE;     )
KRISTI NOEM, in her official  )

12 capacity as Secretary of    )
Homeland Security; and U.S.   )

13 DEPARTMENT OF HOMELAND     )
SECURITY,         )

14             )
        Defendants. )

15 _____)

16

17

18

19       COURT TRIAL DAY 1

20     TRANSCRIPT OF PROCEEDINGS

21       MORNING SESSION

22   BEFORE THE HONORABLE KARIN J. IMMERGUT

23   UNITED STATES DISTRICT COURT JUDGE

24

25

Schoening - D

1    I would say on -- on some -- or on balance, they are

2  generally more successful than the other federal agencies or

3  officers.  The other -- other agencies and officers seem to

4  use force more frequently than the FPS officers.

5  Q.   And during your observation of the protests over the

6  last four months, have you observed any clear organizational

7  structure or group to the people protesting at the

8  ICE facility?

9  A.   Very little.

10    We've had some organized protest groups.  Particularly

11  the ones that have organized large marches and

12  demonstrations in the downtown area.  50501.  PDX is one.

13  There's -- Indivisible is another.  There hasn't been any

14  structured organization or any group in charge of the

15  protest activity down at the ICE facility that I've been

16  able to discern.

17    There have been some organized de-escalation groups

18  that are present down there that are trying to de-escalate

19  events.

20    There is some -- seems to be some level of organic

21  organization, in terms of, you know, the costumes showing

22  up, people wearing inflatable costumes, that sort of thing;

23  but no -- no organized group dictating everyone's activity

24  or behavior.

25  Q.   And have you observed any actions or received any

Schoening - X

1  you see the third paragraph?  It has ORS 181A.820; right?

2  A.    I see that.

3  Q.    And are those the relevant sanctuary laws?

4  A.    I believe so, yes.

5  Q.    If you read the last clause there, it says, "The

6  sanctuary laws prohibit members from participating in,

7  facilitating, or using resources for immigration enforcement

8  activities."  Is that right?

9  A.    That is correct.

10  Q.    And it provides an example at the very bottom there;

11  right?

12  A.    The bottom paragraph states, "City employees may be

13  tasked with clearing debris or other restoration tasks in

14  the areas around the ICE facility, will not remove debris or

15  barricades on ICE property or that only impact ICE

16  operations, which may include immigration activities."

17  Q.    Okay.  But when there are barricades in the driveway of

18  the ICE facility, PPB cannot clear those barricades because

19  that might be facilitating immigration enforcement; right?

20  A.    Well, there's a couple of reasons there:  Number one,

21  obviously, we talked about the sanctuary laws and using

22  resources to do immigration enforcement, including setting

23  up traffic control perimeters.

24        Second, the chief is on record stating that we would

25  not be removing barricades from the ICE driveway.  He made

Schoening - X

1   that release publicly in the media.

2       So, to the extent that the chief provides additional

3   direction or limitations and constraints, that's his

4   prerogative.

5   Q.   If barricades were placed in front of the driveway of a

6   public business, you could remove them; right?

7   A.   Yes.

8   Q.   If barricades were placed in front of the driveway of

9   this courthouse, you could remove them; right?

10  A.   As long as it wasn't facilitating immigration

11  enforcement activities.  Yes.

12  Q.   Sometimes protesters stand in the ICE facility's

13  driveway; is that right?

14  A.   Yes, they do.

15  Q.   And sometimes this means that vehicles cannot enter or

16  exit the facility; is that right?

17  A.   That is correct.

18  Q.   This has been fairly common since June of 2025; right?

19  A.   Yes, it has.

20  Q.   And this is trespassing when they're on the ICE

21  facility driveway, isn't it?

22  A.   Yes.

23  Q.   The PPB cannot remove these people because that might

24  be facilitating immigration enforcement; is that right?

25  A.   Yes.

Schoening - X

1   Q.   If a vehicle exits the ICE facility, do you know why
2   they are leaving the ICE facility?
3   A.   We do not.
4   Q.   They could just be going home from a long shift; is
5   that right?
6   A.   It's possible, yes.
7   Q.   But because you don't know why they're leaving the
8   facility, you can't assist in removing the protesters to
9   allow for that exit; correct?
10  A.   Correct.  It is the Immigration and Customs Enforcement
11  facility, and so vehicles coming and going, unless there's
12  information that specifically outlines they're not involved
13  in immigration enforcement, yes, we were not taking action
14  there.
15  Q.   So there's a presumption that the vehicle is involved
16  in immigration enforcement; correct?
17  A.   Yes.
18  Q.   And if people were blocking the driveway of a private
19  business, you could remove them; right?
20  A.   Yes.  Depending on where they are blocking the driveway
21  and whether or not the property owner wants to press charges
22  for trespass.
23  Q.   And if people were blocking the driveway into this
24  courthouse and the courthouse wanted them removed, you could
25  remove them; right?

| | | |
|---|---|---|
| 1 | IN THE UNITED STATES DISTRICT COURT | |
| 2 | FOR THE DISTRICT OF OREGON | |

| | | |
|---|---|---|
| 3 | STATE OF OREGON, the CITY OF PORTLAND, and the STATE OF | ) ) |
| 4 | CALIFORNIA, | ) |
| | | ) |
| 5 | Plaintiffs, | ) Case No. 3:25-cv-01756-IM |
| | | ) |
| 6 | v. | ) |
| | | ) |
| 7 | DONALD TRUMP, in his official capacity as President of the | ) October 29, 2025 ) |
| 8 | United States; PETE HEGSETH, in his official capacity as | ) ) |
| 9 | Secretary of Defense; U.S. DEPARTMENT OF DEFENSE; KRISTI | ) ) |
| 10 | NOEM, in her official capacity as Secretary of Homeland | ) ) |
| 11 | Security; and U.S. DEPARTMENT OF HOMELAND SECURITY, | ) ) |
| 12 | | ) |
| 13 | Defendants. | ) Portland, Oregon ) _____) |

14

15

16

17

18                          COURT TRIAL DAY 1

19                          (AFTERNOON SESSION)

20                        TRANSCRIPT OF PROCEEDINGS

21                BEFORE THE HONORABLE KARIN J. IMMERGUT

22                 UNITED STATES DISTRICT COURT JUDGE

23

24

25

Hughes - X

1   Q.   But you weren't regularly communicating with FPS about

2   their resources, were you?

3   A.   I was not.

4   Q.   And you understand what the term "doxing" is, right?

5   A.   Yes, I do.

6   Q.   You understand that's when searching for and publishing

7   private and identifying information about a particular

8   individual on the internet occurs?

9   A.   Yes.

10  Q.   And you understand that has happened to the brave federal

11  officers at the ICE facility, right?

12  A.   I have heard that it happened.

13  Q.   You don't know whether PPB has investigated any of those

14  incidents of doxing, do you?

15  A.   I don't know.

16  Q.   PPB is currently under its authorized strength, is it not?

17  A.   That's correct.

18  Q.   And Central Precinct only has 12 to 18 people working each

19  day and night, correct?

20  A.   That's per shift.

21  Q.   Per shift, yes.  To make the record clear, Central

22  Precinct only has 12 to 18 people working each shift of the

23  three shifts that you mentioned earlier, correct?

24  A.   Yes.

25  Q.   And you typically don't have enough officers to fill those

1    spots, do you?

2    A.    That's correct.

3    Q.    And Central Precinct covers approximately 40 square miles?

4    A.    Yes.

5    Q.    With an area covering 200,000 people; is that right?

6    A.    Yes.

7    Q.    And PPB did not physically go to the ICE facility every

8    day since June 2025, right?

9    A.    I -- since June of -- I think almost every day a police

10   officer or sergeant went there to check.

11   Q.    I'll move on.

12         Wouldn't operational issues cause PPB sometimes to

13   not go to the ICE facility when there was a call?

14   A.    That could be, yes.

15   Q.    Yes?

16   A.    Yes, that could be a reason why.

17   Q.    And sergeants weren't required to go down or the officers

18   on duty if FPS called for service, right?

19   A.    I wouldn't say they were required to go down.  They're

20   required to make contact.

21   Q.    Yes, but they were not required to physically go to the

22   building, yes or no?

23   A.    No.

24   Q.    So yes, they were not required to go to the building?

25   A.    They were not required to go to the building.

1  means and likelihood are present to present immediacy of risk

2  to a person incurring serious physical injury or death, right?

3  Isn't that your definition?

4  A.   Yes.

5  Q.   And it's more difficult for officers to make stops when

6  there are larger crowds, correct?

7  A.   Yes.

8  Q.   And officers were not ordered to make arrests at the ICE

9  facility even when protestors threw objects at their cars,

10  right?

11  A.   That's correct.

12  Q.   And in most cases the officers would leave if protestors

13  started charging their cars; is that right?

14  A.   Yes.

15  Q.   And officers had to consider resource availability before

16  making arrests and going into the crowd, correct?

17  A.   Yes.  Like we talked about, it was that deescalation

18  technique.

19  Q.   And PPB was worried about violence by both protestors and

20  counter-protestors, right?

21  A.   Yes.

22  Q.   Conflicts occurred on more than one occasion; is that

23  right?

24  A.   Yes.

25  Q.   And you know what the term "black blocker" means, right?

1      IN THE UNITED STATES DISTRICT COURT

2        FOR THE DISTRICT OF OREGON

3          PORTLAND DIVISION

4

5   STATE OF OREGON, the CITY OF    )
    PORTLAND, and the STATE OF      )
6   CALIFORNIA,                     )
                                    )
7                      Plaintiffs,  )  Case No. 3:25-cv-01756-IM
                                    )
8              v.                   )
                                    )  October 30, 2025
9   DONALD TRUMP, in his official   )
    capacity as President of the    )
10  United States; PETE HEGSETH,    )
    in his official capacity as     )
11  Secretary of Defense; U.S.      )
    DEPARTMENT OF DEFENSE;          )
12  KRISTI NOEM, in her official    )
    capacity as Secretary of        )
13  Homeland Security; and U.S.     )
    DEPARTMENT OF HOMELAND          )
14  SECURITY,                       )
                                    )
15                     Defendants.  )
    _____)

16

17

18

19          COURT TRIAL DAY 2

20        TRANSCRIPT OF PROCEEDINGS

21          MORNING SESSION

22   BEFORE THE HONORABLE KARIN J. IMMERGUT

23    UNITED STATES DISTRICT COURT JUDGE

24

25

396

R.C. - D

1    So, predominantly, I just receive the information as to
2    what's coming to me, and I am involved in the planning
3    process of kind of task organizing and getting them
4    integrated into the operations.
5    Q.   All right.  Well, what about if we just -- if we just
6    stick with FPS.  Do you know if those officers came in
7    groups or all at once or something else?
8    A.   They come in groups.  Every -- we started off with
9    rotations of 30 days.  So in -- in those 30 days, we --
10   we -- my regional director sends a request to our
11   headquarters.  Our headquarters generates a -- their own --
12   an operations order that goes out to all the regions, asking
13   for a specific number of inspectors.  The regions comply,
14   send those -- these inspectors -- and they're from all over
15   the country -- to Portland on a specific date to start
16   operations and for a specific date to demobilize and go back
17   to their regions.
18   Q.   Are these start and end date groups -- are these
19   referred to as "waves"?
20   A.   Waves, rotations, or deployments.
21   Q.   So you might have said this, but at least at the
22   beginning, how long did each rotation last?
23   A.   Each rotation was lasting 30 days.
24   Q.   Has that changed?
25   A.   It has changed.

R.C. - D

1    We started changing the duration of the deployments

2  down to 20 days.

3  Q.   Do you know why it changed?

4  A.   I do.

5    Mostly for the mental health of the officers.  We

6  started seeing the fatigue and the stress on officers who,

7  you know, are in close proximity with participants outside

8  of the federal facilities daily.

9    Keep in mind that, during these deployments, these

10  officers are working overtime and their normal working hours

11  are usually eight hours a day.  Some are working 10.  It

12  could be 12 hours or more, depending on that night's

13  activities, and they're -- they're constantly in proximity

14  to the protesters who say some of the most vulgar, foul,

15  racial slurs consistently throughout the day, throughout the

16  night, on bullhorns, and we started seeing this taking an

17  effect mentally on our officers night after night, day after

18  day, that we decided to shorten the rotations.

19        THE COURT:  I'm going to jump in for -- what date

20  did that change from 30 to 20 days?

21        THE WITNESS:  I don't have that information,

22  ma'am.

23    I do know the first couple of waves were 30 days, and

24  after observation of these deployments and seeing the

25  fatigue, that's when we decided to scale back.

398

R.C. - D

1          THE COURT:  So what month did they change?

2          THE WITNESS:  I don't have that.  I'd have to look

3    at the actual deployment rosters because they will specify

4    the time frame.

5    BY MR. BAILEY: (Continuing):

6    Q.    In your view and based on your experience as the deputy

7    regional director, is it sustainable to surge this many FPS

8    officers to Portland?

9    A.    No, it's not.

10   Q.    Prior to June of 2025, do you know the hours that FPS

11   inspectors were generally available to protect the ICE

12   building?

13   A.    Prior to 20- --

14   Q.    Prior to June of 2025.

15   A.    Yeah, they worked regular Government business hours.

16   Typically, the 9:00 to 5:00.

17        We kind of veer a little bit left or a little bit

18   right; meaning, some officers will start at 7:00 and go to

19   3:00, yeah, so we have some morning coverage; and then we

20   have, you know, an officer that may start at 9:00 and go to

21   5:00 or 10:00 and go to 6:00.  They generally work Monday

22   through Friday, with the capability to respond to calls for

23   service after hours.  We are provided Government cell phones

24   and take-home vehicles that are marked as Federal Protective

25   Service Department of Homeland Security.

R.C. - D

1   street where the federal building is, where we find it,

2   probably for economy of movement, to just open the gate and

3   let a vehicle drive out, if it's a single vehicle.

4       And that -- those types of instances, while it's not

5   all the time, happen during the day; but, certainly, as more

6   people start showing up -- I've seen groups as small as 10,

7   you know, stand in front of the -- the -- on federal prop --

8   or right outside of federal property essentially blocking or

9   attempting to impede vehicles on their way out.

10      So it -- really, it's situationally dependent; but, for

11  the most part, we try to be consistent in what we do.

12  Q.   All right.  So, again, based on your experience

13  personally there and generally is the deputy regional

14  director, how many federal law enforcement officers are

15  currently required at the facility to provide sufficient

16  protection?

17  A.   I'm -- that's tough because I only -- I can only

18  resource so much from the Federal Protective Service.  We

19  are way too small.

20      So the other agencies that support packages that they

21  bring in, I've seen our numbers fluctuate from -- I've seen

22  ICS 209s with 120 people, and I've seen it as high as 180

23  people.

24      Depending on the numbers; and who the incident

25  commander is at the time and the breakdown of task

R.C. - D

1    organization for -- for efficiency, I mean, that could

2    fluctuate.

3    Q.   What number would make you feel comfortable as the

4    deputy regional director?

5                MS. TURCO:  Objection.  Relevance.

6                MR. BAILEY:  May I be heard, Your Honor?

7                THE COURT:  Overruled.

8                THE WITNESS:  180.

9    BY MR. BAILEY: (Continuing):

10   Q.   Why that many?

11   A.   Well, if we're providing security to a facility that

12   requires 24-hour, seven-day-a-week security, then not one --

13   all 180 would be there at one time 24/7.

14       What I would look at doing is actually having shifts.

15       These, you know, depending on the activity level,

16   would -- we would organize the shifts to meet the threat.

17   So I would be able to have three shifts with a good amount

18   of numbers to provide a level of officer safety when we push

19   out specifically for times of heightened unrest, but also

20   have a contingent outside of the facility, potentially

21   stationed at Edith Green or somewhere, that can also surge

22   in the event something happens.

23   Q.   All right.  Sir, if I could please just have you take a

24   look at Defendants' 1194 again?

25                MR. BAILEY:  And if we could put up the first page

R.C. - D

1  of the extracted text on the screen.

2  BY MR. BAILEY: (Continuing):

3  Q.   Are you at that first page of the extracted text, sir?

4  A.   First page.

5  Q.   All right.  If I could have you take a look at that

6  last paragraph that starts with, "Law enforcement personnel

7  for day and evening" -- do you see that?

8  A.   Yes, sir.

9  Q.   All right.  And I hope I'm stating the obvious here.

10  This is just showing staffing numbers from the agency that

11  day?

12  A.   Yes, sir.

13      You're talking Block 10; correct.

14  Q.   Let me put it this way:  What is this last paragraph

15  showing us here on this ICS 209 form here?

16  A.   I've got something different on the -- here and here.

17  So what -- I see what you're saying.

18  Q.   Let me make sure you're looking at the right thing

19  here.

20  A.   Yeah.

21  Q.   Sorry.  I want to make sure you're looking at the last

22  paragraph that is up on the screen here.

23  A.   Sure.  So what I'm seeing is the -- you know, the

24  Federal Protective Service that day, for that reporting

25  period, that 24-hour period, had 32 personnel.

424

R.C. - D

1    The FBI Homeland Security Investigations had three.

2  The ERO Special Response Team had 49.  HSI Special Response

3  Team had three.  CBP Office of Field Operations Special

4  Response Team had 35.  CBP Mobile Field Force, 20.  BORTAC

5  3, CBP BORSTAR, 5.  CBP MRT -- I don't know what "AMO" is.

6  Border -- excuse me -- Bureau of Prisons.  Special

7  Operations Response or Reaction Team, 15.

8  Q.   Sir, can I stop you there?

9  A.   Sure.

10  Q.   We have people from the Bureau of Prisons that are

11  coming to protect the ICE facility?

12  A.   We do, yes.

13  Q.   Could you pick up at "ATF"?

14  A.   Yeah.  The Alcohol Tobacco and Firearms, and the Drug

15  Enforcement Agency, totaling a total of 196 personnel for

16  that 24-hour reporting period.

17  Q.   So I promise I won't make you do all of these; but, in

18  your experience, is it typical for FBI agents to be

19  protecting federal buildings?

20         MS. TURCO:  Objection.  Lack of personal

21  knowledge.

22         THE COURT:  Sustained.

23         MR. BAILEY:  I'll move on.

24  BY MR. BAILEY: (Continuing):

25  Q.   So, again, based on your experience on the ground and

R.C. - D

1   as deputy regional director, have you ever seen evidence

2   that protesters are coordinating their activities?

3   A.   Yes, I have.

4   Q.   Could you say more about what that is?

5   A.   You can see their communications with radios.

6   Currently, right now, we have a walkie-talkie radio in our

7   Emergency Operations Center hoping to catch crosstalk with

8   them.  That is something new we developed.

9        The -- you know, they coordinate in terms of the -- the

10  activity that day, how they dress, and their

11  information-gathering of the -- the activities at the ICE

12  facility.

13       It's not uncommon to be filmed going in, going out,

14  getting license plate numbers, to the point that we see

15  flyers coming out, saying, you know, "Let's organize at such

16  a hotel" -- hotels where FPS or supporting agencies are

17  staying.

18       So you can see there's a coordination to try to

19  continue the activity, gain information on us, and they do

20  it in various ways.

21       They tail us to our place of residence and/or most --

22  our hotels.  I personally have been tailed before, and it

23  was -- it was determined that these were people from -- the

24  participants from the ICE facility later on that -- that

25  tailed me, but that's not uncommon, and -- so, yes, I

R.C. - D

1  believe that there is a level of organization, of intel

2  gathering, of trying to establish a pattern of life and

3  activity at the ICE facility for the potential purposes of

4  their own planning.

5  Q.    Relatedly, do you remember me showing you that map

6  earlier.

7  A.    Yes, sir.

8  Q.    So, if I were to show you that again, would there be

9  any, I don't know, campsites or encampments there?

10  A.    Yes.   There is a campsite.   Actually, I believe it's

11  probably irrelevant now.   Thanks to the Portland Police

12  Bureau, there is no campsite there, but --

13  Q.    Where did that used to be?   Could you draw it on the

14  map?

15  A.    Yes.   So there was a fence line, and this entire area

16  was -- it was blocked, and it had tents.   From what I've

17  seen on the streamers, they've had refrigerators; they've

18  had medical supplies, masks, party favors, all sorts of

19  stuff there.

20  Q.    And what happened exactly to these campsites, to your

21  understanding?

22  A.    The Portland Police Bureau, last weekend, came in, in

23  force.   They told everybody, you know, "You cannot be

24  blocking the sidewalks anymore.   We are going to enforce all

25  laws, to include the small ones."   That included jaywalking,

```
 1                IN THE UNITED STATES DISTRICT COURT

 2                   FOR THE DISTRICT OF OREGON

 3   STATE OF OREGON, the CITY OF  )
     PORTLAND, and the STATE OF    )
 4   CALIFORNIA,                   )
                                   )
 5           Plaintiffs,           )  Case No. 3:25-cv-01756-IM
                                   )
 6      v.                         )
                                   )
 7   DONALD TRUMP, in his official )  October 30, 2025
     capacity as President of the  )
 8   United States; PETE HEGSETH,  )
     in his official capacity as   )
 9   Secretary of Defense; U.S.    )
     DEPARTMENT OF DEFENSE; KRISTI  )
10   NOEM, in her official capacity)
     as Secretary of Homeland      )
11   Security; and U.S. DEPARTMENT )
     OF HOMELAND SECURITY,         )
12                                 )
             Defendants.           )  Portland, Oregon
13   _____)
```

14

15

16

17

18                       COURT TRIAL DAY 2

19                      (AFTERNOON SESSION)

20                   TRANSCRIPT OF PROCEEDINGS

21          BEFORE THE HONORABLE KARIN J. IMMERGUT

22             UNITED STATES DISTRICT COURT JUDGE

23

24

25

W.T. - D

1    A.    They'll hit it with objects or their hands or their feet.

2    Q.    And so does -- I think you might have already spoken to

3    this, but every time a vehicle goes out, are officers going out

4    to clear the driveway?

5    A.    No.  So I've tried to keep our officers essentially inside

6    the facility for the most part, because I'm trying to avoid the

7    interactions between our officers and the protestors, frankly

8    for the mental health of my officers, but also they tend to get

9    loud when they see us, and they tend to get, you know, really

10   focused on some of our officers.  So what we've done is if

11   there is just a few out front, a handful out front, what we've

12   tried to do a couple times is open the gate and send cars out.

13   We've had a couple of instances where that was successful, but

14   then we had a couple cars get hit.  And for the safety of the

15   drivers, we've had to start having teams go back out again.  So

16   we've tried various levels of the getting them to move off the

17   driveway.

18   Q.    When you say, "for the safety of the drivers," what do you

19   mean?

20   A.    I don't want a window broken and one of our people getting

21   harmed inside the vehicle.  It's been pretty constant, pretty

22   constant narrative out there that we deserve to die, and there

23   have been threats of violence against our people, so when I

24   allow them to get close to vehicles and actually start

25   physically striking vehicles, that's an act of aggression, and

W.T. - D

1  we're there to again make sure the people in those vehicles and

2  the facility stay safe.

3  Q.   Now, are there other -- is FPS the only federal law

4  enforcement at the facility?

5  A.   No.

6  Q.   So who else is there?

7  A.   I can't tell you who all is there right now because I'm

8  not operating there, but I can tell you when I was there, of

9  course, Enforcement and Removal Operations, the daily officers

10 that work there, Homeland Security Investigations, but in terms

11 of Operation Skip Jack, my time there was the Federal

12 Protective Service Enforcement and Removal Operations SRT or

13 ICE SRT, and then Homeland Security Investigations SRT.  And

14 when I say that, I mean the groups are kind of mixed, so not

15 always a full contingent.

16 Q.   As incident commander, do you more or less coordinate the

17 federal law enforcement at the facility?

18 A.   As the incident commander, that's correct.

19 Q.   And that's in response to the protests?

20 A.   Yes.

21         MS. JACOBS:  Your Honor, if I may, permission to

22 approach the witness?

23         THE COURT:  You've shown whatever it is to opposing

24 counsel?

25         MS. JACOBS:  (Handing.)

W.T. - D

1          And generally speaking, these, I believe, are all --

2    to the extent they're not, I'll address them one by one, but I

3    do believe these are already admitted into evidence, but I just

4    figured it's easier to circulate the paper copy, given there

5    may be some confidential information related to identity on

6    them.

7          THE COURT:  I think you have not said the number of

8    the exhibit on the record yet.

9          MS. JACOBS:  Yes, Your Honor.  That would be Exhibit

10   No. 835, 847, 852, 855, and then --

11         THE COURT:  Slow down just a little bit.  835, did

12   you say 837 or 847?

13         MS. JACOBS:  847, Your Honor.  852, 855, and then,

14   Your Honor, we'll just hold off -- I'll address the last

15   exhibit whenever we get there.

16         THE COURT:  Okay.

17   BY MS. JACOBS: (continuing)

18   Q.   Commander, could you please take a look at Exhibit 835.

19   A.   Yes.

20   Q.   And what is that document?

21   A.   This is an FPS Incident Summary, ICS 209.

22   Q.   And what is the operational period on that document?

23   A.   August 18th, 2025, 0001 hours, to August 18th, 2025, 2359

24   hours.

25   Q.   And without -- without saying the name on the document --

W.T. - D

```
1    Q.    And how large are these boards?

2    A.    They're approximately 4-by-6, kind of standard-size piece

3    of plywood.

4    Q.    Okay.  So these are -- it's not like a regular fencepost?

5    A.    It's not like a fencepost, no.  It leaned up against the

6    metal fence, you know.  The boards were located on the inside

7    of our facility.

8    Q.    All right.  I would like you to next move down to at

9    approximately 2036 hours.  Do you see that?

10   A.    Yes.

11   Q.    Can you read that sentence, please.

12   A.    Yes.  "At approximately 2036 hours, protestors placed a

13   prop guillotine in front of the facility, blocking the

14   roadway."

15   Q.    Tell me about the guillotine.

16   A.    So we had noticed at one point that they had placed a --

17   what appeared to be a guillotine in the street, partially

18   blocking the driveway.

19   Q.    And had you seen a guillotine there before?

20   A.    This was the first time.

21   Q.    And was that significant to you?

22   A.    Yes.  Significant because we had had them make statements

23   that we deserved to be decapitated, and again, more death

24   threats.  And then they were playing a song in the background

25   that I'm not familiar with called "We've Got a Guillotine."
```

W.T. - D

```
 1   They kept saying, "We have the guillotine," something to that
 2   effect.
 3   Q.   So whenever you talk -- discuss protestors saying things
 4   to you, but -- and we've also discussed that there have been
 5   actual physical violence as well; is that correct?
 6   A.   That's correct.
 7   Q.   And so whenever you see a guillotine placed outside the
 8   facility, what does that -- is that a threat to you?
 9             MS. SHEFFIELD:  Objection.  Leading.
10             THE COURT:  Rephrase your question.
11             MS. JACOBS:  Yes.
12   BY MS. JACOBS: (continuing)
13   Q.   As a law enforcement officer, what does it mean -- how did
14   you react to seeing the guillotine outside the facility?
15   A.    In order to prove or take serious a threat, you have to
16   have means, intent, and opportunity.  So they have made the
17   threat.  So they've showed us the intent also with the
18   guillotine and the various threats they've made.  They've
19   showed up at our hotels, they've said they're going to find our
20   homes, and they've threatened us with physical violence.  So
21   then when I see a guillotine -- and at the time it looked very
22   real to us, we didn't know it was a prop, we take that as an
23   actual threat.
24   Q.   Generally speaking, do you remember this day?
25   A.    I do.
```

1          IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF OREGON

3                  PORTLAND DIVISION

4

5   STATE OF OREGON, the CITY OF     )
    PORTLAND, and the STATE OF       )
6   CALIFORNIA,                      )
                                     )
                  Plaintiffs,  )   Case No. 3:25-cv-01756-IM
7                                    )
                  v.                 )
8                                    )   October 31, 2025
    DONALD TRUMP, in his official    )
9   capacity as President of the     )
    United States; PETE HEGSETH,     )
10  in his official capacity as      )
    Secretary of Defense; U.S.       )
11  DEPARTMENT OF DEFENSE;           )
    KRISTI NOEM, in her official     )
12  capacity as Secretary of         )
    Homeland Security; and U.S.      )
13  DEPARTMENT OF HOMELAND           )
    SECURITY,                        )
14                                   )
                 Defendants.  )
15  _____)

16

17

18

19              COURT TRIAL DAY 3

20           TRANSCRIPT OF PROCEEDINGS

21               MORNING SESSION

22      BEFORE THE HONORABLE KARIN J. IMMERGUT

23       UNITED STATES DISTRICT COURT JUDGE

24

25

A142

Commander T - ReD

1      So redirect.

2

3                    REDIRECT EXAMINATION

4   BY MS. JACOBS:

5   Q.    Commander, yesterday you were asked by plaintiffs'

6   counsel for the City of Oregon [sic] a question stating,

7   "Despite having this point of contact" -- presumably with

8   PPB -- or it was in reference to PPB -- "you did not

9   typically call these sergeants to request help; correct?"

10  A.    That's correct.

11  Q.    Do you recall that question?

12  A.    I do.

13  Q.    And just for purposes of the record, that is at the

14  transcript on page 547, line 25, to page 548, line 9.

15        Why would you not typically request help?

16  A.    It has become common knowledge that Portland Police

17  Bureau is not going to respond to assist us with the protest

18  activity at the ICE facility.

19              MS. JACOBS:  No further questions.

20              THE COURT:  All right.  You may step down.

21        Thank you.

22        Please call your next witness.

23              MS. JACOBS:  Oh, excuse me.  Your Honor, may

24  Commander T be excused?

25              THE COURT:  Is there any further need for

Rieger - D

1   Q.   And what action is this post describing?

2   A.   I believe it's describing the protection by National

3   Guardsmen or other troops of federal law enforcement agents

4   doing their mission.

5   Q.   And is this an authorization for use of the National

6   Guard to address that situation?

7   A.   Yes.

8   Q.   What, if anything, did you do following this post,

9   related to the President's decision to deploy the Oregon

10  National Guard?

11  A.   So I called Adjutant General Al Gronewald on the phone,

12  and I began to prepare my memorandum to him.

13  Q.   Okay.  Let's flip now to Exhibit 1048, please.

14       Okay.  General Rieger, is this the memorandum that you

15  just described that you began to write?

16  A.   Yes, it is.

17  Q.   Did anyone direct you to write this memorandum?

18  A.   Yes.  The Office of Secretary of War.

19  Q.   And, again, did you have any personal knowledge of the

20  situation on the ground in the Portland area?

21  A.   I did not.

22  Q.   Did you believe the situation, as you described it in

23  the memo, to be accurate?

24       MS. REILLEY:  Objection.  Calls for speculation.

25  Vague.

Rieger - D

1        THE COURT:  Overruled.

2        THE WITNESS:  Yes.  Based upon the documents, the

3 request for assistance from Secretary Noem, based upon the

4 Secretary of War's direction to me in the memo, and also the

5 President's announcement on Truth Social.

6 BY MR. EDELMAN: (Continuing):

7 Q.   Does this memorandum propose under what Title the

8 National Guard would be activated to the state of Oregon?

9 A.   Yes.  The request was to the Governor for the Oregon

10 National Guard's assistance in protecting federal agents,

11 and the request was under Title 32 United States Code

12 §502(f), which is governor's command and control paid for by

13 the Federal Government.

14 Q.   And do you personally know why Title 32 was proposed by

15 the President instead of Title 10?

16        MS. REILLEY:  It lacks foundation.  Calls for

17 speculation.

18        THE COURT:  Overruled.

19    If you can answer that question.

20        THE WITNESS:  I do not know why, no.

21 BY MR. EDELMAN: (Continuing):

22 Q.   Once the President proposed this Title 32 mobilization,

23 whose decision was it whether to accept it or not?

24 A.   Governor Kotek's.

25 Q.   If Governor Kotek had accepted this Title 32

614

Rieger - D

1  mobilization, who would have been in command of the Oregon

2  National Guard troops deployed to the Portland area?

3  A.  Governor Kotek.

4  Q.  And if she had accepted this Title 32 mobilization,

5  would the Governor have been able to determine for herself

6  whether the circumstances at the ICE detention center in

7  Portland justified use of the Guard on any given day?

8  A.  Yes.  That would have been entirely her decision.

9  Q.  If Governor Kotek had accepted this Title 32

10  mobilization, would the Governor have been able to determine

11  for herself how many National Guard would be protecting

12  federal personnel and property on any given day?

13  A.  Yes.  Up to 200.

14  Q.  And, finally, if the Governor had accepted this

15  Title 32 mobilization, who would have paid for it?

16  A.  The Federal Government.

17  Q.  Did you transmit this memorandum to anyone, sir?

18  A.  I did.  I sent it to Adjutant General Gronewald.

19  Q.  Did you have any communication with the adjutant

20  general before sending him this communication?

21  A.  Yes, I did.  I called him, to give him as much notice

22  as possible that this was coming.  We usually appreciate

23  that.  It gives us time to, you know, organize and plan.

24  Q.  And did you have any communication with the adjutant

25  general after sending him this memorandum?

615

Rieger - D

1   A.   Yes, I did.   He called to tell me that he had both

2   received it and that also that Governor Kotek was talking to

3   Governor -- I'm sorry -- Secretary Noem and the President.

4   Q.   On that call, did the adjutant general express any

5   concerns about the Title 32 deployment to you?

6            MS. REILLEY:  Hearsay.

7            THE COURT:  Overruled.

8            THE WITNESS:  He did not.

9   BY MR. EDELMAN: (Continuing):

10  Q.   What was the next communication you had with the

11  adjutant general after the phone call that you just

12  described?

13  A.   He told me that -- the Governor had declined the offer

14  under Title 32.

15  Q.   What form was that communication in?

16  A.   I believe it was both -- I believe it was both email

17  and phone call.

18  Q.   Let's turn now to Exhibit 1051, please.

19       Do you recognize this document, General Rieger?

20  A.   Yes, I do.

21  Q.   And what is it?

22  A.   This is the Secretary of War -- Mr. Hegseth's order for

23  National Guard troops to be called out in Title 10, §12406

24  in support of the federal agents in Oregon.

25  Q.   And when is the document dated?

Wamsley - D

1   A.   Yes.

2   Q.   What was the nature of that visit?

3   A.   At that time I went to survey the damage to the

4   building.

5   Q.   Ms. Wamsley, to your knowledge, was the Portland office

6   closed at any point this summer?

7   A.   Yes.

8   Q.   Who made the decision to close the office?

9   A.   I did.

10   Q.   And why did you decide to close the office -- let me

11   step back.  Let me strike that and ask a new question.

12       Approximately when was the office closed at your

13   direction?

14   A.   I think it was, like, June 11th or 12th, like, in that

15   time frame, up until July 7th or 8th.

16   Q.   And what was the -- what was the reason for closing the

17   facility?

18   A.   So, as I had indicated, there were some protests that

19   did, in fact, turn a little more violent than what was

20   normal.  All of our card readers were ripped out; all of the

21   windows on the first floor and some on the second and third

22   were broken, and these -- these were -- essentially, it was

23   a wall of windows.  It wasn't just, like, one window.  It

24   was pretty big.  All the doors were broken, the entry doors.

25   Protesters had gotten into our lobby, and there were windows

677

Wamsley - D

1    more people.

2        Some -- well, I should say "some people."  There were

3    days when we processed no people.  There are other days

4    where we had to take everybody up to Tacoma, in Washington,

5    to be processed at the Northwest Immigration Processing

6    Center.

7        So it was a mixed handbag.

8    Q.   Did you have to move your employees out of the building

9    as a result of the closure?

10   A.   Yes.

11   Q.   Where did you move them to?

12   A.   So we moved them to an alternate location.

13   Q.   What was the -- what operations could be conducted at

14   the alternate location?

15   A.   Administrative functions.  Yeah.

16   Q.   Was it -- was it open to the public?

17   A.   No.

18   Q.   Did you process detainees at the facility?

19   A.   No.

20   Q.   So we earlier circled to the -- we discussed the

21   Alternatives to Detention and the non-detained programs.

22       In your experience, approximately how many of ICE's

23   arrests historically come through those sorts of encounters

24   versus arrests at-large in the community?

25   A.   So I would -- I would say it's about 60 percent

684

Wamsley - D

1   shifts of people that are working in different locations to

2   identify and arrest people.

3       So, again, there are times when we still are sending

4   people to Tacoma for processing instead of processing at the

5   Portland location during the afternoon, towards the evening

6   hours.

7   Q.   Okay.  I want to shift gears a little bit.  Has the ICE

8   ERO Seattle field office had to divert resources -- strike

9   that.  I withdraw the question.  I'll ask a foundational

10  question.

11      Are you familiar with the operation -- the protective

12  mission at the ICE facility on Macadam Avenue?

13  A.   Yes.

14  Q.   Has the ICE ERO Seattle field office had to divert

15  resources to support that mission?

16  A.   Yes.

17  Q.   What -- what resources have you had to divert?

18  A.   So I have seven of eight Special Response Team members

19  assigned to conduct FPS appended duties at the Macadam

20  location.

21  Q.   What is -- what is a Special Response Team member?

22  A.   So a Special Response Team for ERO is just -- they're

23  regular deportation officers who undergo additional training

24  in things like crowd control, additional chemical munitions,

25  conducting high-risk warrants and high-risk charters.  Just

**A150**

| 1 | IN THE UNITED STATES DISTRICT COURT |
| 2 | FOR THE DISTRICT OF OREGON |

| 3 | STATE OF OREGON, the CITY OF ) |
| | PORTLAND, and the STATE OF ) |
| 4 | CALIFORNIA, ) |
| | ) |
| 5 | Plaintiffs, ) Case No. 3:25-cv-01756-IM |
| | ) |
| 6 | v. ) |
| | ) |
| 7 | DONALD TRUMP, in his official ) October 31, 2025 |
| | capacity as President of the ) |
| 8 | United States; PETE HEGSETH, ) |
| | in his official capacity as ) |
| 9 | Secretary of Defense; U.S. ) |
| | DEPARTMENT OF DEFENSE; KRISTI ) |
| 10 | NOEM, in her official capacity) |
| | as Secretary of Homeland ) |
| 11 | Security; and U.S. DEPARTMENT ) |
| | OF HOMELAND SECURITY, ) |
| 12 | ) |
| | Defendants. ) Portland, Oregon |
| 13 | _____) |

14

15

16

17

18                    COURT TRIAL DAY 3

19                   (AFTERNOON SESSION)

20               TRANSCRIPT OF PROCEEDINGS

21        BEFORE THE HONORABLE KARIN J. IMMERGUT

22          UNITED STATES DISTRICT COURT JUDGE

23

24

25

1    Plaintiffs also argue there is an equal sovereignty
2    problem with the use of Guardsmen from out of a state.  This is
3    actually an argument that Section 12406 is unconstitutional.
4    Again, Section 12406 is clear in its text that when that
5    authority is invoked, Guardsmen may be utilized from any state.

6    If the Court does enter any sort of relief for
7    plaintiffs, as we argued earlier this morning, the Court should
8    only issue one order and one opinion based on the record
9    developed at trial.  Plaintiffs have not cited any precedent
10   remotely close to what they are proposing where the Court would
11   enter a preliminary injunction this weekend, and then an order
12   and opinion based on the same record.

13   In addition, if the Court enters judgment or any sort
14   of injunction, we have moved for a stay pending -- we have
15   moved for a stay pending any appeal that is authorized by the
16   Solicitor General.  This motion and request for a stay pending
17   appeal applies both to any preliminary injunction that may be
18   issued this weekend, as well -- if the Court does decouple the
19   preliminary injunction from partial final judgment, it also
20   applies to the -- any final judgment that may be entered, and
21   we would ask, as this Court has done in previous orders, that
22   it would rule on this motion for a stay pending appeal in the
23   same order that it issues.

24   At a minimum, the Court should enter an
25   administrative stay for a 14-day period to allow for orderly

Rebuttal Closing Argument - Plaintiffs    833

1    proceedings in appellate courts.  These are weighty issues that

2    merit appellate review.  And I'd add that administrative stays

3    have been issued in all three National Guard cases.  The Ninth

4    Circuit issued a unanimous administrative stay on October 8th

5    of the first temporary restraining order that this Court

6    entered, and the en banc court has not called for a vote or

7    vacated that.

8             In addition, the Seventh Circuit issued an

9    administrative stay in Illinois, and twice the Ninth Circuit

10   has issued administrative stays in appeals from injunctions

11   issued by Judge Breyer.  And Judge Breyer himself, after a

12   trial was held, imposed a ten-day administrative stay on his

13   order.

14            So for all these reasons, as well as the reasons we

15   will explain in post-trial briefing, we ask this Court to enter

16   a partial final judgment in defendants' favor on the claims

17   that have been tried.

18            Thank you, Your Honor.

19            THE COURT:  Mr. Kennedy, rebuttal.

20            MR. KENNEDY:  Thank you, Your Honor.  Just a few

21   additional points I'd like to make in response to my friend's

22   comments from the other side.

23            I'm going to refrain from wading more deeply into

24   legal issues, understanding that the Court has asked for

25   additional briefing on those by tomorrow, and we think that

**FOR PUBLICATION**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

**FILED**

OCT 28 2025

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| STATE OF OREGON; CITY OF PORTLAND, | No. 25-6268 |
| Plaintiffs - Appellees, | D.C. No. 3:25-cv-01756-IM District of Oregon, Portland |
| v. | **ORDER** |
| DONALD J. TRUMP, In his official capacity as President of the United States; PETER HEGSETH, In his official capacity as Secretary of Defense; UNITED STATES DEPARTMENT OF DEFENSE; KRISTI NOEM, In her official capacity as Secretary of Homeland Security; UNITED STATES DEPARTMENT OF HOMELAND SECURITY, | |
| Defendants - Appellants, | |
| -------------------------------------- | |
| STATE OF CALIFORNIA, | |
| Intervenor - Pending. | |

**MURGUIA**, Chief Judge:

Upon the vote of a majority of nonrecused active judges, it is ordered that

this case be reheard en banc pursuant to Federal Rule of Appellate Procedure 40(c)

**A154**

and Circuit Rule 40-3.  The order published at ---F.4th---, 2025 WL 2951371 (9th

Cir. Oct. 20, 2025), is vacated.

**A155**



**Personnel Resource Committment from ICS 209**



State of Oregon, et al v. Trump

**EXHIBIT**

**773**

USDC No. 3:25-cv-01756-IM




# *Portland Police Bureau*

# INCIDENT ACTION PLAN

## *Event Name:*

October 8th, 2025 Event

### *Key Case Number*
25-680644

### *Operational Period*

**Begin Date:** 10/8/2025    **Time:** 1500
**End Date:** 10/9/2025    **Time:** 0300

**Overtime Code:** 9PLCH0000572

**Incident Commander:** Commander Schoening

THIS DOCUMENT IS FOR OFFICIAL LAW ENFORCEMENT PURPOSES ONLY AND IS LAW ENFORCEMENT SENSITIVE. THIS INFORMATION IS EXEMPT FROM PUBLIC DISCLOSURE PURSUANT TO ORS 192.345 (18) AND OTHER EXEMPTIONS. NO ONE IS AUTHORIZED TO DISCLOSE THIS DOCUMENT OR FORWARD IT TO ANY INDIVIDUAL, GROUP, OR AGENCY. ANY REQUEST FOR COPIES OF THIS DOCUMENT NEED TO BE DIRECTED TO THE PORTLAND CITY ATTORNEY'S OFFICE (PUBLIC RECORDS TEAM) AT 503-823-4047.

**FINAL**

*Oregon v. Trump*
No. 3:25-cv-01756
**Defendants' Exhibit**
1202

## INCIDENT OBJECTIVES (ICS 202)

| 1. Incident Name: | 2. Operational Period: | Date From: | 10/8/2025 | Date To: | 10/9/2025 |
|---|---|---|---|---|---|
| | | Time From: | 1500 | Time To: | 0300 |

**3. Situation:**

The United States government recently surged additional federal officers to Portland to address nightly demonstrations at the Immigrations and Customs Enforcement facility at 4310 S Macadam Ave in the South Waterfront neighborhood. In addition, President Trump has activated Oregon National Guard resources under Title 10, and mobilized them to support federal resources. Protest activity at the ICE facility has increased in response to these actions.

**4: Commanders' Intent:**

The Portland Police Bureau is committed to upholding the rights of individuals to peacefully protest while maintaining public safety and neighborhood livability. We will provide a visible presence around the ICE facility, and engage with event participants and community members, in order to convey a sense of safety and normalcy in areas impacted by demonstrations, and to encourage lawful behavior. We will attempt, through a dialogue-led approach, to facilitate safe, peaceful, and lawful events.

Due to legal and operational constraints, we will not provide traffic control in the immediate area of the ICE facility unless there is an immediate life safety risk or traffic control is necessary to support tactical operations for Police Bureau resources.

We will monitor protest activity at the ICE facility and attempt to make arrests, when feasible and appropriate, for any person or property crimes that take place. If members of the public are simply obstructing vehicular traffic directly in front of the ICE facility on Bancroft Street, our preferred approach is to allow federal officers to facilitate federal vehicles coming and going from the facility.

We will be prepared to intervene if there are any immediate threats to the lives or safety of community members or federal employees.

Unless directed otherwise, officers assigned to the event should use appropriate initiative, in alignment with the Commander's Intent, to accomplish incident objectives.

**5: Priorities:**

Life Safety
Protecting critical infrastructure and Emergency Transportation Routes
Preventing/Mitigating Disorder (property crimes, person crimes)
Holding individuals accountable for criminal conduct
Respect constitutionally protected lawful speech and assembly
Organizational Legitimacy

| ICS 202 - page 1 | IAP Page: 1 of | |
|---|---|---|

CONFIDENTIAL

## INCIDENT OBJECTIVES (ICS 202)

| 1. Incident Name: | 2. Operational Period: Date From: 10/8/2025 Date To: 10/9/2025 |
|---|---|
| | Time From:  1500  Time To:  0300 |

**6. Management Objectives:**

Provide timely and regular updates to City Leadership regarding demonstrations and protests as they occur, disruptions caused by those assemblies, criminal activity that is occurring within or associated with those public assemblies, and City responses.

Communicate with internal stakeholders regarding information about the ongoing events, Police Bureau responses to the events, and any anticipated or emerging disruptions or risks to City operations or employees.

Notify area hospitals regarding any use of handheld chemical incapacitants, tear gas, or kinetic impact projectiles within a crowd.

Maintain communication with Federal Protective Services leadership to share information and situational awareness regarding life safety issues or criminal conduct (non-immigration related) around the ICE facility and to deconflict response activities.

Coordinate with other City of Portland Bureaus to mitigate impacts to City services and to recover from any disruptions to service or damage that occur during the events.

**7: Operational Objectives:**

Maintain situational awareness around demonstrations around the ICE facility using technology and/or operational resources.

Communicate with event participants before and during the events to encourage safe, lawful, and peaceful assemblies and to deter criminal conduct.

Provide a visible presence in the areas around the ICE facility during demonstrations.

Intervene to address any immediate threats to life or safety of community members or federal employees.

Identify and arrest persons engaged in property crimes or person crimes, as soon as it is safe and feasible to do so.

Address other violations or crimes related to public order as directed by the CMIC.

Provide an appropriate response to fire or medical incidents within or around the events as soon as safe and feasible to do so.

| ICS 202 - page 1 | IAP Page: 2 of | |
|---|---|---|

CONFIDENTIAL

## INCIDENT OBJECTIVES (ICS 202)

| 1. Incident Name: | 2. Operational Period: Date From: 10/8/2025 Date To: 10/9/2025 |
|---|---|
| | Time From: 1500 Time To: 0300 |

**8: Limitations/Constraints:**

All use of force is governed by ORS 181A.708 Use of Tools in Crowd Management, Directive 1010.00 Use of Force, and Directive 1015.00 Less Lethal Weapons and Tools, with additional constraints as outlined in Directive 635.10 Portland Police Bureau Response to Public Order Events.

Use of tear gas, FSDD's, mass detentions, mass arrests, riot declarations, and area closures require CMIC authorization.

ORS 181A.820 to 181A.826, City of Portland Resolution 37277, and PPB Directive 810.10 Bureau Contact with Members of Immigrant Communities all prohibit Bureau members from participating in, facilitating, or using resources for immigration enforcement activities.

ORS 181A.710 Use of Other Law Enforcement Agencies to Engage in Barred Conduct prohibits PPB members from:

Using a proxy law enforcement agency to use crowd management measures that a court or statute has barred the law enforcement agency from using.

Acting in concert with another law enforcement agency to engage in misconduct barred by a court order or statute.

City employees who may be tasked with clearing debris or other restoration tasks in the areas around the ICE facility will not remove debris or barricades on ICE property or that only impact ICE operations (**which may** include immigration activities).

| ICS 202 - page 1 | IAP Page: 3 of |
|---|---|

CONFIDENTIAL

## INCIDENT OBJECTIVES (ICS 202)

| 1. Incident Name: | 2. Operational Period: Date From: 10/8/2025 Date To: 10/9/2025 |
|---|---|
| | Time From: 1500 Time To: 0300 |

**9: Critical Informations Requirements:**

- Information about threats to life or safety
- Presence of community members with firearms
- Information about disruptions to essential functions including emergency transportation routes
- Information about property damage
- Any arrests
- Any uses of force
- Any officer injuries

Radio Net:_SE TAC 1_____

**5. Site Safety Plan Required?** Yes ☐ No ☒

**Approved Site Safety Plan(s) Located at:**

**6. Incident Action Plan (the items checked below are included in this Incident Action Plan):**

| ☒ ICS 203 | ☒ ICS 207 | Other Attachments: |
|---|---|---|
| ☒ ICS 204 | ☐ ICS 208 | ☒ Ice Facility Map |
| ☐ ICS 205 | ☒ Map/Chart | ☐ |
| ☐ ICS 205A | ☐ Weather Forecast/Tides/Currents | ☐ |
| ☒ ICS 206 | | ☐ |

**7. Prepared by:** Name: Adrian Matica    Position/Title: PSC    Signature: AM

**8. Approved by Incident Commander:** Name: Michael Leasure    Signature:

| ICS 202 | IAP Page: 4 of | Date/Time: |
|---|---|---|

CONFIDENTIAL

## ORGANIZATION ASSIGNMENT LIST (ICS 203)

| 1. Incident Name:<br>October 8th, 2025 Event | | 2. Operational Period: Date From: 10/8/2025   Date To: 10/9/2025<br>Time From:   1500   Time To:   0300 | | |
|---|---|---|---|---|

| 3. Incident Commander(s) and Command Staff: | | 7. Operations Section: | | |
|---|---|---|---|---|
| IC/UCs | Commander Franz Schoening | Chief | Lt. Josh Kraner | |
| | | | | |
| Intel | | Fire Operations | Chief Steve Bregman | |
| Intel IMT Rep | ▮▮▮▮ | Fire Plans | | |
| Safety Officer | | RRT | | |
| Public Info. Officer | Sgt. Kevin Allen | Field Command | | |
| Liaison Officer | Lt. Israel Hill | Alpha | | |

| 4. Agency/Organization Representatives: | | Alpha | | |
|---|---|---|---|---|
| Agency/Organization | Name | Bravo | Sgt. Kofoed (Bikes) | |
| Finance Rep. | Ryan Wojcicki | Bravo | | |
| PBEM | Chris Carey / Rachit Nerwal | | ▮▮▮▮▮▮▮▮▮▮▮ | |
| COA | Mike Porter | | | |
| Chief Deputy DA | | | | |
| Senior Deputy DA | M. Mota | Sound Truck | A/Sgt. Derek Carmon | |
| Senior Deputy DA | | QRT | Sgt. James Townley | |

| 5. Planning Section: | | DLO 1 | Sgt. H. Ismail | |
|---|---|---|---|---|
| Chief | Lt. Adrian Matica | FAT 1 | Sgt. Trevor Tyler | |
| Deputy | | FAT2 | | |
| Resources Unit | | DLO 2 | Sgt. Dan DiMatteo | |
| Situation Unit | | OSP - MRT | Sgt. Rod Thomas | |
| Documentation Unit | | | | |
| Demobilization Unit | | MFF Central - C | Sgt. Jeff Livingston | |
| Technical Specialists | | MFF Central - E | Sgt. T. Fergusson | |
| Recorder/Scribe | | MFF East - C | Sgt. Kula | |
| Records | Jennifer Holling | MFF EAST - E | A/Sgt. Gill | |
| Mutual Aid - OSP MRT | Captain Cameron Bailey | MFF North - C | Sgt. R. Boak | |

| 6. Logistics Section: | | MFF North - E | Sgt. J. McDaniel | |
|---|---|---|---|---|
| Chief | Kehau Searle | | | |
| Deputy | | Air Operations Branch | | |
| Support Branch | | Air Ops Branch Dir. | | |
| Director | | | Sgt. Andew Jensen | |
| Supply Unit | | AAR Sergeants | Currier/Pak | |
| Facilities Unit | | 8. Investigations Section: | | |
| Ground Support Unit | | Chief | Sgt. Davis Kyle | |
| Service Branch | | Deputy | | |
| Director | | | | |
| Communications Unit | | | | |
| Medical Unit | | | | |
| Food Unit | | | | |

| 9. Prepared by: Name:   Adrian Matica | Position/Title:   PSC | Signature:   AM |
|---|---|---|
| ICS 203 | IAP Page: 5 of | Date/Time:   10/6/2025 14:00 |

CONFIDENTIAL

## ASSIGNMENT LIST (ICS 204)

| 1. Incident Name: October 8, 2025 Event | 2. Operational Period: Date From: 10/08/2025  Date To: 10/09/2025  Time From: 1500  Time To: 0300 | 3. Branch: Investigations  Division: SRD  Group: RRT  Staging Area: Kelly Building |
|---|---|---|

**4. Operations Personnel:** Name — Contact Number(s)

Operations Section Chief: Lt. Josh Kraner ███████

Branch Director: _____

Division/Group Supervisor: LT Kenneth Duilio ███████

**5. Resources Assigned:**

| Resource Identifier | Leader | # of Persons | Contact (e.g., phone, pager, radio frequency, etc.) | Reporting Location, Special Equipment and Supplies, Remarks, Notes, Information |
|---|---|---|---|---|
| RRT Bravo (Bikes) | Sgt Kofoed | 21 | ██████ | Kelly Building @ 1500 hrs |
| ████████ | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

**6. Work Assignments:**

**7. Special Instructions:**
Cost Center/IO: 9PLCH0000572
Key Case #25-680635

**8. Communications** (radio and/or phone contact numbers needed for this assignment):

| Name/Function | Primary Contact: indicate cell, pager, or radio (frequency/system/channel) |
|---|---|
| _____ / _____ | _____ |
| _____ / _____ | _____ |
| _____ / _____ | _____ |
| _____ / _____ | _____ |

**9. Prepared by:** Name: Andrew Kofoed   Position/Title: RRT Supervisor   Signature: Andrew Kofoed

| ICS 204 | IAP Page _____ | Date/Time: _____ |
|---|---|---|

CONFIDENTIAL

## ASSIGNMENT LIST (ICS 204)

| 1. Incident Name:<br>October 8, 2025 Event | 2. Operational Period:<br>Date From: 10/08/2025 Date To: 10/09/2025<br>Time From: 1500 Time To: 0300 | 3.<br>Branch: Investigations<br>Division: SRD<br>Group: Sound Truck<br>Staging Area:<br>Kelly Penumbra Bldg. |
|---|---|---|

**4. Operations Personnel:** Name     Contact Number(s)

Operations Section Chief: Lt. Josh Kraner    ▮▮▮▮▮

Branch Director: _____

Division/Group Supervisor: _____

**5. Resources Assigned:**

| Resource Identifier | Leader | # of Persons | Contact (e.g., phone, pager, radio frequency, etc.) | Reporting Location, Special Equipment and Supplies, Remarks, Notes, Information |
|---|---|---|---|---|
| Sound Truck | A/Sgt. Derek Carmon | 3 | ▮▮▮▮▮ | Kelly Bldg. @ 1500 hrs |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

**6. Work Assignments:**

**7. Special Instructions:**
Cost Center/IO: 9PLCH0000572
Key Case #25-6806835

**8. Communications** (radio and/or phone contact numbers needed for this assignment):

Name/Function     Primary Contact: indicate cell, pager, or radio (frequency/system/channel)

_____/_____   _____

_____/_____   _____

_____/_____   _____

_____/_____   _____

| 9. Prepared by: Name: Weinberger | Position/Title: SGT/SRD-CNT | Signature: _____ |
|---|---|---|
| ICS 204 | IAP Page ____ | Date/Time: 10/7/2025 @ 1119 by BWW |

CONFIDENTIAL

## ASSIGNMENT LIST (ICS 204)

| 1. Incident Name:<br>October 8, 2025 Event | 2. Operational Period:<br>Date From: 10/08/2025    Date To: 10/09/2025<br>Time From: 1500    Time To: 0300 | 3.<br>Branch:   Investigations<br>Division:   SRD<br>Group:   SERT<br>Staging Area:<br>SRD |
|---|---|---|

| 4. Operations Personnel:   Name | Contact Number(s) |
|---|---|
| Operations Section Chief: Lt. Josh Kraner | ▓▓▓▓▓ |
| Branch Director: _____ | |
| Division/Group Supervisor: _____ | |

| 5. Resources Assigned: | | # of Persons | Contact (e.g., phone, pager, radio frequency, etc.) | Reporting Location, Special Equipment and Supplies, Remarks, Notes, Information |
|---|---|---|---|---|
| Resource Identifier | Leader | | | |
| SERT QRT | Sgt Townley | 4 | ▓▓▓▓▓ | SRD |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

**6. Work Assignments:**
Provide QRT support for event.

**7. Special Instructions:**
Cost Center/IO: 9PLCH0000572
Key Case #25-680635

**8. Communications** (radio and/or phone contact numbers needed for this assignment):

| Name/Function | Primary Contact: indicate cell, pager, or radio (frequency/system/channel) |
|---|---|
| _____ / _____ | _____ |
| _____ / _____ | _____ |
| _____ / _____ | _____ |
| _____ / _____ | _____ |

| 9. Prepared by: Name: Nick Frankus | Position/Title: SGT | Signature: Nick Frankus |
|---|---|---|
| ICS 204 | IAP Page _____ | Date/Time: _____ |

CONFIDENTIAL

## ASSIGNMENT LIST (ICS 204)

| 1. Incident Name:<br>October 8, 2025 | 2. Operational Period:<br>Date From: 10/08/2025   Date To: 10/09/2025<br>Time From: 1500   Time To: 0300 | 3. Branch: Investigations<br><br>Division: SRD<br><br>Group: DLO<br><br>Staging Area:<br>Central Precinct |
|---|---|---|

**4. Operations Personnel:** Name

Operations Section Chief: Lt. Lacey Sparling      Contact Number(s) ███████

Branch Director: _____

Division/Group Supervisor: _____

**5. Resources Assigned:**

| Resource Identifier | Leader | # of Persons | Contact (e.g., phone, pager, radio frequency, etc.) | Reporting Location, Special Equipment and Supplies, Remarks, Notes, Information |
|---|---|---|---|---|
| DLO - 1 | Sgt Ismail | 2 | | Central Precinct |
| DLO - 2 | Sgt DiMatteo | 1 | ████████ | Central Precinct |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

**6. Work Assignments:**




**7. Special Instructions:**
Cost Center/IO: 9PLCH0000572
Key Case #25-680633

**8. Communications** (radio and/or phone contact numbers needed for this assignment):

| Name/Function | Primary Contact: indicate cell, pager, or radio (frequency/system/channel) |
|---|---|
| _____ / _____ | _____ |
| _____ / _____ | _____ |
| _____ / _____ | _____ |
| _____ / _____ | _____ |

| 9. Prepared by: Name: Sgt DiMatteo | Position/Title: Sergeant | Signature: Dan DiMatteo |
|---|---|---|
| **ICS 204** | **IAP Page** 1 | Date/Time: 6-Oct-2025 2010 |

CONFIDENTIAL

## ASSIGNMENT LIST (ICS 204)

| 1. Incident Name: October 8, 2025 Event | 2. Operational Period:<br>Date From: 10/08/2025  Date To: 10/09/2025<br>Time From: 1500  Time To: 0300 | 3. Branch: Investigations<br>Division: Detectives<br>Group: Field Arrest<br>Staging Area: Detectives Division |
|---|---|---|

**4. Operations Personnel:** Name _____ Contact Number(s) _____

Operations Section Chief: Lt. Josh Kraner ████████

Branch Director: _____

Division/Group Supervisor: _____

| 5. Resources Assigned: | | # of Persons | Contact (e.g., phone, pager, radio frequency, etc.) | Reporting Location, Special Equipment and Supplies, Remarks, Notes, Information |
|---|---|---|---|---|
| Resource Identifier | Leader | | | |
| FAT1 | Sgt. Tyler | 6 | | DET Division |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

**6. Work Assignments:**
Provide custody/arrest support for RRT.

**7. Special Instructions:**
Cost Center/IO: 9PLCH0000572
Key Case #25-680635

Vehicles will be secured by Logistics Section Chief.

**8. Communications** (radio and/or phone contact numbers needed for this assignment):
Name/Function _____ Primary Contact: indicate cell, pager, or radio (frequency/system/channel)

_____ / _____ _____
_____ / _____ _____
_____ / _____ _____
_____ / _____ _____

**9. Prepared by:** Name: _____ Position/Title: _____ Signature: _____

| ICS 204 | IAP Page _____ | Date/Time: _____ |
|---|---|---|

CONFIDENTIAL

## ASSIGNMENT LIST (ICS 204)

| 1. Incident Name: October 6, 2025 | 2. Operational Period: Date From: 10/08/2025 Date To: 10/09/2025 Time From: 1500 Time To: 0300 | 3. Branch: CHO  Division: CIU  Group: Intel  Staging Area: Justice Center - 11th floor |
|---|---|---|

**4. Operations Personnel:** Name ___ Contact Number(s)

Operations Section Chief: Lt. Lacey Sparling ████████

Branch Director: _____

Division/Group Supervisor ████████

**5. Resources Assigned:**

| Resource Identifier | Leader | # of Persons | Contact (e.g., phone, pager, radio frequency, etc.) | Reporting Location, Special Equipment and Supplies, Remarks, Notes, Information |
|---|---|---|---|---|
| Intel Officer | ████████ | | | JC – 11th floor classroom |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

**6. Work Assignments:**



**7. Special Instructions:**
Cost Center/IO: 9PLCH0000572
Key Case #25-680633

**8. Communications** (radio and/or phone contact numbers needed for this assignment):

| Name/Function | Primary Contact: indicate cell, pager, or radio (frequency/system/channel) |
|---|---|
| / | |
| / | |
| / | |
| / | |

**9. Prepared by:** Name ████ Position/Title: ████ Signature ████

| ICS 204 | IAP Page ___ | Date/Time: 10/6/25 @ 1054 |

CONFIDENTIAL

## ASSIGNMENT LIST (ICS 204)

| 1. Incident Name: October 8, 2025 Event | 2. Operational Period: Date From: 10/08/2025  Date To: 10/09/2025  Time From: 1500  Time To: 0300 | 3. Branch: Investigations |
|---|---|---|

| 4. Operations Personnel: Name | Contact Number(s) | Division: SRD |
|---|---|---|
| Operations Section Chief: Lt. Josh Kraner | ▮▮▮▮▮▮▮ | Group: Air Support Unit |
| Branch Director: | | Staging Area: |
| Division/Group Supervisor: ASU/Sgt. Brian Sweeney | | Aurora State Airport – KUAO ▮ |

### 5. Resources Assigned:

| Resource Identifier | Leader | # of Persons | Contact (e.g., phone, pager, radio frequency, etc.) | Reporting Location, Special Equipment and Supplies, Remarks, Notes, Information |
|---|---|---|---|---|
| Air Support | Sgt. Andrew Jenson | 2 | ▮▮▮▮▮▮ | KUAO |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

**6. Work Assignments:**

**7. Special Instructions:**
Cost Center/IO: 9PLCH0000572
Key Case #25-680635

**8. Communications** (radio and/or phone contact numbers needed for this assignment):

| Name/Function | Primary Contact: indicate cell, pager, or radio (frequency/system/channel) |
|---|---|
| / | |
| / | |
| / | |
| / | |

**9. Prepared by:** Name: Sgt. Brian Sweeney   Position/Title: Sgt./Chief Pilot   Signature: Brian Sweeney *(digitally signed)*

| ICS 204 | IAP Page ____ | Date/Time: 10/6/25 @ 1404hrs |
|---|---|---|

## ASSIGNMENT LIST (ICS 204)

| 1. Incident Name:<br>October 8, 2025 Event | | 2. Operational Period:<br>Date From: 10/08/2025   Date To: 10/09/2025<br>Time From: 1500   Time To: 0300 | | 3.   Operations<br>Branch: |
|---|---|---|---|---|
| 4. Operations Personnel: Name | | | Contact Number(s) | Division:   North Precinct |
| Operations Section Chief: Lt. Josh Kraner | | | ▮▮▮▮▮▮ | Group: |
| Branch Director: | | | | Staging Area: |
| Division/Group Supervisor: | | | | |

| 5. Resources Assigned: | | # of Persons | Contact (e.g., phone, pager, radio frequency, etc.) | | Reporting Location, Special Equipment and Supplies, Remarks, Notes, Information |
|---|---|---|---|---|---|
| Resource Identifier | Leader | | | | |
| NO C-shift MFF Sgt. | Sgt. Boak | 5 | | | North |
| NO E-shift MFF Sgt. | Sgt. McDaniel | 5 | ███████ | | North |
| NO C-shift AAR Sgt. | Sgt. Currier | | | | North |
| NO E-shift AAR Sgt. | Sgt. Pak | | | | North |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

**6. Work Assignments:**

Designated MFF and AAR Sgt. on UDAR for both C & E shift hours.

**7. Special Instructions:**

Cost Center/IO: 9PLCH0000572
Key Case #25-680635

**8. Communications** (radio and/or phone contact numbers needed for this assignment):

Name/Function                    Primary Contact: indicate cell, pager, or radio (frequency/system/channel)

_____ / _____          _____
_____ / _____          _____
_____ / _____          _____
_____ / _____          _____

**9. Prepared by:** Name: _____   Position/Title: _____   Signature: _____

| ICS 204 | IAP Page ____ | Date/Time: _____ |

CONFIDENTIAL

## ASSIGNMENT LIST (ICS 204)

| 1. Incident Name:<br>October 8, 2025 Event | 2. Operational Period:<br>Date From: 10/08/2025   Date To: 10/09/2025<br>Time From: 1500   Time To: 0300 | 3. Operations<br>Branch:<br>Central Precinct<br>Division: |
|---|---|---|

| 4. Operations Personnel: Name | Contact Number(s) | |
|---|---|---|
| Operations Section Chief: Lt. Josh Kraner | ▮ | Group: |
| Branch Director: _____ | | Staging Area: |
| Division/Group Supervisor: _____ | | |

| 5. Resources Assigned: | | # of Persons | Contact (e.g., phone, pager, radio frequency, etc.) | Reporting Location, Special Equipment and Supplies, Remarks, Notes, Information |
|---|---|---|---|---|
| Resource Identifier | Leader | | | |
| CE C-shift MFF Sgt. | T LIVINGSTON, JEFFF | 6 | | |
| CE E-shift MFF Sgt. | T FERGUSON, TIMOT | 6 | ▮ | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

**6. Work Assignments:**
Designated MFF on UDAR for both C & E shift hours.

**7. Special Instructions:**
Cost Center/IO: 9PLCH0000572
Key Case #25-680635

**8. Communications** (radio and/or phone contact numbers needed for this assignment):

| Name/Function | Primary Contact: indicate cell, pager, or radio (frequency/system/channel) |
|---|---|
| / | |
| / | |
| / | |
| / | |

| 9. Prepared by: Name: Madison Ceaser Jr | Position/Title: A/LT | Signature: Madison Ceaser Jr |
|---|---|---|
| ICS 204 | IAP Page _____ | Date/Time: October 6, 2025 @ 1800 |

CONFIDENTIAL

## ASSIGNMENT LIST (ICS 204)

| 1. Incident Name:<br>Noem Visit 2025 | 2. Operational Period:<br>Date From: 10/08/2025  Date To: 10/08/2025<br>Time From: 1600HRS  Time To: 0200HRS | 3.<br>**Branch:** Law Enforcement |
|---|---|---|
| 4. Operations Personnel: <u>Name</u>  <u>Contact Number(s)</u> | | **Division:** East Precinct |
| Operations Section Chief: Lt. Ty Engstrom | | **Group:** MFF C Shift |
| Branch Director: | | **Staging Area:** |
| Division/Group Supervisor: | | |

| 5. Resources Assigned: | | # of Persons | Contact (e.g., phone, pager, radio frequency, etc.) | Reporting Location, Special Equipment and Supplies, Remarks, Notes, Information |
|---|---|---|---|---|
| Resource Identifier | Leader | | | |
| EAST C MFF | Sgt. Kula | 7 | ███████ | Udar- Designation Only |
| | Ofc. Ionesi | | | |
| | Ofc. Sean Burns | | | |
| | Ofc. Grahn | | | |
| | Ofc. Geroge Anderson | | | |
| | Ofc. K. Jenkins | | | |
| | Ofc. Nyone | | | |
| | Ofc. Zivney | | | |
| | | | | |

**6. Work Assignments:**
Designated MFF if needed.

**7. Special Instructions:**
Cost Center: 9PLCH0000577
Key Case #25-680635

**8. Communications** (radio and/or phone contact numbers needed for this assignment):

| Name/Function | Primary Contact: indicate cell, pager, or radio (frequency/system/channel) |
|---|---|
| / | |
| / | |
| / | |
| / | |

| 9. Prepared by: Name: Nicholas Bianchini | Position/Title: Sergeant | Signature: |
|---|---|---|
| ICS 204 | IAP Page ____ | Date/Time: 10/07/25 1745 |

CONFIDENTIAL

## ASSIGNMENT LIST (ICS 204)

| 1. Incident Name:<br>Noem Visit 2025 | 2. Operational Period:<br>Date From: 10/08/2025    Date To: 10/09/2025<br>Time From: 2200    Time To: 0800 | 3.   EAST<br>Branch:<br>Division: E Shift |
|---|---|---|
| **4. Operations Personnel:** Name     Contact Number(s) | | Group: |
| Operations Section Chief: Lt. Ty Engstrom | | |
| Branch Director: _____ | | Staging Area:<br>East |
| Division/Group Supervisor: _____ | | |

| 5. Resources Assigned: | | # of Persons | Contact (e.g., phone, pager, radio frequency, etc.) | Reporting Location, Special Equipment and Supplies, Remarks, Notes, Information |
|---|---|---|---|---|
| Resource Identifier | Leader | | | |
| MFF, Shift E | A/Sgt Gill | 8 | ███████ | UDAR- EAST |
| | Ofc. J. Francis | | | |
| | Ofc. B. Powell | | | |
| | Ofc. Neidiffer | | | |
| | Ofc. J. Orozco | | | |
| | Ofc. M. Day | | | |
| | Ofc. Bleyl | | | |
| | Ofc. Cronin | | | |

**6. Work Assignments:**
Class B uniform with all PPE.

**7. Special Instructions:**
Cost Center: 9PLCH0000577
Key Case #25-680635

**8. Communications** (radio and/or phone contact numbers needed for this assignment):

| Name/Function | Primary Contact: indicate cell, pager, or radio (frequency/system/channel) |
|---|---|
| / | |
| / | |
| / | |
| / | |

| 9. Prepared by: Name: Bianchini | Position/Title: Sergeant | Signature: |
|---|---|---|
| **ICS 204** | **IAP Page** _____ | Date/Time: 10/7/27 1755 |

CONFIDENTIAL

# ASSIGNMENT LIST (ICS 204)

| 1. Incident Name:<br>OCTOBER 8, 2025 Event | 2. Operational Period:<br>Date From: 10/08/25 Date To: 10/09/25<br>Time From: 1500 Time To: 0300 | | | | 3.<br>Branch: |
|---|---|---|---|---|---|
| **4. Operations Personnel:** | Name and Contact Number(s) | | | | **FIRE-MEDICAL** |
| Deputy Ops Fire-Medical: | Battalion Chief C1 – Mike Pringle | | | | **Staging Area: Various** |
| Branch Director (LM1): | Lincoln Medic 1 – Lt. Damon Simmons | | | | |

| 5. Resources Assigned: | | # of Persons | Contact (e.g., phone, pager, radio frequency, etc.) | | Reporting Location, Special Equipment and Supplies, Remarks, Notes, Information |
|---|---|---|---|---|---|
| Resource Identifier | Leader | | | | |
| Alpha Medic 1 (RMT 1)<br>Alpha Medic 2 (RMT 10)<br>(Move into BU99 as needed) | Schultz<br>Barsotti | 2 | OPS9/SE TAC1/RRTX | | Pickup BU99 at Logistics - keys at Station 23. Brief at SE Precinct @1500 and stage BU99 there. |
| | | | | | |

**6. Work Assignments:**

RRT Fire-Medics will be assigned to support Portland Police and respond appropriately with them. Joint Law Enforcement and Fire-Medical needs will be evaluated when responding to calls for service. Medical care to ill or injured responders and the public, along with initial response to any reported fires, will be provided by RRT Fire-Medics within the area of any civil unrest or any established Modified Response Zone(s). Resource requests will be coordinated by Deputy Ops Fire Medical for:
- Additional Fire resources
- Additional Medical resources to include 911 System, AMR Ambulances
- Arson Investigations and/or FMO Fire Watch or Referral resources
- Hazmat resources
- Any other resources

RRT Fire-Medics will provide safe routes of ingress and egress directions for any resources entering an area of civil unrest or any established Modified Response Zone in coordination with Lincoln Medic 1.

RRT Fire-Medics will embed with RRT squad and move into BU99 as needed.

**7. Special Instructions:**

In the event of a Mass Casualty Incident (MCI), Multnomah County EMS MCI protocols will be implemented and adhered to. Casualty Collection Point(s) (CCP) to be coordinated between PPB with Lincoln Medic 1 and RRT medics. PF&R will contact regional hospital on the MRH talk-group or at 503-494-7333 and advise them of the situation, number of patients, triage status, transport. Heavy Squad 18 will be primary MCI squad.

Use Internal Order **9FREO0000262 Demonstrations - 09/28/2025 60 Days.**

| 8. Communications (radio and/or phone contact numbers needed for this assignment): | |
|---|---|
| Name/Function | Primary Contact: indicate cell, pager, or radio (frequency/system/channel) |
| Fire-Medical Dispatch / County Dispatch | PF DISP (NOT Encrypted) |
| Fire-Medical Ops/ Incident Coordination | OPS 9 (NOT Encrypted) |
| Law Enforcement/ Incident Coordination | SE TAC1 (Encrypted) |
| Law Enforcement/ RRT Operations | RRTX (Encrypted) |
| PFB Talk/Internal Comms | PFB Talk (Semi-private) |

| 9. Prepared by: Name: S. Bregman   Position/Title: Deputy Chief Special Operations   Signature: *Steve Bregman* | | |
|---|---|---|
| ICS 204 | IAP Page | Date/Time: 10/07/25 17:55 |

CONFIDENTIAL

## MEDICAL PLAN (ICS 206)

| 1. Incident Name: OCTOBER 8, 2025 Event | 2. Operational Period: | Date From: 10/08/25 Time From: 1500 | Date To: 10/09/25 Time To: 0300 |
|---|---|---|---|

**3. Medical Aid Stations:** No dedicated aid stations for this incident. 31 staffed PF&R Stations across the city.

**4. Transportation** (indicate air or ground): **No dedicated private ambulance service for this incident. Ambulances will be utilized from the 911 System in coordination with Lincoln Medic 1 and RRT medics.**

| Ambulance Service | Location | Contact Number(s)/Frequency | Level of Service |
|---|---|---|---|
| AMR-Ground | Various | ▓▓▓▓▓ | ■ ALS ☐ BLS |
| Life-Flight Air | Various | ▓▓▓▓▓ | ■ ALS ☐ BLS |
| | | | ☐ ALS ☐ BLS |
| | | | ☐ ALS ☐ BLS |

**5. Hospitals:**

| Hospital Name | Address, Latitude & Longitude if Helipad | Contact Number(s)/ Frequency | Travel Time from Downtown Air | Travel Time from Downtown Ground | Trauma Center | Burn Center | Helipad |
|---|---|---|---|---|---|---|---|
| Emanuel | 2801 N Gantenbein 45°32'35"N 122°40'12"W | 503-413-2200 | 5 Min | 5 Min | ■ Yes Level:____ | ■ Yes ☐ No | ■ Yes ☐ No |
| OHSU | 3181 Sam Jackson Park Rd. 45°29'44.43"N 122°41'14.35"W | 503-494-8311 | 5 Min | 7 Min | ■ Yes Level:____ | ☐ Yes ■ No | ■ Yes ☐ No |
| Providence Portland | 4805 NE Glisan 45°31'41.43"N 122°36'43.34"W | 503-215-1111 | 5 Min | 10 Min | ☐ Yes Level:____ | ☐ Yes ■ No | ■ Yes ☐ No |
| Good Samaritan | 1015 NW 22nd Ave | 503-413-7711 | N/A | 5 Min | ☐ Yes Level:____ | ☐ Yes ■ No | ☐ Yes ☐ No |

**6. Special Medical Emergency Procedures:**

Minor Injuries – Should be assessed, treated as needed, reported up the chain of command, and documented according to bureau specific policies and procedures.

Major Injuries – Same as above, with the following additional: assessed and treated by PF&R and/or AMR personnel as appropriate. C103 shall be notified immediately. Hospital transport shall be coordinated through Deputy Fire-Medical Operations and/or RRT Medics. Deputy Fire-Medical Operations shall notify PPB Operations Chief who **in turn will** notify the IC.

**All injuries, no matter the severity, must be reported up the chain of command.**

In the event of a Mass Casualty Incident, PF&R will contact regional hospital on the MCI talk-group or at 503-494-7333 and advise them of the situation as it relates to the number of patients, patient triage status, and patient transport.

☐ Check box if aviation assets are utilized for rescue. If assets are used, coordinate with Air Operations.

| 7. Prepared by: Name: Steve Bregman – Deputy Chief Special Operations | Signature: *Steve Bregman* |
|---|---|

| 8. Approved by (Safety Officer): Name: _____ | Signature: _____ |
|---|---|

| ICS 206 | IAP Page ____ | Date/Time: 10/07/25 17:45 |
|---|---|---|

CONFIDENTIAL

## IAP MAP

| 1. Incident Name: | 2. Incident Number: | 3. Date/Time Initiated: |
|---|---|---|
| | | Date: 10/8/2025   Time:   1500 |

4. Map/Sketch (include sketch, showing the total area of operations, the incident site/area, impacted and threatened areas, overflight results, trajectories, impacted shorelines, or other graphics depicting situational status and resource assignment):



| 6. Prepared by:  Name: _____ | Position/Title: _____ | Signature: _____ |
|---|---|---|
| **IAP MAP**      Page: 12 of | Date/Time: | |

CONFIDENTIAL

**FOR PUBLICATION**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

FILED

OCT 8 2025

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| STATE OF OREGON and CITY OF PORTLAND, | No. 25-6268 |
| Plaintiffs - Appellees, | D.C. No. 3:25-cv-01756-IM District of Oregon, Portland |
| v. | |
| DONALD J. TRUMP, In his official capacity as President of the United States; et al., | ORDER |
| Defendants - Appellants. | |

Before: GRABER, R. NELSON, and BADE, Circuit Judges.

On September 28, 2025, Secretary Hegseth issued a memorandum

authorizing the federalization and deployment of 200 Oregon National Guard

service members (Memorandum). Plaintiffs, the City of Portland and the State of

Oregon, filed a complaint seeking declaratory and injunctive relief, and moved for

a temporary restraining order to enjoin the implementation of the Memorandum.

*State of Oregon v. Trump*, No. 3:25-CV-1756, Dkt. 6 (D. Or. Sept. 29, 2025) (Dist.

Ct. Dkt.). On October 4, the district court granted Plaintiffs' motion and issued a

temporary restraining order enjoining implementation of the Memorandum. *Id*. at

Dkt. 56. That same day, Defendants filed a notice of appeal, *id*. at Dkt. 57, and an

emergency motion under Circuit Rule 27-3, seeking an administrative stay of the district court's October 4 order, and a stay of that order pending appeal.  Dkt. 11-12.

On October 5, Plaintiffs filed an amended complaint and a second motion seeking a temporary restraining order to enjoin Defendants from deploying members of the California National Guard to Oregon.  Dist. Ct. Dkt. 58, 59.  The district court granted Plaintiffs' motion and entered a second temporary restraining order enjoining the "deploy[ment] [of] federalized members of the National Guard in Oregon."  *Id*. at Dkt. 68.  Defendants have not appealed or challenged the second temporary restraining order, and it is not before us.

In this order, we address only the emergency motion for an administrative stay of the district court's October 4 temporary restraining order.  In a separate order we have set argument on the motion for a stay pending appeal for October 9, 2025.  Dkt. 18.

An administrative stay is intended to "minimize harm while an appellate court deliberates" and lasts "no longer than necessary to make an intelligent decision on the motion for stay pending appeal."  *United States v. Texas*, 144 S. Ct. 797, 798-99 (2024) (Barrett, J., concurring); *see also Nken v. Holder*, 556 U.S. 418, 427 (2009) (explaining that the authority to enter an administrative stay "allows an appellate court to act responsibly").  Given its limited nature, an

administrative stay "does not constitute in any way a decision as to the merits of the motion for a stay pending appeal." *Doe #1 v. Trump*, 944 F.3d 1222, 1223 (9th Cir. 2019). And we "defer weighing the *Nken* factors until the motion for stay pending appeal is considered." *Nat'l Urb. League v. Ross*, 977 F.3d 698, 702 (9th Cir. 2020) (footnote omitted).

"When considering the request for an administrative stay, our touchstone is the need to preserve the status quo." *Id.* That inquiry necessarily depends "on the facts of this case." *Id.* at 701. We ask what real-world effects would result "if an administrative stay is put in place." *Id.*; *accord Doe #1*, 944 F.3d at 1223 (examining the practical effects of "granting the temporary stay request").

In the circumstances here, granting an administrative stay will best preserve the status quo. Prior to the October 4 temporary restraining order, Oregon National Guard members had been federalized but not deployed. The Memorandum authorized federalization of the Oregon National Guard members. An administrative stay of the October 4 temporary restraining order will maintain the federalization of Oregon National Guard members, because that order prohibits implementation of the Memorandum. Additionally, the second temporary restraining order has not been challenged or appealed, and it prohibits the deployment of National Guard members in Oregon. Thus, the effect of granting an administrative stay preserves the status quo in which National Guard members

3

have been federalized but not deployed.

**Administrative Stay GRANTED.**

**A180**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **STATE OF OREGON**; the **CITY OF PORTLAND**; and **STATE OF CALIFORNIA**, | Case No. 3:25-cv-1756-IM |
| Plaintiffs, | **SECOND TEMPORARY RESTRAINING ORDER** |
| v. | |
| **DONALD TRUMP**, in his official capacity as President of the United States; **PETE HEGSETH**, in his official capacity as Secretary of Defense; **U.S. DEPARTMENT OF DEFENSE**; **KRISTI NOEM**, in her official capacity as Secretary of Homeland Security; and **U.S. DEPARTMENT OF HOMELAND SECURITY**, | |
| Defendants. | |

Based on this Court's prior Opinion and Order Granting Plaintiffs' First Motion for Temporary Restraining Order, ECF 56; the hearing on Plaintiffs' Second Motion for Temporary Restraining Order; and the newly submitted declarations, ECF 60, 63, 65, this Court GRANTS Plaintiffs' Second Motion for Temporary Restraining Order, ECF 59, and ORDERS as follows:

    1.    Defendants are temporarily enjoined from deploying federalized members of the National Guard in Oregon.

2.      This Second Temporary Restraining Order expires by its own terms in fourteen days on October 19, 2025.

3.      Plaintiffs are ORDERED to post a nominal bond of $100 within 48 hours. The bond shall be filed in the Clerk's Office and be deposited into the registry of the Court.

4.      Defendants' Request to Stay or Administratively Stay this Second Temporary Restraining Order, which was raised in the hearing on Plaintiffs' Second Motion for Temporary Restraining Order, is DENIED.

5.      The Court Clerk will contact the parties to schedule a telephone hearing on October 17, 2025, to address whether this Second Temporary Restraining Order should be extended for another 14 days.

6.      Any motion for a Preliminary Injunction shall be filed no later than October 17, 2025; Defendants' opposition shall be due no later than October 23, 2025, and Plaintiffs' reply shall be due on October 27, 2025.

7.      A combined hearing on the preliminary injunction motion and a trial on the merits under Rule 65(a)(2) is set for October 29, 2025, before the Honorable Judge Karin J. Immergut, in Courtroom 13A, beginning at 9:00 a.m.

**IT IS SO ORDERED**

DATED this 5th day of October.


/s/ Karin J. Immergut
Karin J. Immergut
United States District Judge


**A182**

| EXHIBIT |
|---|
| 15 |
| DEPONENT NAME: | DATE: |
| Timothy Rieger | 10/23/2025 |

Outlook

**Fwd: R8 Daily SITREP Portland: 5 OCT 25**

**From** Merenkov, Jeffrey A COL USARMY ARNORTH (USA)  [PII]

**Date** Sun 10/5/2025 4:00 PM

**To** Francemone, Colton J CPT USARMY ARNORTH (USA)  [PII] Strange, Cameron S LTC USARMY ARNORTH (USA) [PII] Kardong, Nicholas G MAJ USARMY ARNORTH (USA) [PII] Konefal, Jason J LTC USARMY ARNORTH (USA)
[PII]

Forgot to CC my team on the SITREP to the CG. Colton, add you all to the email DL tomorrow.

Monitoring your activities and proud of you all.

COL Jeff Merenkov
Defense Coordinating Officer
DCE Region 8
Denver Federal Center
Denver, Colorado

[PII]

---

**From:** "Merenkov, Jeffrey A COL USARMY ARNORTH (USA)"
< [PII] >
**Date:** Sunday, October 5, 2025 at 15:35:36
**To:** "Pepin, Allan M LTG USARMY ARNORTH (USA)" < [PII] >
**Cc:** "USA" < [PII] >, "USA" <Scott M MG USARMY NORAD-USNC ARNORTH scott.m.sherman.mil@army.mil>, "USA" <Jimmy L COL USARMY ARNORTH [PII] >, "USA" <Damon P SES USARMY [PII] >, "USA" <Jerimiah E CSM USARMY ARNORTH
[PII] USA" <T Jason COL USARMY ARNORTH
, "USA" <David Sean CIV USARMY ARNORTH
>, "USA" <Edward B COL USARMY ARNORTH
"USA" <John R JR CIV USARMY ARNORTH
USARMY JB San Antonio ARNORTH Mailbox OPS CENTER-
AOC [PII] <USARMY JB San Antonio
ARNORTH Mailbox OPS CENTER-AOC [PII] >,
"USA" <Ivan J CIV NORAD-USNC ARNORTH [PII] >, "USA" <Katie
Maree LTC USARMY ARNORTH [PII] , "Dave C Beachman CIV
ARNORTH [PII] <Dave C Beachman CIV ARNORTH

[PII]

PLAINTIFF'S EXHIBIT
202
3:25-cv-01756-IM

A183



**Subject:** R8 Daily SITREP Portland: 5 OCT 25

Sir,

BLUF: 101 Soldiers from Task Force Spartan were received at Portland Internation Airport, with an additional 99 Soldiers arriving this afternoon. TF Spartan leadership was oriented to the JOA during a Leader's reconnaissance with the ARNORTH DCG/O, MG Knell. TF Oregon is currently enjoined from mobilization but stands at 99.5% training and administrative readiness. The plan for TF Oregon movement to BSI Withycombe was planned prior to the legal enjoinment and is prepared to be swiftly executed on order.


**DCE Region 8 (ARNORTH TAC FWD)**

· LSA Progress: LSA at BSI Withycombe is currently FOC with the capability to support 255 Soldiers.

· 32 staff augmentees are now on-site and assigned to their roles. Pending arrival of 3 additional augmentees.

· TF Rose Shield LNO has arrived at the TAC and aiding in tracking status and issues with the BN TF.

· The routing chain for Requests for Assistance (RFAs) from the Lead federal Agencies (LFA) has been codified and disseminated through the EPLOs embedded at the agencies' fusion cells.

  - Conducted 13x vehicle convoy to transport TF Spartan to BSI Withycombe.


**TF Rose Shield (ORARNG)**

· 199 Soldiers have completed SRP/ 199 Soldiers have received Orders (Final SM will be complete 06OCT.)

· 189 Soldiers Completed JRSOI (99%)

· 189 Soldiers have initiated CDO Training

· 50/50 qualified on the M17 Pistol (100%)

· 149/150 qualified on the M4 Rifle (99.5%)

· A nine Soldier "small response team" completed the first shift at the ICE Facility.


**Last 24 Hours:**

**A184**

| Local Time | DST Time | Event | Location | Who |
|---|---|---|---|---|
| | | **05OCT** | | |
| 0000 | 0200 | Advanced MP squad shift conclusion | ICE Facility, Portland, OR | OR NG |
| 0030 | 0230 | Advanced MP RP LSA W | Camp Withycombe | OR NG |
| 0445 | 0645 | Flight pickup Mission SP | LSA Withycombe | FWD TAC Staff |
| 0620 | 0820 | Flight #1 Wheels Down (W/D) | Portland Airport | TF Spartan |
| 0650 | 0850 | SP with TF Spartan to LSA W | Portland Airport | TF Spartan, FWD TAC Staff |
| 0720 | 0920 | TF Spartan RP | LSA Withycombe | TF Spartan, FWD TAC Staff |
| 1315-1715 | 1515-1915 | Leader's RECON | ICE BLDG | TF Spartan |

**Next 24 Hours:**

| Local Time | DST Time | Event | Location | Who |
|---|---|---|---|---|
| | | **06OCT (Tentative)** | | |
| 0900 | 1100 | ADVON SP LSA W | Camp Rilea | OR NG |
| 0946 | 1146 | Chalk #2 W/D | Portland Airport | TF Spartan, FWD TAC Staff |
| 0800 | 1000 | SRP #2 | Camp Rilea | OR NG |
| 1045 | 1245 | TF Spartan TP | LSA Withycombe | TF Spartan, FWD TAC Staff |
| 1200 | 1400 | ADVON RP LSA W | Camp Withycombe | OR NG |
| 1400 | 1600 | Main Body 1 SP LSA W | Camp Rilea | OR NG |
| 1700 | 1900 | Main Body 1 RP LSA W | Camp Withycombe | OR NG |

**RFA Status:**

We have received one RFA t[_____ **A/C Priv.** _____]to provide 40x Soldiers to the ICE/U.S. and Customs Building (4310 SW Macadam Avenue, Portland, OR) from 1500-0100 during the duration of 06-12OCT25.

Additionally, TF Spartan is prepared to supply a Mobile Assistance Team (MAT) to provide assisted support/egress to Soldiers as required. This is not an RFA but is authorized by DOD force protection authorities.

Upon discussion with the LFE, we have determined the following requirements:

- C2: 27 PAX
- FPM daily at ICE Facility: 40 PAX
- MAT (formerly "QRF"-additional Soldiers if required at ICE Facility): 18 PAX
- Force protection at Camp Withycombe: 18 - 27 PAX [depending on shift (8 hours versus 12)]
- ** TOTAL: 103-112 PAX per day.  We have more than sufficient capacity to meet the LFA's needs.

Based off the requirements above, if requested we could provide 24/7 support to the Federal ICE BLDG as soon as tomorrow.


Pending your questions.

COL Jeff Merenkov

Defense Coordinating Officer

Region 8

ARNORTH FWD CP


**A185**



COL Jeff Merenkov
Defense Coordinating Officer
DCE Region 8
Denver Federal Center
Denver, Colorado

**PII**

A186

DAN RAYFIELD
Attorney General
BENJAMIN GUTMAN
Solicitor General
DUSTIN BUEHLER
Special Counsel
SCOTT KENNEDY #T25070201, D.C. Bar #1658085
BRIAN SIMMONDS MARSHALL #196129
THOMAS CASTELLI #226448
IAN VAN LOH #225163
RACHEL SOWRAY #095159
Senior Assistant Attorneys General
ALEXANDER C. JONES #213898
DEREK OLSON #225504
Assistant Attorneys General
100 SW Market Street
Portland, OR 97201
Telephone: (971) 673-1880
Fax: (971) 673-5000
Email: Scott.Kennedy@doj.oregon.gov

*Counsel for the State of Oregon*

[Additional counsel to appear on signature page]

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| STATE OF OREGON, the CITY OF PORTLAND, and the STATE OF CALIFORNIA<br><br>Plaintiffs,<br><br>v.<br><br>DONALD TRUMP, in his official capacity as President of the United States; PETE HEGSETH, in his official capacity as Secretary of Defense; U.S. DEPARTMENT OF DEFENSE; KRISTI NOEM, in her official capacity as Secretary of Homeland Security; and U.S. DEPARTMENT OF HOMELAND SECURITY,<br><br>Defendants. | Case No.<br><br>AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF |

Page 1 -    AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## I. INTRODUCTION

1.      The "traditional and strong resistance of Americans to any military intrusion into civilian affairs" has "deep roots in our history." *Laird v. Tatum*, 408 U.S. 1, 15 (1972). Our nation's founders recognized that military rule—particularly by a remote authority indifferent to local needs—was incompatible with liberty and democracy. Foundational principles of American law therefore limit the President's authority to involve the military in domestic affairs.

2.      Those principles stem first from the U.S. Constitution, which reserves the general police power for the states while establishing civilian control over the military. It also affords Congress, not the President, the power "to provide for calling forth the militia to execute the laws of the union, suppress insurrections, and repel invasions." Art. I, § 8, cl. 15–16. While Congress has delegated a portion of that power to the Executive, it carefully limited the President's authority to exert control over a state's National Guard—the modern term for the militia—to specific circumstances. And for over a century and a half, Congress has expressly forbidden federal military interference in civilian law enforcement.

3.      Defendants have trampled on these principles by federalizing members of the Oregon National Guard for deployment in Portland, Oregon, to participate in civilian law enforcement. On September 28, 2025, the Secretary of Defense (now referred to as the Secretary of War) issued a memorandum calling into federal service 200 members of the Oregon National Guard. This order effectuated a social media post by President Trump on September 27, 2025, which authorized the Secretary to employ "Troops" using "Full Force" in Portland. Citing nothing more than baseless, wildly hyperbolic pretext—the President says Portland is a "War ravaged" city "under siege" from "domestic terrorists"—Defendants have thus infringed on Oregon's sovereign power to manage its own law enforcement activity and National Guard

Page 2 -    AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

resource. Far from promoting public safety, Defendants' provocative and arbitrary actions threaten to undermine public safety by inciting a public outcry.

4.    The facts cannot justify this overreach. While Defendants' actions appear focused on ongoing protests near an Immigration and Customs Enforcement facility in Portland, those protests have been small in recent weeks—typically involving less than thirty people—and the protesters' activities have not necessitated any arrests since mid-June. But Defendants' heavy-handed deployment of troops threatens to escalate tensions and stokes new unrest, meaning more of the Plaintiffs' law enforcement resources will be spent responding to the predictable consequences of Defendants' action.

5.    Defendants' deployment of troops to Oregon is patently unlawful. Because their stated basis for federalizing members of Oregon's National Guard is patently pretextual and baseless, Defendants cannot satisfy any of the three perquisites for involuntarily federalizing a state's National Guard under 10 U.S.C. § 12406. Defendants' purpose in federalizing those troops—to integrate them into federal law enforcement activities in Portland—also violates the Posse Comitatus Act.

6.    Additionally, Defendants' actions violate the Tenth Amendment's guarantee that the police power—including the authority to promote safety at protests and deter violent crime—resides with the states, not the federal government. And by singling out a particular disfavored jurisdiction for political retribution, these actions also eviscerate the constitutional principle that the states' sovereignty should be treated equally.

7.    For these and other reasons discussed below, Defendants' actions should be declared unlawful and preliminarily and permanently enjoined.

Page 3 -    AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

## II. JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 2201(a) and the Administrative Procedure Act, 5 U.S.C. §§ 701–706.

9.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(2) and (e)(1). Defendants are agencies of the United States and officers sued in their respective official capacities. The State of Oregon is a resident of this district, and a substantial part of the events or omissions giving rise to this Complaint occurred and continue to occur within the District of Oregon.

## III. PARTIES

### A.    Plaintiffs

10.     The State of Oregon is a sovereign state of the United States. Oregon is represented by Attorney General Dan Rayfield, who is the chief legal officer of Oregon.

11.     Plaintiff City of Portland is a municipal corporation of the State of Oregon duly organized and existing under the laws of the State of Oregon. The Portland Police Bureau (PPB) is a bureau of the City of Portland. PPB is the largest law enforcement agency in Oregon and has the primary responsibility for policing the City of Portland.

12.     The State of California is a sovereign State of the United States. California is represented by Attorney General Rob Bonta, who is the chief legal officer of Oregon. California Governor Gavin Newsom is the Commander in Chief of the California National Guard.

### B.    Defendants

13.     Donald Trump is President of the United States. As such, he is the Commander-in-Chief of the United States' armed forces, including those portions of the National Guard lawfully under federal control. He is sued in his official capacity for declaratory relief only.

Page 4 -    AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

14.     Pete Hegseth is Secretary of Defense and the head of the U.S. Department of Defense. He is sued in his official capacity.

15.     The U.S. Department of Defense (DOD) is a department of the Executive Branch of the United States government responsible for coordinating and supervising the United States armed forces, including those portions of the National Guard lawfully under federal control. DOD is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1). On September 5, 2025, President Trump issued Executive Order 14,347, entitled "Restoring the United States Department of War," in which he stated that the Department of Defense "may be referred to as the Department of War" as a secondary title in certain contexts. 90 Fed. Reg. 43893, 43893 (Sept. 5, 2025).

16.     Kristi Noem is Secretary of Homeland Security and the head of the U.S. Department of Homeland Security. She is sued in her official capacity.

17.     The U.S. Department of Homeland Security (DHS) is a department of the Executive Branch of the United States government. DHS is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1). One component of DHS is U.S. Immigration and Customs Enforcement (ICE).

## IV. BACKGROUND

### A.     The Oregon National Guard is a State-Based Military Reserve Force

18.     The U.S. Constitution authorizes Congress "to provide for calling forth the militia to execute the laws of the union, suppress insurrections, and repel invasions." U.S. Const. art. I, § 8, cl. 15–16. This state-based militia that existed at the nation's founding was the forerunner of the modern National Guard.

Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

19.     Today, the National Guard is a state-based military reserve force that consists of two overlapping but distinct organizations: the National Guard of the various States and the National Guard of the United States. Since 1933, anyone who enlists in a state's National Guard is simultaneously enlisted into the National Guard of the United States. And when a member of a state's National Guard is ordered into federal service, that member is relieved of his or her status in the state's National Guard for the duration of that federal service.

20.     Members of the National Guard may serve in one of three capacities: State Active Duty status, Title 32 status, and Title 10 status.

21.     First, members of the National Guard may serve in "State Active Duty" status. This means they exercise state functions under the authority of their state's governor, and their actions generally are governed by state law. For example, when wildfires occur in Oregon, Governor Kotek frequently authorizes the Oregon National Guard to assist with firefighting efforts.

22.     Second, members of the National Guard may serve in a hybrid federal-state status under Title 32 of the United States Code. In particular, 32 U.S.C. § 502(f)(2)(A) provides that, "[u]nder regulations to be prescribed by the Secretary of the Army or Secretary of the Air Force, as the case may be, a member of the National Guard may," under certain circumstances, "be ordered to perform" enumerated duties, including "[s]upport of operations or missions undertaken by the member's unit at the request of the President or Secretary of Defense." The United States has traditionally recognized that National Guard members serving federal missions in Title 32 status must have the consent not only of their home state's governor but also the consent of any other governors concerned in the mission. Here, Oregon does not consent to the deployment of Oregon National Guard members pursuant to 32 U.S.C. § 502(f)(2)(A).

Page 6 -    AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

23.     Third, members of the National Guard may be "federalized" and called into

federal service in what is known as "Title 10" status under Title 10 of the United States Code.

The President's authority under Title 10 is carefully limited to specific circumstances under 10

U.S.C. § 12406.

**B.     10 U.S.C. § 12406 Limits the Circumstances When a President Can Call a State's National Guard Members into Federal Service**

24.     Congress has granted the President authority over the states' respective National

Guards, but it carefully limited that authority to specific circumstances. As relevant here, 10

U.S.C. § 12406 provides that:

> Whenever-
>
> (1) the United States, or any of the Commonwealths or possessions, is invaded or is in danger of invasion by a foreign nation;
>
> (2) there is a rebellion or danger of a rebellion against the authority of the Government of the United States; or
>
> (3) the President is unable with the regular forces to execute the laws of the United States;
>
> the President may call into Federal service members and units of the National Guard of any State in such numbers as he considers necessary to repel the invasion, suppress the rebellion, or execute those laws. Orders for these purposes shall be issued through the governors of the States or, in the case of the District of Columbia, through the commanding general of the National Guard of the District of Columbia.

25.     Thus, the President's authority over a state's National Guard pursuant to § 12406

is limited to circumstances involving a foreign nation's "invasion," an outright "rebellion," or

where the President has been "unable with regular forces" to execute Federal Law through

ordinary means. And if one of those circumstances is present, the President "shall" issue any

orders to a state's National Guard "through" that state's governor.

Page 7 -    AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

**A193**

C.    **The Posse Comitatus Act Prohibits the Deployment of Federalized National Guard Troops for the Purpose of Civilian Law Enforcement**

26.    The President's authority over a state's National Guard is subject to other constraints as well. The Posse Comitatus Act, 18 U.S.C. § 1385, prohibits anyone from deploying the U.S. military—including any National Guard members in federal service—for the purpose of civilian law enforcement within the United States. That prohibition applies "except in cases . . . expressly authorized by the Constitution or Act of Congress." *Id.*

27.    Notably, 10 U.S.C. § 12406 does not confer an exception to the Posse Comitatus Act because, while it authorizes the president to "call into federal service" a state's National Guard under certain circumstances, it does not authorize the president to domestically deploy the National Guard in pursuit of any particular purpose. This stands in contrast to other statutory provisions, like 10 U.S.C. § 252, which authorizes the President to not only "call into Federal service . . . the militia of any state" but also "*use* such of the armed forces" in specified law enforcement activities under certain circumstances (emphasis added).

28.    In light of these restrictions—together with Americans' "traditional insistence on limitations on military operations in peacetime," *Laird*, 408 U.S. at 15—it is unsurprising that until the last few months, no President had invoked § 12406 since President Nixon called up the National Guard to deliver mail during a Postal Service Strike over 50 years ago. *See* Exec. Order No. 11519, 35 Fed. Reg. 5003 (1970).

29.    The legal and normative constraints on presidential authority to federalize and deploy a state's National Guard are so well established that President Trump previously acknowledged them. Questioned in September 2020 about his commitment to restore law and order, the President said, "[w]e have laws. We have to go by the laws. We can't move in the National Guard. . . . Even in a Portland [Oregon] case, we can't call in the National Guard unless

Page 8 -    AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

we're requested by a governor."[1] Instead, the president emphasized that communication and cooperation is key, because even "[i]f a governor or a mayor is a Democrat, like in Portland, we call them constantly."

**D.    The President Has Repeatedly Expressed Intentions to Use the Military for Routine Domestic Law Enforcement**

30.    Despite his prior statements, the President has shared his plans to deploy members of the National Guard to further his civilian law enforcement priorities.

31.    For example, asked in April 2024 whether his domestic immigration enforcement efforts would include using the U.S. military, President Trump said "It would."[2] The president continued that he would have "no problem using the military," which he understood to include "the National Guard," in order to further his domestic priorities and promote "law and order in our country."[3] Asked whether he would go so far as to override the Posse Comitatus Act, the President opined that the Act would not apply to immigration enforcement because in his view, "these [undocumented immigrants] aren't civilians. These are people that aren't legally in our country."[4]

---

[1] Meg Kinnard & Adriana Gomez Licon, *In His Own Words: Trump Said During 2024 Campaign He Would Use Military for Immigration Enforcement*, AP News (June 10, 2025, at 5:10 PM PT), https://apnews.com/article/trump-immigration-military-los-angeles-a2611009fd40d593f07c58255911513d.

[2] *Read the Full Transcripts of Donald Trump's Interviews With TIME*, TIME Mag. (Apr. 30, 2024, at 6:27 PM ET), https://time.com/6972022/donald-trump-transcript-2024-election/.

[3] *Id.*

[4] *Id.*

Page 9 -    AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

32.     Similarly, on November 17, 2024, when a social media post predicted that President Trump "will declare a national emergency and will use military assets" to implement "a mass deportation program," the President responded: "TRUE!!!"[5]

**E.    Defendants Have Since Used the Military for Civilian Law Enforcement in Los Angeles and Washington, D.C.**

33.     Prior to President Trump ordering troops to Portland, federalized national guard and active-duty soldiers were first deployed in Los Angeles, California, and then Washington, D.C.

34.     Trump federalized the California National Guard on June 7, 2025, following a day of aggressive immigration enforcement activity in the Los Angeles metropolitan area. The authorization memorandum cited 10 U.S.C. § 12406 as legal authority, and claimed a factual basis of violence, disorder, and damage to federal property. *Newsom v Trump*, 141 F.4th 1032, 1041, 1051 (9th Cir., 2025).

35.     California filed suit claiming, among other things, that the federal action violated the Posse Comitatus Act. On September 2, 2025, the district court found that the Trump administration had "instigated a months-long deployment of the National Guard and Marines to Los Angeles for the purpose of establishing a military presence there and enforcing federal law. Such conduct is a serious violation of the Posse Comitatus Act." *Newsom v. Trump*, No. 3:25-cv-04870-CRB, 2025 WL 2501619, at *24 (N.D. Cal. Sept. 2, 2025).

36.     On August 11, 2025, the Trump administration's focus turned to Washington, D.C. At a press conference that day, President Trump announced the planned deployment of the

---

[5] Meg Kinnard & Adriana Gomez Licon, *In His Own Words: Trump Said During 2024 Campaign He Would Use Military for Immigration Enforcement*, AP News(June 10, 2025, at 5:10 PM PT), https://apnews.com/article/trump-immigration-military-los-angeles-a2611009fd40d593f07c58255911513d.

Page 10 -  AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

D.C. National Guard into the district to "to rescue our nation's capital from crime, bloodshed, bedlam and squalor and worse."[6] He called it "Liberation Day in DC," and said, "we're gonna take our capital back."[7]

37.    The same day, Defendant Hegseth also announced that National Guard troops would be deployed in D.C. to "stand with their law enforcement partners"—which, he said, was the "same thing" the National Guard did in Los Angeles. The Trump administration deployed national guard troops from D.C. and seven other states into Washington, D.C.[8]

38.    On September 4, 2025, the District of Columbia filed a lawsuit challenging that deployment on multiple grounds. D.C. alleged that, among other harms, the "encroachment of National Guard troops in the District has also already caused harm to public safety in the District." Complaint ¶¶ 129–30, *District of Columbia v. Trump*, No. 1:25-cv-03005 (D.D.C. Sept. 4, 2025), Dkt. No. 1.

**F.    Portlanders Protest Against Portland ICE Facility**

39.    On June 2, 2025, for the first time, federal authorities arrested an asylum-seeker at Immigration Court in Portland.[9]  This arrest catalyzed small public protests at Portland's ICE facility, located at 4310 S. Macadam Avenue.

---

[6] AP Archive, *Trump Says He's [sic] Wants to Rescue Washington, DC from 'Crime, Bloodshed, Bedlam, and Squalor'* (YouTube, Aug. 11, 2025), https://www.youtube.com/watch?v=O-C0NwtFKoU

[7] *Id.*

[8] Brian Krans, *California Argues Trump's Use of Troops in LA Violated Federal Law*, KQED (Aug. 12, 2025 at 11:33 AM PT) https://www.kqed.org/news/12051797/california-argues-trumps-use-of-troops-in-l-a-violated-federal-law

[9] Fedor Zarkhin & Zaeem Shaikh, *How ICE Protests Have Unfolded in Portland, From June Until Now*, The Oregonian (Sept. 12, 2025, at 11:27 AM PT), https://www.oregonlive.com/portland/2025/09/how-ice-protests-have-unfolded-in-portland-from-june-until-now.html.

Page 11 -  AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

40.      On June 6, 2025, protests began in Los Angeles following increased immigration enforcement activities in the city.[10] In the following days, small protests continued outside of Portland's ICE facility. At one point, protestors blocked an ICE driveway with a makeshift barricade.  Portland Police Bureau (PPB) officers cleared the barricade within minutes, citing safety concerns.[11] Protests in Portland continued, with PPB officers taking appropriate action, arresting those few ICE-facility protesters who engaged in criminal activity.[12]

41.      On June 15, 2025, Portland Mayor Keith Wilson, reacting to troop deployments in Los Angeles, stated that Portland does not need help from National Guard.[13] Subsequent events proved the Mayor correct.

42.      The small protests at the ICE facility became less energetic and required less law-enforcement involvement. Indeed, the last arrest PPB made at those protests was on June 19, 2025.[14] In the days since, PPB has monitored the near-nightly protests, none of which required

---

[10] *Id.*

[11] Zaeem Shaikh, *Portland Police Clear Blockade of ICE Office; Chief Says It Was for Safety Not Immigration Information*, The Oregonian (June 10, 2025, at 6:19 AM PT), https://www.oregonlive.com/crime/2025/06/portland-police-clear-blockade-of-ice-office-chief-says-it-was-for-safety-not-immigration-enforcement.html.

[12] Tatum Todd, *Portland Police Arrest 10 at ICE Protest as Nationwide Demonstrations Continue*, The Oregonian (June 13, 2025, at 2:53 PM PT), https://www.oregonlive.com/crime/2025/06/portland-police-arrest-10-at-ice-protest-as-nationwide-demonstrations-continue.html.

[13] Zane Sparling, *How Protests Outside Portland ICE Unfolded Before Trump's Troop Announcement*, The Oregonian (Sept. 27, 2025, at 7:36 PM PT) https://www.oregonlive.com/politics/2025/09/how-protests-outside-portland-ice-unfolded-before-trumps-troop-announcement.html.

[14] Fedor Zarkhin & Zaeem Shaikh, *How ICE Protests Have Unfolded in Portland, From June Until Now*, The Oregonian (Sept. 12, 2025, at 11:27 AM PT), https://www.oregonlive.com/portland/2025/09/how-ice-protests-have-unfolded-in-portland-from-june-until-now.html. *But see* Sparling, *supra* note 13 (noting that federal authorities made arrests on July 4).

Page 12 -  AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

police intervention to protect public safety or interdict criminal activity on the part of the protesters.

43.    On July 8, 2025, as small ICE-facility protests continued, Tom Homan, the President's "Border Czar," pledged that immigration enforcement officers would be "tripling down" on enforcement in Portland.[15]

44.    On July 19, 2025, protests continued with up to 60 people gathered at the ICE facility. A PPB officer described the group as "low energy and seated quietly."[16]

45.    Sporadic protests continued over the subsequent weeks. On September 1, 2025, over 100 protestors marched to the ICE building. In response, federal officers deployed chemical gas and pepperballs at the crowd.[17]

## G.    Local Law Enforcement Authorities Have Been and Remain Fully Equipped to Address the Protests

46.    Portland Police Bureau is a sophisticated law-enforcement agency employing 812 full-time officers. Every officer receives basic crowd management training and specialized teams receive up to forty hours of annual crowd management training.

47.    PPB's Central Precinct covers downtown Portland, where most public protests occur. As a result, Central Precinct officers have significant experience in protest management. Portland's ICE facility is located within PPB's Central Precinct, which employs 80 full-time officers who are the ideal frontline force for monitoring and responding to the small ongoing ICE-facility protests.

---

[15] Zarkhin & Shaikh, *supra* note 14.

[16] *Id.*

[17] *Id.*

Page 13 -  AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

48.     PPB monitors social media and regularly communicates with protest organizers to develop internal risk assessments associated with public protests. Based on the needs associated with any protest, PPB can deploy additional personnel from other precincts, activate crowd management incident commanders, call in PPB's Rapid Reaction Team, bring in off-duty officers, or rely on an extensive network of other local, county, and state agencies.

49.     PPB has needed to activate such resources during select times in response to protests involving the ICE Facility in June and July of 2025. And in that single instance, on or around July 17, 2025, the Rapid Reaction Team was deployed in connection with ensuring public order during a planned march from a nearby park to the ICE-facility. In every case before and after July 17, 2025, baseline Central Precinct monitoring has been sufficient to maintain public safety at the ICE-facility protests.

**H.     In September 2025, the President Turned His Attention to Portland, Oregon**

50.     Aside from the incidents discussed above, the ICE-facility protests have generally been small and are frequently sedate. On any given weekend, the nightlife in Portland's entertainment district warrants greater PPB resources than have the small, nightly protests in front of the ICE facility a few blocks away.

51.     Nonetheless, on September 5, 2025, Fox News aired a report on Portland ICE protests that included misleading clips from Portland protests in 2020.[18]

52.     Shortly thereafter, President Trump appeared to reference events in the same misleading FoxNews report when speaking to the press. A reporter asked which city President Trump planned to send troops to next, and he said he was considering targeting Portland because of news coverage the night before. President Trump alleged that "paid terrorists" and "paid

---

[18] *Id.*

Page 14 -  AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

agitators" were making the city unlivable, further stating "[a]nd when we go there, if we go to Portland, we're gonna wipe them out. They're going to be gone and they're going to be gone fast. They won't even stand the fight."[19]

53.    President Trump later designated Antifa a terrorist organization on September 19, 2025. Afterward, he described a plan to insert federal personnel in cities such as Chicago, Memphis, and Portland. He stated "Have you seen Portland at all? You take a look what's happening in Portland. It's uh I mean, this has been going on for years. It's just people out of control. Crazy. We're going to stop that very soon."[20]

54.    While answering questions from the press on September 25, 2025, the President baselessly insisted people had "just burned the place down."[21] He said Portland is "on my list of things that I want to do before, uh, we finish up with the cities because I think we're going to whip the cities into shape. . . ." The President declared his intention "to get out there" and "do a pretty big number of those people in Portland that are doing that."[22]

55.    On September 27, 2025, the President followed through on his threats, posting a message to his Truth Social account: "At the request of Secretary of Homeland Security, Kristi Noem, I am directing Secretary of War, Pete Hegseth, to provide all necessary Troops to protect

---

[19] The Oregonian, *"It Is Like Living in Hell": Trump Discusses Portland as He Considers Sending the National Guard* (YouTube, Sept. 5, 2025), https://www.youtube.com/watch?v=6tP9QqDmu74.

[20] The Oregonian, *Trump Mentions Portland at White House: 'Just People Out of Control and Crazy'*, at 0:10 (YouTube, Sept. 19, 2025), https://www.youtube.com/watch?v=cisl1y10YRw&t=10s.

[21] The Oregonian, *Trump Escalates Rhetoric Promising Federal Intervention in Portland, Citing "Anarchy"*, at 0:44 (YouTube, Sept. 25, 2025), https://www.youtube.com/watch?v=G0TdH2aC-Jg&t=44s.

[22] *Id.*

Page 15 -  AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

War ravaged Portland, and any of our ICE Facilities under siege from attack by Antifa, and other domestic terrorists. Thank you for your attention to this matter!"[23]



> Donald J. Trump
> @realDonaldTrump
>
> At the request of Secretary of Homeland Security, Kristi Noem, I am directing Secretary of War, Pete Hegseth, to provide all necessary Troops to protect War ravaged Portland, and any of our ICE Facilities under siege from attack by Antifa, and other domestic terrorists. I am also authorizing Full Force, if necessary. Thank you for your attention to this matter!
>
> 12.8k ReTruths   53.1k Likes                    9/27/25, 7:19 AM

56.     Later that day, Major General Timothy L. Rieger, Acting Vice Chief of the National Guard Bureau, requested that Oregon Governor Tina Kotek authorize mobilization of the Oregon National Guard in a non-federalized status based on a request from DHS. *See* Ex. 1. The memorandum threatened to direct mobilization of Oregon National Guard members under Title 10 of the U.S. Code if Governor Kotek did not agree within 12 hours to activate the National Guard. *Id.*

57.     DHS spokeswoman Tricia McLaughlin stated on September 27, 2025, that "President Trump and Secretary Noem are taking action to restore law and order following weeks of violent riots at ICE facilities, assaults on law enforcement, and the terrorist attack at our

---

[23] Donald J. Trump, (@realDonaldTrump) Truth Social (Sept. 27, 2025 at 07:19 ET), https://truthsocial.com/@realDonaldTrump/posts/115276694936263266

Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

**A202**

ICE facility in Dallas."[24] Specifics on how these concerns are related to Portland were not outlined.

58.     In a press conference on the same day, Governor Kotek stated that Oregon does not want military troops and that public safety will be handled by local law enforcement.[25]

59.     Nonetheless, on September 28, 2025, the Secretary of Defense issued a memorandum calling 200 members of the Oregon National Guard into federal service for a period of 60 days. *See* Ex. 2 at 1. That order was styled as "further implement[ation]" of a June 7, 2025 Presidential Memorandum, which vaguely cited "[n]umerous incidents of violence and disorder . . . in response to the enforcement of Federal law" that purportedly "constitute a form of rebellion against the authority of the United States." *Id.* at 2.

I.     **Defendants' Actions Represent the Latest Political Attack Against Democrat-led Jurisdictions that Refuse to Assist with Immigration Enforcement.**

60.     The federal government holds key powers and responsibilities over the subject of immigration and the status of non-citizens. Those are laid out in the Immigration and Naturalization Act.

61.     Components within DHS enforce those laws. Among them, Customs and Border Protection (CBP) is responsible for determining the admissibility of non-citizens and securing the country's borders. ICE has two primary subcomponents: Enforcement and Removal Operations (ERO) and Homeland Security Investigations (HSI). ERO is tasked with civil immigration enforcement and removal, including housing detainees in facilities nationwide, for

---

[24] Luke Broadwater, Hamed Aleaziz & Anna Griffin, *Trump Says He Has Ordered Troops to Protect ICE Facilities in Portland*, N.Y. Times (Sept. 27, 2025), https://www.nytimes.com/2025/09/27/us/politics/trump-portland-troops.html.

[25] KATU News, *'We Do Not Need Help': Oregon Gov. Tina Kotek on Trump's Portland Announcement to Send Troops* (YouTube, Sept. 27, 2025), https://www.youtube.com/watch?v=aa_CImbyLW4.

Page 17 -  AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

immigration proceedings or removal from the United States. HSI conducts federal criminal

investigations, in coordination with federal prosecutors and other criminal investigatory

agencies.

62. States and municipalities, by contrast, do not have this responsibility. States and

municipalities instead protect the general public welfare. The Constitution vests the States with

traditional police powers, which include the authority to make policy judgments and regulations

for increasing the safety of all residents and focusing local police officers' limited time and

resources on preventing and responding to crime.

63. Under the Tenth Amendment to the United States Constitution, the "powers not

delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved

to the States respectively, or to the people." U.S. Const. amend. X; *Slaughterhouse Cases*, 83

U.S. 36, 62 (1873) (describing the police power as extending "to the protection of the lives,

limbs, health, comfort, and quiet of all persons . . . within the State"). Among other meanings of

this amendment is this: the states—and not the federal government—wield the general police

power.

64. Public health and safety are among the more "conspicuous examples of the

traditional application of the police power." *Berman v. Parker*, 348 U.S. 25, 32 (1954). States

"traditionally have had great latitude under their police powers to legislate as to the protection of

the lives, limbs, health, comfort, and quite of all persons." *Medtronic, Inc. v. Lohr*, 518 U.S. 470,

475 (1996).

65. In consideration of that responsibility, in 1987 Oregon passed the "Sanctuary

Promise," the first law of its kind in the United States, which prohibits state and local

government agencies from using their resources to assist with federal immigration enforcement.

Page 18 -  AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

*See* ORS 181A.820. Oregon's Sanctuary Promise has been updated several times since 1987. *See, e.g.*, H.B. 3265, 81st Legis. Assemb., Reg. Sess. (Or. 2021).

66.    The President has repeatedly attacked Democrat-led cities and states, including over immigration enforcement.[26]

67.    On June 23, 2020, he stated: "[A]ll of these problems, Seattle, Portland, Chicago, uh, you could go to Oakland, you could go to Baltimore. What do they have in common? They're run by liberal Democrats, just like Joe Biden."[27]

68.    While running for his current term, the President continued to demonize cities where Democrats had been elected as leaders. On August 20, 2024, he said that "the crime is so out of control in our country. I mean, you have cities – I will say this, the top 25, almost all are run by Democrats, and they have very similar policies. . . . But you can't walk across the street to get a loaf of bread. . . . You get shot. You get mugged. You get raped, you get whatever it may be. And you've seen it and I've seen it, and it's time for a change. We have to bring back our cities."[28]

69.    On inauguration day, 2025, President Trump signed Executive Order 14,159, "Protecting the American People Against Invasion," which once again sought to unlawfully

---

[26] *See* Brett Samuels, *Trump Steps Up Clash with DC, Democratic-Led Cities*, The Hill (Aug. 12, 2025, at 6:00 AM ET), https://thehill.com/homenews/administration/5447093-trump-dc-democratic-cities-chicago ("Trump has long picked fights with Democratic cities, attacking mayors in Chicago, New York, Los Angeles, Baltimore and other areas and using them to boost his own image as a tough-on-crime president.").

[27] David Brody, *EXCLUSIVE President Trump Ramps Up 2020 Message to Evangelicals, Says Biden Will Destroy Pro-Life Movement*, Christian Broad. Network (June 23, 2020), https://cbn.com/news/politics/exclusive-president-trump-ramps-2020-message-evangelicals-says-biden-will-destroy-pro.

[28] Phillip Bump, *Trump's Claims About Violent Crime Increasingly Diverge from Reality*, Wash. Post (Aug. 21, 2024, at 11:52 AM ET), https://www.washingtonpost.com/politics/2024/08/21/trump-crime-fear/.

Page 19 -  AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

defund "'sanctuary' jurisdictions" and directed the U.S. Department of Justice (DOJ) and DHS

to target jurisdictions like the Plaintiffs:

> Sec. 17. Sanctuary Jurisdictions. The Attorney General and the
> Secretary of Homeland Security shall, to the maximum extent
> possible under law, evaluate and undertake any lawful actions to
> ensure that so-called "sanctuary" jurisdictions, which seek to
> interfere with the lawful exercise of Federal law enforcement
> operations, do not receive access to Federal funds. Further, the
> Attorney General and the Secretary of Homeland Security shall
> evaluate and undertake any other lawful actions, criminal or civil,
> that they deem warranted based on any such jurisdiction's practices
> that interfere with the enforcement of Federal law.

90 Fed. Reg. 8443, 8446 (Jan. 20, 2025).

70.    On February 19, 2025, Trump signed Executive Order 14,218, "Ending Taxpayer

Subsidization of Open Borders," which sought to defund certain State programs based on new

immigration enforcement demands related to the provision of federal public benefits. 90 Fed.

Reg. 10581 (Feb. 19, 2025).

71.    A coalition of affected jurisdictions, including the City of Portland, promptly sued

to enjoin the January and February immigration-related executive orders. *City & Cnty. of San

Francisco v. Donald J. Trump*, No. 25-cv-01350-WHO (N.D. Cal. Feb. 7, 2025). About a week

and a half before the court granted a preliminary injunction against those executive orders,

Trump again posted an attack on "sanctuary cities" claiming they "protect the Criminals:"[29]

---

[29] Donald J. Trump (@realDonaldTrump), Truth Social (Apr. 10, 2025, at 06:53 ET),
https://truthsocial.com/@realDonaldTrump/posts/114313927527638500.

Page 20 - AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF



72.  On April 18, 2025, Stephen Miller, on behalf of the Trump administration, leveled

the accusation that "Sanctuary cities shield criminal [undocumented immigrants] from removal."

Miller opined that "these cities are engaged in systemic criminal violations and that they are

engaged in a scheme to nullify and obstruct the duly enacted laws of the United States of

America."[30]

73.  On April 28, 2025, President Trump signed Executive Order 14287, titled

"Protecting American Communities From Criminal Aliens." In it, he targeted "sanctuary

jurisdictions" as well as "State and local officials" who allegedly "use their authority to violate,

obstruct, and defy the enforcement of Federal immigration laws."  The order accused its targets

of undertaking a "lawless insurrection against the supremacy of Federal law and the Federal

Government's obligation to defend the territorial sovereignty of the United States." 90 Fed Reg

18761, 18761 (Apr. 28, 2025).

74.  The same executive order also expressed the administration's intention to defund

grants or programs to states or municipalities with "sanctuary" laws that leave federal civil

---

[30] Roll Call Factbase Videos, *Press Briefing: Stephen Miller Speaks to Reporters Outside the White House – April 18, 2025*, at 10:17–36 (YouTube, May 12, 2025), https://www.youtube.com/watch?v=PyKrfqG51uI.

Page 21 -  AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

immigration enforcement entirely to the federal government, even though federal courts had held this unlawful during Trump's first term.

75.     In furtherance of his effort to coerce sanctuary jurisdictions with threats of defunding, the Trump administration, acting through various federal agencies, has asserted sweeping authority to use state law enforcement officers for federal immigration enforcement. It has done so by requiring Oregon and other states to agree to cooperate with federal immigration enforcement activities as a condition to receiving billions of dollars in federal funding.

76.     For example, beginning in March 2025, DHS and its sub-agencies, including Federal Emergency Management Agency (FEMA), sought to upend the state-federal emergency management system, holding critical emergency preparedness and response funding hostage unless certain states promised to devote their criminal enforcement and other state agency resources to the federal government's civil immigration enforcement.

77.     Forced to choose between foregoing federal funds or facing compulsory diversion of limited law enforcement resources to enforce federal immigration law beyond what Oregon law allows, Oregon, with other states, prevailed in litigation challenging those coercive conditions. *Illinois v. Fed. Emergency Mgmt. Agency*, No. 1:25-cv-00206-WES-PAS, 2025 WL 2716277, at *16 (D.R.I. Sept. 24, 2025) (granting summary judgment to the plaintiff states). Oregon and other states have similarly challenged coercive immigration-enforcement conditions by the U.S. Department of Transportation, *California v. U.S. Dep't of Transportation*, No. 1:25-cv-00208-JJM-PAS (D.R.I. May 13, 2025), and the U.S. Department of Justice, *New Jersey v. U.S. Dep't of Just.*, No. 1:25-cv-00404-JJM-AEM (D.R.I. Aug. 18, 2025).

78.     In the midst of these immigration-related federal defunding actions and responsive lawsuits, DHS published, on May 29, 2025, a list of 500 purported "sanctuary

Page 22 -  AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

jurisdictions" around the country.[31] It accused them of "shamefully obstructing" the Trump administration's deportation plans and "shielding dangerous criminal aliens."[32]

79.     The Trump Administration later revised that list on August 5, 2025, shortening it to just 35 jurisdictions, stating that those jurisdictions were "[c]ities, states, or counties that have laws, ordinances, regulations, resolutions, policies, or other formalized practices that obstruct or limit local law enforcement cooperation with U.S. Immigration and Customs Enforcement (ICE)."[33]

80.     That list included the false accusation that the State of Oregon and the City of Portland (along with the listed others) "impede law enforcement and put American citizens at risk by design." It also stated the Department of Justice would "work closely with the Department of Homeland Security to eradicate these harmful policies around the country."[34]

81.     Collectively, these efforts sought to coerce sovereign states and their subdivisions and instrumentalities—including the Plaintiffs—to disavow their own laws and subjugate themselves to the political proclivities of the Trump administration. The August 5 publication

---

[31] Press Release, U.S. Dep't of Homeland Sec., DHS Exposes Sanctuary Jurisdictions Defying Federal Immigration Law (May 29, 2025), https://www.dhs.gov/news/2025/05/29/dhs-exposes-sanctuary-jurisdictions-defying-federal-immigration-law.

[32] Campbell Robertson, Halina Bennet & Jill Cowan, *A Federal List of Immigrant 'Sanctuaries' Nets Trump Allies and Foes Alike*, N.Y. Times (May 31, 2025), https://www.nytimes.com/2025/05/31/us/politics/sanctuary-cities-trump.html

[33] U.S. Off. of Att'y Gen., Dep't of Just., *U.S. Sanctuary Jurisdiction List Following Executive Order 14287: Protecting American Communities from Criminal Aliens* (Sept. 26, 2025), https://www.justice.gov/ag/us-sanctuary-jurisdiction-list-following-executive-order-14287-protecting-american-communities.

[34] Press Release, U.S. Dep't of Just., Justice Department Publishes List of Sanctuary Jurisdictions (Aug. 5, 2025), https://www.justice.gov/opa/pr/justice-department-publishes-list-sanctuary-jurisdictions.

Page 23 -  AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

specifically bragged about the success of a "threatening" letter that coerced Louisville, Kentucky to revoke its "sanctuary policies."[35]

82.    Also, during that time, President Trump directed federal agencies to focus immigration enforcement efforts in cities led by Democrats.[36]

83.    On August 13, 2025, Attorney General Bondi sent letters to officials in 32 of the 35 jurisdictions on the August 5 list, including Oregon Governor Tina Kotek and Portland Mayor Keith Wilson. The letters contended that "sanctuary jurisdiction policies have undermined this necessary cooperation and obstructed federal immigration enforcement, giving aliens cover to perpetrate crimes in our communities and evade the immigration consequences that federal law requires."[37]

84.    Bondi's August 13 letters further stated that, to ensure full cooperation in federal immigration enforcement efforts, "the President has directed the Attorney General of the United States, in coordination with the Secretary of Homeland Security, to identify sanctuary jurisdictions and notify them of their unlawful sanctuary status and potential violations of federal law," which was the letter's purpose. The letters did not include any specifics regarding any particular laws, nor did they reflect any recognition of prior court rulings holding the laws valid. The Bondi letter also demanded a response by August 19, 2025.[38]

---

[35] *Id.*

[36] Aamer Madhani, *Trump Directs ICE to Expand Deportations in Democratic-Run Cities, Undeterred by Protests*, AP News (June 15, 2025, at 7:51 PM PT), https://apnews.com/article/trump-ice-deportations-protests-65fa8d64ea12a78a0ee0ebeea008ee4d.

[37] Letters from Pam Bondi, U.S. Att'y Gen., to Various State and City Leaders 15, 57 (Aug 13, 2025), https://www.justice.gov/ag/media/1411166/dl?inline (Letter from Pam Bondi, U.S. Att'y Gen., to Tina Kotek, Governor, State of Oregon; Letter from Pam Bondi, U.S. Att'y Gen., to Keith Wilson, Mayor, City of Portland).

[38] *Id.* at 16, 58.

Page 24 -  AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

85.     On August 19, 2025, Governor Kotek responded to Bondi's letter. Kotek responded that "Oregon, its public officials and its law enforcement officers do not engage in conduct that thwarts federal immigration enforcement." Kotek further responded that, under Oregon's Sanctuary Promise, "Requests from federal agencies to local law enforcement agencies about immigration enforcement without a judicial order must be documented, reported and denied." Kotek further explained that "Oregon complies with federal law and it will continue to follow its own laws."[39]

86.     That same day, President Trump used the pretext of "crime" to threaten a plan to expand domestic troop deployment to other Democrat-led cities and states.[40]

**J.     Defendants' Actions Will Harm the State of Oregon by Interfering with the State's Sovereign Interest in Managing Its Own Law Enforcement Activities**

87.     Defendants' unlawful federalization and deployment of Oregon National Guard members infringes on Oregon's sovereign interest in managing law enforcement within its borders, including the authority to manage protests and unrest. This power is reserved for the states under the Tenth Amendment. It also infringes upon the State's sovereign authority—and the Governor of Oregon's authority under Section 9 of the Constitution of Oregon—to manage the Oregon National Guard's resources according to the State's needs absent lawful federalization of the Guard's members.

---

[39] Mia Maldonado, *'I Respectfully Disagree': Kotek Says Oregon Will Follow Sanctuary Law Despite Threats*, Or. Cap. Chron. (Aug. 19, 2025, at 12:22 PM PT), https://oregoncapitalchronicle.com/2025/08/19/i-respectfully-disagree-kotek-says-oregon-will-follow-sanctuary-law-despite-threats/.

[40] Mariah Welfel & Alexandra Hall, *Trump Says He'll Expand His Focus on Crimes to Other Democratic-Led Cities*, Nat'l Pub. Radio (Aug. 19, 2025, at 4:21 PM ET), https://www.npr.org/2025/08/19/nx-s1-5501329/trump-says-hell-expand-his-focus-on-crimes-to-other-democratic-led-cities.

Page 25 -  AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

88.     Defendants' intended use of federalized National Guard troops to control protests in Oregon communities amounts to a usurpation of the role of domestic law enforcement. The State has neither requested nor consented to federal intervention to take over that law enforcement role, which is being carried out by local law enforcement under their lawful authority. The impending use of federalized troops to engage in domestic law enforcement, without the State's consent, threatens an irreparable injury to the State's sovereign interest in managing its own law enforcement activities.

89.     Defendants' conduct also will directly and concretely interfere with current and planned law enforcement activities of state and local authorities. State and local law enforcement agencies, including the Oregon State Police and the  Portland Police Bureau, have in place their own plans and protocols for maintaining safety and order in Oregon communities, and they are carrying out their lawful role accordingly. The unlawful deployment of federalized National Guard troops to usurp that law enforcement role will directly interfere with the ability of state and local law enforcement to deal with any given situation. The presence of military units purporting to exercise law enforcement authority creates confusion among the public and threatens to undermine the work of local law enforcement in maintaining order and combating local crime. Further, the needless presence of federalized troops will lead directly to escalated tensions and increased unrest, interfering with state and local law enforcement's ability to maintain order.

90.     Further, Defendants' deployment of troops threatens to increase civil unrest, requiring diversion of state law enforcement and state resources. Recent deployments of troops elsewhere in the country have provoked protests and escalated tensions. Those military incursions included operations that were directly calculated as shows of force, intended to

Page 26 -  AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

demonstrate federal presence and strength in otherwise peaceful locations. *See Newsom*, 2025 WL 2501619, at *7 (describing "Operation Excalibur," where federal troops were stationed in Humvees and tactical vehicles outside MacArthur Park in Los Angeles and blocked traffic along a stretch of Wilshire Boulevard while federal law enforcement officials marched across the park as a "show of presence"). As in those instances, Defendants' deployment of troops in Oregon communities will provoke and escalate protests and unrest and will require the State to divert its law enforcement personnel and resources to deal with unrest that the federal military presence has created.

### K.    Defendants' Actions Will Also Harm the State of Oregon and the City of Portland by Suppressing Business Activity

91.    Defendants' conduct threatens the economic well-being of the people of Oregon. In recent months, unlawful federal deployments and militarized raids in California and the District of Columbia have directly and rapidly chilled economic activity. The deployment of troops in California stifled economic activity in the Los Angeles area. Restaurants, festivals, and farmers' markets shut down, as individuals were afraid to leave their homes due to militarized raids. Similarly, the deployment of National Guard troops in the District of Columbia depressed key industries, including tourism, restaurants, and hospitality services. Within a week after the deployment of federal troops in D.C., foot traffic in the District dropped 7 percent on average, with restaurant reservations showing an even steeper drop.[41] Defendants' military incursion into Oregon threatens similar immediate harms by depressing business activities, travel, and tourism in Oregon communities.

---

[41] Andrea Sachs & Federica Cocco, *D.C. Tourism Was Already Struggling. Then the National Guard Arrived*, Wash. Post (Aug. 29, 2025, at 5:00 AM ET), https://www.washingtonpost.com/travel/2025/08/29/dc-tourism-trump-takeover-national-guard-impacts/.

Page 27 -  AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

92.     Defendants' conduct also threatens financial harm to the government of Oregon in multiple ways. The military incursion's chilling effect on economic activity will directly decrease tax revenue collected by the State and by the City. In the District of Columbia, troop deployment has resulted in a reduction of work hours for some District workers, and a corresponding decline in income tax withholding paid to the District government. Deployment of troops in Oregon communities threatens similar harm to Oregon tax revenues.

**L.    Defendants' Actions Will Harm the State of Oregon by Diverting National Guard Personnel and Rendering Them Unable to Engage in Other Critical Work**

93.     Defendants' unlawful federalization and deployment of the Oregon National Guard will concretely harm the State's interests by rendering those members unable to engage in other critical work.

94.     Except for when it has been lawfully called into federal service, the Oregon National Guard answers to its Commander-in-Chief, the Governor of Oregon. The Governor calls members of the Guard into active duty to serve the needs of Oregon in numerous ways, including to assist with emergent and unpredictable situations the State could face at any moment. The Governor, in consultation with other state government officials and local law enforcement, is in the best position to determine the needs of the State and how the Guard could be deployed to meet those needs.

95.     The Oregon National Guard's resources are limited. While the Guard has over 6,500 total members, only a fraction of those are presently available for assignment over the next six months. Others are unavailable because, among other reasons, they are already deployed in federal service; engaged in the Guard's essential administrative functions; or in basic training. Unlawfully federalizing even a portion of these Guard members impairs the State's capacity to respond to emergencies.

Page 28 -  AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

96.     Wildfire response is one of the most significant functions the Oregon National

Guard performs in the State. In 2017, for example, roughly 1,090 members were mobilized to

respond to wildfires. In 2020, roughly 998 were mobilized for fire response. On September 27,

2025—the same day that the President announced his intention to send troops into Portland—

Governor Kotek invoked the Emergency Conflagration Act in response to a complex of wildfires

burning on Southwest Oregon's Rogue River, which has grown to over 17,300 acres.[42] Because

wildfires can begin unpredictably and spread rapidly, it is critical that all qualified personnel—

including members of the Oregon National Guard—remain ready to respond to growing

wildfires on short notice.

97.     The Oregon National Guard serves many other critical functions in the State.

Historically, these functions have included, among other things, counter-drug-trafficking efforts;

natural disaster response; and supporting the State's response to the Covid-19 pandemic.

98.     Given the Guard's limited resources, and the inherent uncertainty about what

needs might arise, needlessly calling hundreds of the Guard's members into federal service for a

months-long period places the State in jeopardy. All of the Guard members in federal service are

unavailable to the State for emergency response efforts.

**M.    Federalization of California's National Guard**

99.     California is the first State to experience Defendants' deployment of its National

Guard without the consent of its Governor. It is also the first State to experience—without

gubernatorial consent—the cross-state deployment of its National Guard.

---

[42] Zach Urness, *Rogue River Moon Complex Wildfire Explodes, Doubles in Size as New Evacuation Orders Issued*, Statesman J. (Sept. 28, 2025 at 9:50 AM PT), https://www.statesmanjournal.com/story/news/2025/09/27/moon-complex-rogue-river-wildfire-explodes-new-evacuation-orders-issued/86391465007/.

Page 29 -  AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

100.    On June 6, 2025, ICE agents began carrying out aggressive, military-style immigration enforcement operations across Los Angeles County, which provoked anger and spurred protests. Although the protests were primarily peaceful, there were instances of violence and unlawful behavior, which were responded to by state and local law enforcement and unequivocally condemned by California Governor Gavin Newsom and other elected officials.

101.    In response to these events in Los Angeles, on June 7, 2025, President Trump issued a memorandum authorizing Secretary Hegseth to "call[] into Federal service . . . at least 2,000 National Guard personnel . . . for 60 days or longer."

102.    That same day, Secretary Hegseth called into service 2,000 members of the California National Guard for a period of 60 days. Two days later, on June 9, 2025, Secretary Hegseth federalized an addition 2,000 members of the California National Guard for 60 days and deployed 700 active-duty Marines to Los Angeles.

103.    Throughout June and July, Defendants deployed California's federalized National Guard soldiers to conduct civil law enforcement activities throughout Southern California.

104.    On June 9, 2025, California Governor Gavin Newsom and the State of California brought suit in the Northern District of California, challenging the federalization of the California National Guard. The district court issued a temporary restraining order enjoining the deployment of federal troops to Los Angeles, and the Ninth Circuit Court of Appeals later granted a stay pending appeal. *See Newsom v. Trump*, 786 F. Supp. 3d 1235 (N.D. Cal. 2025), *stayed pending appeal*, 141 F.4th 1032 (9th Cir. 2025.) The appeal on the merits of the TRO remains pending, as is an en banc call for reconsideration of the stay order. *Newsom v. Trump*, No. 25-3727 (9th Cir. July 11, 2025).

105.    On July 1, Defendants released 150 of the federalized California National Guard troops from federal service. On July 15, Defendants released an additional 2,000 National Guard troops, and on July 21, Defendants withdrew all 700 Marines from Los Angeles and redeployed

Page 30 -  AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

them to base. On July 15, a Pentagon spokesperson explained these defederalization orders by stating that "the lawlessness in Los Angeles is subsiding."[43]

106.    On August 5, Defendants issued a new order federalizing 300 California National Guard troops for an additional 90 days, until November 5, 2025. The August 5 order directed two separate California National Guard units to report to Los Alamitos, CA and Santa Rosa, CA, respectively.

107.    As of at least August 8, 2025, the remaining California National Guard troops were (1) providing security for a federal building in Los Angeles, (2) providing security for an ICE facility in Paramount, CA, and (3) serving in two Mobile Response Forces in Southern California.

108.    On August 15, 2025, Defendants sent a letter to Major General Matthew Beevers, the Adjutant General of the California Military Department, stating that "[a]pproximately 300 remaining CA NG personnel will remain in Federal service and continue to execute the Federal protective mission through November 4, 2025." The letter further states: "We appreciate your cooperation on this matter as we both seek to reduce the violence against Federal personnel in Los Angeles and the surrounding counties."

109.    While litigation over the June federalization was pending in the Ninth Circuit, litigation proceeded in the Northern District of California regarding allegations that the conduct of federalized troops violated the Posse Comitatus Act. On September 2, following a three-day trial, the Honorable Charles R. Breyer issued an order finding that Defendants' use of federalized California National Guard troops throughout Southern California violated the Posse Comitatus Act. Judge Breyer's order enjoined Defendants from "deploying, ordering, instructing, training, or using the National Guard currently deployed in California, and any military troops heretofore deployed in California, to execute the laws, including but not limited to engaging in arrests,

---

[43] Luis Martinez, *Pentagon Pulling 2,000 National Guard Deployed to LA Amid ICE Protests, ABC News* (July 15, 2025), https://abcnews.go.com/Politics/pentagon-pulling-half-guard-members-deployed-la-support/story?id=123784553.

Page 31 -  AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

apprehensions, searches, seizures, security patrols, traffic control, crowd control, riot control, evidence collection, interrogation, or acting as informants, unless and until Defendants satisfy the requirements of a valid constitutional or statutory exception, as defined herein, to the Posse Comitatus Act." *Newsom v. Trump*, Case No. 3:25-cv-04870-CRB, ECF No. 176. Judge Breyer's order is currently subject to an administrative stay pending appeal in the Ninth Circuit.

**N.    Cross-State Deployment of California National Guard to Oregon**

110.    On the evening of Saturday, October 4, 2025, after this Court issued a temporary restraining order blocking the attempted federalization of Oregon National Guard personnel to deploy to Portland, Oregon, the U.S. Army Northern Command communicated to the California Military Department Executive Leadership that they intended to send 200 of the federalized California National Guard personnel in Los Angeles to Portland.

111.    As of 6:30 a.m. on Sunday, October 5 one transport carrying approximately 100 federalized California National Guard personnel had already departed from Los Angeles to Portland, with additional transport scheduled for later in the day.  Additionally, California Military Department Executive Leadership learned that all 300 federalized California National Guard personnel will be imminently deployed to Portland.

112.    Also on Sunday, October 5, 2025, the California Military Department received an order extending the federalization of the 300 federalized California National Guard personnel through January 31, 2026.

**CAUSES OF ACTION**

**COUNT I**

***Ultra Vires* Action – Violation of 10 U.S.C. § 12406**
**(Against All Defendants)**

113.    Plaintiffs reallege and incorporate by reference the foregoing allegations as if fully set forth herein.

Page 32 -  AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

114.    Under 10 U.S.C. § 12406, the President is permitted to federalize a state's National
Guard only when (1) the United States, or any of the Commonwealths or possessions, is invaded
or is in danger of invasion by a foreign nation; (2) there is a rebellion or danger of a rebellion
against the authority of the Government of the United States; or (3) the President is unable with
the regular forces to execute the laws of the United States. Any such order "shall be issued through
the governor[] . . . ." 10 U.S.C. § 12406.

115.    None of those factual circumstances are present in Oregon, and Defendants'
assertions to the contrary are patently pretextual and lack any good-faith basis.

116.    Defendants have not identified any "invasion by a foreign nation."

117.    Nor is there any "rebellion or danger of a rebellion." The President's
characterization of Portland as "war ravaged" community is pure fiction. The protests contained
to a small area near Portland's ICE facility have been successfully managed by local law
enforcement and do not in any way constitute a rebellion or danger of a rebellion. And the
President's June 7, 2025 Memorandum, (Ex. 2 at 2–3), made no reference to the City of Portland
or the protests near the City's ICE facility.

118.    Nor have Defendants cited even a *single instance* in which they were "unable . . .
to execute the laws of the United States." For example, they have not identified an inability to
detain or deport those who are unlawfully present in the United States due to protests in Portland.

119.    All of these facts—together with the overwhelming evidence of the President's
true intentions—reveal the obvious truth: that this action was motivated by his desire to
normalize the use of military troops for ordinary domestic law enforcement activity while also
punishing politically disfavored jurisdictions like Portland, Oregon.

Page 33 -  AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

120.    Because Defendants' invocation of the prerequisites for federalization in § 12406 was wholly pretextual, the Court should find Defendants' actions are ultra vires because they violate the statute's plain language.

121.    Because none of the prerequisites for federalization in § 12406 is met, Defendants lack statutory authority to federalize Oregon National Guard members and lack statutory authority to deploy federalized National Guard members to Oregon—regardless of whether those Guard members are drawn from the Oregon National Guard, the California National Guard, or the National Guard of any other state. Regardless of whether Defendants' federalization of California National Guard members was lawful, Defendants' mission to Portland is wholly unrelated to that prior federalization and is thus beyond the scope of any authority Defendants could have to deploy those federalized members of the California National Guard. Defendants' actions both in federalizing Oregon National Guard members and in deploying federalized California National Guard members are ultra vires because they violate the statute's plain language.

## COUNT II
### *Ultra Vires* Action – Violation of the Posse Comitatus Act & 10 U.S.C. § 275
### (Against All Defendants)

122.    Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

123.    The Posse Comitatus Act forbids Defendants from employing the armed forces to engage in law enforcement "except in cases and under circumstances expressly authorized by the Constitution or Act of Congress." 18 U.S.C. § 1385.

124.    This restriction is underscored by 10 U.S.C. § 275, which provides that "The Secretary of Defense shall prescribe such regulations as may be necessary to ensure that any

Page 34 -  AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

activity (including the provision of any equipment or facility or the assignment or detail of any personnel) under this chapter does not include or permit direct participation by a member of the Army, Navy, Air Force, or Marine Corps in a search, seizure, arrest, or other similar activity unless participation in such activity by such member is otherwise authorized by law."

125.    Neither the Constitution nor any Act of Congress permits Defendants to use the armed forces—which includes the National Guard—for routine law enforcement such as protest management, the suppression of violent crime or property damage, and immigration enforcement.

126.    The Court need look no further than Defendants' own statements to conclude that this troop deployment is being made for purposes that are plainly incompatible with the Posse Comitatus Act. The President's statements dating back to his most recent campaign reveal his plans to incorporate military troops into civilian law enforcement activity. And Defendants' deployment of troops in Los Angeles and Washington, D.C. furthered that plan. Then on September 5, 2025, the President said he planned to deploy troops in Portland to "wipe out" what he described as "paid terrorists" and "paid agitators." And in his September 27, 2025 social media post, the President said he planned to use troops to "protect" Portland from "domestic organization that will perpetrate crimes in the City."

127.    Defendants' actions in Los Angeles—where they were found to have violated the PCA—further support the conclusion that they plan to do the same thing in Portland.

128.    By willfully ignoring the PCA and 10 U.S.C. § 275, while also relying on a pretextual, baseless, and bad-faith invocation of 10 U.S.C. § 12406, Defendants are acting *ultra vires*.

Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

129.    Therefore, Plaintiffs are entitled to a declaration that any action taken pursuant to the President's September 27 directive is invalid, and an injunction prohibiting Defendants from implementing. Absent such relief, Plaintiffs will continue to be harmed by Defendants' illegal actions.

130.    Defendants' deployment of members of the California National Guard to Oregon violates the PCA for the same reasons as the federalization and deployment of members of the Oregon National Guard. The violation of the PCA and the ensuing harm to Plaintiffs will be the same whether the Guard members being used to violate the PCA are from Oregon or from California. Plaintiffs are therefore entitled to a declaration that any deployment of the California National Guard to Oregon to carry out the purposes of the President's September 27 directive is invalid, and an injunction prohibiting Defendants from carrying out that deployment.

## COUNT III
### Violation of the Tenth Amendment of the U.S. Constitution
### (Against All Defendants)

***Infringement on Oregon's Police Power***

131.    Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

132.    The Tenth Amendment provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."

133.    If Defendants federalize members of the Oregon National Guard under present circumstances, they would usurp the Governor of Oregon's role as Commander-in-Chief of the National Guard in Oregon and violates the State's sovereign role over local law enforcement, pursuant to its police powers.

Page 36 -  AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

134.    Under our system of federalism, policing and crime control remain one of the most basic rights reserved to the states. "Indeed, we can think of no better example of the police power, which the Founders denied the National Government and reposed in the States, than the suppression of violent crime and vindication of its victims." *United States v. Morrison*, 529 U.S. 598, 618 (2000). "[T]he power to establish the ordinary regulations of police has been left with the individual States and cannot be assumed by the national government." *Patterson v. Kentucky*, 97 U.S. 501, 503 (1878).

135.    Local control of law enforcement is also essential to the protection of liberty and government accountability. "Because the police power is controlled by 50 different States instead of one national sovereign, the facets of governing that touch on citizens' daily lives are normally administered by smaller governments closer to the governed. The Framers thus ensured that powers which 'in the ordinary course of affairs, concern the lives, liberties, and properties of the people' were held by governments more local and more accountable than a distant federal bureaucracy. The Federalist No. 45, at 293 (J. Madison)." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 536 (2012).

136.    Deploying federalized military forces to respond to suppress violence and manage protests despite any evidence that local law enforcement was incapable of asserting control and ensuring public safety during such protests represents the exact type of intrusion on State power that is at the heart of the Tenth Amendment. State officials in conjunction with local officials, such as the officers of the PPB, are in the best position to determine what resources are necessary to preserve public safety amid protest activity, and to intervene to enforce public safety and criminal laws when warranted.

Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

A223

137.    Plaintiffs are entitled to a declaration that any action to federalize the Oregon

National Guard is invalid, that deployment of the federalized California National Guard to

Oregon is invalid, and an injunction prohibiting Defendants from implementing those directives.

**Unlawful Coercion and Retaliation**

138.    Local control of law enforcement is also essential to the protection of liberty and

government accountability. "Because the police power is controlled by 50 different States

instead of one national sovereign, the facets of governing that touch on citizens' daily lives are

normally administered by smaller governments closer to the governed. The Framers thus ensured

that powers which "in the ordinary course of affairs, concern the lives, liberties, and properties of

the people" were held by governments more local and more accountable than a distant federal

bureaucracy. The Federalist No. 45, at 293 (J. Madison)." *Sebelius*, 567 U.S. at 536.

139.    The Defendants' actions in calling up and deploying members of the Oregon

National Guard and deploying the California National Guard are designed to punish Plaintiffs for

refusing to accede to the Trump administration's political prerogatives, not least of which on

Plaintiffs' so-called sanctuary laws.

140.    This violates the Tenth Amendment by seeking to coerce Oregon and California

into abandoning its own statutory prerogatives and instead adopt the President's policy priorities.

**Violation of Equality of State Sovereignty**

141.    "Not only do States retain sovereignty under the Constitution, there is also a

'fundamental principle of *equal* sovereignty' among the States." *Shelby Cnty., Ala. v. Holder*,

570 U.S. 529, 544 (2013) (citation omitted). The Supreme Court has long recognized that our

nation "was and is a union of States, equal in power, dignity and authority," and that this

Page 38 -  AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

"constitutional equality of the States is essential to the harmonious operation of the scheme upon which the Republic was organized." *Coyle v. Smith,* 221 U.S. 559, 567, 580 (1911).

142.    This "fundamental principle of equal sovereignty remains highly pertinent in assessing subsequent disparate treatment of States" by the federal government. *Shelby Cnty*, 570 U.S. at 544 (citation omitted).

143.    Defendants have trampled these principles by selecting certain politically disfavored jurisdictions—now including the City of Portland, the State of Oregon and the State of California—for an involuntary deployment of military troops under federal control. "And despite the tradition of equal sovereignty," Defendants have applied this harsh infringement on state sovereignty "to only [two] states" and the District of Columbia. *Id.* at 544.

144.    Such an "extraordinary departure from the traditional course of relations between the States and the Federal Government" can only be justified by dire and "unique circumstances," and must be limited to "area where immediate action" is truly necessary. *Id.* at 546.

145.    But Defendants' selection of Portland, Oregon for National Guard federalization and deployment was, at best, arbitrary, and at worst, a politically motivated retaliation for the Plaintiffs' adoption of policies that the President disfavors. After all, if Defendants' true aim were to protect jurisdictions that are "ravaged" and "under siege" by criminal activity, then they would have deployed the military to any of the many jurisdictions where violent crime rates are significantly higher.

**COUNT IV**

**Violation of the Administrative Procedure Act**

**Action That is in Excess of Statutory Authority, Arbitrary
and Capricious, and Contrary to Law**

Page 39 -  AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

**(Against Department of Defense, Secretary Hegseth,
Department of Homeland Security, and Secretary Noem)**

146.    Plaintiffs reallege and incorporate the foregoing allegations as if fully set forth herein.

147.    Under the Administrative Procedure Act, a court must "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law," that is "contrary to constitutional right [or] power," or that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A)-(C).

148.    The DOD and Secretary Hegseth's September 28, 2025, Memorandum, (Ex. 2 at 1), federalizing 200 members of the Oregon National Guard at the request of DHS and Secretary Noem constitute final agency action because they represent the "consummation" of the agency's decision-making process and they represent action "from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (citation and quotation marks omitted).

149.    For the reasons discussed above, the DOD and Secretary Hegseth have exceeded their statutory authority to federalize the Oregon National Guard under 10 U.S.C. § 12406 or to deploy federalized California National Guard members to Oregon. For the reasons also discussed above, that action is also arbitrary and capricious. And their direction in deploying the National Guard for law enforcement will violate the Posse Comitatus Act and 10 U.S.C. § 275 as well as the U.S. Constitution.

## COUNT V
### Violation of the Constitution Separation of Powers and the Militia and Take Care Clauses
### (Against All Defendants)

150.    Plaintiffs reallege and incorporate the foregoing allegations as if fully set forth herein.

Page 40 -  AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

151.    The Constitution's separation of powers doctrine and the Take Care Clause all place limitations on the exercise of executive authority.

152.    The separation of powers doctrine is "foundational" and "evident from the Constitution's vesting of certain powers in certain bodies." *Seila Law LLC v. CFPB*, 591 U.S. 197, 227 (2020); *see also Trump v. United States*, 603 U.S. 593, 637–38 (2024).

153.    The Constitution grants Congress the power to regulate the domestic activities of state militias and to authorize the President to "provide for calling forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions." U.S. Const. Art. I, § 8, cl. 15. The Constitution limits the President's authority to act as Commander-in-Chief of the "Militia of the several States" to instances when they are "called into the actual Service of the United States." U.S. Const. art. II, § 2, cl. 1.

154.    The Executive's powers are limited to those specifically conferred by "an act of Congress or from the Constitution itself." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952). The Executive has no power "to enact, to amend, or to repeal statutes." *Clinton v. City of New York*, 524 U.S. 417, 438 (1998).

155.    The Militia Clauses expressly provide that "Congress shall have Power . . . To provide for calling forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions. . . ." U.S. Const. art. I, § 8, cl. 15. They further provide that Congress has authority "To provide for organizing, arming, and disciplining, the Militia, and for governing such Part of them as may be employed in the Service of the United States, reserving to the States respectively, the Appointment of the Officers, and the Authority of training the Militia according to the discipline prescribed by Congress. . . ." U.S. Const. art. I, § 8, cl. 16.

Page 41 -  AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

156.    In addition, the Take Care Clause provides that the Executive must "take Care that the Laws be faithfully executed . . . ." U.S. Const. art. II, § 3; *Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302, 327 (2014) ("Under our system of government, Congress makes the laws and the President . . . faithfully executes them") (internal quotation marks and citation omitted). The Executive violates the Take Care Clause where it overrides statutes enacted by Congress and signed into law or duly promulgated regulations implementing such statutes. *See In re United Mine Workers of Am. Int'l Union*, 190 F.3d 545, 551 (D.C. Cir. 1999) (holding that "the President is without authority to set aside congressional legislation by executive order"); *Kendall v. United States*, 37 U.S. (12 Pet.) 524, 613 (1838) (rejecting argument that by charging the President with faithful execution of the laws, the Take Care clause "implies a power to forbid their execution").

157.    Defendants have violated each of these constitutional doctrines by asserting authority over a state Militia that the Constitution and federal law expressly assign to the States and disregarding the limits in the Posse Comitatus Act and 10 U.S.C. § 275, which limit the participation of federal military forces in law enforcement.

158.    This court is authorized to enjoin any action by the Executive and his agencies that "is unauthorized by statute, exceeds the scope of constitutional authority, or is pursuant to unconstitutional enactment." *Youngstown Sheet & Tube Co. v. Sawyer*, 103 F. Supp. 569, 576 (D.D.C. 1952), *aff'd*, 343 U.S. 579 (1952). Plaintiffs are entitled to preliminary and permanent injunctive relief barring the actions challenged herein.

159.    Pursuant to 28 U.S.C. § 2201, Plaintiffs are also entitled to a declaration that the actions challenged herein violate the constitutional separation of powers doctrine, the Take Care

Page 42 -  AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Clause, and impermissibly arrogate to the Executive power that is reserved to Congress or the states.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that the Court:

a.    Declare that any order federalizing and deploying members of the Oregon National Guard is ultra vires and contrary to law;

b.    Declare that any order federalizing and deploying members of the California National Guard to Oregon is ultra vires and contrary to law;

c.    Hold unlawful and enjoin Defendants' federalization and deployment of members of the Oregon National Guard;

d.    Hold unlawful and enjoin Defendants' deployment of members of the California National Guard to Oregon;

e.    Preliminarily and permanently enjoin, and stay and set-aside, Secretary Hegseth and the Department of Defense from calling Oregon National Guard members into federal service, deploying them in Oregon, or taking any other similar action in Oregon;

f.    Preliminarily and permanently enjoin, and stay and set-aside, Secretary Hegseth and the Department of Defense from deploying California National Guard members in Oregon;

g.    Award Plaintiffs' costs of suit and reasonable attorneys' fees and expenses under any applicable law; and

h.    Award such additional relief as the interests of justice may require.


DATED October 28, 2025.


Page 43 -  AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Respectfully submitted,

DAN RAYFIELD
Attorney General
BENJAMIN GUTMAN
Solicitor General
DUSTIN BUEHLER
Special Counsel

*s/ Brian Simmonds Marshall*
SCOTT KENNEDY #T25070201, D.C. Bar
#1658085
BRIAN SIMMONDS MARSHALL #196129
THOMAS CASTELLI #226448
IAN VAN LOH #225163
RACHEL SOWRAY #095159
Senior Assistant Attorneys General
ALEXANDER C. JONES #213898
DEREK OLSON #225504
Assistant Attorneys General
100 SW Market Street
Portland, OR 97201
971-673-1880
Scott.Kennedy@doj.oregon.gov
Brian.S.Marshall@doj.oregon.gov
Thomas.Castelli@doj.oregon.gov
Ian.VanLoh@doj.oregon.gov
Rachel.Sowray@doj.oregon.gov
Alex.Jones@doj.oregon.gov
Derek.Olson@doj.oregon.gov

*Counsel for the State of Oregon*

ROBERT TAYLOR  #044287
Portland City Attorney

*s/ Caroline Turco*
CAROLINE TURCO  #083813
Senior Deputy City Attorney
NAOMI SHEFFIELD  #170601
Chief Deputy City Attorney
1221 SW Fourth Avenue
Fourth Floor, Room 430
Portland, OR 97204
Tel: (503) 823-4047
Fax: (503) 823-3089
Caroline.Turco@portlandoregon.gov
Naomi.Sheffield@portlandoregon.gov

*Counsel for the City of Portland*

Page 44 -  AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

**ROB BONTA**
Attorney General of California

*s/ Barbara Horne-Petersdorf*
Michael L. Newman
Thomas S. Patterson
Senior Assistant Attorneys General
Anya M. Binsacca
Marissa Malouff
James E. Stanley
Supervising Deputy Attorneys General
Jesse Basbaum
Barbara Horne-Petersdorf
Jane Reilley
Meghan H. Strong
Deputy Attorneys General
455 Golden Gate Ave.
San Francisco, CA 94102
Telephone: (415) 510-3877
E-mail: Meghan.Strong@doj.ca.gov

*Counsel for the State of California*

Page 45 -  AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

# EXHIBIT 1

DAN RAYFIELD
Attorney General
BENJAMIN GUTMAN
Solicitor General
DUSTIN BUEHLER
Special Counsel
SCOTT KENNEDY #T25070201, D.C. Bar #1658085
BRIAN SIMMONDS MARSHALL #196129
THOMAS CASTELLI #226448
IAN VAN LOH #225163
RACHEL SOWRAY #095159
Senior Assistant Attorneys General
ALEXANDER C. JONES #213898
DEREK OLSON #225504
Assistant Attorneys General
100 SW Market Street
Portland, OR 97201
Telephone: (971) 673-1880
Fax: (971) 673-5000
Email: Scott.Kennedy@doj.oregon.gov

*Counsel for the State of Oregon*

[Additional counsel to appear on signature page]

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| STATE OF OREGON, the CITY OF PORTLAND, and the STATE OF CALIFORNIA | Case No. |
| Plaintiffs, | |
| v. | AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF |
| DONALD TRUMP, in his official capacity as President of the United States; PETE HEGSETH, in his official capacity as Secretary of Defense; U.S. DEPARTMENT OF DEFENSE; KRISTI NOEM, in her official capacity as Secretary of Homeland Security; and U.S. DEPARTMENT OF HOMELAND SECURITY, | |
| Defendants. | |

Page 1 -   AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## I.  INTRODUCTION

1.      The "traditional and strong resistance of Americans to any military intrusion into civilian affairs" has "deep roots in our history." *Laird v. Tatum*, 408 U.S. 1, 15 (1972). Our nation's founders recognized that military rule—particularly by a remote authority indifferent to local needs—was incompatible with liberty and democracy. Foundational principles of American law therefore limit the President's authority to involve the military in domestic affairs.

2.      Those principles stem first from the U.S. Constitution, which reserves the general police power for the states while establishing civilian control over the military. It also affords Congress, not the President, the power "to provide for calling forth the militia to execute the laws of the union, suppress insurrections, and repel invasions." Art. I, § 8, cl. 15–16. While Congress has delegated a portion of that power to the Executive, it carefully limited the President's authority to exert control over a state's National Guard—the modern term for the militia—to specific circumstances. And for over a century and a half, Congress has expressly forbidden federal military interference in civilian law enforcement.

3.      Defendants have trampled on these principles by federalizing members of the Oregon National Guard for deployment in Portland, Oregon, to participate in civilian law enforcement. On September 28, 2025, the Secretary of Defense (now referred to as the Secretary of War) issued a memorandum calling into federal service 200 members of the Oregon National Guard. This order effectuated a social media post by President Trump on September 27, 2025, which authorized the Secretary to employ "Troops" using "Full Force" in Portland. Citing nothing more than baseless, wildly hyperbolic pretext—the President says Portland is a "War ravaged" city "under siege" from "domestic terrorists"—Defendants have thus infringed on Oregon's sovereign power to manage its own law enforcement activity and National Guard

Page 2 -    AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

resource. Far from promoting public safety, Defendants' provocative and arbitrary actions threaten to undermine public safety by inciting a public outcry.

4.    The facts cannot justify this overreach. While Defendants' actions appear focused on ongoing protests near an Immigration and Customs Enforcement facility in Portland, those protests have been small in recent weeks—typically involving less than thirty people—and the protesters' activities have not necessitated any arrests since mid-June. But Defendants' heavy-handed deployment of troops threatens to escalate tensions and stokes new unrest, meaning more of the Plaintiffs' law enforcement resources will be spent responding to the predictable consequences of Defendants' action.

5.    Defendants' deployment of troops to Oregon is patently unlawful. Because their stated basis for federalizing members of Oregon's National Guard is patently pretextual and baseless, Defendants cannot satisfy any of the three perquisites for involuntarily federalizing a state's National Guard under 10 U.S.C. § 12406. Defendants' purpose in federalizing those troops—to integrate them into federal law enforcement activities in Portland—also violates the Posse Comitatus Act.

6.    Additionally, Defendants' actions violate the Tenth Amendment's guarantee that the police power—including the authority to promote safety at protests and deter violent crime—resides with the states, not the federal government. And by singling out a particular disfavored jurisdiction for political retribution, these actions also eviscerate the constitutional principle that the states' sovereignty should be treated equally.

7.    For these and other reasons discussed below, Defendants' actions should be declared unlawful and preliminarily and permanently enjoined.

---

Page 3 -    AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## II. JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and

2201(a) and the Administrative Procedure Act, 5 U.S.C. §§ 701–706.

9.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(2) and (e)(1).

Defendants are agencies of the United States and officers sued in their respective official

capacities. The State of Oregon is a resident of this district, and a substantial part of the events or

omissions giving rise to this Complaint occurred and continue to occur within the District of

Oregon.

## III. PARTIES

**A.      Plaintiffs**

10.     The State of Oregon is a sovereign state of the United States. Oregon is

represented by Attorney General Dan Rayfield, who is the chief legal officer of Oregon.

11.     Plaintiff City of Portland is a municipal corporation of the State of Oregon duly

organized and existing under the laws of the State of Oregon. The Portland Police Bureau (PPB)

is a bureau of the City of Portland. PPB is the largest law enforcement agency in Oregon and has

the primary responsibility for policing the City of Portland.

11.12.  The State of California is a sovereign State of the United States. California is

represented by Attorney General Rob Bonta, who is the chief legal officer of Oregon. California

Governor Gavin Newsom is the Commander in Chief of the California National Guard.

**B.      Defendants**

12.13.  Donald Trump is President of the United States. As such, he is the Commander-

in-Chief of the United States' armed forces, including those portions of the National Guard

lawfully under federal control. He is sued in his official capacity for declaratory relief only.

Page 4 -   AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

13.14.  Pete Hegseth is Secretary of Defense and the head of the U.S. Department of Defense. He is sued in his official capacity.

14.15.  The U.S. Department of Defense (DOD) is a department of the Executive Branch of the United States government responsible for coordinating and supervising the United States armed forces, including those portions of the National Guard lawfully under federal control. DOD is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1). On September 5, 2025, President Trump issued Executive Order 14,347, entitled "Restoring the United States Department of War," in which he stated that the Department of Defense "may be referred to as the Department of War" as a secondary title in certain contexts. 90 Fed. Reg. 43893, 43893 (Sept. 5, 2025).

15.16.  Kristi Noem is Secretary of Homeland Security and the head of the U.S. Department of Homeland Security. She is sued in her official capacity.

16.17.  The U.S. Department of Homeland Security (DHS) is a department of the Executive Branch of the United States government. DHS is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1). One component of DHS is U.S. Immigration and Customs Enforcement (ICE).

## IV. BACKGROUND

### A.    The Oregon National Guard is a State-Based Military Reserve Force

17.18.  The U.S. Constitution authorizes Congress "to provide for calling forth the militia to execute the laws of the union, suppress insurrections, and repel invasions." U.S. Const. art. I, § 8, cl. 15–16. This state-based militia that existed at the nation's founding was the forerunner of the modern National Guard.

Page 5 -    AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

18.19.  Today, the National Guard is a state-based military reserve force that consists of two overlapping but distinct organizations: the National Guard of the various States and the National Guard of the United States. Since 1933, anyone who enlists in a state's National Guard is simultaneously enlisted into the National Guard of the United States. And when a member of a state's National Guard is ordered into federal service, that member is relieved of his or her status in the state's National Guard for the duration of that federal service.

19.20.  Members of the National Guard may serve in one of three capacities: State Active Duty status, Title 32 status, and Title 10 status.

20.21.  First, members of the National Guard may serve in "State Active Duty" status. This means they exercise state functions under the authority of their state's governor, and their actions generally are governed by state law. For example, when wildfires occur in Oregon, Governor Kotek frequently authorizes the Oregon National Guard to assist with firefighting efforts.

21.22.  Second, members of the National Guard may serve in a hybrid federal-state status under Title 32 of the United States Code. In particular, 32 U.S.C. § 502(f)(2)(A) provides that, "[u]nder regulations to be prescribed by the Secretary of the Army or Secretary of the Air Force, as the case may be, a member of the National Guard may," under certain circumstances, "be ordered to perform" enumerated duties, including "[s]upport of operations or missions undertaken by the member's unit at the request of the President or Secretary of Defense." The United States has traditionally recognized that National Guard members serving federal missions in Title 32 status must have the consent not only of their home state's governor but also the consent of any other governors concerned in the mission. Here, Oregon does not consent to the deployment of Oregon National Guard members pursuant to 32 U.S.C. § 502(f)(2)(A).

Page 6 -   AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

22.23.  Third, members of the National Guard may be "federalized" and called into federal service in what is known as "Title 10" status under Title 10 of the United States Code. The President's authority under Title 10 is carefully limited to specific circumstances under 10 U.S.C. § 12406.

**B.      10 U.S.C. § 12406 Limits the Circumstances When a President Can Call a State's National Guard Members into Federal Service**

23.24.  Congress has granted the President authority over the states' respective National Guards, but it carefully limited that authority to specific circumstances. As relevant here, 10 U.S.C. § 12406 provides that:

> Whenever-
>
> (1) the United States, or any of the Commonwealths or possessions, is invaded or is in danger of invasion by a foreign nation;
>
> (2) there is a rebellion or danger of a rebellion against the authority of the Government of the United States; or
>
> (3) the President is unable with the regular forces to execute the laws of the United States;
>
> the President may call into Federal service members and units of the National Guard of any State in such numbers as he considers necessary to repel the invasion, suppress the rebellion, or execute those laws. Orders for these purposes shall be issued through the governors of the States or, in the case of the District of Columbia, through the commanding general of the National Guard of the District of Columbia.

24.25.  Thus, the President's authority over a state's National Guard pursuant to § 12406 is limited to circumstances involving a foreign nation's "invasion," an outright "rebellion," or where the President has been "unable with regular forces" to execute Federal Law through ordinary means. And if one of those circumstances is present, the President "shall" issue any orders to a state's National Guard "through" that state's governor.

Page 7 -    AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

**C.    The Posse Comitatus Act Prohibits the Deployment of Federalized National Guard Troops for the Purpose of Civilian Law Enforcement**

25.26.   The President's authority over a state's National Guard is subject to other constraints as well. The Posse Comitatus Act, 18 U.S.C. § 1385, prohibits anyone from deploying the U.S. military—including any National Guard members in federal service—for the purpose of civilian law enforcement within the United States. That prohibition applies "except in cases . . . expressly authorized by the Constitution or Act of Congress." *Id.*

26.27.   Notably, 10 U.S.C. § 12406 does not confer an exception to the Posse Comitatus Act because, while it authorizes the president to "call into federal service" a state's National Guard under certain circumstances, it does not authorize the president to domestically deploy the National Guard in pursuit of any particular purpose. This stands in contrast to other statutory provisions, like 10 U.S.C. § 252, which authorizes the President to not only "call into Federal service . . . the militia of any state" but also "*use* such of the armed forces" in specified law enforcement activities under certain circumstances (emphasis added).

27.28.   In light of these restrictions—together with Americans' "traditional insistence on limitations on military operations in peacetime," *Laird*, 408 U.S. at 15—it is unsurprising that until the last few months, no President had invoked § 12406 since President Nixon called up the National Guard to deliver mail during a Postal Service Strike over 50 years ago. *See* Exec. Order No. 11519, 35 Fed. Reg. 5003 (1970).

28.29.   The legal and normative constraints on presidential authority to federalize and deploy a state's National Guard are so well established that President Trump previously acknowledged them. Questioned in September 2020 about his commitment to restore law and order, the President said, "[w]e have laws. We have to go by the laws. We can't move in the National Guard. . . . Even in a Portland [Oregon] case, we can't call in the National Guard unless

Page 8 -   AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

we're requested by a governor."[1] Instead, the president emphasized that communication and cooperation is key, because even "[i]f a governor or a mayor is a Democrat, like in Portland, we call them constantly."

### D. The President Has Repeatedly Expressed Intentions to Use the Military for Routine Domestic Law Enforcement

~~29.~~30.  Despite his prior statements, the President has shared his plans to deploy members of the National Guard to further his civilian law enforcement priorities.

~~30.~~31.  For example, asked in April 2024 whether his domestic immigration enforcement efforts would include using the U.S. military, President Trump said "It would."[2] The president continued that he would have "no problem using the military," which he understood to include "the National Guard," in order to further his domestic priorities and promote "law and order in our country."[3] Asked whether he would go so far as to override the Posse Comitatus Act, the President opined that the Act would not apply to immigration enforcement because in his view, "these [undocumented immigrants] aren't civilians. These are people that aren't legally in our country."[4]

---

[1] Meg Kinnard & Adriana Gomez Licon, *In His Own Words: Trump Said During 2024 Campaign He Would Use Military for Immigration Enforcement*, AP News (June 10, 2025, at 5:10 PM PT), https://apnews.com/article/trump-immigration-military-los-angeles-a2611009fd40d593f07c58255911513d.

[2] *Read the Full Transcripts of Donald Trump's Interviews With TIME*, TIME Mag. (Apr. 30, 2024, at 6:27 PM ET), https://time.com/6972022/donald-trump-transcript-2024-election/.

[3] *Id.*

[4] *Id.*

Page 9 -    AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

31.32.  Similarly, on November 17, 2024, when a social media post predicted that President Trump "will declare a national emergency and will use military assets" to implement "a mass deportation program," the President responded: "TRUE!!!"[5]

**E.    Defendants Have Since Used the Military for Civilian Law Enforcement in Los Angeles and Washington, D.C.**

32.33.  Prior to President Trump ordering troops to Portland, federalized national guard and active-duty soldiers were first deployed in Los Angeles, California, and then Washington, D.C.

33.34.  Trump federalized the California National Guard on June 7, 2025, following a day of aggressive immigration enforcement activity in the Los Angeles metropolitan area. The authorization memorandum cited 10 U.S.C. § 12406 as legal authority, and claimed a factual basis of violence, disorder, and damage to federal property. *Newsom v Trump*, 141 F.4th 1032, 1041, 1051 (9th Cir., 2025).

34.35.  California filed suit claiming, among other things, that the federal action violated the Posse Comitatus Act. On September 2, 2025, the district court found that the Trump administration had "instigated a months-long deployment of the National Guard and Marines to Los Angeles for the purpose of establishing a military presence there and enforcing federal law. Such conduct is a serious violation of the Posse Comitatus Act." *Newsom v. Trump*, No. 3:25-cv-04870-CRB, 2025 WL 2501619, at *24 (N.D. Cal. Sept. 2, 2025).

35.36.  On August 11, 2025, the Trump administration's focus turned to Washington, D.C. At a press conference that day, President Trump announced the planned deployment of the

---

[5] Meg Kinnard & Adriana Gomez Licon, *In His Own Words: Trump Said During 2024 Campaign He Would Use Military for Immigration Enforcement*, AP News(June 10, 2025, at 5:10 PM PT), https://apnews.com/article/trump-immigration-military-los-angeles-a2611009fd40d593f07c58255911513d.

Page 10 -   AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

D.C. National Guard into the district to "to rescue our nation's capital from crime, bloodshed, bedlam and squalor and worse."[6] He called it "Liberation Day in DC," and said, "we're gonna take our capital back."[7]

~~36.~~37.  The same day, Defendant Hegseth also announced that National Guard troops would be deployed in D.C. to "stand with their law enforcement partners"—which, he said, was the "same thing" the National Guard did in Los Angeles. The Trump administration deployed national guard troops from D.C. and seven other states into Washington, D.C.[8]

~~37.~~38.  On September 4, 2025, the District of Columbia filed a lawsuit challenging that deployment on multiple grounds. D.C. alleged that, among other harms, the "encroachment of National Guard troops in the District has also already caused harm to public safety in the District." Complaint ¶¶ 129–30, *District of Columbia v. Trump*, No. 1:25-cv-03005 (D.D.C. Sept. 4, 2025), Dkt. No. 1.

### F.    Portlanders Protest Against Portland ICE Facility

~~38.~~39.  On June 2, 2025, for the first time, federal authorities arrested an asylum-seeker at Immigration Court in Portland.[9]  This arrest catalyzed small public protests at Portland's ICE facility, located at 4310 S. Macadam Avenue.

---

[6] AP Archive, *Trump Says He's [sic] Wants to Rescue Washington, DC from 'Crime, Bloodshed, Bedlam, and Squalor'* (YouTube, Aug. 11, 2025), https://www.youtube.com/watch?v=O-C0NwtFKoU

[7] *Id.*

[8] Brian Krans, *California Argues Trump's Use of Troops in LA Violated Federal Law*, KQED (Aug. 12, 2025 at 11:33 AM PT) https://www.kqed.org/news/12051797/california-argues-trumps-use-of-troops-in-l-a-violated-federal-law

[9] Fedor Zarkhin & Zaeem Shaikh, *How ICE Protests Have Unfolded in Portland, From June Until Now*, The Oregonian (Sept. 12, 2025, at 11:27 AM PT), https://www.oregonlive.com/portland/2025/09/how-ice-protests-have-unfolded-in-portland-from-june-until-now.html.

Page 11 -   AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

39.40.  On June 6, 2025, protests began in Los Angeles following increased immigration enforcement activities in the city.[10] In the following days, small protests continued outside of Portland's ICE facility. At one point, protestors blocked an ICE driveway with a makeshift barricade.  Portland Police Bureau (PPB) officers cleared the barricade within minutes, citing safety concerns.[11] Protests in Portland continued, with PPB officers taking appropriate action, arresting those few ICE-facility protesters who engaged in criminal activity.[12]

40.41.  On June 15, 2025, Portland Mayor Keith Wilson, reacting to troop deployments in Los Angeles, stated that Portland does not need help from National Guard.[13] Subsequent events proved the Mayor correct.

41.42.  The small protests at the ICE facility became less energetic and required less law-enforcement involvement. Indeed, the last arrest PPB made at those protests was on June 19, 2025.[14] In the days since, PPB has monitored the near-nightly protests, none of which required

---

[10] *Id.*

[11] Zaeem Shaikh, *Portland Police Clear Blockade of ICE Office; Chief Says It Was for Safety Not Immigration Information*, The Oregonian (June 10, 2025, at 6:19 AM PT), https://www.oregonlive.com/crime/2025/06/portland-police-clear-blockade-of-ice-office-chief-says-it-was-for-safety-not-immigration-enforcement.html.

[12] Tatum Todd, *Portland Police Arrest 10 at ICE Protest as Nationwide Demonstrations Continue*, The Oregonian (June 13, 2025, at 2:53 PM PT), https://www.oregonlive.com/crime/2025/06/portland-police-arrest-10-at-ice-protest-as-nationwide-demonstrations-continue.html.

[13] Zane Sparling, *How Protests Outside Portland ICE Unfolded Before Trump's Troop Announcement*, The Oregonian (Sept. 27, 2025, at 7:36 PM PT) https://www.oregonlive.com/politics/2025/09/how-protests-outside-portland-ice-unfolded-before-trumps-troop-announcement.html.

[14] Fedor Zarkhin & Zaeem Shaikh, *How ICE Protests Have Unfolded in Portland, From June Until Now*, The Oregonian (Sept. 12, 2025, at 11:27 AM PT), https://www.oregonlive.com/portland/2025/09/how-ice-protests-have-unfolded-in-portland-from-june-until-now.html. *But see* Sparling, *supra* note 13 (noting that federal authorities made arrests on July 4).

Page 12 -   AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

police intervention to protect public safety or interdict criminal activity on the part of the protesters.

42.43.  On July 8, 2025, as small ICE-facility protests continued, Tom Homan, the President's "Border Czar," pledged that immigration enforcement officers would be "tripling down" on enforcement in Portland.[15]

43.44.  On July 19, 2025, protests continued with up to 60 people gathered at the ICE facility. A PPB officer described the group as "low energy and seated quietly."[16]

44.45.  Sporadic protests continued over the subsequent weeks. On September 1, 2025, over 100 protestors marched to the ICE building. In response, federal officers deployed chemical gas and pepperballs at the crowd.[17]

## G.    Local Law Enforcement Authorities Have Been and Remain Fully Equipped to Address the Protests

45.46.  Portland Police Bureau is a sophisticated law-enforcement agency employing 812 full-time officers. Every officer receives basic crowd management training and specialized teams receive up to forty hours of annual crowd management training.

46.47.  PPB's Central Precinct covers downtown Portland, where most public protests occur. As a result, Central Precinct officers have significant experience in protest management. Portland's ICE facility is located within PPB's Central Precinct, which employs 80 full-time officers who are the ideal frontline force for monitoring and responding to the small ongoing ICE-facility protests.

---

[15] Zarkhin & Shaikh, *supra* note 14.

[16] *Id.*

[17] *Id.*

Page 13 -  AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

47.48.  PPB monitors social media and regularly communicates with protest organizers to develop internal risk assessments associated with public protests. Based on the needs associated with any protest, PPB can deploy additional personnel from other precincts, activate crowd management incident commanders, call in PPB's Rapid Reaction Team, bring in off-duty officers, or rely on an extensive network of other local, county, and state agencies.

48.49.  PPB has needed to activate such resources during select times in response to protests involving the ICE Facility in June and July of 2025. And in that single instance, on or around July 17, 2025, the Rapid Reaction Team was deployed in connection with ensuring public order during a planned march from a nearby park to the ICE-facility. In every case before and after July 17, 2025, baseline Central Precinct monitoring has been sufficient to maintain public safety at the ICE-facility protests.

## H.    In September 2025, the President Turned His Attention to Portland, Oregon

49.50.  Aside from the incidents discussed above, the ICE-facility protests have generally been small and are frequently sedate. On any given weekend, the nightlife in Portland's entertainment district warrants greater PPB resources than have the small, nightly protests in front of the ICE facility a few blocks away.

50.51.  Nonetheless, on September 5, 2025, Fox News aired a report on Portland ICE protests that included misleading clips from Portland protests in 2020.[18]

51.52.  Shortly thereafter, President Trump appeared to reference events in the same misleading FoxNews report when speaking to the press. A reporter asked which city President Trump planned to send troops to next, and he said he was considering targeting Portland because of news coverage the night before. President Trump alleged that "paid terrorists" and "paid

---

[18] *Id.*

Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

agitators" were making the city unlivable, further stating "[a]nd when we go there, if we go to

Portland, we're gonna wipe them out. They're going to be gone and they're going to be gone

fast. They won't even stand the fight."[19]

~~52.~~53.  President Trump later designated Antifa a terrorist organization on September 19,

2025. Afterward, he described a plan to insert federal personnel in cities such as Chicago,

Memphis, and Portland. He stated "Have you seen Portland at all? You take a look what's

happening in Portland. It's uh I mean, this has been going on for years. It's just people out of

control. Crazy. We're going to stop that very soon."[20]

~~53.~~54.  While answering questions from the press on September 25, 2025, the President

baselessly insisted people had "just burned the place down."[21] He said Portland is "on my list of

things that I want to do before, uh, we finish up with the cities because I think we're going to

whip the cities into shape. . . ." The President declared his intention "to get out there" and "do a

pretty big number of those people in Portland that are doing that."[22]

~~54.~~55.  On September 27, 2025, the President followed through on his threats, posting a

message to his Truth Social account: "At the request of Secretary of Homeland Security, Kristi

Noem, I am directing Secretary of War, Pete Hegseth, to provide all necessary Troops to protect

---

[19] The Oregonian, *"It Is Like Living in Hell": Trump Discusses Portland as He Considers Sending the National Guard* (YouTube, Sept. 5, 2025), https://www.youtube.com/watch?v=6tP9QqDmu74.

[20] The Oregonian, *Trump Mentions Portland at White House: 'Just People Out of Control and Crazy'*, at 0:10 (YouTube, Sept. 19, 2025), https://www.youtube.com/watch?v=cisl1y10YRw&t=10s.

[21] The Oregonian, *Trump Escalates Rhetoric Promising Federal Intervention in Portland, Citing "Anarchy"*, at 0:44 (YouTube, Sept. 25, 2025), https://www.youtube.com/watch?v=G0TdH2aC-Jg&t=44s.

[22] *Id.*

Page 15 -  AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

War ravaged Portland, and any of our ICE Facilities under siege from attack by Antifa, and other

domestic terrorists. Thank you for your attention to this matter!"[23]



> **Donald J. Trump** @realDonaldTrump
>
> At the request of Secretary of Homeland Security, Kristi Noem, I am directing Secretary of War, Pete Hegseth, to provide all necessary Troops to protect War ravaged Portland, and any of our ICE Facilities under siege from attack by Antifa, and other domestic terrorists. I am also authorizing Full Force, if necessary. Thank you for your attention to this matter!
>
> **12.8k** ReTruths   **53.1k** Likes                   9/27/25, 7:19 AM

~~55.~~56.  Later that day, Major General Timothy L. Rieger, Acting Vice Chief of the

National Guard Bureau, requested that Oregon Governor Tina Kotek authorize mobilization of

the Oregon National Guard in a non-federalized status based on a request from DHS. *See* Ex. 1.

The memorandum threatened to direct mobilization of Oregon National Guard members under

Title 10 of the U.S. Code if Governor Kotek did not agree within 12 hours to activate the

National Guard. *Id.*

~~56.~~57.  DHS spokeswoman Tricia McLaughlin stated on September 27, 2025, that

"President Trump and Secretary Noem are taking action to restore law and order following

weeks of violent riots at ICE facilities, assaults on law enforcement, and the terrorist attack at our

---

[23] Donald J. Trump, (@realDonaldTrump) Truth Social (Sept. 27, 2025 at 07:19 ET), https://truthsocial.com/@realDonaldTrump/posts/115276694936263266

Page 16 -  AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

ICE facility in Dallas."[24] Specifics on how these concerns are related to Portland were not

outlined.

~~57.~~58.  In a press conference on the same day, Governor Kotek stated that Oregon does

not want military troops and that public safety will be handled by local law enforcement.[25]

~~58.~~59.  Nonetheless, on September 28, 2025, the Secretary of Defense issued a

memorandum calling 200 members of the Oregon National Guard into federal service for a

period of 60 days. *See* Ex. 2 at 1. That order was styled as "further implement[ation]" of a June

7, 2025 Presidential Memorandum, which vaguely cited "[n]umerous incidents of violence and

disorder . . . in response to the enforcement of Federal law" that purportedly "constitute a form of

rebellion against the authority of the United States." *Id.* at 2.

## I.   Defendants' Actions Represent the Latest Political Attack Against Democrat-led Jurisdictions that Refuse to Assist with Immigration Enforcement.

~~59.~~60.  The federal government holds key powers and responsibilities over the subject of

immigration and the status of non-citizens. Those are laid out in the Immigration and

Naturalization Act.

~~60.~~61.  Components within DHS enforce those laws. Among them, Customs and Border

Protection (CBP) is responsible for determining the admissibility of non-citizens and securing

the country's borders. ICE has two primary subcomponents: Enforcement and Removal

Operations (ERO) and Homeland Security Investigations (HSI). ERO is tasked with civil

immigration enforcement and removal, including housing detainees in facilities nationwide, for

---

[24] Luke Broadwater, Hamed Aleaziz & Anna Griffin, *Trump Says He Has Ordered Troops to Protect ICE Facilities in Portland*, N.Y. Times (Sept. 27, 2025), https://www.nytimes.com/2025/09/27/us/politics/trump-portland-troops.html.

[25] KATU News, *'We Do Not Need Help': Oregon Gov. Tina Kotek on Trump's Portland Announcement to Send Troops* (YouTube, Sept. 27, 2025), https://www.youtube.com/watch?v=aa_CImbyLW4.

Page 17 -  AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

immigration proceedings or removal from the United States. HSI conducts federal criminal investigations, in coordination with federal prosecutors and other criminal investigatory agencies.

61.62.  States and municipalities, by contrast, do not have this responsibility. States and municipalities instead protect the general public welfare. The Constitution vests the States with traditional police powers, which include the authority to make policy judgments and regulations for increasing the safety of all residents and focusing local police officers' limited time and resources on preventing and responding to crime.

62.63.  Under the Tenth Amendment to the United States Constitution, the "powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X; *Slaughterhouse Cases*, 83 U.S. 36, 62 (1873) (describing the police power as extending "to the protection of the lives, limbs, health, comfort, and quiet of all persons . . . within the State"). Among other meanings of this amendment is this:  the states—and not the federal government—wield the general police power.

63.64.  Public health and safety are among the more "conspicuous examples of the traditional application of the police power." *Berman v. Parker*, 348 U.S. 25, 32 (1954). States "traditionally have had great latitude under their police powers to legislate as to the protection of the lives, limbs, health, comfort, and quite of all persons." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 475 (1996).

64.65.  In consideration of that responsibility, in 1987 Oregon passed the "Sanctuary Promise," the first law of its kind in the United States, which prohibits state and local government agencies from using their resources to assist with federal immigration enforcement.

Page 18 -  AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

*See* ORS 181A.820. Oregon's Sanctuary Promise has been updated several times since 1987. *See, e.g.*, H.B. 3265, 81st Legis. Assemb., Reg. Sess. (Or. 2021).

65.66.  The President has repeatedly attacked Democrat-led cities and states, including over immigration enforcement.[26]

66.67.  On June 23, 2020, he stated: "[A]ll of these problems, Seattle, Portland, Chicago, uh, you could go to Oakland, you could go to Baltimore. What do they have in common? They're run by liberal Democrats, just like Joe Biden."[27]

67.68.  While running for his current term, the President continued to demonize cities where Democrats had been elected as leaders. On August 20, 2024, he said that "the crime is so out of control in our country. I mean, you have cities – I will say this, the top 25, almost all are run by Democrats, and they have very similar policies. . . . But you can't walk across the street to get a loaf of bread. . . . You get shot. You get mugged. You get raped, you get whatever it may be. And you've seen it and I've seen it, and it's time for a change. We have to bring back our cities."[28]

68.69.  On inauguration day, 2025, President Trump signed Executive Order 14,159, "Protecting the American People Against Invasion," which once again sought to unlawfully

---

[26] *See* Brett Samuels, *Trump Steps Up Clash with DC, Democratic-Led Cities*, The Hill (Aug. 12, 2025, at 6:00 AM ET), https://thehill.com/homenews/administration/5447093-trump-dc-democratic-cities-chicago ("Trump has long picked fights with Democratic cities, attacking mayors in Chicago, New York, Los Angeles, Baltimore and other areas and using them to boost his own image as a tough-on-crime president.").

[27] David Brody, *EXCLUSIVE President Trump Ramps Up 2020 Message to Evangelicals, Says Biden Will Destroy Pro-Life Movement*, Christian Broad. Network (June 23, 2020), https://cbn.com/news/politics/exclusive-president-trump-ramps-2020-message-evangelicals-says-biden-will-destroy-pro.

[28] Phillip Bump, *Trump's Claims About Violent Crime Increasingly Diverge from Reality*, Wash. Post (Aug. 21, 2024, at 11:52 AM ET), https://www.washingtonpost.com/politics/2024/08/21/trump-crime-fear/.

Page 19 -  AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

defund "'sanctuary' jurisdictions" and directed the U.S. Department of Justice (DOJ) and DHS to target jurisdictions like the Plaintiffs:

> Sec. 17. Sanctuary Jurisdictions. The Attorney General and the Secretary of Homeland Security shall, to the maximum extent possible under law, evaluate and undertake any lawful actions to ensure that so-called "sanctuary" jurisdictions, which seek to interfere with the lawful exercise of Federal law enforcement operations, do not receive access to Federal funds. Further, the Attorney General and the Secretary of Homeland Security shall evaluate and undertake any other lawful actions, criminal or civil, that they deem warranted based on any such jurisdiction's practices that interfere with the enforcement of Federal law.

90 Fed. Reg. 8443, 8446 (Jan. 20, 2025).

~~69.~~70.  On February 19, 2025, Trump signed Executive Order 14,218, "Ending Taxpayer Subsidization of Open Borders," which sought to defund certain State programs based on new immigration enforcement demands related to the provision of federal public benefits. 90 Fed. Reg. 10581 (Feb. 19, 2025).

~~70.~~71.  A coalition of affected jurisdictions, including the City of Portland, promptly sued to enjoin the January and February immigration-related executive orders. *City & Cnty. of San Francisco v. Donald J. Trump*, No. 25-cv-01350-WHO (N.D. Cal. Feb. 7, 2025). About a week and a half before the court granted a preliminary injunction against those executive orders, Trump again posted an attack on "sanctuary cities" claiming they "protect the Criminals:"[29]

---

[29] Donald J. Trump (@realDonaldTrump), Truth Social (Apr. 10, 2025, at 06:53 ET), https://truthsocial.com/@realDonaldTrump/posts/114313927527638500.

Page 20 -  AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000



71.72.  On April 18, 2025, Stephen Miller, on behalf of the Trump administration, leveled the accusation that "Sanctuary cities shield criminal [undocumented immigrants] from removal." Miller opined that "these cities are engaged in systemic criminal violations and that they are engaged in a scheme to nullify and obstruct the duly enacted laws of the United States of America."[30]

72.73.  On April 28, 2025, President Trump signed Executive Order 14287, titled "Protecting American Communities From Criminal Aliens." In it, he targeted "sanctuary jurisdictions" as well as "State and local officials" who allegedly "use their authority to violate, obstruct, and defy the enforcement of Federal immigration laws."  The order accused its targets of undertaking a "lawless insurrection against the supremacy of Federal law and the Federal Government's obligation to defend the territorial sovereignty of the United States." 90 Fed Reg 18761, 18761 (Apr. 28, 2025).

73.74.  The same executive order also expressed the administration's intention to defund grants or programs to states or municipalities with "sanctuary" laws that leave federal civil

---

[30] Roll Call Factbase Videos, *Press Briefing: Stephen Miller Speaks to Reporters Outside the White House – April 18, 2025*, at 10:17–36 (YouTube, May 12, 2025), https://www.youtube.com/watch?v=PyKrfqG51uI.

Page 21 -   AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

immigration enforcement entirely to the federal government, even though federal courts had held this unlawful during Trump's first term.

74.75.  In furtherance of his effort to coerce sanctuary jurisdictions with threats of defunding, the Trump administration, acting through various federal agencies, has asserted sweeping authority to use state law enforcement officers for federal immigration enforcement. It has done so by requiring Oregon and other states to agree to cooperate with federal immigration enforcement activities as a condition to receiving billions of dollars in federal funding.

75.76.  For example, beginning in March 2025, DHS and its sub-agencies, including Federal Emergency Management Agency (FEMA), sought to upend the state-federal emergency management system, holding critical emergency preparedness and response funding hostage unless certain states promised to devote their criminal enforcement and other state agency resources to the federal government's civil immigration enforcement.

76.77.  Forced to choose between foregoing federal funds or facing compulsory diversion of limited law enforcement resources to enforce federal immigration law beyond what Oregon law allows, Oregon, with other states, prevailed in litigation challenging those coercive conditions. *Illinois v. Fed. Emergency Mgmt. Agency*, No. 1:25-cv-00206-WES-PAS, 2025 WL 2716277, at *16 (D.R.I. Sept. 24, 2025) (granting summary judgment to the plaintiff states). Oregon and other states have similarly challenged coercive immigration-enforcement conditions by the U.S. Department of Transportation, *California v. U.S. Dep't of Transportation*, No. 1:25-cv-00208-JJM-PAS (D.R.I. May 13, 2025), and the U.S. Department of Justice, *New Jersey v. U.S. Dep't of Just.*, No. 1:25-cv-00404-JJM-AEM (D.R.I. Aug. 18, 2025).

77.78.  In the midst of these immigration-related federal defunding actions and responsive lawsuits, DHS published, on May 29, 2025, a list of 500 purported "sanctuary

Page 22 -  AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

jurisdictions" around the country.[31] It accused them of "shamefully obstructing" the Trump

administration's deportation plans and "shielding dangerous criminal aliens."[32]

78.79.  The Trump Administration later revised that list on August 5, 2025, shortening it

to just 35 jurisdictions, stating that those jurisdictions were "[c]ities, states, or counties that have

laws, ordinances, regulations, resolutions, policies, or other formalized practices that obstruct or

limit local law enforcement cooperation with U.S. Immigration and Customs Enforcement

(ICE)."[33]

79.80.  That list included the false accusation that the State of Oregon and the City of

Portland (along with the listed others) "impede law enforcement and put American citizens at

risk by design." It also stated the Department of Justice would "work closely with the

Department of Homeland Security to eradicate these harmful policies around the country."[34]

80.81.  Collectively, these efforts sought to coerce sovereign states and their subdivisions

and instrumentalities—including the Plaintiffs—to disavow their own laws and subjugate

themselves to the political proclivities of the Trump administration. The August 5 publication

---

[31] Press Release, U.S. Dep't of Homeland Sec., *DHS Exposes Sanctuary Jurisdictions Defying Federal Immigration Law* (May 29, 2025), https://www.dhs.gov/news/2025/05/29/dhs-exposes-sanctuary-jurisdictions-defying-federal-immigration-law.

[32] Campbell Robertson, Halina Bennet & Jill Cowan, *A Federal List of Immigrant 'Sanctuaries' Nets Trump Allies and Foes Alike*, N.Y. Times (May 31, 2025), https://www.nytimes.com/2025/05/31/us/politics/sanctuary-cities-trump.html

[33] U.S. Off. of Att'y Gen., Dep't of Just., *U.S. Sanctuary Jurisdiction List Following Executive Order 14287: Protecting American Communities from Criminal Aliens* (Sept. 26, 2025), https://www.justice.gov/ag/us-sanctuary-jurisdiction-list-following-executive-order-14287-protecting-american-communities.

[34] Press Release, U.S. Dep't of Just., *Justice Department Publishes List of Sanctuary Jurisdictions* (Aug. 5, 2025), https://www.justice.gov/opa/pr/justice-department-publishes-list-sanctuary-jurisdictions.

Page 23 -  AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

specifically bragged about the success of a "threatening" letter that coerced Louisville, Kentucky to revoke its "sanctuary policies."[35]

~~81.~~82.  Also, during that time, President Trump directed federal agencies to focus immigration enforcement efforts in cities led by Democrats.[36]

~~82.~~83.  On August 13, 2025, Attorney General Bondi sent letters to officials in 32 of the 35 jurisdictions on the August 5 list, including Oregon Governor Tina Kotek and Portland Mayor Keith Wilson. The letters contended that "sanctuary jurisdiction policies have undermined this necessary cooperation and obstructed federal immigration enforcement, giving aliens cover to perpetrate crimes in our communities and evade the immigration consequences that federal law requires."[37]

~~83.~~84.  Bondi's August 13 letters further stated that, to ensure full cooperation in federal immigration enforcement efforts, "the President has directed the Attorney General of the United States, in coordination with the Secretary of Homeland Security, to identify sanctuary jurisdictions and notify them of their unlawful sanctuary status and potential violations of federal law," which was the letter's purpose. The letters did not include any specifics regarding any particular laws, nor did they reflect any recognition of prior court rulings holding the laws valid. The Bondi letter also demanded a response by August 19, 2025.[38]

---

[35] *Id.*

[36] Aamer Madhani, *Trump Directs ICE to Expand Deportations in Democratic-Run Cities, Undeterred by Protests*, AP News (June 15, 2025, at 7:51 PM PT), https://apnews.com/article/trump-ice-deportations-protests-65fa8d64ea12a78a0ee0ebeea008ee4d.

[37] Letters from Pam Bondi, U.S. Att'y Gen., to Various State and City Leaders 15, 57 (Aug 13, 2025), https://www.justice.gov/ag/media/1411166/dl?inline (Letter from Pam Bondi, U.S. Att'y Gen., to Tina Kotek, Governor, State of Oregon; Letter from Pam Bondi, U.S. Att'y Gen., to Keith Wilson, Mayor, City of Portland).

[38] *Id.* at 16, 58.

Page 24 -  AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

~~84.~~85.  On August 19, 2025, Governor Kotek responded to Bondi's letter. Kotek responded that "Oregon, its public officials and its law enforcement officers do not engage in conduct that thwarts federal immigration enforcement." Kotek further responded that, under Oregon's Sanctuary Promise, "Requests from federal agencies to local law enforcement agencies about immigration enforcement without a judicial order must be documented, reported and denied." Kotek further explained that "Oregon complies with federal law and it will continue to follow its own laws."[39]

~~85.~~86.  That same day, President Trump used the pretext of "crime" to threaten a plan to expand domestic troop deployment to other Democrat-led cities and states.[40]

**J.    Defendants' Actions Will Harm the State of Oregon by Interfering with the State's Sovereign Interest in Managing Its Own Law Enforcement Activities**

~~86.~~87.  Defendants' unlawful federalization and deployment of Oregon National Guard members infringes on Oregon's sovereign interest in managing law enforcement within its borders, including the authority to manage protests and unrest. This power is reserved for the states under the Tenth Amendment. It also infringes upon the State's sovereign authority—and the Governor of Oregon's authority under Section 9 of the Constitution of Oregon—to manage the Oregon National Guard's resources according to the State's needs absent lawful federalization of the Guard's members.

---

[39] Mia Maldonado, *'I Respectfully Disagree': Kotek Says Oregon Will Follow Sanctuary Law Despite Threats*, Or. Cap. Chron. (Aug. 19, 2025, at 12:22 PM PT), https://oregoncapitalchronicle.com/2025/08/19/i-respectfully-disagree-kotek-says-oregon-will-follow-sanctuary-law-despite-threats/.

[40] Mariah Welfel & Alexandra Hall, *Trump Says He'll Expand His Focus on Crimes to Other Democratic-Led Cities*, Nat'l Pub. Radio (Aug. 19, 2025, at 4:21 PM ET), https://www.npr.org/2025/08/19/nx-s1-5501329/trump-says-hell-expand-his-focus-on-crimes-to-other-democratic-led-cities.

Page 25 -   AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

87.88.  Defendants' intended use of federalized National Guard troops to control protests in Oregon communities amounts to a usurpation of the role of domestic law enforcement. The State has neither requested nor consented to federal intervention to take over that law enforcement role, which is being carried out by local law enforcement under their lawful authority. The impending use of federalized troops to engage in domestic law enforcement, without the State's consent, threatens an irreparable injury to the State's sovereign interest in managing its own law enforcement activities.

88.89.  Defendants' conduct also will directly and concretely interfere with current and planned law enforcement activities of state and local authorities. State and local law enforcement agencies, including the Oregon State Police and the  Portland Police Bureau, have in place their own plans and protocols for maintaining safety and order in Oregon communities, and they are carrying out their lawful role accordingly. The unlawful deployment of federalized National Guard troops to usurp that law enforcement role will directly interfere with the ability of state and local law enforcement to deal with any given situation. The presence of military units purporting to exercise law enforcement authority creates confusion among the public and threatens to undermine the work of local law enforcement in maintaining order and combating local crime. Further, the needless presence of federalized troops will lead directly to escalated tensions and increased unrest, interfering with state and local law enforcement's ability to maintain order.

89.90.  Further, Defendants' deployment of troops threatens to increase civil unrest, requiring diversion of state law enforcement and state resources. Recent deployments of troops elsewhere in the country have provoked protests and escalated tensions. Those military incursions included operations that were directly calculated as shows of force, intended to

Page 26 -  AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

demonstrate federal presence and strength in otherwise peaceful locations. *See Newsom*, 2025

WL 2501619, at *7 (describing "Operation Excalibur," where federal troops were stationed in

Humvees and tactical vehicles outside MacArthur Park in Los Angeles and blocked traffic along

a stretch of Wilshire Boulevard while federal law enforcement officials marched across the park

as a "show of presence"). As in those instances, Defendants' deployment of troops in Oregon

communities will provoke and escalate protests and unrest and will require the State to divert its

law enforcement personnel and resources to deal with unrest that the federal military presence

has created.

## K.    Defendants' Actions Will Also Harm the State of Oregon and the City of Portland by Suppressing Business Activity

90.91.  Defendants' conduct threatens the economic well-being of the people of Oregon.

In recent months, unlawful federal deployments and militarized raids in California and the

District of Columbia have directly and rapidly chilled economic activity. The deployment of

troops in California stifled economic activity in the Los Angeles area. Restaurants, festivals, and

farmers' markets shut down, as individuals were afraid to leave their homes due to militarized

raids. Similarly, the deployment of National Guard troops in the District of Columbia depressed

key industries, including tourism, restaurants, and hospitality services. Within a week after the

deployment of federal troops in D.C., foot traffic in the District dropped 7 percent on average,

with restaurant reservations showing an even steeper drop.[41] Defendants' military incursion into

Oregon threatens similar immediate harms by depressing business activities, travel, and tourism

in Oregon communities.

---

[41] Andrea Sachs & Federica Cocco, *D.C. Tourism Was Already Struggling. Then the National Guard Arrived*, Wash. Post (Aug. 29, 2025, at 5:00 AM ET), https://www.washingtonpost.com/travel/2025/08/29/dc-tourism-trump-takeover-national-guard-impacts/.

Page 27 -  AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

91.92.  Defendants' conduct also threatens financial harm to the government of Oregon in multiple ways. The military incursion's chilling effect on economic activity will directly decrease tax revenue collected by the State and by the City. In the District of Columbia, troop deployment has resulted in a reduction of work hours for some District workers, and a corresponding decline in income tax withholding paid to the District government. Deployment of troops in Oregon communities threatens similar harm to Oregon tax revenues.

**L.  Defendants' Actions Will Harm the State of Oregon by Diverting National Guard Personnel and Rendering Them Unable to Engage in Other Critical Work**

92.93.  Defendants' unlawful federalization and deployment of the Oregon National Guard will concretely harm the State's interests by rendering those members unable to engage in other critical work.

93.94.  Except for when it has been lawfully called into federal service, the Oregon National Guard answers to its Commander-in-Chief, the Governor of Oregon. The Governor calls members of the Guard into active duty to serve the needs of Oregon in numerous ways, including to assist with emergent and unpredictable situations the State could face at any moment. The Governor, in consultation with other state government officials and local law enforcement, is in the best position to determine the needs of the State and how the Guard could be deployed to meet those needs.

94.95.  The Oregon National Guard's resources are limited. While the Guard has over 6,500 total members, only a fraction of those are presently available for assignment over the next six months. Others are unavailable because, among other reasons, they are already deployed in federal service; engaged in the Guard's essential administrative functions; or in basic training. Unlawfully federalizing even a portion of these Guard members impairs the State's capacity to respond to emergencies.

Page 28 -  AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

95.96.  Wildfire response is one of the most significant functions the Oregon National

Guard performs in the State. In 2017, for example, roughly 1,090 members were mobilized to

respond to wildfires. In 2020, roughly 998 were mobilized for fire response. On September 27,

2025—the same day that the President announced his intention to send troops into Portland—

Governor Kotek invoked the Emergency Conflagration Act in response to a complex of wildfires

burning on Southwest Oregon's Rogue River, which has grown to over 17,300 acres.[42] Because

wildfires can begin unpredictably and spread rapidly, it is critical that all qualified personnel—

including members of the Oregon National Guard—remain ready to respond to growing

wildfires on short notice.

96.97.  The Oregon National Guard serves many other critical functions in the State.

Historically, these functions have included, among other things, counter-drug-trafficking efforts;

natural disaster response; and supporting the State's response to the Covid-19 pandemic.

97.98.  Given the Guard's limited resources, and the inherent uncertainty about what

needs might arise, needlessly calling hundreds of the Guard's members into federal service for a

months-long period places the State in jeopardy. All of the Guard members in federal service are

unavailable to the State for emergency response efforts.

**M.      Federalization of California's National Guard**

99.      California is the first State to experience Defendants' deployment of its National

Guard without the consent of its Governor. It is also the first State to experience—without

gubernatorial consent—the cross-state deployment of its National Guard.

---

[42] Zach Urness, *Rogue River Moon Complex Wildfire Explodes, Doubles in Size as New Evacuation Orders Issued*, Statesman J. (Sept. 28, 2025 at 9:50 AM PT), https://www.statesmanjournal.com/story/news/2025/09/27/moon-complex-rogue-river-wildfire-explodes-new-evacuation-orders-issued/86391465007/.

Page 29 -  AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

A261

100.    On June 6, 2025, ICE agents began carrying out aggressive, military-style immigration enforcement operations across Los Angeles County, which provoked anger and spurred protests. Although the protests were primarily peaceful, there were instances of violence and unlawful behavior, which were responded to by state and local law enforcement and unequivocally condemned by California Governor Gavin Newsom and other elected officials.

101.    In response to these events in Los Angeles, on June 7, 2025, President Trump issued a memorandum authorizing Secretary Hegseth to "call[] into Federal service . . . at least 2,000 National Guard personnel . . . for 60 days or longer."

102.    That same day, Secretary Hegseth called into service 2,000 members of the California National Guard for a period of 60 days. Two days later, on June 9, 2025, Secretary Hegseth federalized an addition 2,000 members of the California National Guard for 60 days and deployed 700 active-duty Marines to Los Angeles.

103.    Throughout June and July, Defendants deployed California's federalized National Guard soldiers to conduct civil law enforcement activities throughout Southern California.

104.    On June 9, 2025, California Governor Gavin Newsom and the State of California brought suit in the Northern District of California, challenging the federalization of the California National Guard. The district court issued a temporary restraining order enjoining the deployment of federal troops to Los Angeles, and the Ninth Circuit Court of Appeals later granted a stay pending appeal. *See Newsom v. Trump*, 786 F. Supp. 3d 1235 (N.D. Cal. 2025), *stayed pending appeal*, 141 F.4th 1032 (9th Cir. 2025.) The appeal on the merits of the TRO remains pending, as is an en banc call for reconsideration of the stay order. *Newsom v. Trump*, No. 25-3727 (9th Cir. July 11, 2025).

105.    On July 1, Defendants released 150 of the federalized California National Guard troops from federal service. On July 15, Defendants released an additional 2,000 National Guard troops, and on July 21, Defendants withdrew all 700 Marines from Los Angeles and redeployed

Page 30 -  AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

A262

them to base. On July 15, a Pentagon spokesperson explained these defederalization orders by stating that "the lawlessness in Los Angeles is subsiding."[43]

106.    On August 5, Defendants issued a new order federalizing 300 California National Guard troops for an additional 90 days, until November 5, 2025. The August 5 order directed two separate California National Guard units to report to Los Alamitos, CA and Santa Rosa, CA, respectively.

107.    As of at least August 8, 2025, the remaining California National Guard troops were (1) providing security for a federal building in Los Angeles, (2) providing security for an ICE facility in Paramount, CA, and (3) serving in two Mobile Response Forces in Southern California.

108.    On August 15, 2025, Defendants sent a letter to Major General Matthew Beevers, the Adjutant General of the California Military Department, stating that "[a]pproximately 300 remaining CA NG personnel will remain in Federal service and continue to execute the Federal protective mission through November 4, 2025." The letter further states: "We appreciate your cooperation on this matter as we both seek to reduce the violence against Federal personnel in Los Angeles and the surrounding counties."

109.    While litigation over the June federalization was pending in the Ninth Circuit, litigation proceeded in the Northern District of California regarding allegations that the conduct of federalized troops violated the Posse Comitatus Act. On September 2, following a three-day trial, the Honorable Charles R. Breyer issued an order finding that Defendants' use of federalized California National Guard troops throughout Southern California violated the Posse Comitatus Act. Judge Breyer's order enjoined Defendants from "deploying, ordering, instructing, training, or using the National Guard currently deployed in California, and any military troops heretofore deployed in California, to execute the laws, including but not limited to engaging in arrests,

---

[43] Luis Martinez, *Pentagon Pulling 2,000 National Guard Deployed to LA Amid ICE Protests, ABC News* (July 15, 2025), https://abcnews.go.com/Politics/pentagon-pulling-half-guard-members-deployed-la-support/story?id=123784553.

Page 31 -   AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

apprehensions, searches, seizures, security patrols, traffic control, crowd control, riot control, evidence collection, interrogation, or acting as informants, unless and until Defendants satisfy the requirements of a valid constitutional or statutory exception, as defined herein, to the Posse Comitatus Act." *Newsom v. Trump*, Case No. 3:25-cv-04870-CRB, ECF No. 176. Judge Breyer's order is currently subject to an administrative stay pending appeal in the Ninth Circuit.

**N.    Cross-State Deployment of California National Guard to Oregon**

110.    On the evening of Saturday, October 4, 2025, after this Court issued a temporary restraining order blocking the attempted federalization of Oregon National Guard personnel to deploy to Portland, Oregon, the U.S. Army Northern Command communicated to the California Military Department Executive Leadership that they intended to send 200 of the federalized California National Guard personnel in Los Angeles to Portland.

111.    As of 6:30 a.m. on Sunday, October 5 one transport carrying approximately 100 federalized California National Guard personnel had already departed from Los Angeles to Portland, with additional transport scheduled for later in the day.  Additionally, California Military Department Executive Leadership learned that all 300 federalized California National Guard personnel will be imminently deployed to Portland.

112.    Also on Sunday, October 5, 2025, the California Military Department received an order extending the federalization of the 300 federalized California National Guard personnel through January 31, 2026.

**CAUSES OF ACTION**

**COUNT I**

***Ultra Vires* Action – Violation of 10 U.S.C. § 12406**

**(Against All Defendants)**

98.113.    Plaintiffs reallege and incorporate by reference the foregoing allegations as if fully set forth herein.

Page 32 -  AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

99.114.　　　Under 10 U.S.C. § 12406, the President is permitted to federalize a state's National Guard only when (1) the United States, or any of the Commonwealths or possessions, is invaded or is in danger of invasion by a foreign nation; (2) there is a rebellion or danger of a rebellion against the authority of the Government of the United States; or (3) the President is unable with the regular forces to execute the laws of the United States. Any such order "shall be issued through the governor[] . . . ." 10 U.S.C. § 12406.

100.115.　　　None of those factual circumstances are present in Oregon, and Defendants' assertions to the contrary are patently pretextual and lack any good-faith basis.

101.116.　　　Defendants have not identified any "invasion by a foreign nation."

102.117.　　　Nor is there any "rebellion or danger of a rebellion." The President's characterization of Portland as "war ravaged" community is pure fiction. The protests contained to a small area near Portland's ICE facility have been successfully managed by local law enforcement and do not in any way constitute a rebellion or danger of a rebellion. And the President's June 7, 2025 Memorandum, (Ex. 2 at 2–3), made no reference to the City of Portland or the protests near the City's ICE facility.

103.118.　　　Nor have Defendants cited even a *single instance* in which they were "unable . . . to execute the laws of the United States." For example, they have not identified an inability to detain or deport those who are unlawfully present in the United States due to protests in Portland.

104.119.　　　All of these facts—together with the overwhelming evidence of the President's true intentions—reveal the obvious truth: that this action was motivated by his desire to normalize the use of military troops for ordinary domestic law enforcement activity while also punishing politically disfavored jurisdictions like Portland, Oregon.

Page 33 -  AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

~~105.~~120.        Because Defendants' invocation of the prerequisites for federalization in § 12406 was wholly pretextual, the Court should find Defendants' actions are ultra vires because they violate the statute's plain language.

121.    Because none of the prerequisites for federalization in § 12406 is met, Defendants lack statutory authority to federalize Oregon National Guard members and lack statutory authority to deploy federalized National Guard members to Oregon—regardless of whether those Guard members are drawn from the Oregon National Guard, the California National Guard, or the National Guard of any other state. Regardless of whether Defendants' federalization of California National Guard members was lawful, Defendants' mission to Portland is wholly unrelated to that prior federalization and is thus beyond the scope of any authority Defendants could have to deploy those federalized members of the California National Guard. Defendants' actions both in federalizing Oregon National Guard members and in deploying federalized California National Guard members are ultra vires because they violate the statute's plain language.

## COUNT II

### *Ultra Vires* **Action – Violation of the Posse Comitatus Act & 10 U.S.C. § 275**
### **(Against All Defendants)**

~~106.~~122.        Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

~~107.~~123.        The Posse Comitatus Act forbids Defendants from employing the armed forces to engage in law enforcement "except in cases and under circumstances expressly authorized by the Constitution or Act of Congress." 18 U.S.C. § 1385.

~~108.~~124.        This restriction is underscored by 10 U.S.C. § 275, which provides that "The Secretary of Defense shall prescribe such regulations as may be necessary to ensure that

Page 34 -  AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

any activity (including the provision of any equipment or facility or the assignment or detail of any personnel) under this chapter does not include or permit direct participation by a member of the Army, Navy, Air Force, or Marine Corps in a search, seizure, arrest, or other similar activity unless participation in such activity by such member is otherwise authorized by law."

~~109.~~125.      Neither the Constitution nor any Act of Congress permits Defendants to use the armed forces—which includes the National Guard—for routine law enforcement such as protest management, the suppression of violent crime or property damage, and immigration enforcement.

~~110.~~126.      The Court need look no further than Defendants' own statements to conclude that this troop deployment is being made for purposes that are plainly incompatible with the Posse Comitatus Act. The President's statements dating back to his most recent campaign reveal his plans to incorporate military troops into civilian law enforcement activity. And Defendants' deployment of troops in Los Angeles and Washington, D.C. furthered that plan. Then on September 5, 2025, the President said he planned to deploy troops in Portland to "wipe out" what he described as "paid terrorists" and "paid agitators." And in his September 27, 2025 social media post, the President said he planned to use troops to "protect" Portland from "domestic" organization that will perpetrate crimes in the City.

~~111.~~127.      Defendants' actions in Los Angeles—where they were found to have violated the PCA—further support the conclusion that they plan to do the same thing in Portland.

~~112.~~128.      By willfully ignoring the PCA and 10 U.S.C. § 275, while also relying on a pretextual, baseless, and bad-faith invocation of 10 U.S.C. § 12406, Defendants are acting *ultra vires*.

Page 35 -  AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

113.129.          Therefore, Plaintiffs are entitled to a declaration that any action taken

pursuant to the President's September 27 directive to is invalid, and an injunction prohibiting

Defendants from implementing. Absent such relief, Plaintiffs will continue to be harmed by

Defendants' illegal actions.

130.    Defendants' deployment of members of the California National Guard to Oregon

violates the PCA for the same reasons as the federalization and deployment of members of the

Oregon National Guard. The violation of the PCA and the ensuing harm to Plaintiffs will be the

same whether the Guard members being used to violate the PCA are from Oregon or from

California. Plaintiffs are therefore entitled to a declaration that any deployment of the California

National Guard to Oregon to carry out the purposes of the President's September 27 directive is

invalid, and an injunction prohibiting Defendants from carrying out that deployment.

## COUNT III
### Violation of the Tenth Amendment of the U.S. Constitution
### (Against All Defendants)

*Infringement on Oregon's Police Power*

114.131.          Plaintiffs reallege and incorporate by reference the allegations set forth in

each of the preceding paragraphs of this Complaint.

115.132.          The Tenth Amendment provides that "[t]he powers not delegated to the

United States by the Constitution, nor prohibited by it to the States, are reserved to the States

respectively, or to the people."

116.133.          If Defendants federalize members of the Oregon National Guard under

present circumstances, they would usurp the Governor of Oregon's role as Commander-in-Chief

of the National Guard in Oregon and violates the State's sovereign role over local law

enforcement, pursuant to its police powers.

Page 36 -  AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

117.134.    Under our system of federalism, policing and crime control remain one of the most basic rights reserved to the states. "Indeed, we can think of no better example of the police power, which the Founders denied the National Government and reposed in the States, than the suppression of violent crime and vindication of its victims." *United States v. Morrison*, 529 U.S. 598, 618 (2000). "[T]he power to establish the ordinary regulations of police has been left with the individual States and cannot be assumed by the national government." *Patterson v. Kentucky*, 97 U.S. 501, 503 (1878).

118.135.    Local control of law enforcement is also essential to the protection of liberty and government accountability. "Because the police power is controlled by 50 different States instead of one national sovereign, the facets of governing that touch on citizens' daily lives are normally administered by smaller governments closer to the governed. The Framers thus ensured that powers which 'in the ordinary course of affairs, concern the lives, liberties, and properties of the people' were held by governments more local and more accountable than a distant federal bureaucracy. The Federalist No. 45, at 293 (J. Madison)." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 536 (2012).

119.136.    Deploying federalized military forces to respond to suppress violence and manage protests despite any evidence that local law enforcement was incapable of asserting control and ensuring public safety during such protests represents the exact type of intrusion on State power that is at the heart of the Tenth Amendment. State officials in conjunction with local officials, such as the officers of the PPB, are in the best position to determine what resources are necessary to preserve public safety amid protest activity, and to intervene to enforce public safety and criminal laws when warranted.

Page 37 -  AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

120.137.　　Plaintiffs are entitled to a declaration that any action to federalize the

Oregon National Guard is invalid, that deployment of the federalized California National Guard

to Oregon is invalid, and an injunction prohibiting Defendants from implementing those

directives.

### Unlawful Coercion and Retaliation

121.138.　　Local control of law enforcement is also essential to the protection of

liberty and government accountability. "Because the police power is controlled by 50 different

States instead of one national sovereign, the facets of governing that touch on citizens' daily

lives are normally administered by smaller governments closer to the governed. The Framers

thus ensured that powers which "in the ordinary course of affairs, concern the lives, liberties, and

properties of the people" were held by governments more local and more accountable than a

distant federal bureaucracy. The Federalist No. 45, at 293 (J. Madison)." *Sebelius*, 567 U.S. at

536.

122.139.　　The Defendants' actions in calling up and deploying members of the

Oregon National Guard and deploying the California National Guard are designed to punish

Plaintiffs for refusing to accede to the Trump administration's political prerogatives, not least of

which on Plaintiffs' so-called sanctuary laws.

123.140.　　This violates the Tenth Amendment by seeking to coerce Oregon and

California into abandoning its own statutory prerogatives and instead adopt the President's

policy priorities.

### Violation of Equality of State Sovereignty

124.141.　　"Not only do States retain sovereignty under the Constitution, there is also

a 'fundamental principle of *equal* sovereignty' among the States." *Shelby Cnty., Ala. v. Holder*,

Page 38 -  AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

570 U.S. 529, 544 (2013) (citation omitted). The Supreme Court has long recognized that our

nation "was and is a union of States, equal in power, dignity and authority," and that this

"constitutional equality of the States is essential to the harmonious operation of the scheme upon

which the Republic was organized." *Coyle v. Smith,* 221 U.S. 559, 567, 580 (1911).

125.142.    This "fundamental principle of equal sovereignty remains highly pertinent

in assessing subsequent disparate treatment of States" by the federal government. *Shelby Cnty*,

570 U.S. at 544 (citation omitted).

126.143.    Defendants have trampled these principles by selecting certain politically

disfavored jurisdictions—now including the City of Portland, the State of Oregon and the State

of California—for an involuntary deployment of military troops under federal control. "And

despite the tradition of equal sovereignty," Defendants have applied this harsh infringement on

state sovereignty "to only [two] states" and the District of Columbia. *Id.* at 544.

127.144.    Such an "extraordinary departure from the traditional course of relations

between the States and the Federal Government" can only be justified by dire and "unique

circumstances," and must be limited to "area where immediate action" is truly necessary. *Id.* at

546.

128.145.    But Defendants' selection of Portland, Oregon for National Guard

federalization and deployment was, at best, arbitrary, and at worst, a politically motivated

retaliation for the Plaintiffs' adoption of policies that the President disfavors. After all, if

Defendants' true aim were to protect jurisdictions that are "ravaged" and "under siege" by

criminal activity, then they would have deployed the military to any of the many jurisdictions

where violent crime rates are significantly higher.

Page 39 -  AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## COUNT IV

### Violation of the Administrative Procedure Act

### Action That is in Excess of Statutory Authority, Arbitrary and Capricious, and Contrary to Law

### (Against Department of Defense, Secretary Hegseth, Department of Homeland Security, and Secretary Noem)

~~129.~~146.    Plaintiffs reallege and incorporate the foregoing allegations as if fully set forth herein.

~~130.~~147.    Under the Administrative Procedure Act, a court must "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law," that is "contrary to constitutional right [or] power," or that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A)-(C).

~~131.~~148.    The DOD and Secretary Hegseth's September 28, 2025, Memorandum, (Ex. 2 at 1), federalizing 200 members of the Oregon National Guard at the request of DHS and Secretary Noem constitute final agency action because they represent the "consummation" of the agency's decision-making process and they represent action "from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (citation and quotation marks omitted).

~~132.~~149.    For the reasons discussed above, the DOD and Secretary Hegseth have exceeded their statutory authority to federalize the Oregon National Guard under 10 U.S.C. § 12406~~.~~ or to deploy federalized California National Guard members to Oregon. For the reasons also discussed above, that action is also arbitrary and capricious. And their direction in deploying the National Guard for law enforcement will violate the Posse Comitatus Act and 10 U.S.C. § 275 as well as the U.S. Constitution.

Page 40 -   AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## COUNT V

### Violation of the Constitution Separation of Powers and the Militia and Take Care Clauses
### (Against All Defendants)

~~133.~~150.        Plaintiffs reallege and incorporate the foregoing allegations as if fully set forth herein.

~~134.~~151.        The Constitution's separation of powers doctrine and the Take Care Clause all place limitations on the exercise of executive authority.

~~135.~~152.        The separation of powers doctrine is "foundational" and "evident from the Constitution's vesting of certain powers in certain bodies." *Seila Law LLC v. CFPB*, 591 U.S. 197, 227 (2020); *see also Trump v. United States*, 603 U.S. 593, 637–38 (2024).

~~136.~~153.        The Constitution grants Congress the power to regulate the domestic activities of state militias and to authorize the President to "provide for calling forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions." U.S. Const. Art. I, § 8, cl. 15. The Constitution limits the President's authority to act as Commander-in-Chief of the "Militia of the several States" to instances when they are "called into the actual Service of the United States." U.S. Const. art. II, § 2, cl. 1.

~~137.~~154.        The Executive's powers are limited to those specifically conferred by "an act of Congress or from the Constitution itself." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952). The Executive has no power "to enact, to amend, or to repeal statutes." *Clinton v. City of New York*, 524 U.S. 417, 438 (1998).

~~138.~~155.        The Militia Clauses expressly provide that "Congress shall have Power . . . To provide for calling forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions. . . ." U.S. Const. art. I, § 8, cl. 15. They further provide that Congress has authority "To provide for organizing, arming, and disciplining, the Militia, and for

Page 41 -  AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

governing such Part of them as may be employed in the Service of the United States, reserving to

the States respectively, the Appointment of the Officers, and the Authority of training the Militia

according to the discipline prescribed by Congress. . . ." U.S. Const. art. I, § 8, cl. 16.

139.156.    In addition, the Take Care Clause provides that the Executive must "take

Care that the Laws be faithfully executed . . . ." U.S. Const. art. II, § 3; *Util. Air Regulatory Grp.*

*v. EPA*, 573 U.S. 302, 327 (2014) ("Under our system of government, Congress makes the laws

and the President . . . faithfully executes them") (internal quotation marks and citation omitted).

The Executive violates the Take Care Clause where it overrides statutes enacted by Congress and

signed into law or duly promulgated regulations implementing such statutes. *See In re United*

*Mine Workers of Am. Int'l Union*, 190 F.3d 545, 551 (D.C. Cir. 1999) (holding that "the

President is without authority" to set aside congressional legislation by executive order); *Kendall*

*v. United States*, 37 U.S. (12 Pet.) 524, 613 (1838) (rejecting argument that by charging the

President with faithful execution of the laws, the Take Care clause "implies a power to forbid

their execution").

140.157.    Defendants have violated each of these constitutional doctrines by

asserting authority over a state Militia that the Constitution and federal law expressly assign to

the States and disregarding the limits in the Posse Comitatus Act and 10 U.S.C. § 275, which

limit the participation of federal military forces in law enforcement.

141.158.    This court is authorized to enjoin any action by the Executive and his

agencies that "is unauthorized by statute, exceeds the scope of constitutional authority, or is

pursuant to unconstitutional enactment." *Youngstown Sheet & Tube Co. v. Sawyer*, 103 F. Supp.

569, 576 (D.D.C. 1952), *aff'd*, 343 U.S. 579 (1952). Plaintiffs are entitled to preliminary and

permanent injunctive relief barring the actions challenged herein.

Page 42 -   AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

142.159.        Pursuant to 28 U.S.C. § 2201, Plaintiffs are also entitled to a declaration

that the actions challenged herein violate the constitutional separation of powers doctrine, the

Take Care Clause, and impermissibly arrogate to the Executive power that is reserved to

Congress or the states.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that the Court:

a.        Declare that any order federalizing and deploying members of the Oregon

National Guard is ultra vires and contrary to law;

bb.        Declare that any order federalizing and deploying members of the California

National Guard to Oregon is ultra vires and contrary to law;

c.        Hold unlawful and enjoin Defendants' federalization and deployment of members

of the Oregon National Guard;

c.d.        Hold unlawful and enjoin Defendants' deployment of members of the California

National Guard to Oregon;

e.        Preliminarily and permanently enjoin, and stay and set-aside, Secretary Hegseth

and the Department of Defense from calling Oregon National Guard members into federal

service, deploying them in Oregon, or taking any other similar action in Oregon;

df.        Preliminarily and permanently enjoin, and stay and set-aside, Secretary Hegseth

and the Department of Defense from deploying California National Guard members in Oregon;

g.        Award Plaintiffs' costs of suit and reasonable attorneys' fees and expenses under

any applicable law; and

eh.        Award such additional relief as the interests of justice may require.

Page 43 -  AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

DATED October 28, 2025.

Respectfully submitted,

DAN RAYFIELD
Attorney General
BENJAMIN GUTMAN
Solicitor General
DUSTIN BUEHLER
Special Counsel

s/ ~~Scott Kennedy~~ *Brian Simmonds Marshall*
SCOTT KENNEDY #T25070201, D.C. Bar
#1658085
BRIAN SIMMONDS MARSHALL #196129
THOMAS CASTELLI #226448
IAN VAN LOH #225163
RACHEL SOWRAY #095159
Senior Assistant Attorneys General
ALEXANDER C. JONES #213898
DEREK OLSON #225504
Assistant Attorneys General
100 SW Market Street
Portland, OR 97201
971-673-1880
Scott.Kennedy@doj.oregon.gov
Brian.S.Marshall@doj.oregon.gov
Thomas.Castelli@doj.oregon.gov
Ian.VanLoh@doj.oregon.gov
Rachel.Sowray@doj.oregon.gov
Alex.Jones@doj.oregon.gov
Derek.Olson@doj.oregon.gov

*Counsel for the State of Oregon*

Page 44 -  AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

A276

ROBERT TAYLOR  #044287
Portland City Attorney

*s/ Caroline Turco*
CAROLINE TURCO  #083813
Senior Deputy City Attorney
NAOMI SHEFFIELD  #170601
Chief Deputy City Attorney
1221 SW Fourth Avenue
Fourth Floor, Room 430
Portland, OR 97204
Tel: (503) 823-4047
Fax: (503) 823-3089
Caroline.Turco@portlandoregon.gov
Naomi.Sheffield@portlandoregon.gov

*Counsel for the City of Portland*

**ROB BONTA**
Attorney General of California

*s/ Barbara Horne-Petersdorf*
Michael L. Newman
Thomas S. Patterson
Senior Assistant Attorneys General
Anya M. Binsacca
Marissa Malouff
James E. Stanley
Supervising Deputy Attorneys General
Jesse Basbaum
Barbara Horne-Petersdorf
Jane Reilley
Meghan H. Strong
Deputy Attorneys General
455 Golden Gate Ave.
San Francisco, CA 94102
Telephone: (415) 510-3877
E-mail: Meghan.Strong@doj.ca.gov

*Counsel for the State of California*

Page 45 -  AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **STATE OF OREGON** and the **CITY OF PORTLAND**,<br><br>              Plaintiffs,<br><br>       v.<br><br>**DONALD TRUMP**, in his official capacity as President of the United States; **PETE HEGSETH**, in his official capacity as Secretary of Defense; **U.S. DEPARTMENT OF DEFENSE**; **KRISTI NOEM**, in her official capacity as Secretary of Homeland Security; and **U.S. DEPARTMENT OF HOMELAND SECURITY**,<br><br>              Defendants. | Case No. 3:25-cv-1756-IM<br><br>**OPINION AND ORDER GRANTING MOTION FOR TEMPORARY RESTRAINING ORDER** |

Dan Rayfield, Oregon Attorney General; Benjamin Gutman, Oregon Solicitor General; Dustin Buehler, Special Counsel; Scott Kennedy, Brian Simmonds Marshall, Thomas Castelli, Ian Van Loh, and Rachel Sowray, Senior Assistant Attorneys General; and Alexander C. Jones and Derek Olson, Assistant Attorneys General, OREGON DEPARTMENT OF JUSTICE, 100 SW Market Street, Portland, OR 97201. Attorneys for Plaintiff State of Oregon.

Robert Taylor, Portland City Attorney; Caroline Turco, Senior Deputy City Attorney; and Naomi Sheffield, Chief Deputy City Attorney, OFFICE OF THE PORTLAND CITY ATTORNEY, 1221 SW Fourth Avenue, Room 430, Portland, OR 97204. Attorneys for Plaintiff City of Portland.

Brett A. Shumate, Assistant Attorney General; Eric J. Hamilton, Deputy Assistant Attorney General; Alexander K. Haas, Branch Director, Federal Programs Branch; Jean Lin, Special Litigation Counsel, Federal Programs Branch; Christopher D. Edelman, Senior Counsel; and Benjamin S. Kurland, Trial Attorney, U.S. DEPARTMENT OF JUSTICE, CIVIL DIVISION, FEDERAL PROGRAMS BRANCH, 1100 L Street, NW, Washington, DC 20005. Attorneys for Defendants.

**IMMERGUT, District Judge.**

This case involves the intersection of three of the most fundamental principles in our constitutional democracy. The first concerns the relationship between the federal government and the states. The second concerns the relationship between the United States armed forces and domestic law enforcement. The third concerns the proper role of the judicial branch in ensuring that the executive branch complies with the laws and limitations imposed by the legislative branch. Whether we choose to follow what the Constitution mandates with respect to these three relationships goes to the heart of what it means to live under the rule of law in the United States.

On June 7, 2025, President Donald J. Trump issued a Memorandum broadly authorizing the federalization of National Guard service members under 10 U.S.C. § 12406, without specifying a designated location or duration. This Memorandum authorized federalized troops to temporarily protect U.S. Immigration and Customs Enforcement ("ICE") and other federal employees "who are performing Federal functions, including the enforcement of Federal law, and to protect Federal property, at locations where protests against these functions are occurring or are likely to occur based on current threat assessments and planned operations." Declaration of Major General Timothy L. Rieger ("Rieger Decl."), Ex. D, ECF 37 at 20.

In the wake of this June 7, 2025 Memorandum, protests ensued at the ICE facility in Portland. From June 11th to June 25th, these protests included violent behavior and required an increased law enforcement presence by both the Portland Police Bureau ("PPB") and federal law enforcement agencies. After June 25, 2025, however, the protests were generally peaceful in nature with only sporadic incidents of violence and disruptive behavior. By late September, these protests typically involved twenty or fewer people.

On September 27, 2025, President Trump posted a message on his Truth Social account stating that he was directing Pete Hegseth, the Secretary of War, to provide troops to protect "War ravaged Portland" from "Antifa, and other domestic terrorists" and authorizing "Full Force, if necessary." Declaration of Assistant Attorney General Brian Marshall ("Marshall Decl."), Ex. 12, ECF 9-12 at 2. In response, on September 28th, Secretary Hegseth issued a memorandum authorizing the deployment and federalization of 200 of Oregon National Guard service members, over the objection of Oregon's Governor, Tina Kotek.

That same day, the State of Oregon and the City of Portland (collectively, "Plaintiffs") brought this lawsuit against President Trump, Secretary Hegseth, the Secretary of Homeland Security Kristi Noem, and the U.S. Departments of Defense and Homeland Security (collectively, "Defendants"). Plaintiffs allege that Defendants' actions are *ultra vires*[1] and therefore unlawful because they violate 10 U.S.C. § 12406, the Posse Comitatus Act, and 10 U.S.C. § 175 by federalizing Oregon's National Guard. Plaintiffs also allege that Defendants' conduct violates the Tenth Amendment and the separation of powers doctrine by infringing on Oregon's state sovereignty and police powers. Finally, Plaintiffs assert that Secretary Hegseth's Memorandum violates the Administrative Procedure Act ("APA") because it is not in accordance with the law, is in excess of statutory jurisdiction, authority, or limitations, and is arbitrary and capricious.

Plaintiffs move for a temporary restraining order ("TRO") and stay of Defendants' September 28, 2025, Memorandum ordering the federalization and deployment of Oregon

---

[1] *Ultra vires* actions allow courts to adjudicate "constitutional challenges to presidential acts" and "actions by subordinate Executive Branch officials that extend beyond delegated statutory authority." *Murphy Co. v. Biden*, 65 F.4th 1122, 1128–29 (9th Cir. 2023) (first citing *Franklin v. Massachusetts*, 505 U.S. 788, 790–91 (1992); then citing *Larson v. Domestic & Foreign Com. Corp.* 337 U.S. 682, 689–90 (1949)).

National Guard service members to Portland. Defendants respond that this Court may not second guess the President's determination that conditions in Portland warranted a federal military response. Defendants also contend that their conduct did not violate the U.S. Constitution or any statutory provision or exceed their statutory authority.

This Court has considered the briefing and declarations submitted in this case, the submission of *amici*, and the presentation of the parties at the hearing on Plaintiffs' TRO on October 3, 2025. For the foregoing reasons, this Court finds that Plaintiffs have met their burden at this stage of the litigation and GRANTS Plaintiffs' motion for a temporary restraining order.

## STANDARDS

In deciding whether to grant a motion for a TRO, courts look to substantially the same factors that apply to a court's decision on whether to issue a preliminary injunction. *See Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001). "A plaintiff seeking a preliminary injunction must establish [1] that it is likely to succeed on the merits, [2] that it is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in its favor, and [4] that an injunction is in the public interest." *Bennett v. Isagenix Int'l LLC*, 118 F.4th 1120, 1122–23 (9th Cir. 2024) (brackets omitted) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). "The first factor— likelihood of success on the merits—is 'the most important.'" *Apache Stronghold v. United States*, 101 F.4th 1036, 1049 (9th Cir. 2024) (quoting *Garcia v. Google, Inc.,* 786 F.3d 733, 740 (9th Cir. 2015) (en banc)). "When the government is a party, the last two factors (equities and public interest) merge." *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 668 (9th Cir. 2021). In addition, "[d]ue to the urgency of obtaining a preliminary injunction at a point when there has been limited factual development, the rules of evidence do not apply strictly to preliminary

injunction proceedings." *Herb Reed Enters., LLC v. Fla. Entmt. Mgmt., Inc.*, 736 F.3d 1239, 1250 n.5 (9th Cir. 2013); *see also Johnson v. Couturier*, 572 F.3d 1067, 1083 (9th Cir. 2009).

## BACKGROUND

### A.  The National Guard

Members of the National Guard must be "activated" to serve on a mission. Declaration of Lieutenant General Jeffrey S. Buchanan, (Retired) ("Buchanan Decl.") ECF 9-1 ¶ 11. First, they may serve in "State Active Duty" in the state where they are commissioned when the governor of the state or commonwealth activates their unit, and they are under the command of the governor. *Id.* ¶ 12. Second, they may be activated under Title 32 of the United States Code, where the governor asks the federal government to bring troops into active duty for a particular mission, and they are under the command of the governor, but the costs are borne by the federal government. *Id.* ¶ 13; *see also* 32 U.S.C. § 502(f)(2)(A). Finally, they may be activated under Title 10 of the United States Code, where they are considered federal military and under the command of the U.S. President, *i.e.*, the "federalized" National Guard. Buchanan Decl. ¶ 14; *see also* 10 U.S.C. § 12406. This is the activation that occurred here.

State Active Duty National Guard troops and those activated under Title 32 may engage in domestic law enforcement functions, subject to restrictions under state law. Buchanan Decl. ¶ 25. Federalized National Guard troops activated under Title 10 may not engage in domestic law enforcement activities, with some exceptions. *Id.* Members of the National Guard generally do not receive training to perform local law enforcement tasks, such as learning de-escalation techniques, the use of non-lethal force, or how to properly conduct criminal investigations. *Id.* ¶¶ 34–46.

**B.  Law Enforcement Resources in Portland**

Plaintiffs present several witness declarations from local law enforcement officials detailing local and state law enforcement resources that stand ready to address unlawful conduct at protests in Portland. The primary local law enforcement agency in Portland is the Portland Police Bureau. PPB employs approximately 812 officers. Declaration of PPB Assistant Chief of Operations Craig Dobson ("Dobson Decl."), ECF 7 ¶ 7. All PPB officers are trained in crowd management and First Amendment law. *Id.* ¶ 8. Crowd Management Incident Commanders receive an additional 40 hours of crowd management training. *Id.* ¶ 11. PPB also has a Rapid Response Team of 50 officers that is specially trained in crowd management, intervention (removing someone from a protest), and "direct crowd control through approved maneuvers and tactics." *Id.* ¶ 13. The Rapid Response Team receives an initial 40 hours of crowd control training and then 10 hours of crowd control training per month, meeting the standards of the National Tactical Officers Association. *Id.* The Rapid Response Team works under a Crowd Management Incident Commander. *Id.* PPB also has specially trained Dialogue Officers who work with protest organizers, *id.* ¶ 12, and Mobile Field Forces, who can move from one precinct to another as the situation demands, *id.* ¶ 15.

Crowd Management Incident Commanders work outside of their everyday PPB roles and are activated in that role based on PPB's risk assessment of an event. *Id.* ¶ 11. These commanders are activated for large events, such as the April 2025 "No Kings" protest that drew approximately 40,000–50,000 participants. *Id.* ¶ 14. PPB also uses traffic control officers and can coordinate with other local and state resources and existing federal partners as needed. *Id.* ¶¶ 14, 17. PPB has mutual aid agreements with the Multnomah County Sheriff, the City of Gresham, the Port of Portland, Clark County, Washington, and the Oregon State Police. *Id.* ¶ 17. PPB also can call in off-duty officers if PPB anticipates risks will stretch the capacity of PPB's on-duty

workforce. *Id.* ¶ 16. If additional resources beyond all of these are critically needed, PPB may request that Oregon's Governor provide National Guard resources for a locally declared emergency. *Id.* ¶ 18.

The Multnomah County District Attorney took office in January 2025 with a strong commitment to prosecuting political violence and public criminal activity. Declaration of Multnomah County District Attorney Nathan Vasquez ("Vasquez Decl."), ECF 42 ¶ 5. The District Attorney's Office has a Strategic Prosecution Unit that works closely with the Crowd Management Incident Commander. *Id.* ¶ 6. Strategic Prosecution Unit District Attorneys are on call 24 hours per day. *Id.* ¶ 6. They meet weekly with PPB to assess public safety needs. *Id.* ¶ 8. When there is a demonstration that is anticipated to require a law enforcement presence, a DDA is assigned and a supervisory DDA participates in pre-event planning to try to prevent violent gatherings. *Id.* ¶¶ 6–7.

The Oregon State Police is a partner with PPB. It responds to requests from local law enforcement for assistance. Declaration of Oregon State Police Criminal Investigations Captain Cameron Bailey ("Bailey Decl."), ECF 8 ¶ 11. Although Portland has not requested the Oregon State Police's help with the current protests, the State Police stands ready to assist PPB should it so request. *Id.* ¶ 13. The Oregon State Police has approximately 700–800 sworn officers at any given time. *Id.* ¶ 5. The State Police trains every trooper on use of force, de-escalation, and crowd management. *Id.* ¶¶ 7, 9.

Existing federal law enforcement resources also protect federal facilities in Portland. *See, e.g.*, Dobson Decl. ¶ 25; Declaration of Deputy Director of the Federal Protective Service Robert Cantu ("Cantu Decl."), ECF 40 ¶¶ 17, 37 (describing federal law enforcement activities in Portland); Declaration of Seattle Enforcement and Removal Operations Field Officer Director

PAGE 7 – OPINION AND ORDER

Cammilla Wamsley ("Wamsley Decl."), ECF 38 ¶ 15 (describing federal law enforcement resources assisting in Portland). The federal government also has deployed additional federal law enforcement officers to Portland from around the country in response to protests when necessary. Cantu Decl., ECF 40 ¶ 18; Wamsley Decl., ECF 38 ¶ 20.

## C. Protests in Portland

ICE has a facility located at 4310 S. Macadam Avenue in Southwest Portland. Dobson Decl., ECF 7 ¶ 19. This facility encompasses approximately one block of the City of Portland. *See* Marshall Decl., Ex. 21, ECF 9-21 at 2. Following federal officials' arrests of asylum seekers in Portland's Immigration Court in June 2025, protests broke out around the ICE facility. These protests were small, generally involving fewer than 100 people, *see* Dobson Decl., ECF 7 ¶ 20, but were concentrated at the ICE facility and disruptive to the facility. The ICE facility is within PPB's Central Precinct. *Id.* ¶ 21. Unless a Crowd Management Incident Commander is activated, protests at the ICE facility are monitored by Central Precinct. *Id.*

Assistant Chief Dobson activated a Crowd Management Incident Commander for the ICE facility protests from June 11–25, 2025, who in turn activated a PPB Rapid Response Team, mostly in a monitoring capacity. *Id.* ¶ 22. The protests were mostly peaceful, but there were some individuals who engaged in unlawful conduct requiring PPB intervention. *Id.* PPB made 25 arrests from June 11–19, 2025. *Id.* After June 25, PPB transitioned monitoring over to Central Precinct because PPB determined that the protests were low risk. *Id.* ¶ 23. Since July 18, 2025, PPB has "carried out routine monitoring of the ICE-Facility protests without serious incident," and "the risks posed by nightly ICE-Facility protests have not merited anything more than standard, periodic monitoring like any other neighborhood in the City." *Id.* ¶ 24.

Defendants proffer three declarations in support of their opposition to the TRO from individuals who do not appear to be based in Oregon. These declarations detail some specific

instances of violence and other unlawful conduct involving the ICE facility and protests from this same period. On June 8, 2025, protestors attempted to block the vehicle entrance. Wamsley Decl., ECF 38 ¶ 17. On June 11, protestors lit fires to barricade a vehicle gate. *Id.* ¶ 11. Four offenders were arrested and are being prosecuted for arson, assaulting a federal officer, and depredation of federal property. *Id.* On June 14, protestors threw rocks and sticks and M80 fireworks at Federal Protective Services ("FPS") officers. Cantu Decl., ECF 40 ¶ 8. The Border Patrol Tactical Unit and the ICE Special Response Team responded, and the violent protest was under control within approximately two hours of its start. *Id.* A few FPS officers suffered minor injuries, and three protestors were arrested by federal officers and charged with assault on a federal officer. *Id.*

On June 24, 2025, one protestor was detained for assaulting a federal officer with a machete and knife—the officer deployed his taser and recovered the protestor's weapons without getting injured. *Id.* ¶ 10. Another protester shot officers with a paintball gun, and a third shined a laser in an officer's eyes. *Id.* All three were arrested by federal law enforcement and charged with assault on a federal officer. *Id.* Another protester attempted to set a U.S. flag on fire in the driveway. Wamsley Decl., ECF 38 ¶ 11. On June 29, a protestor tampered with the card reader at the ICE facility and resisted arrest. Cantu Decl., ECF 40 ¶ 9. Ultimately, three card readers were damaged in June 2025, as well as damage to gates and windows. Wamsley Decl., ECF 38 ¶ 12. With the card readers broken, personnel must call someone ahead of time to let them in, causing delays and inconvenience. *Id.* The ICE facility in Portland shut down from June 13, 2025, until July 7, 2025, due to the property damage from protesters. *Id.* ¶ 13. As a result of the closure, most Portland ICE officers had to work out of separate temporary space. *Id.*

On August 20, 2025, PPB activated a Crowd Management Incident Commander from 4:00 p.m. to 7:30 p.m., having assessed potential risk of increased protest activity that did not end up occurring. Supplemental Declaration of Craig Dobson ("Dobson Supp. Decl."), ECF 21 ¶ 3. Otherwise, from July 18th to September 27th, Central Precinct police officers handled the ICE protests with routine monitoring. Dobson Decl., ECF 7 ¶¶ 24, 25. The protests generally were limited to fewer than 30 people and were "largely sedate." *Id.* ¶ 25. If the protests were to increase or threaten public safety, PPB could call on additional available resources. *Id.* ¶ 26. But the protests have been such a minor issue, that the normal nightlife in downtown Portland has required more police resources than the ICE facility. *Id.*

Federal law enforcement encountered some instances of unlawful conduct in the two months leading up to the federal deployment. On August 9, 2025, protesters attempted to block an ICE vehicle and federal officers had to use pepper spray so the vehicle could depart. Cantu Decl., ECF 40 ¶ 12. On September 1, protestors assembled a "guillotine," and two protestors had riot shields. Wamsley Decl., ECF 38 ¶ 16. That night, PPB checked in twice with FPS Supervisor Will Turner and was told despite FPS being "down ten tactical officers" who were sent to other parts of the country, he was "not concerned" about the protestors. Declaration of Central Precinct Commander Brian Hughes ("Hughes Decl."), Ex. 1, ECF 46-1 at 2. At one point, however, federal officers had to come out and deploy tear gas to clear the area for a vehicle to exit. *Id.* According to PPB dispatch logs, on that occasion Federal officers arrested "a few" people. Hughes Decl., Ex. 2, ECF 46-2 at 2.

On September 9, 2025, four protestors shined high-powered flashlights in the eyes of drivers leaving the ICE facility. Wamsley Decl., ECF 38 ¶ 18. ICE received additional reports of drivers leaving the building that week having flashlights shone in their eyes. *Id.* PPB, however,

did not receive any requests for assistance from federal officers during the next 17 days of September. Additionally, PPB's independent monitoring of the protests and regular communications with FPS during this time show protests generally averaging less than 20 persons, with a few nights having around 50 persons. *See generally* Hughes Decl., Ex. 3, ECF 46-3 to Ex. 16, ECF 46-16. Sometimes the protests had "higher energy," and sometimes they had skirmishes between protestors, but they rarely had any issues with federal officers or federal property. *Id.*

On September 18, 2025, the protests increased in size to around 150 people, but there were no issues with federal property or personnel and FPS did not request assistance. *Id.*, Ex. 17, ECF 46-17 at 2. On September 19, federal law enforcement employed munitions to break up a crowd and reported to PPB assaults on protestors and one journalist by a known "agitator." *Id.*, Ex. 18, ECF 46-18 at 2 to Ex. 19, ECF 46-19 at 2. There was no reported activity, however, against federal property or personnel.

From Monday, September 22, 2025, through Friday, September 26, 2025, in the days immediately preceding the President's federalization directive, the protests involved around 20 or fewer people. *Id.*, Ex. 22, ECF 46-22 to Ex. 26, ECF 46-26. PPB reported no incidents of disruptions outside the ICE facility except for a few individuals shining flashlights into drivers' eyes. *Id.*, Ex. 25, ECF 46-25 at 2.

In support of their opposition to the TRO, Defendants include in their supporting declarations that federal law enforcement officers are concerned that protests "risk escalation at any moment," Cantu Decl., ECF 40 ¶ 14, and that ICE employees are being "doxed" and having their personal information posted online. Wamsley Decl., ECF 38 ¶ 12. Several Portland ICE officers have had flyers with their names, photographs, and home addresses posted publicly. *Id.*

¶ 18. And on September 12, 2025, a photograph of an unmarked ICE vehicle in Portland was posted online with its make, model, license plate, and location after it left the ICE facility. *Id.* ¶ 18.

Defendants also express concern about danger in Portland because of incidents that have occurred elsewhere in the country. *Id.* ¶ 21. Most concerning is the sniper shooting in Dallas, Texas, targeting an ICE van, and the protest that followed in Chicago when a protestor was found with a firearm. *Id.* ¶¶ 21–22.

## D.  Defendants' Actions Relating to Federalization of National Guard

On June 6 and 7, 2025, violent protests broke out in Los Angeles at ICE facilities and elsewhere. *See Newsom v. Trump* (*Newsom I*), 786 F. Supp. 3d 1235, 1242–43 (N.D. Cal. 2025), *stayed pending appeal*, 141 F.4th 1032 (9th Cir. 2025). On June 7, 2025, President Trump issued a Memorandum to the Secretary of Defense, the Attorney General, and the Secretary of Homeland Security, broadly authorizing the federalization of National Guard service members under 10 U.S.C. § 12406. Rieger Decl., Ex. D, ECF 37 at 20–21. The June 7, 2025 Presidential Memo recited that "incidents of violence and disorder have recently occurred and threaten to continue in response to the enforcement of Federal law by [ICE] and other United States Government personnel who are performing Federal functions and supporting the faithful execution of Federal immigration laws." Rieger Decl., Ex. D, ECF 37 at 20. The June 7, 2025 Presidential Memo also stated that the protests "threaten the security" of ICE detention centers and other federal property. *Id.* The June 7, 2025 Presidential Memo concluded that "[t]o the extent that protests or acts of violence directly inhibit the execution of the laws, they constitute a form of rebellion against the authority of the Government of the United States." *Id.*

The June 7, 2025 Presidential Memo authorized the federalized troops to "temporarily protect ICE and other United States Government personnel who are performing Federal

functions, including the enforcement of Federal law, and to protect Federal property, at locations where protests against these functions are occurring or are likely to occur based on *current threat assessments* and planned operations." *Id.* (emphasis added). The number of National Guard troops was to be no fewer than 2,000 and the duration of the deployment under the June 7, 2025 Presidential Memo was 60 days or at the discretion of the Defense Secretary. The June 7, 2025 Presidential Memo did not refer to any specific location.

In response to the June 7, 2025 Presidential Memorandum, that same night Secretary Hegseth issued his own memorandum federalizing 2,000 California National Guard members. *Newsom I*, 786 F. Supp. 3d at 1244. Two days later he federalized another 2,000 California National Guard members and deployed the National Guard along with approximately 700 active duty Marines. *Id.* at 1244–45. The first of these troops arrived to Los Angeles on June 8, 2025. *Id.* at 1245. Governor Gavin Newsom and the State of California sued President Trump and other defendants, obtaining a TRO under § 12406, which was stayed by the Ninth Circuit. *See Newsom v. Trump* (*Newsom II*), 141 F.4th 1032 (9th Cir. 2025).

On September 19, 2025, President Trump explained that the administration was going to "get rid of" the "problems" in cities, including Chicago, Memphis, and Portland. Marshall Decl., ECF 9 ¶ 25. He described that in Portland people were "out of control" and "crazy." *Id.*

On September 25, 2025, the President again described Portland, exclaiming that "nobody's ever seen anything like it" with activity happening "every night," with people that "just burn the place down." Marshall Decl., ECF 9 ¶ 26. President Trump commented on "professional agitators" in Portland who are "paid a lot of money by rich people," "anarchists," and "crazy people" who try to "burn down buildings, including federal buildings," with Portland

having activity "every night . . . for years." *Id.* He promised to do a "pretty big number" on the "people in Portland that are doing that." *Id.*

On September 27, 2025, President Trump posted a message on Truth Social, stating:

> At the request of Secretary of Homeland Security, Kristi Noem, I am directing Secretary of War, Pete Hegseth, to provide all necessary Troops to protect War ravaged Portland, and any of our ICE Facilities under siege from attack by Antifa, and other domestic terrorists. I am also authorizing Full Force, if necessary. Thank you for your attention to this matter!

*See* Marshall Decl., Ex. 12, ECF 9-12 at 2. Later that day, Major General Timothy L. Rieger, Acting Vice Chief of the National Guard Bureau, asked Governor Kotek, via Oregon National Guard Adjutant General Alan R. Gronewald, to immediately mobilize 200 National Guard members "to protect federal personnel, functions, and property in Oregon." Rieger Decl., Ex. B, ECF 37 at 14. Major General Rieger threatened federalization of the Oregon National Guard if Governor Kotek refused. Rieger Decl., Ex. B, ECF 37 at 14.

Governor Kotek spoke with President Trump and explained that there was no insurrection or threat to public safety in Oregon. *See* Marshall Decl., Ex. 14, ECF 9-14 at 2–3. She declined to voluntarily activate Oregon's National Guard. *Id.* Oregon's Attorney General emphasized that local law enforcement has "the capacity to manage public safety without federal interference" and that sending "200 National Guard troops to guard a single building is not normal." *Id.*; *see also id.*, Ex. 15, ECF 9-15 at 2–3.

On September 28, 2025, Secretary Hegseth issued his memorandum, authorizing the federalization of 200 Oregon National guard members. Rieger Decl., Ex. C, ECF 37 at 16. He cited and attached the June 7, 2025 Presidential Memo. *Id.* at 17–18. He explained that his memorandum "further implements the President's direction" from the June 7, 2025 Presidential Memo. *Id.* He then directed the federalization and deployment of 200 Oregon National Guard

service members for 60 days. *Id.* Those members will be "under the command and control of the Commander, U.S. Northern Command." *Id.* Plaintiffs filed this lawsuit later that day, and their motion for a TRO on September 29, 2025.

On October 1, 2025, President Trump posted on Truth Social:

> As I determined on September 27th, when I activated and called into service the National Guard in Oregon, conditions continue to deteriorate into lawless mayhem. Our GREAT Federal Law Enforcement Officers have not been able to enforce the Laws in Oregon. ANTIFA and the Radical Left Anarchists have been viciously attacking our Federal Law Enforcement Officers, men and women who are simply doing their job, protecting Federal Property, and enforcing Federal Immigration Laws and the Rule of Law. We will never allow MOBS to take over our streets, burn our Cities, or destroy America. The National Guard is now in place, and has been dedicated to restoring LAW AND ORDER, and ending the Chaos, Death, and Destruction! We are a Nation of LAW, and we will PREVAIL. Thank you for your attention to this matter!

Donald J. Trump (@realDonaldTrump), Truth Social (Oct. 1, 2025 at 10:36 AM), https://truthsocial.com/@realDonaldTrump/posts/115300118756896774 (emphasis in original); *see also* Rieger Decl., ECF 37 ¶ 12 (stating that the President "further explained" his September 27, 2025, decision to federalize troops in his October 1 Truth Social post). According to Defendants, "National Guard personnel activated would be limited in their functions to protecting federal property, personnel, and functions." Rieger Decl., ECF 37 ¶ 24.; *see also* Cantu Decl., ECF 40 ¶ 22 (same).

## DISCUSSION

Plaintiffs bring claims alleging that Defendants' actions violate (1) the statutory authority granted the President in 10 U.S.C. § 12406, (2) Oregon's sovereign rights as protected in the Tenth Amendment, (3) the Posse Comitatus Act, (4) the Administrative Procedures Act, and (5) the separation of powers, as well as the Militia and Take Care Clauses of the U.S.

PAGE 15 – OPINION AND ORDER
**A292**

Constitution. Plaintiffs argue that they are likely to succeed on all of their claims, that they will suffer irreparable harm absent injunctive relief, and that the balance of equities and public interest tip in their favor. Defendants respond that President Trump determined that the situation in Portland met the statutory criteria under Section 12406, and under the deference this Court must give that determination, Plaintiffs' fail to show a likelihood of success on that claim. And absent a showing that Defendants' conduct violated Section 12406, Defendants argue that Plaintiffs cannot show that they are likely to succeed on their remaining claims.

For the reasons discussed below, this Court finds that Plaintiffs are likely to succeed on their claim that the President's federalization of the Oregon National Guard exceeded his statutory authority under 10 U.S.C. § 12406 and was *ultra vires*. In addition, because Section 12406 defines the scope of Congress's constitutional delegation to the President to federalize the National Guard, Plaintiffs are likely to succeed on their claim that the President exceeded his constitutional authority and violated the Tenth Amendment. Because this Court finds that Plaintiffs are likely to succeed on these two claims, this Court declines to reach Plaintiffs' arguments regarding their likelihood of success on their remaining claims. Plaintiffs also have adequately shown irreparable harm and that the balance of equities and public interest weigh in their favor. This Court therefore grants Plaintiffs' motion for a temporary restraining order.

## A. Likelihood of Success on the Merits

### 1. Section 12406 Claim

#### a. Statutory Framework

Under the Militia Clause of U.S. Constitution, Congress has the power "[t]o provide for calling forth the Militia to execute the Laws of the Union, suppress Insurrections, and repel Invasions." U.S. Const. art. I, § 8, cl. 15. Congress first delegated authority to the President to call forth the militia in extraordinary, limited circumstances in the Militia Act of 1792. *See* Ch.

28, § 1, 1 Stat. 264–65. Congress affirmed this power in the Militia Act of 1795, which "was a precursor to the Militia Act of 1903." *Newsom II*, 141 F.4th at 1047. The Militia Act of 1903 created the modern framework of the National Guard, *see* Ch. 196, § 25, 32 Stat. 775 (1903), and this statute was the "precursor to [10 U.S.C.] § 12406." *Newsom II*, 141 F.4th at 1047.

Under 10 U.S.C. § 12406, the President may federalize National Guard service members if:

> (1) the United States, or any of the Commonwealths or possessions, is invaded or is in danger of invasion by a foreign nation;
>
> (2) there is a rebellion or danger of a rebellion against the authority of the Government of the United States; or
>
> (3) the President is unable with the regular forces to execute the laws of the United States.

After making this determination, the President may federalize National Guard troops "in such numbers as he considers necessary to repel the invasion, suppress the rebellion, or execute those laws. Orders for these purposes shall be issued through the governors of the States or, in the case of the District of Columbia, through the commanding general of the National Guard of the District of Columbia." *Id.*

In *Newsom II*, the Ninth Circuit held that 10 U.S.C. § 12406 does not "preclude[] judicial review of the President's determination that a statutory precondition exists." 141 F.4th at 1047.[2] However, a reviewing court must give "a great level of deference to the President's determination that a predicate condition exists." *Id.* at 1048. A court "review[s] the President's determination to ensure that it reflects a colorable assessment of the facts and law within a 'range

---

[2] Defendants argue that the President's determination under 10 U.S.C. § 12406 is unreviewable, but they acknowledge that the Ninth Circuit has held that this determination is reviewable. Resp., ECF 35 at 18–19.

of honest judgment.'" *Id.* at 1051 (quoting *Sterling v. Constantin*, 278 U.S. 378, 399 (1932)). At the same time, the Executive's "exercise of his authority to maintain peace" must be "*conceived in good faith*, in the face of the emergency and directly related to the quelling of the disorder or the prevention of its continuance." *Id.* (emphasis in original) (quoting *Sterling*, 278 U.S. at 399–400).

> **b. Whether the President is Unable with the Regular Forces to Execute the Laws of the United States**

Defendants first argue that the President "had a colorable basis for invoking § 12406(3)," *id.* at 1052, because he was "unable with the regular forces to execute the laws of the United States." 10 U.S.C. § 12406(3); *see* Resp., ECF 35 at 20–22. Although Section 12406(3) "does not have as a prerequisite that the President be completely precluded from executing the relevant laws of the United States," "minimal interference with the execution of laws is, by itself," insufficient "to justify invoking § 12406(3)." *Newsom* II, 141 F.4th at 1051.

As a threshold matter, this Court must determine to what extent the President can rely on violence that occurred months prior to his September 27, 2025 federalization directive and that had subsided by September. Under *Newsom II*, and as a matter of logic, this Court assesses whether the President invoked Section 12406(3) based on "a colorable assessment of the facts" as they existed *at the time* he federalized the National Guard. *Newsom II*, 141 F.4th at 1051. In *Newsom II*, the Ninth Circuit evaluated the "protesters' interference with the ability of federal officers to execute the laws, *leading up to* the President's federalization of the National Guard on June 7." *Id.* at 1052 (emphasis added). And the Ninth Circuit specifically cited events from "the day before" the June 7, 2025 federalization order to conclude that "the President had a colorable basis for invoking § 12406(3)." *Id.* Likewise, this Court will focus on "the ability of federal

officers to execute the laws[] leading up to the President's federalization of the National Guard"
on September 28, 2025. *Id.*

In this case, and unlike in *Newsom II*, Plaintiffs provide substantial evidence that the
protests at the Portland ICE facility were not significantly violent or disruptive in the days—or
even weeks—leading up to the President's directive on September 27, 2025. The record evidence
establishes that while disruption outside the Portland ICE facility peaked in June of 2025, federal
and local law enforcement officers were able to "quell[] . . . the disorder." *Newsom II*, 141 F.4th
at 1051 (quoting *Sterling*, 278 U.S. at 399–400). As of September 27, 2025, it had been months
since there was any sustained level of violent or disruptive protest activity in Portland. During
this time frame, there were sporadic events requiring either PPB monitoring or federal law
enforcement intervention, but overall, the protests were small and uneventful.

Defendants' declarants describe only four incidents of protesters clashing with federal
officers in the month of September preceding the federalization order—on September 1st, 9th,
12th, and without further specification, the second week of September. Wamsley Decl., ECF 38
¶¶ 16, 18; Cantu Decl., ECF 40 ¶ 15. The first involved protesters setting up a makeshift
guillotine to intimidate federal officials; the second involved four people shining overpowered
flashlights in the eyes of drivers; the third involved someone posting a photograph of an
unmarked ICE vehicle online; and the last involved additional drivers having flashlights shone in
their eyes. Cantu Decl., ECF 40 ¶ 15; Wamsley Decl., ECF 38 ¶¶ 16–18. These incidents are
inexcusable, but they are nowhere near the type of incidents that cannot be handled by regular
law enforcement forces. They also occurred at least two weeks before President Trump issued
his directive. More broadly, these incidents are categorically different from the violent incidents
as described in *Newsom II* that took place in Los Angeles when the President federalized the

California National Guard on June 7, 2025. *See* 141 F.4th at 1052 ("[P]rotesters threw objects at ICE vehicles trying to complete a law enforcement operation, 'pinned down' several FPS officers defending federal property by throwing 'concrete chunks, bottles of liquid, and other objects,' and used 'large rolling commercial dumpsters as a battering ram' in an attempt to breach the parking garage of a federal building.").

Plaintiffs provide all the PPB call logs in the month of September, which show that PPB worked in close coordination with FPS supervisors and regularly checked the status of the ICE facility. As detailed above, they also show that the protest activity in September generally did not involve violence against federal property or personnel. At the hearing, Defendants highlighted a September 19 entry relating to FPS reporting an assault by a known agitator against other protestors and a journalist. Hughes Decl., Ex. 19, ECF 46-19. This isolated assault, which did not target federal personnel, and which occurred a week before the federalization order, along with the other isolated September incidents, do not approach the level of disruption to federal functions in Los Angeles that *Newsom II* described as occurring "the day before" President Trump's June 7, 2025 federalization of the California National Guard. 141 F.4th at 1052. Neither outside the Portland ICE facility nor elsewhere in the City of Portland was there unlawful activity akin to what was occurring in Los Angeles leading up to June 7, 2025. *See id.* at 1041 (describing the riotous activity).

Defendants also argue that strained FPS resources suffice to show that the President had a colorable basis to invoke Section 12406(3). Resp., ECF 35 at 20–21. But they demonstrate just the opposite, that federal law enforcement officers, unaided by any military forces, were capable of not only "quelling" the violence in June but also "preventi[ng]" it through September. *Newsom II*, 141 F.4th at 1051 (quoting *Sterling*, 287 at 399–400). The Deputy Director of the

Federal Protective Service Region that encompasses Oregon noted that to date, FPS has deployed 115 officers from other FPS Regions to Portland. Cantu Decl., ECF 40 ¶ 18. This deployment of additional federal law enforcement officers reduced the level of disorder between June and September to the point that in the immediate days leading up to the federalization order, around twenty or fewer protesters gathered outside the ICE Facility and "FPS indicated no issues or criminal reports." Hughes Decl., Ex. 22, ECF 46-22 to Ex. 26, ECF 46-26. On September 26, the eve of the President's directive, law enforcement "observed approximately 8–15 people at any given time out front of ICE. Mostly sitting in lawn chairs and walking around. Energy was low, minimal activity." Hughes Decl., Ex. 26, ECF 46-26. It is clear that "the regular forces," i.e. FPS and additional federal law enforcement, *were able* to execute the laws of the United States.

Defendants' argument that this diversion of federal law enforcement officers from out-of-state demonstrates that "the regular forces" were unable to execute the laws is not persuasive. Defendants' proposed test for Section 12406(3) would allow the President to call in the National Guard whenever one law enforcement office receives support from another office, which is a routine aspect of law enforcement activity. If the President could equate diversion of federal resources with his inability to execute federal law, then the President could send military troops virtually anywhere at any time.

In support of their opposition, Defendants also rely on occurrences of violence elsewhere in the country and the risk that peaceful protests in Portland might escalate into violence "at any moment." Resp., ECF 35 at 13. But violence in a different state and the mere potential for future escalation do not provide a colorable basis to invoke Section 12406(3). To accept Defendants' arguments would be to render meaningless the extraordinary requirements of 10 U.S.C. § 12406 by allowing the President to federalize one state's National Guard based on events in a different

PAGE 21 – OPINION AND ORDER
**A298**

state or mere speculation about future events. In other words, violence *elsewhere* cannot support troop deployments *here*, and concern about hypothetical *future* conduct does not demonstrate a *present* inability to execute the laws using nonmilitary federal law enforcement.

Finally, the President's own statements regarding the deployment of federalized National Guardsmen further support that his determination was not "*conceived in good faith*" or "in the face of the emergency and directly related to the quelling of the disorder or the prevention of its continuance." *Newsom II*, 141 F.4th at 1051 (emphasis in original) (quoting *Sterling*, 287 U.S. at 399–400). Despite the "minimal activity" outside the Portland ICE facility in the days preceding September 27, 2025, Hughes Decl., Ex. 22, ECF 46-22 to Ex. 26, ECF 46-26, President Trump directed Secretary Hegseth "to provide all necessary Troops to protect War ravaged Portland, and any of our ICE Facilities under siege from attack by Antifa, and other domestic terrorists." Marshall Decl., Ex. 12, ECF 9-12. Two days before that directive, the President claimed that Portland has "professional agitators" who are "paid a lot of money by rich people," "anarchists," and "crazy people" who try to "burn down buildings, including federal buildings." *See* Marshall Decl., ECF 9 ¶ 26. Whatever the factual basis the President may have for these allegations, nothing in the record suggests that anything of this sort was occurring "every night" outside the Portland ICE building or in the City of Portland in the days or weeks leading up to his September 27 directive. *Id.*

In sum, the President is certainly entitled "a great level of deference," *Newsom II*, 141 F.4th at 1048, in his determination that he "is unable with the regular forces to execute the laws of the United States." 10 U.S.C. § 12406(3). But "a great level of deference" is not equivalent to ignoring the facts on the ground. As the Ninth Circuit articulated, courts must "review the President's determination to ensure that it reflects a colorable assessment of the facts and law

within a 'range of honest judgment.'" *Id.* at 1051 (quoting *Sterling*, 278 U.S. at 399). Here, this Court concludes that the President did not have a "colorable basis" to invoke § 12406(3) to federalize the National Guard because the situation on the ground belied an inability of federal law enforcement officers to execute federal law. *Id.* at 1051–52. The President's determination was simply untethered to the facts.

### c.   Whether there is a Rebellion or Danger of Rebellion

Defendants also argue that the September 28, 2025 federalization order is authorized under subsection two, which permits federalization of the National Guard in response to "a rebellion or danger of a rebellion against the authority of the Government of the United States." 10 U.S.C. § 12406(2). In the June 7, 2025 Presidential Memo, President Trump stated that, "[t]o the extent that protests or acts of violence directly inhibit the execution of the laws, they constitute a form of rebellion." Rieger Decl., Ex. D, ECF 37 at 20.

The parties disagree about the meaning of the word rebellion in the statute. "Interpretation of a word or phrase depends upon reading the whole statutory text, considering the purpose and context of the statute, and consulting any precedents and authorities that inform the analysis." *Dolan v. U.S. Postal Serv.*, 546 U.S. 481, 486 (2006). Additionally, courts must interpret words in statutes "consistent with their 'ordinary meaning . . . at the time Congress enacted the statute.'" *Wisc. Cent. Ltd. v. United States*, 585 U.S. 274, 277 (2018) (quoting *Perrin v. United States*, 444 U.S. 37, 42 (1979)).

The Ninth Circuit did not reach the government's rebellion arguments in *Newsom II*. *See* 141 F.4th at 1051. In *Newsom I*, however, the district court performed a detailed statutory interpretation of § 12406(2) that this Court finds instructive. 786 F. Supp. 3d at 1251. There, the court surveyed four dictionaries from the late 1800s and early 1900s—when Congress passed the first predecessor statute to § 12406, the Militia Act of 1903. *See id.* at 1252. From that survey,

the court identified several shared characteristics of a rebellion, as Congress would have

understood the term in 1903:

> First, a rebellion must not only be violent but also be armed.
> Second, a rebellion must be organized. Third, a rebellion must be
> open and avowed. Fourth, a rebellion must be against the
> government as a whole—often with an aim of overthrowing the
> government—rather than in opposition to a single law or issue."

*Id.* at 1253 (emphasis omitted).

The court also considered three of the same definitions that the parties here proffer from

the current edition of *Black's Law Dictionary*:

> 1. Open, organized, and armed resistance to an established
> government or ruler; esp., an organized attempt to change the
> government or leader of a country, [usually] through violence.
>
> 2. Open resistance or opposition to an authority or tradition.
>
> 3. Hist. Disobedience of a legal command or summons.

*Id.* at 1252 (quoting *Rebellion*, *Black's Law Dictionary* (12th ed. 2024)).

Plaintiffs advocate for the first definition, whereas Defendants advocate for the second

and third definitions. *See* Resp., ECF 35 at 22–23. As a threshold matter, the second and third

definitions that Defendants proffer fail to meet any of the shared characteristics of early 1900s

definitions of "rebellion"—that the rebellion be (1) violent and armed; (2) organized; (3) open

and avowed; and "against the government as a whole—often with an aim of overthrowing the

government." *See Newsom I*, 786 F. Supp. 3d at 1253.

Even overlooking that problem, however, Defendants' definition of rebellion also

contravenes the greater statutory context of § 12406. *See Dolan*, 546 U.S. at 486. In *Newsom II*,

the Ninth Circuit defined the statutory phrase "unable with the regular forces to execute the laws

of the United States" in subsection (3) by reference to "[t]he statutory context." *See* 141 F.4th

at 1051. To do so, it compared the phrase to subsections (1) and (2). *Id.* "Subsections one and

two of the statute describe unusual and extreme exigencies—invasions and rebellions—that

threaten the normal operations of civil government." *Id.* Defendants' broad proffered definitions

of rebellion fall far short of an unusual and extreme exigency.

Therefore, this Court reaches the same conclusion as the district court in *Newsom I* that

the following "key characteristics" provide the boundaries for what constitutes a "rebellion":

> First, a rebellion must not only be violent but also be armed.
> Second, a rebellion must be organized. Third, a rebellion must be
> open and avowed. Fourth, a rebellion must be against the
> government as a whole—often with an aim of overthrowing the
> government—rather than in opposition to a single law or issue.

*Newsom I*, 786 F. Supp. 3d at 1253 (emphasis omitted). Here, the protests in Portland were not

"a rebellion" and did not pose a "danger of a rebellion," especially in the days leading up to the

federalization. As discussed above, Defendants presented evidence of sporadic violence against

federal officers and property damage to a federal building. Defendants have not, however,

proffered any evidence demonstrating that those episodes of violence were part of an organized

attempt to overthrow the government as a whole, and therefore, Defendants have failed to show

that the President had a colorable basis to conclude that Section 12406(2) was satisfied.

Defendants nevertheless argue that the President was authorized under Section 12406(2)

to quell "violent resistance to lawful enforcement of federal immigration law occurring in

Portland." Resp., ECF 35 at 22. Indeed, the President also stated that "protests or acts of violence

[that] directly inhibit execution of the laws[] constitute a form of rebellion." Rieger Decl., Ex. D,

ECF 37 at 20. These conceptions of rebellion improperly conflate the statutory preconditions in

Sections 12406(2) and (3). As discussed above, subsection (3) only authorizes the President to

federalize the National Guard if he is "unable with the regular forces to execute the laws of the

United States." If subsection (2) ("rebellion") was satisfied whenever "protests or acts of

violence directly inhibit execution of the laws," subsection (3) (requiring inability to enforce

federal law) would be superfluous. "If we were to adopt the federal government's reading of subsection [two], it would swallow subsection[ ] [three]." *See Newsom II*, 141 F.4th at 1051; *see also Fischer v. United States*, 603 U.S. 480, 490 (2024) ("Congress would not go to the trouble of spelling out [a list of terms] if a neighboring term swallowed it up . . . .").

### 1. Tenth Amendment

Defendants' *ultra vires* federalization of Oregon's National Guard troops also violates the Tenth Amendment. "No matter the context, the President's authority to act necessarily 'stem[s] either from an act of Congress or from the Constitution itself.'" *Trump v. United States*, 603 U.S. 593, 607 (2024) (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952)). The Tenth Amendment reserves to the States all rights and powers "not delegated to the United States by the Constitution." U.S. Const. amend. X. In turn, action that "exceeds the National Government's enumerated powers undermines the sovereign interests of the States." *Bond v. United States*, 564 U.S. 211, 225 (2011).

The Constitution grants Congress the power to "provide for calling forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions." U.S. Const. art. I, § 8, cl. 15. "Congress has delegated portions of that power to the President" in 10 U.S.C. § 12406. *Newsom II*, 141 F.4th at 1055; *see Youngstown*, 343 U.S. at 636–38 (Jackson, J., concurring). Here, because the President is acting outside that delegation, he is "'tak[ing] measures incompatible with the expressed . . . will of Congress' reflected in that statute." *Newsom II*, 141 F.4th at 1045–46 (quoting *Youngstown*, 343 U.S. at 637 (Jackson, J., concurring)). "But the Constitution authorizes Congress, not the President, to determine when (and how) the militia can be called into actual service of the United States." *Newsom II*, 141 F.4th at 1045. Therefore, the President lacks constitutional authority to federalize the National

Guard once he exceeds the constitutional authority that Congress granted him, such as in Section 12406.[3]

Because the President is federalizing the Oregon National Guard absent constitutional authority, his actions undermine the sovereign interest of Oregon as protected by the Tenth Amendment. Oregon has a Tenth Amendment power to control its National Guard to the extent it is not cabined by the Militia Clause. And as discussed above, Defendants have acted outside the scope of this constitutional authority conferred by Congress. Put another way, Defendants "interfere[d] with the constitutional balance of power between the federal and state governments" by federalizing state National Guardsmen for federal service when no statutory or constitutional authority permitted their federalization. Brief for the State of California and Governor Newsom as Amici Curiae, ECF 41-1 at 9.

## B.  Irreparable Harm

Having demonstrated a likelihood of success on the merits, Plaintiffs must also show that "irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22 (emphasis in original). Irreparable harm is that "for which there is no adequate legal remedy." *See Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014). If a plaintiff is likely to succeed on a constitutional claim, "that showing will almost always demonstrate [the plaintiff] is suffering irreparable harm as well." *Baird v. Bonta*, 81 F.4th 1036, 1042 (9th Cir. 2023).

---

[3] In arguing that Defendants did not violate the Posse Comitatus Act, Defendants assert that under the Take Care Clause, "the President has inherent Article II authority to use troops for the protection of federal property and federal function." Resp., ECF 35 at 25. But the President's inherent authority under the Take Care Clause does not support the conclusion that he has inherent authority to federalize the state National Guard to accomplish this purpose. *See Newsom II*, 141 F.4th at 1045 ("[T]he Constitution authorizes Congress, not the President, to determine when (and how) the militia can be called into actual service of the United States.").

First, Oregon has demonstrated a likelihood that it will suffer a constitutional injury due to Defendants' violation of the state's Tenth Amendment right to control its National Guard. This encroachment on Oregon's police power leaves an indelible mark on Oregon's "sovereignty under the Constitution," *see Shelby County v. Holder*, 570 U.S. 529, 544 (2013), which cannot be remedied by a "legal remedy, such as an award of damages." *Ariz. Dream Act Coal.*, 757 F.3d at 1068. Because Oregon is likely to succeed on its Tenth Amendment claim, it will also likely suffer irreparable harm in the absence of a temporary restraining order.

Second, Plaintiffs claim "ongoing and concrete" harms to their "law enforcement and public safety interests" due to the diversion of state resources. Motion, ECF 6 at 38 (quoting *Maryland v. King*, 567 U.S. 1301, 1303 (2012)). Federalizing Oregon National Guard members diverts them from their state responsibilities, which impairs the State's ability to call on the Guard to respond to emergencies. *See id.* Further, state and local law enforcement will need to expend additional resources to quell increased civil unrest that is likely to result from the Guard's mobilization. Dobson Decl., ECF 7 ¶ 30 ("Scaling resources to address protests based on the federal deployment may mean that PPB is less able to respond to regular public safety calls for service.").

Defendants respond that the deployment, federalizing only 200 of a total 6,500 Oregon National Guard members, does not substantially impair Oregon's use of the overall force. Resp., ECF 35 at 35–37. However, the 200 members constitute 60% of Oregon National Guardsmen "who are trained to quickly respond to emergencies, including national disasters." Declaration of Brigadier General Alan R. Gronewold, ECF 34 ¶ 3.

Defendants also argue that these harms from diversion are "so conclusory" as to render them "utterly meaningless." Resp., ECF at 37. But the increased need for state and local law

enforcement reflects reality. On the night the September 28, 2025, National Guard federalization order was announced, the size of the protests increased substantially, ballooning to around 200 people, with a second protest at a different location including "a few hundred." Schoening Decl., Ex. B, ECF 12-1 at 1. Moreover, this Court notes that in Los Angeles, the National Guard mobilizations inflamed protests, spawned unrest at new locations, and required additional resources from the California Highway Patrol. Brief for the State of California and Governor Newsom as Amici Curiae, ECF 41-1 at 11. Likewise, the deployment of federal law enforcement officers to Portland in 2020 "reignited" protests and riots that had "largely self-extinguished." Declaration of Caroline Turco, ECF 13 ¶ 3.

## C. Balancing the Equities and Public Interest

Lastly, the balance of the equities and the public interest, *see E. Bay Sanctuary Covenant*, 993 F.3d at 668, also weigh in favor of granting Plaintiffs' TRO. The public has a profound interest in "prevent[ing] irreparable injury so as to preserve the court's ability to render a meaningful decision on the merits." *Doe #1 v. Trump*, 957 F.3d 1050, 1068 (9th Cir. 2020) (quoting *Golden Gate Rest. Ass'n v. City & County of San Francisco*, 512 F.3d 1112, 1116 (9th Cir. 2008)). Put simply, the issues at stake in this case are important, and the consequences of this Court's decision are far-reaching. As soon as the federalized National Guard deploys to Portland, the state of Oregon will suffer an injury to its sovereignty. Conversely, if the TRO issues, federal law enforcement may continue "to protect federal personnel, functions, and property in Oregon." ECF 1-1 at 2. In addition, both state and federal law enforcement officers may continue to arrest protestors who violate the law. The impact on Defendants, if any, is therefore *de minimis*.[4]

---

[4] Defendants claim that they have a "significant" and "uncontested interest in the protection of federal agents and property and the faithful execution of the law." *Newsom II*, 141

Furthermore, this country has a longstanding and foundational tradition of resistance to government overreach, especially in the form of military intrusion into civil affairs. "That tradition has deep roots in our history and found early expression, for example, in . . . the constitutional provisions for civilian control of the military." *Laird v. Tatum*, 408 U.S. 1, 15 (1972); *see also* James Madison, Address to the Constitutional Convention (1787), reprinted in 1 Records of the Federal Convention of 1787, at 465 (Max Farrand ed., 1911) ("A standing military force, with an overgrown Executive will not long be safe companions to liberty. The means of defence [against] foreign danger, have been always the instruments of tyranny at home."). This historical tradition boils down to a simple proposition: this is a nation of Constitutional law, not martial law. Defendants have made a range of arguments that, if accepted, risk blurring the line between civil and military federal power—to the detriment of this nation.

---

F.4th at 1054–55. But the record demonstrates that the threats to that interest in Portland do not warrant the extraordinary measure of bringing in the military. Rather, based on the current record, it is clear that any threats to federal agents and property are readily remedied—as they have been—by federal civilian law enforcement, with the support of State and local law enforcement. Therefore, this interest cannot overcome the countervailing balance of equities and public interest that weigh in favor of Plaintiffs.

PAGE 30 – OPINION AND ORDER
**A307**

## CONCLUSION

For the above reasons, this Court GRANTS Plaintiffs' Motion for Temporary Restraining Order, ECF 6, and temporarily enjoins Defendants' September 28, 2025, Memorandum ordering the federalization and deployment of Oregon National Guard service members to Portland. The TRO expires in fourteen days on October 18, 2025, and the parties are ORDERED to comply with the attached TRO. The Defendants' request to stay or administratively stay the Temporary Restraining Order, *see* Defendants' Opposition to Plaintiffs' Motion for Temporary Restraining Order, ECF 35 at 41, is DENIED.

**IT IS SO ORDERED**

DATED this 4th day of October, 2025 at 3:40 p.m. pacific daylight time.

/s/ Karin J. Immergut
Karin J. Immergut
United States District Judge

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **STATE OF OREGON** and the **CITY OF PORTLAND**, | Case No. 3:25-cv-1756-IM |
| Plaintiffs, | **TEMPORARY RESTRAINING ORDER** |
| v. | |
| **DONALD TRUMP**, in his official capacity as President of the United States; **PETE HEGSETH**, in his official capacity as Secretary of Defense; **U.S. DEPARTMENT OF DEFENSE**; **KRISTI NOEM**, in her official capacity as Secretary of Homeland Security; and **U.S. DEPARTMENT OF HOMELAND SECURITY**, | |
| Defendants. | |

The Court GRANTS Plaintiffs' Motion for Temporary Restraining Order, ECF 6, and

ORDERS as follows:

1.     Defendants are temporarily enjoined from implementing Defendants' September

28, 2025, Memorandum ordering the federalization and deployment of Oregon National Guard

service members to Portland.

2.     This Temporary Restraining Order expires by its own terms on October 18, 2025,

at 11:59 p.m.

PAGE 1 – TEMPORARY RESTRAINING ORDER
**A309**

3.      Plaintiffs are ORDERED to post a nominal bond of $100 within 48 hours. The bond shall be filed in the Clerk's Office and be deposited into the registry of the Court.

4.      Defendants' Request to Stay or Administratively Stay the Temporary Restraining Order, *see* Defendants' Opposition to Plaintiffs' Motion for Temporary Restraining Order, ECF 35 at 41, is DENIED.

5.      The Court Clerk will contact the parties to schedule a telephone hearing on October 17, 2025, to address whether this Temporary Restraining Order should be extended for another 14 days.

6.      Any motion for a Preliminary Injunction shall be filed no later than October 17, 2025; Defendants' opposition shall be due no later than October 23, 2025, and Plaintiffs' reply shall be due on October 27, 2025.

7.      A combined hearing on the preliminary injunction motion and a trial on the merits under Rule 65(a)(2) is set for October 29, 2025, before the Honorable Judge Karin J. Immergut, in Courtroom 13A, beginning at 9:00 a.m.

**IT IS SO ORDERED**

DATED this 4th day of October, 2025 at 3:40 p.m. pacific daylight time.

/s/ Karin J. Immergut
Karin J. Immergut
United States District Judge



**Donald J. Trump**
@realDonaldTrump · October 1, 2025, 1:36 PM

☐ Original Post

As I determined on September 27th, when I activated and called into service the National Guard in Oregon, conditions continue to deteriorate into lawless mayhem. Our GREAT Federal Law Enforcement Officers have not been able to enforce the Laws in Oregon. ANTIFA and the Radical Left Anarchists have been viciously attacking our Federal Law Enforcement Officers, men and women who are simply doing their job, protecting Federal Property, and enforcing Federal Immigration Laws and the Rule of Law. We will never allow MOBS to take over our streets, burn our Cities, or destroy America. The National Guard is now in place, and has been dedicated to restoring LAW AND ORDER, and ending the Chaos, Death, and Destruction! We are a Nation of LAW, and we will PREVAIL. Thank you for your attention to this matter! President DJT



**PLAINTIFF'S EXHIBIT**

194

3:24-cv-01756-IM

| **EXHIBIT** | |
|---|---|
| 7 | |
| DEPONENT NAME: | DATE: |
| Timothy Rieger | 10/23/2025 |

A311

# ACTIVITY LOG (ICS 214)

| 1. Incident Name: September 28 | 2. Operational Period: Date From 09/28/25    Date To:<br>Time From: 1400    Time To: 0200 |
|---|---|
| | |

| 3. Name:<br>Franz Schoening | 4. ICS Position: CMIC | 5. Home Agency (and Unit): PPB |
|---|---|---|

**6. Resources Assigned:**

| Name | ICS Position | Home Agency (and Unit) |
|---|---|---|
| Schoening | INCIDENT COMMANDER | |
| Abrahamson | DEPUTY INCIDENT COMMANDER | |
| Burton | OPERATIONS | |
| Konczal | DEPUTY OPERATIONS | |
| Dunbar | PLANNING | |
| Searle | LOGISTICS | |
| ██████████ | INTEL | |
| | SITUATION STATUS | |
| Manpreet | SCRIBE | |
| Stensgaard | LIAISON | |
| | RESOURCES | |

**7. Activity Log:**

| Date/Time | Notable Activities |
|---|---|
| 0900-1400 | Number of phone calls with FPS IC to deconflict air ops, plainclothes ops, and liaison roles, etc. |
| | Meetings with CHO/Mayors Office |
| 1400 | Ops briefing |
| 1500 | DLOs report 100-150 at WFP and a couple dozen at ICE.  50501 group at WFP talking with |
| | DLOs and sharing march route info.  Group at ICE not willing to talk to DLOs. |
| 1525 | 50501 shared march route with DLOs. Passed to Traffic.  They have a corking group, but |
| | Traffic will still engage in mitigating traffic safety risks and fill gaps. |
| 1540 | 35-40 at ICE |
| 1550 | DLOs report 50-55 at ICE...newcomers are generally neutral towards DLOs.  Established camp folks are |
| | Antagonistic towards DLOs. |
| 1610 | March has started. Traffic Officers are closing streets. |
| 1630 | March is uneventful so far...lead approaching Naito from Salmon.  ICE crowd is growing but no criminal |
| | Activity right now. |
| 1635 | DLOs delivered incorrect message to ICE crowd and said they may be arrested if they step in the street |
| | And escalated tensions.   I reiterated that the threshold for intervention is life safety and/or person or |
| | Property crimes. |
| 1650 | March is over.  Moving resources down to ICE. |

| 8. Prepared by:  Name: | Position/Title: | Signature: _____ |
|---|---|---|
| ICS 214    Page **1** of **3** | Date/Time: | |

CONFIDENTIAL<br>A312

CIT

**PLS' EX. 525**
**Page 1 of 3**

State of Oregon, et al v. Trump<br>**EXHIBIT**<br>**525**<br>USDC No. 3:25-cv-01756-IM

# ACTIVITY LOG (ICS 214)

| 1. Incident Name: September 28 | 2. Operational Period: Date From 09/28/25 | Date To: |
|---|---|---|
| | Time From: 1400 | Time To: 0200 |
| | | |

| | |
|---|---|
| | ICE crowd is mix of confrontational/antagonistic folks and non-confrontational folks. |
| 1650 | Federal officers came out of the ICE facility to coordinate getting a couple vehicles into the facility. Crowd |
| | Appeared to be verbally confrontational but did not see any assaults/crim misch on the air video. |
| 1728 | RRT contacting one for attempt crim misch. Block or so away from main protest. |
| 1737 | Vehicle tried to drive through crowd from Moody onto Bancroft through crowd. Crowd surrounded |
| | Vehicle. DLOs were able to get crowd to move back and get vehicle to back out of crowd. |
| 1800 | Fairly static….some live streamers are being yelled at by the crowd and having heated arguments but |
| | No violence. |
| 1820 | Report from BOEC of an anonymous 911 caller reporting being surrounded by 50 people with knives at |
| | Bancroft and Macadam. Officers at the location did not observe anything matching. |
| 1840 | RRT taking a report from complainant from earlier call. |
| 1850 | DLOs report PC on a person who knocked a phone out of someone's hand. Report taken, suspect got |
| | In vehicle and drove away from the scene. PC is for assault 4 |
| 1855 | DLOs report a second confrontation with a livestreamer |
| 1900 | DLOs reporting that corking volunteers have left, as have many of the non-confrontational members of the |
| | Crowd. The remaining crowd is more highly populated by black bloc and confrontational people |
| 1900 | Based on multiple incidents of crowd members assaulting or harassing livestreamers, and escalating |
| | Behavior of the remaining members of the crowd, I have approved embedding plainclothes officers |
| | Into the crowd. Possible that assaults of livestreamers may be indicator of planned criminal activity. |
| 1900 | Truck tried to drive through area and got blocked by crowd. DLOs report that "Richard" threw a water |
| | Bottle at the truck but the driver declined to press charges or remain at the scene and drove away. |
| 1910 | Crowd size is approx. 100 now. |
| 1913 | Feds coming out, using pepper ball and moving crowd back. Not clear why. |
| 1950 | Activating one MFF (combined from the precincts). There are insufficient officers available to activate |
| | Additional MFFs. |
| 2030 | Assaults taking place. DLOs trying to sort out who was suspect/who was victim |
| 2035-45 | Crowd escalating and interfering with DLOs investigation. RRT bikes deployed to area. No one involved |
| | Willing to cooperate with police or articulate basis for arrests. RRT and DLOs leaving area. |
| 2050 | Plainclothes officers have established independent PC on three suspects for assault. They are continuing |
| | To watch the suspects to attempt arrests when safe to do so. |
| 2100 | RRT developing plan to make arrests. Sound Truck prepping announcements |
| 2130 | RRT arrests one of the suspects for Assault 3 at Bond/Abernathy |
| 2200 | RRT makes 2nd arrest of suspect for Assault 3. RRT Alpha and Bravo make arrests in front of ICE. No |
| | Resistance from crowd but verbal confrontation. |
| 2300 | Crowd energy is down following arrests and less than 50 people remaining. No criminal activity towards ICE |
| | Facility and no additional skirmishes within crowd. Demobilizing IMT resources and handing event to |
| | Central Precinct to monitor. |

| 8. Prepared by: Name: | Position/Title: | Signature: _____ |
|---|---|---|
| ICS 214    Page **2** of **3** | Date/Time: | |

# ACTIVITY LOG (ICS 214)

| 1. Incident Name: September 28 | 2. Operational Period: Date From 09/28/25      Date To:<br>Time From: 1400      Time To: 0200 |
|---|---|
|  |  |

| | |
|---|---|
| | |
| | |
| | |
| | |

| 8. Prepared by: Name: | Position/Title: | Signature: _____ |
|---|---|---|
| **ICS 214**    Page **3** of **3** | Date/Time: | |



SECRETARY OF WAR
1000 DEFENSE PENTAGON
WASHINGTON, DC 20301-1000

SEP 2 8 2025

MEMORANDUM FOR THE ADJUTANT GENERAL, OREGON NATIONAL GUARD
THROUGH: THE GOVERNOR OF OREGON

SUBJECT: Calling Members of the Oregon National Guard into Federal Service

On June 7, 2025, the President of the United States called forth at least 2,000 National Guard personnel into Federal service pursuant to section 12406 of title 10, U.S. Code, to protect U.S. Immigration and Customs Enforcement and other U.S. Government personnel who are performing Federal functions, including the enforcement of Federal law, and to protect Federal property, at locations where protests against these functions are occurring or are likely to occur based on current threat assessments and planned operations. The President signed a copy of the attached memorandum to effectuate the calling forth of these Service members.

This memorandum further implements the President's direction. 200 members of the Oregon National Guard will be called into Federal service effective immediately for a period of 60 days. The Chief of the National Guard Bureau will immediately coordinate the details of the mobilization with you, in coordination with the Chairman of the Joint Chiefs of Staff and Commander, U.S. Northern Command. The mobilized Service members will be under the command and control of the Commander, U.S. Northern Command.

Attachment(s):
As stated


cc:
Chairman of the Joint Chiefs of Staff
Chief, National Guard Bureau
Commander, U.S. Northern Command
Under Secretary of Defense for Policy
Under Secretary of Defense for Personnel and Readiness

*Oregon v. Trump*
No. 3:25-cv-01756

**Defendants' Exhibit**

1051

**A315**

# ATTACHMENT 12

A316





← **Truth Details**
7675 replies                                                          •••

Donald J. Trump 🏵️ ➕
@realDonaldTrump

At the request of Secretary of Homeland Security, Kristi Noem, I am directing Secretary of War, Pete Hegseth, to provide all necessary Troops to protect War ravaged Portland, and any of our ICE Facilities under siege from attack by Antifa, and other domestic terrorists. I am also authorizing Full Force, if necessary. Thank you for your attention to this matter!

**16.7k** ReTruths   **69.9k** Likes                          Sep 27, 2025, 7:19 AM



## Truth Social uses cookies

Truth Social uses session cookies to help provide you with a fast and consistent user experience. These cookies are essential for the Truth Social service to work as intended. Truth Social also employs a third-party cookie to protect its website from harmful automated attacks. To learn more about the cookies we use, please visit our Privacy Policy.

Reject all      Accept

Plaintiff's Exhibit 1
Page 3 of 3



**NATIONAL GUARD BUREAU**
111 SOUTH GEORGE MASON DRIVE
ARLINGTON VA 22204-1373

MEMORANDUM FOR: THE ADJUTANT GENERAL, OREGON NATIONAL GUARD

SUBJECT: Request for Oregon National Guard Federal Protection Mission

1. I am writing to inform you that the Department of War has received a request from the Department of Homeland Security (DHS) for immediate assistance to protect federal personnel, functions, and property in Oregon. In response, the Secretary of War has authorized additional federal funding for up to 200 members of the Oregon National Guard (ORNG) under Title 32 United States Code, Section 502(f), to perform this mission in a non-federalized status under your command and control.

2. I have enclosed DHS's request for protective measures while executing operations in Oregon. Due to the circumstances and immediate nature of this request, if ORNG forces are not mobilized in the next 12 hours, the Secretary of War may direct the mobilization of as many members of the ORNG as he may deem necessary under Title 10 United States Code.

3. The Department of War greatly appreciates your collaboration on this emergent situation. If your Governor agrees to a Title 32 mobilization of the ORNG, we will work with DHS to coordinate mission details with you. To be clear, we believe time is of the essence and failure to mobilize sufficient forces quickly to address the situation may risk lives and property damage. I respectfully request that you inform me immediately if your Governor is unable or unwilling to mobilize the ORNG under Title 32 to perform the necessary protective functions.

RIEGER.TIMOTHY.
LEE. PII
Digitally signed by
RIEGER.TIMOTHY.LEE. PII
Date: 2025.09.27 14:21:14 -04'00'

Encl as.

Timothy L. Rieger
Major General, USA
Acting Vice Chief, National Guard Bureau

*Oregon v. Trump*
No. 3:25-cv-01756
**Defendants' Exhibit**
1048

**A319**

FOR OFFICIAL USE ONLY//LAW ENFORCEMENT SENSITIVE



*Executive Secretary*
U.S. Department of Homeland Security
Washington, DC 20528

# Homeland Security

September 26, 2025

MEMORANDUM FOR:    COL Anthony Fuscellaro
Executive Secretary
U.S. Department of Defense

FROM:    Andrew J. Whitaker
Executive Secretary
U.S. Department of Homeland Security

SUBJECT:    **Request for Assistance from the Department of War for Federal Facility Protection Support to the Department of Homeland Security (State of Oregon)**

## Overview

The Department of Homeland Security (DHS) requests immediate and sustained assistance from the Department of War (DoW) in order to safeguard federal personnel, facilities, and operations in the State of Oregon. Federal facilities, including those directly supporting Immigration and Customs Enforcement (ICE) and the Federal Protective Service (FPS), have come under coordinated assault by violent groups intent on obstructing lawful federal enforcement actions. These groups are actively aligned with designated domestic terrorist organizations and have sought to impede the deportation and removal of criminal noncitizens through violent protest, intimidation, and sabotage of federal operations.

At the President's direction, DHS is seeking to put an end to the migrant invasion and these lawless riots. This further executes and follows the intent of past Executive Orders: (1) Executive Order Clarifying the Military's Role in Protecting the Territorial Integrity of the U.S. (20 Jan 2025), section 2; (2) Executive Order Declaring a National Emergency at the Southern Border of the U.S. (20 Jan 2025); (3) Executive Order Guaranteeing the States Protection Against Invasion (20 Jan 2025). Additional requests may follow as the situation develops.

## DHS Overarching Goal

DHS seeks DoW support to ensure the continued protection of federal facilities in Oregon that are experiencing sustained unrest, thereby reinforcing the safety of federal personnel, safeguarding public property, and enabling uninterrupted execution of federal law enforcement missions.

*Oregon v. Trump*
No. 3:25-cv-01756
**Defendants' Exhibit**
1050

FOR OFFICIAL USE ONLY//LAW ENFORCEMENT SENSITIVE

A320

FOR OFFICIAL USE ONLY//LAW ENFORCEMENT SENSITIVE

**Subject: Request for Assistance from the Department of War for Federal Facility Protection Support to the Department of Homeland Security (State of Oregon)**
Page 2

**Specific Topics for Request**
DHS requests deployment element of approximately 200 DoW personnel, trained and equipped for mission security in complex urban environments. These personnel would integrate with federal law enforcement operations, serving in direct support of federal facility protection, access control, and crowd control measures.

**End of Mission**
DHS requests that DoW-authorized support capabilities remain in place through the cessation of unrest and unlawful protests in Oregon.

**Funding**
DHS requests DoW provide support on a reimbursable basis.

FOR OFFICIAL USE ONLY//LAW ENFORCEMENT SENSITIVE

A321

| From: | Braun, Andrew |
|---|---|
| To: | Lloyd, Bryan |
| Cc: | Sheppard, Nathan; Hughes, Brian; Perry, Charles; Kenney, Zachary |
| Subject: | Disturbance at ICE 9/20 |
| Date: | Sunday, September 21, 2025 3:28:15 AM |

25-259969

9/20 at 2332 hours

ICE 4310 S Macadam Ave.

Victims: Amacher, Rhein██████

Bouferrache, Chelly ██████

Daviscourt, Katelyn ██████

Suspect(s): Unidentified

Summary: FPS dispatch alerted BOEC to a disturbance in front of ICE between 12 protesters and one counter-protester (Amacher). One protester pepper-sprayed Amacher. FPS updated that the same protester pepper-sprayed another counter-protester. Video from FPS helped to establish PC for Attempt Robbery II and Unlawful Use of Pepper Spray. There were as many as 50 protesters gathered, and more agitated than most nights, so I requested a MFF from East to assist us. Once we had all of our resources and a solid plan in place, officers searched for the suspect while avoiding a confrontation with the main crowd. Ultimately, the suspect was not located, but FPS noted that the crowd's demeanor shifted and they began to break up after police drove threw the area a few times.

Units Notified: Major Crimes via email, due to the robbery charge.

Outstanding Action Items: Perry or Kenney, can you please send a Dayshifter to pick up the full video from FPS in the morning? They should have it earmarked.

These 3 counter-protesters continue to be a chronic source of police and medical calls at ICE. Despite repeated advice from officers to stay away from the ICE crowd, they constantly return and antagonize the protesters until they are assaulted or pepper sprayed. They refuse or are reluctant to walk away from these confrontations, even when police are in the area trying to meet with them. They even engage in the same trespassing behavior on federal and trolley property as the main protesters. Aside from the confrontation between opposing protesters, there was no reported activity around ICE that would have otherwise generated a police response.

CONFIDENTIAL

A322


State of Oregon, et al v. Trump

**EXHIBIT 514**

USDC No. 3:25-cv-01756-IM

Sergeant Andrew Braun

#56961

Portland Police Bureau

1111 SW 2nd Ave. Portland, OR 97204

Central E Shift UMT

971-337-4539

CONFIDENTIAL

CITY_000255

**From:** Edwards, John
**To:** Maxey, Brent; Tackett, Todd; Sheppard, Nathan; Hughes, Brian
**Subject:** Friday Night ICE update
**Date:** Saturday, September 20, 2025 1:06:22 AM

Good evening/morning.

FPS Agents were busy tonight. There was a group of 50 at the facility. Due to short staffing, lots of calls and a major crime scene I was on the entire night, I did not drive by, however Sgt. Duarte did. Again, once a marked car drives through, the will flip off, scream and throw objects at the car and in most cases run towards the car as if they are going to charge the car.

FPS Will Turner called me throughout the night with info about black blockers assaulting people. We were on Pri 1-2 with 50-60 calls holding, however only got one call from someone reporting they were assaultded on Saturday.

I received video from FPS and a report about a journolist who was assaulted by a black blocker with a large sword or stick. VI is Rhein Amacher and suspect is Seth Sinclair. They are known to FPS as Seth is a nightly agitator that has been cited by FPS.

I set up a call (25-259060) for nights to att contact and make a report. The other call is (25-258940).

To be clear, even if these folks were still at ICE or nearby, we would not be able to address the call or make an arrest with the resources we have.

**Sgt. John Edwards #32391**
**Portland Police Bureau**
**Central Precinct/C Shift (3pm-1am)**
**Cell- (971) 804-2161**
**Office (503) 823-0097**



State of Oregon, et al v. Trump
**EXHIBIT**
**513**
USDC No. 3:25-cv-01756-IM

| | |
|---|---|
| **From:** | Edwards, John |
| **To:** | Ceaser, Madison; Tackett, Todd; Maxey, Brent; Sheppard, Nathan |
| **Subject:** | Thursday Night ICE update |
| **Date:** | Thursday, September 18, 2025 10:08:00 PM |

Good Evening,

The afternoon started with around 150 plus folks outside the ICE facility, it is unknown if some were counter protestors, however we did not get called on any of them and FPS had no issue.

At 1600 hours today, I drove by and saw 2 protestors across the street with no issues.

No calls for service here and no assistance requested by FPS

At 2200, I drove into the area and found 50-60 of the normal agitators.  My presence in the roadway in front of ICE triggered the crowd.  I was screamed at, flipped off and some of the maksked up folks ran after my car throwing things.  (Not sure what.)

There does appear to be a large camp set up again even though it was cleaned out earlier in the day.

**Sgt. John Edwards #32391**
**Portland Police Bureau**
**Central Precinct/C Shift (3pm-1am)**
**Cell- (971) 804-2161**
**Office (503) 823-0097**


State of Oregon, et al v. Trump
**EXHIBIT
511**
USDC No. 3:25-cv-01756-IM

**To:** JIOC-ICE[JIOC-ICE@ice.dhs.gov]; SeniorLeaderThreats-Doxing[SeniorLeaderThreats-Doxing@ice.dhs.gov]; Peter, Taula[Taula.Peter@ice.dhs.gov]; Hicks, Matthew E[Matthew.E.Hicks@ice.dhs.gov]; Chan, Jeffrey K[Jeffrey.K.Chan@ice.dhs.gov]; Johnson, Erik K[Erik.K.Johnson@ice.dhs.gov]; Johnson, Ellen K[Ellen.K.Johnson@hsi.dhs.gov]; Jones, Clifford T[Clifford.T.Jones@hsi.dhs.gov]; Jackson, Colin[Colin.Jackson@hsi.dhs.gov]; Wamsley, Cammilla[Cammilla.Wamsley@ice.dhs.gov]; Meyer, Scott R[Scott.R.Meyer@ice.dhs.gov]; Igne, Kristyn K[Kristyn.K.Igne@ice.dhs.gov]; Miller, April L[April.L.Miller@hsi.dhs.gov]; Kruklis, Thomas D[Thomas.D.Kruklis@hsi.dhs.gov]; Rignel, Todd R[Todd.R.Rignel@hsi.dhs.gov]; Baez-Santiago, Wilfredo[Wilfredo.Baez-Santiago@ice.dhs.gov]; Ingersoll, Jay A[Jay.A.Ingersoll@ice.dhs.gov]; Franklin, Darrell M[Darrell.M.Franklin@ice.dhs.gov]; Atchley, Jesse W[Jesse.W.Atchley@ice.dhs.gov]; Sewell, James C[James.C.Sewell@hsi.dhs.gov]
**Cc:** Werner, Caitlin S[Caitlin.S.Werner@ice.dhs.gov]; Wilson, Cleveland[Cleveland.Wilson@ice.dhs.gov]; McCutcheon, Chatham L[Chatham.L.McCutcheon@ice.dhs.gov]; Adams, William E[William.E.Adams@ice.dhs.gov]
**From:** Vossler, Jordan
**Sent:** Sat 9/13/2025 4:11:57 PM
**Subject:** ⸢ PII/LEP ⸣ suspected unloading weapons to Antifa last night at ICE ERO Portland.
**Received:** Sat 9/13/2025 4:12:03 PM
RE: HSI Tip Line Priority Notification

Good morning,

Please see the attached e-mail from SDDO Adams who has been working SRT for the building protection at the ICE ERO Office in Portland, OR the last few weeks. Protesters have been wearing helmets and gas masks on a nightly bases but are beginning to wear body armor and were observed unloading weapons from a vehicle last night.

Tomorrow marks the 100 days of non-stop protests at the ICE ERO Building in Portland, OR and we are expecting a larger protest presence at the building along with another one on Tuesday.

⸢ PII/LEP ⸣ was previously mentioned in an HSI tip line referral of an individual who is facilitating violence at the ICE ERO Building in Portland, OR. This person was observed unloading weapons out of a ⸢ LEP ⸣ yesterday to Antifa members, her information is on the HSI tip line at the bottom of the attached e-mail.

Katie Daviscourt on X, who has been actively reporting on ANTIFA activity at the ICE ERO Building in Portland, OR also reported yesterday that the threats to the lives of federal officers in Portland, OR are escalating and has heard ANTIFA talking that ICE agents are the Nazi gestapo who need to be killed.
https://x.com/katiedaviscourt/status/1966584306937327993?s=42

Sending for awareness,

**Jordan Vossler**
Supervisory Detention and Deportation Officer
Criminal Alien Program/Task Force Officer/Field Intelligence Officer
Seattle Field Office, Portland, Oregon
**Enforcement and Removal Operations**
**U.S. Immigration and Customs Enforcement**
Cell: 503-849-9001 Desk: 503-326-7043 Fax: 503-326-7720

This communication is UNCLASSIFIED//FOR OFFICIAL USE ONLY (U//FOUO). It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. 552). It is to be controlled, stored, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to FOUO information and is not to be released to the public or other personnel who do not have a valid "need-to-know" without prior approval of
an authorized DHS official. No portion of this communication should be furnished to the media, either in written or verbal form.

*Oregon v. Trump*
No. 3:25-cv-01756
**Defendants' Exhibit**
1077

**A326**

**To:** ███████████████████████████████████████████

███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████

**From:** ███████████████████
**Sent:** Wed 9/10/2025 1:16:44 AM
**Subject:** death threat to ICE officers Portland, OR
**Received:** Wed 9/10/2025 1:16:48 AM
image000001.JPG
image000000.JPG
Photo 2025-09-09 04.43.11.594 PM.jpeg
Photo 2025-09-09 04.43.11.591 PM.jpeg

Good afternoon,

Information was received today that a social media user on X (Toasty_T) located in Hillsboro, Oregon made threats regarding the death of Portland, OR ICE agents. In the post they added the recent doxed agents flyers from Portland, Oregon with grave stone emoji's. Also stating "keep working with ICE pigs you gonna get raped pussy bitch and you deserve to die slowly with them while your family watches". On their user handle the stated "I'm toasted! Fed ain't nothin but a target practice".

Ignatius J. Reily (IgnatiusJ1001) replied Execute gestapo on sight
Kache (Kacheling) replied Off The Pigs

This is the second known death threat to ICE agents in the Hillsboro/Washington County, OR area in the last week.

X user account information.
https://x.com/360terps?s=21&t=qMqZaVN3T4hMuHCAut6ICA

Thanks,

████████████████████
Supervisory Detention and Deportation Officer
Criminal Alien Program/Task Force Officer/Field Intelligence Officer
Seattle Field Office, Portland, Oregon
**Enforcement and Removal Operations**
**U.S. Immigration and Customs Enforcement**
███████████████████████████

This communication is UNCLASSIFIED//FOR OFFICIAL USE ONLY (U//FOUO). It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. 552). It is to be controlled, stored, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to FOUO information and is not to be released to the public or other personnel who do not have a valid "need-to-know" without prior approval of an authorized DHS official. No portion of this communication should be furnished to the media, either in written or verbal form.

*Oregon v. Trump*
No. 3:25-cv-01756
**Defendants' Exhibit**

1065

**A327**

# FPS INCIDENT SUMMARY (ICS 209)

| | |
|---|---|
| **1. Incident Name:** Operation Skip Jack Portland-2025 | |

| 2. Version: | 3. Incident Command: | 4. Incident Type: |
|---|---|---|
| ☐ Initial | Name: ▮▮▮▮▮▮▮▮ | ☑ FPS Operation |
| ☑ Update    Report No. 90 | Title: **Incident Commander** | ☐ Support to Other LE |
| ☐ Final | Name: ▮▮▮▮▮▮ | ☑ Multi Agency Operation |
| | Title: (DIC/Senior Inspecto ☐N/A | |

| 5. Incident Location: | 6. Operational Period: |
|---|---|
| Portland, Oregon | September 09, 2025, 0001 hours |

| 7. Submitted By: | 8. Date Submitted: |
|---|---|
| ▮▮▮▮▮▮ | September 09, 2025, 2359 hours |

**9. Incident Objectives This Operational Period:**

As First Amendment activities against immigration raids continue at the ICE facility downtown Portland, Oregon, Federal Protective Service (FPS) requires an increased security posture in and around federally protected buildings. The ICE facility has been experiencing large demonstrations ranging from

**10. Significant Events for the Reporting Period:**

At approximately 0021 hours: A ▮▮▮e counter-demonstrator, described as a heavy-set ▮▮▮e wearing a black shirt, jacket, and blue jeans, was surrounded by a group of twelve to thirteen (12–13) individuals.

At approximately 0022 hours: One of the demonstrators, described as a heavy-set ▮▮▮ wearing all black, took possession of two water bottles believed to belong to the counter-demonstrator.

At approximately 0101 hours: ICE/SRT and FPS Bravo Team cleared the facility.

**11. Projected Incident Activity for the Next Operational Period:**

All FPS personnel will continue to perform LE operations at the facility on September 10, 2025.

All FPS personnel expected to perform OT (various times due to shift assignments, approximately three to four (3-4) hours per FPS Law Enforcement Officer based on operational needs.

State of Oregon, et al v. Trump
**EXHIBIT 855**
USDC No. 3:25-cv-01756-IM

### 12. Facility Damage Report
Enter number of facilities for each category for this operational period. Detailed reporting for each facility should be submitted on a separate with building number, status, type of damage, etc.

| Risk Level | Closed | Damaged | Destroyed | Threatened (next 72 hours) |
|---|---|---|---|---|
| FSL 3/4/5 | 0 | 0 | 0 | 0 |
| FSL 1/2 | 0 | 0 | 0 | 0 |
| Other | | | | |

### 13. Occupant Status:

| Location | Evacuated | Sheltered | Injured | Fatalities | Missing |
|---|---|---|---|---|---|
| 4310 S Macadam | | | | | |
| | | | | | |
| | | | | | |

### 14. Enforcement Activities:

| Status | FPS | Agency ICE SRT | Agency _____ | Agency _____ |
|---|---|---|---|---|
| Arrests | 0 | 0 | | |
| Citations | 0 | 0 | | |
| Use of Force (Level 4&5) | 0 | 0 | | |

### 15. LEO Status:

| Assigned to IC's AOR | FPS | Agency ICE SRT | Agency _____ | Agency _____ |
|---|---|---|---|---|
| Injury | 0 | 0 | | |
| Illness | 0 | 0 | | |
| Missing | 0 | 0 | | |
| Fatalities | 0 | 0 | | |

### 16. Personnel Resource Commitment:

| Personnel | FPS Host Region | FPS Deployed | Partner Agency ICE SRT | Partner Agency _____ | Partner Agency _____ | Partner Agency _____ | Other _____ | Total |
|---|---|---|---|---|---|---|---|---|
| Supervisors | 1 | 4 | 2 | | | | | 7 |
| Inspectors/Officers | 0 | 18 | 6 | | | | | 24 |
| EDCTs | 0 | 0 | 0 | | | | | 0 |
| Special Agents | 0 | 3 | 0 | | | | | 3 |
| Non-LE (Fed) | 1 | 0 | 0 | | | | | 1 |
| Contractors | 1 | 0 | 0 | | | | | 1 |
| Other | 0 | 0 | 0 | | | | | 0 |

### 17. Personnel Assignments:

| Personnel | Assigned Location OR6732 | Assigned Location ICE/SRT | Assigned Location OR0043 | Assigned Location | Assigned Location | Assigned Location | Other _____ | Total |
|---|---|---|---|---|---|---|---|---|
| Commanders/Supv | 4 | 1 | 0 | | | | | 5 |
| Inspectors | 18 | 6 | 0 | | | | | 24 |
| EDCTs | 0 | 0 | 0 | | | | | 0 |
| Special Agents | 2 | 0 | 0 | | | | | 2 |
| Non-LE (Fed) | 0 | 0 | 0 | | | | | 0 |
| Contractors | 1 | 0 | 0 | | | | | 1 |
| Other | 0 | 0 | 0 | | | | | 0 |

**A329**
Confidential

**PLS' EX. 855**
**Page 2 of 12**

OREGON_DEFS_00001419
OREGON_DEFS_00001418_0002

**18. Equipment and Countermeasures:**

| Type | Assigned Location OR6732 | Assigned Location ICE/SRT | Assigned Location OR0043 | Assigned Location | Assigned Location | Assigned Location | Other | Total |
|---|---|---|---|---|---|---|---|---|
| MCV | 0 | 0 | 0 | | | | | 0 |
| SCV | 0 | 0 | 0 | | | | | 0 |
| Arrest Kits | 1 | 0 | 0 | | | | | 1 |
| Fence (linear feet) | 0 | 0 | 0 | | | | | 0 |
| PSO Posts | 1 | 0 | 0 | | | | | 1 |
| Light Tower | 0 | 0 | 0 | | | | | 0 |
| Port. Video System | 0 | 0 | 0 | | | | | 0 |
| cUAS | 0 | 0 | 0 | | | | | 0 |
| LRAD | 1 | 1 | 0 | | | | | 2 |

**A330**
Confidential

**PLS' EX. 855**
**Page 3 of 12**

OREGON_DEFS_00001420
OREGON_DEFS_00001418_0003

FPS INCIDENT SUMMARY (ICS 209)
1. Incident Name:
2. Version:
   Report No.
   _____            3. Incident Command:
Name: _____
Title:     Incident Commander
Name: _____
Title:     _____
4. Incident Type:
5. Incident Location: 6. Operational Period:
7. Submitted By: 8. Date Submitted:
9. Incident Objectives This Operational Period:
10. Significant Events for the Reporting Period:
11. Projected Incident Activity for the Next Operational Period:
FPS Operation
Support to Other LE
Multi Agency Operation
Initial
Update
Final
N/A
Operation Skip Jack Portland-2025
████████████████
90
███████████████
Portland, Oregon
September 09, 2025, 0001 hours
████████████████████
September 09, 2025, 2359 hours
As First Amendment activities against immigration raids continue at the ICE
facility downtown Portland, Oregon, Federal Protective Service (FPS) requires an
increased security posture in and around federally protected buildings. The ICE
facility has been experiencing large demonstrations ranging from peaceful to
violent protest activities. The possibility of civil unrest around the city, and
the general threat to the federal government necessitates an increased FPS presence
at FPS Protected Facilities in Portland, Oregon. The objectives of this
operational period are to prevent additional damage to the facility and provide
security for contracted services to conduct repairs to the facility.
At approximately 0021 hours: A █████ counter-demonstrator, described as a
heavy-set ████ wearing a black shirt, jacket, and blue jeans, was surrounded by a
group of twelve to thirteen (12?13) individuals. At approximately 0022 hours: One
of the demonstrators, described as a heavy-set ████ wearing all black, took
possession of two water bottles believed to belong to the counter-demonstrator. At
approximately 0101 hours: ICE/SRT and FPS Bravo Team cleared the facility. At
approximately 0108 hours: Approximately ten (10) protesters surrounded the
counter-demonstrator. One (1) protester physically harassed ████ while another used
a high-powered flashlight to shine into ███ eyes. At approximately 0109 hours: The
Portland Police Bureau (PPB) was requested for assistance. At approximately 0110

hours: PPB advised DMC that two (2) units would respond but could not provide an estimated time of arrival (ETA). At approximately 0115 hours: Charlie Team member ███ requested an ETA from PPB. At approximately 0126 hours: PPD Sergeant ███ called in requesting a description of the situation and the counter-demonstrator being harassed. At approximately 0127 hours: Charlie Team member ███ advised that five (5) protesters were surrounding the counter-demonstrator and were in close proximity to ███ face. At approximately 0133 hours: PPD drove by the area on Macadam but did not dismount or engage with the situation. At approximately 0139 hours: Protective Security Officer (PSO) ███ advised that one (1) protestor shoved a leaf into the counter-demonstrator?s face. PPD was informed of the incident. At approximately 0144 hours: Charlie Team member ███ called PPD, emphasizing that this was not an immigration issue or a federal-related situation but rather a civilian in distress. He advised that the counter-demonstrator was surrounded and in danger. He described the protesters, including one (1) individual with nunchaku and a cane, one (1) wearing all black and a Misfits band T-shirt with a black unzipped hoodie, and two (2) individuals known to have assaulted others in the past. At approximately 0146 hours: DMC Supervisor ███ called PPB to provide an update and shared Charlie Team Lead ███?s contact information. PPB stated they did not perceive the counter-demonstrator to be in distress or at risk of bodily harm and did not intervene. At approximately 0159 hours: PSO ███ advised that three (3) protesters were shoving their hands into the counter-demonstrator?s face, and ███ was attempting to slap them away. At approximately 0200 hours: Charlie Team member ███ reported that eleven (11) protesters were surrounding the counter-demonstrator, and three (3) had touched ███ At approximately 0204 hours: PSO 10G172 advised that two (2) protesters were attempting to grab items off the counter-demonstrator?s person. At approximately 0220 hours: PSO ███ reported that one (1) protestor threw water onto the counter-demonstrator, and another threw a water bottle, hitting ███ in the face. An umbrella used to block the counter-demonstrator was grabbed and destroyed. At approximately 0221 hours: Charlie Team member ███ informed DMC that PPB stated they were low on manpower and would respond as soon as possible. FPS Charlie Team Lead continued to monitor the situation. At approximately 0223 hours: PSO ███ advised that one (1) protester, wearing all pink and blue jeans, spat on the counter-demonstrator. At approximately 0227 hours: Charlie Team member ███ advised that Charlie Team would push protesters back to allow the counter-demonstrator to leave safely. The counter-demonstrator was surrounded by eleven (11) protesters on federal property. At approximately 0234 hours: Charlie Team member ███ reported that all units returned to the facility and were code 4. PSO ███ advised that the counter-demonstrator fled southbound on Macadam and was being chased by ten (10) protesters. FPS Team Lead provided a status update to PPD. At approximately 0238 hours: Charlie Team member ███ reported that approximately twenty (20) protestors were searching the area for the counter-demonstrator. He believed the counter-demonstrator had enough of a head start to escape safely. No force was used during the push out, and there were no injuries. At approximately 0354 hours: Charlie Team member ███ called Denver MegaCenter to request event notes. At approximately 0439 hours: PSO ███ observed two (2) protesters on the southeast corner of Bancroft and Moody near the facility. At approximately 0440 hours: FPS Charlie Team arrived at the facility. At approximately 0455 hours: One (1) individual was observed on the driveway. At approximately 0758 hours: Two (2) legal observers were seen on the east side of the facility, off federal property. At

approximately 1026 hours: PSO  reported an interview and photographer on-site for Channel 18 News. At approximately 1154 hours: One (1) individual protested ICE at the main entrance and briefly stepped onto federal property. At approximately 1158 hours: PSO ████ reported that a ████ protester wearing a black-and-white shirt and red pants pulled a pair of nunchaku from ██ bag while off federal property. At approximately 1307 hours: Associated Press personnel returned to the area but remained off federal property. At approximately 0430 hours: FPS Bravo Team arrived at the facility. At approximately 1450 hours: Team Alpha cleared the area. At approximately 1558 hours: Protective Security Officer (PSO) ████ called and advised of a vehicle attempting to block the road to prevent FPS from leaving the driveway. The vehicle turned abruptly when FPS got around it and began following FPS but gave up once they entered the highway. The vehicle was identified as a gold Land Cruiser with Oregon license plate ████ At approximately 1604 hours: One (1) ████ protester was observed in the driveway wearing a brown shirt and blue jeans. At approximately 1655 hours: Bravo Team member ████ advised that protestors were attempting to take close-up photographs of FPS personnel?s faces. At approximately 1713 hours: Bravo Team Lead ████ reported that a protestor known as ██ was using a high-powered camera to take pictures of FPS inspectors? faces. The protestor stated, ?Your identities will not last forever. We will find you.? At approximately 1828 hours: One (1) protestor approached the news crew with a megaphone, yelling at them and blasting sound into their faces. At approximately 1830 hours: Protestor ████ was observed in front of the building wearing a green inflatable frog costume. At approximately 0430 hours: The Federal Protective Service (FPS) Charlie Team arrived at the facility. At approximately 1936 hours: A ████ protestor wearing a tan shirt, black pants, and a gray bag with ██ hair in a ponytail was observed throwing items onto the driveway. At approximately 0048 hours: Four (4) individuals were observed at the trolley stop, three (3) were at the intersection of Moody and Bancroft, seventeen (17) were near the driveway, and none (0) were blocking the driveway entrance. At approximately 2238 hours: Approximately eighteen (18) protesters were off the property on Macadam Street. Two (2) individuals were at the trolley stop, nine (9) were at the intersection of Moody and Bancroft, seven (7) were near the driveway, and four (4) were blocking the driveway entrance. At approximately 2359 hours: Eight (8) individuals were observed at the trolley stop, three (3) were at the intersection of Moody and Bancroft, six (6) were near the driveway, and three (3) were blocking the driveway entrance.
All FPS personnel will continue to perform LE operations at the facility on September 10, 2025. All FPS personnel expected to perform OT (various times due to shift assignments, approximately three to four (3-4) hours per FPS Law Enforcement Officer based on operational needs.
Yes
Yes
Yes
(DIC/Senior Inspector)

12. Facility Damage Report
Enter number of facilities for each category for this
operational period.  Detailed reporting for each facility
should be submitted on a separate with building number,
status, type of damage, etc.
Risk
Level
Closed Damaged Destroyed
Threatened
(next 72
hours)
FSL 3/4/5
FSL 1/2
Other
13. Occupant Status:
Location Evacuated Sheltered Injured Fatalities Missing
14. Enforcement Activities:
Status FPS Agency _____ Agency _____
Arrests
Citations
Use of Force (Level 4&5)
15. LEO Status:
Assigned to IC?s AOR FPS Agency _____  Agency _____  Agency _____
Injury
Illness
Missing
Fatalities
16. Personnel Resource Commitment:
Personnel
FPS Host
Region
FPS
Deployed
Partner
Agency
_____
Partner
Agency
_____
Partner
Agency
_____
Partner
Agency
_____
Other
_____
Total
Supervisors
Inspectors/Officers

OREGON_DEFS_00001418_0007

EDCTs
Special Agents
Non-LE (Fed)
Contractors
Other
17. Personnel Assignments:
Personnel
Assigned
Location
_____
Assigned
Location
_____
Assigned
Location
_____
Assigned
Location
_____
Assigned
Location
_____
Assigned
Location
_____
Other
_____
Total
Commanders/Supv
Inspectors
EDCTs
Special Agents
Non-LE (Fed)
Contractors
Other
Agency _____
0
0
0
0
0
0
0
0
4310 S Macadam
0
0
0
0
0

0
0
0
0
0
0
0
0
0
1
4
2
7
0
18
6
24
0
0
0
0
0
3
0
3
1
0
0
1
1
0
0
1
0
0
0
0
4
1
0
5
18
6
0
24
0
0
0
0
2

OREGON_DEFS_00001418_0009

```
0
0
2
0
0
0
0
1
0
0
1
0
0
0
0
ICE SRT
ICE/SRT
ICE SRT
0R6732
ICE/SRT
OR0043
```

♠

18. Equipment and Countermeasures:
Type
Assigned
Location

_____
Assigned
Location

_____
Assigned
Location

_____
Assigned
Location

_____
Assigned
Location

_____
Assigned
Location

_____
Other

_____
Total

**A337**

MCV
SCV
Arrest Kits
Fence (linear feet)
PSO Posts
Light Tower
Port. Video System
cUAS
LRAD
0
0
0
0
0
0
0
0
1
0
0
1
0
0
0
0
1
0
0
1
0
0
0
0
0
0
0
0
0
0
0
0
1
1
0
2
0R6732
ICE/SRT
OR0043

A338

OREGON_DEFS_00001418_0011

✦

OREGON_DEFS_00001418_0012

**To:** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

**From:** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
**Sent:**       Tue 9/9/2025 10:49:07 PM
**Subject:**    Portland, OR ICE ERO Doxing information found on Google address
**Received:**        Tue 9/9/2025 10:49:12 PM
Adler.png
Adler.png

Good afternoon,

Information received today that the previously doxed agent DO▮▮▮▮ home address has "ICE Agent ▮▮▮▮▮▮
▮▮▮▮ listed when you search his home address on Google web or Google app. The additional agents doxed do not have this added notation yet. DO▮▮▮ was made aware of this today when a package was being ordered by a family member online and this message came up when typing in the address.

DO▮▮▮ is aware. Sending for awareness.

ICE Agent ▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮
Supervisory Detention and Deportation Officer
Criminal Alien Program/Task Force Officer/Field Intelligence Officer
Seattle Field Office, Portland, Oregon
**Enforcement and Removal Operations**
U.S. Immigration and Customs Enforcement
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

This communication is UNCLASSIFIED//FOR OFFICIAL USE ONLY (U//FOUO). It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. 552). It is to be controlled, stored, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to FOUO information and is not to be released to the public or other personnel who do not have a valid "need-to-know" without prior approval of
an authorized DHS official. No portion of this communication should be furnished to the media, either in written or verbal form.

*Oregon v. Trump*
No. 3:25-cv-01756
**Defendants' Exhibit**

1070

**A340**

# FPS INCIDENT SUMMARY (ICS 209)

| 1. Incident Name: Operation Skip Jack Portland-2025 |
|---|

| 2. Version: | 3. Incident Command: | 4. Incident Type: |
|---|---|---|
| ☐ Initial | Name: Turner, William A/DC | ☑ FPS Operation |
| ☑ Update　Report No.　87 | Title: **Incident Commander** | ☐ Support to Other LE |
| ☐ Final | Name: ▮▮▮▮▮▮▮▮ | ☑ **Multi Agency Operation** |
| | Title: (DIC/Senior Inspector　☐ N/A | |

| 5. Incident Location: | 6. Operational Period: |
|---|---|
| Portland, Oregon | September 06, 2025, 0001 hours |

| 7. Submitted By: | 8. Date Submitted: |
|---|---|
| Turner, William A/DC | September 06, 2025, 2359 hours |

**9. Incident Objectives This Operational Period:**

As First Amendment activities against immigration raids continue at the ICE facility downtown Portland, Oregon, Federal Protective Service (FPS) requires an increased security posture in and around federally protected buildings. The ICE facility has been experiencing large demonstrations ranging from

**10. Significant Events for the Reporting Period:**

· At approximately 0434 hours, FPS Alpha Team arrived on site and relieved FPS Charlie Team.

· At approximately 1432 hours, the FPS Bravo Team arrived at the facility.

· At approximately 1452 Bravo Team member ▮▮▮▮ provided verbal warning to protester stepping on and off.

· At approximately 1503 hours, there were approximately two (2) protesters at the trolley stop, two (2) at the intersection of Moody and Bancroft, and one (1) was near the driveway entrance.

**11. Projected Incident Activity for the Next Operational Period:**

All FPS personnel will continue to perform LE operations at the facility on September 07, 2025.

All FPS personnel expected to perform OT (various times due to shift assignments, approximately three to four (3-4) hours per FPS Law Enforcement Officer based on operational needs.

State of Oregon, et al v. Trump
**EXHIBIT**
**852**
USDC No. 3:25-cv-01756-IM

## 12. Facility Damage Report
Enter number of facilities for each category for this operational period. Detailed reporting for each facility should be submitted on a separate with building number, status, type of damage, etc.

| Risk Level | Closed | Damaged | Destroyed | Threatened (next 72 hours) |
|---|---|---|---|---|
| FSL 3/4/5 | 0 | 0 | 0 | 0 |
| FSL 1/2 | 0 | 0 | 0 | 0 |
| Other | | | | |

## 13. Occupant Status:

| Location | Evacuated | Sheltered | Injured | Fatalities | Missing |
|---|---|---|---|---|---|
| 4310 S Macadam | | | | | |
| | | | | | |
| | | | | | |

## 14. Enforcement Activities:

| Status | FPS | Agency ICE SRT | Agency ____ | Agency ____ |
|---|---|---|---|---|
| Arrests | 0 | 0 | | |
| Citations | 1 | 0 | | |
| Use of Force (Level 4&5) | 0 | 0 | | |

## 15. LEO Status:

| Assigned to IC's AOR | FPS | Agency ICE SRT | Agency ____ | Agency ____ |
|---|---|---|---|---|
| Injury | 0 | 0 | | |
| Illness | 0 | 0 | | |
| Missing | 0 | 0 | | |
| Fatalities | 0 | 0 | | |

## 16. Personnel Resource Commitment:

| Personnel | FPS Host Region | FPS Deployed | Partner Agency ICE SRT | Partner Agency ____ | Partner Agency ____ | Partner Agency ____ | Other ____ | Total |
|---|---|---|---|---|---|---|---|---|
| Supervisors | 1 | 4 | 1 | | | | | 7 |
| Inspectors/Officers | 0 | 21 | 5 | | | | | 27 |
| EDCTs | 0 | 0 | 0 | | | | | 0 |
| Special Agents | 0 | 3 | 0 | | | | | 3 |
| Non-LE (Fed) | 1 | 0 | 0 | | | | | 1 |
| Contractors | 1 | 0 | 0 | | | | | 1 |
| Other | 0 | 0 | 0 | | | | | 0 |

## 17. Personnel Assignments:

| Personnel | Assigned Location OR6732 | Assigned Location ICE/SRT | Assigned Location OR0043 | Assigned Location | Assigned Location | Assigned Location | Other ____ | Total |
|---|---|---|---|---|---|---|---|---|
| Commanders/Supv | 3 | 1 | 0 | | | | | 4 |
| Inspectors | 21 | 5 | 0 | | | | | 26 |
| EDCTs | 0 | 0 | 0 | | | | | 0 |
| Special Agents | 3 | 0 | 0 | | | | | 3 |
| Non-LE (Fed) | 1 | 0 | 0 | | | | | 1 |
| Contractors | 1 | 0 | 0 | | | | | 1 |
| Other | 0 | 0 | 0 | | | | | 0 |

**PLS' EX. 852**
**Page 2 of 11**

**18. Equipment and Countermeasures:**

| Type | Assigned Location OR6732 | Assigned Location ICE/SRT | Assigned Location OR0043 | Assigned Location | Assigned Location | Assigned Location | Other | Total |
|---|---|---|---|---|---|---|---|---|
| MCV | 0 | 0 | 0 | | | | | 0 |
| SCV | 0 | 0 | 0 | | | | | 0 |
| Arrest Kits | 1 | 0 | 0 | | | | | 1 |
| Fence (linear feet) | 0 | 0 | 0 | | | | | 0 |
| PSO Posts | 1 | 0 | 0 | | | | | 1 |
| Light Tower | 0 | 0 | 0 | | | | | 0 |
| Port. Video System | 0 | 0 | 0 | | | | | 0 |
| cUAS | 0 | 0 | 0 | | | | | 0 |
| LRAD | 1 | 1 | 0 | | | | | 2 |

**A343**
Confidential

**PLS' EX. 852**
**Page 3 of 11**

OREGON_DEFS_00001411
OREGON_DEFS_00001409_0003

FPS INCIDENT SUMMARY (ICS 209)
1. Incident Name:
2. Version:
   Report No.
   _____          3. Incident Command:
Name: _____
Title:    Incident Commander
Name: _____
Title:    _____
4. Incident Type:
5. Incident Location: 6. Operational Period:
7. Submitted By: 8. Date Submitted:
9. Incident Objectives This Operational Period:
10. Significant Events for the Reporting Period:
11. Projected Incident Activity for the Next Operational Period:
FPS Operation
Support to Other LE
Multi Agency Operation
Initial
Update
Final
N/A
Operation Skip Jack Portland-2025
Turner, William  A/DC
87
██████████████
Portland, Oregon
September 06, 2025, 0001 hours
Turner, William  A/DC
September 06, 2025, 2359 hours
As First Amendment activities against immigration raids continue at the ICE
facility downtown Portland, Oregon, Federal Protective Service (FPS) requires an
increased security posture in and around federally protected buildings. The ICE
facility has been experiencing large demonstrations ranging from peaceful to
violent protest activities. The possibility of civil unrest around the city, and
the general threat to the federal government necessitates an increased FPS presence
at FPS Protected Facilities in Portland, Oregon. The objectives of this
operational period are to prevent additional damage to the facility and provide
security for contracted services to conduct repairs to the facility.
  At approximately 0434 hours, FPS Alpha Team arrived on site and relieved FPS
Charlie Team. At approximately 1432 hours, the FPS Bravo Team arrived at the
facility. At approximately 1452 Bravo Team member █████ provided verbal warning
to protester stepping on and off. At approximately 1503 hours, there were
approximately two (2) protesters at the trolley stop, two (2) at the intersection
of Moody and Bancroft, and one (1) was near the driveway entrance. At
approximately 1656 hours, Bravo Team observed a █████ subject riding a bicycle in
the driveway. At approximately 1657 hours, Bravo Team issued a verbal warning to
the █████ subject to remain off federal property. At approximately 1837 hours,
Bravo Team observed four (4) demonstrators to the east, one (1) across the street,

and one (1) walking the facility perimeter, for a total of six (6) demonstrators. At approximately 1902 hours, Bravo Team ███ directed that the gate be opened. At approximately 1905 hours, FPS Charlie Team arrived on site. At approximately 1912 hours, Bravo Team observed subject ██████████ returned to the area and was observed with green hair. At approximately 1912 hours, Bravo Team observed two (2) individuals enter federal property via the driveway entrance. At approximately 1912 hours, Bravo Team observed protesters throw flowers onto the driveway entrance. At approximately 1912 hours, Bravo Team observed protesters spread a red liquid ?fake blood? at the driveway entrance. At approximately 1913 hours, Bravo Team observed four (4) protesters walking on federal property. At approximately 1913 hours, Bravo Team ██████ advised that demonstrators were throwing flowers on the ground. At approximately 1914 hours, Bravo Team opened the gate to inspect the driveway for screws and nails due to incoming vehicles and prior incidents in which such items were thrown onto the driveway entrance along with flowers. At approximately 1915 hours, Bravo and Charlie teams cleared the driveway of debris. At approximately 1919 hours, the protester who threw the fake blood was described as wearing a green hat, a black jacket, blue pants, and a backpack. At approximately 1919 hours, the subject was accompanied by another subject wearing all black and carrying a green bag. At approximately 1924 incoming vehicle indicated he was thirty (30) seconds out approaching the Federal facility. At approximately 1924 hours, protester began throwing objects toward FPS Inspectors. At approximately 1924 hours, while fleeing, the subject crossed into the path of an incoming agent and struck the special agent?s vehicle. At approximately 1925 hours, the subject was detained and escorted to the processing station. The subject was identified as ████████████████████████. The subject was issued a violation notice for 41 Code of Federal Regulations (CFR) 102-74.380(a) (?Preservation of Property?), with a mandatory court appearance. At approximately 1925 hours, Federal Protective Service (FPS) Bravo Team Leader (TL) reported that, after issuing verbal directions to clear the travel lane for vehicular ingress to the Federal facility, Subject ███████████ remained in the lane and refused to comply. Subject walked toward Bravo Team officers whose backs were turned and as Bravo TL approached to reiterate the order, the subject adopted a forward-leaning stance, squared his shoulders, raised his voice, and verbally refused to comply. Bravo TL then used open-hand guidance (physical redirection) and pushed the subject from the roadway to the sidewalk. During the movement, the subject lost balance and fell to the ground. Subject then stood without apparent injury and continued in the area independently, smiling and clapping ███ hands, and then moved toward the Federal facility. No injuries or complaint were observed. At approximately 1929 hours, Federal Protective Service (FPS) Bravo and Charlie Teams returned to the facility following vehicular ingress; no injuries were reported. At approximately 1952 hours, officers observed a confrontation between demonstrator and counterdemonstrator at the intersection of SW Moody Avenue and SW Lowell Street. Local authorities were notified. At approximately 1959 hours, the Portland Police Bureau (PPB) watch commander was notified and advised he would respond to the area. At approximately 2002 hours, officers observed a counter-demonstrator, identified as a live streamer known as "Velly Ray," on a live stream stating that ███ wanted to "shoot demonstrators." At approximately 2036 hours, Portland Police Bureau (PPB) Officer ██████ called to request a status update on the counter-demonstrator and stated that his dispatch had advised him the subject had been assaulted off Federal property and away from 4310 SW Macadam Avenue. Officer ██████ was provided the

subject?s description.  At approximately 2200 hours, a Long-Range Acoustic Device (LRAD) warning was issued to clear the driveway entrance.  At approximately 2210 hours, five (5) individuals were at the trolley stop, four (4) were at the intersection of Moody and Bancroft, and twenty (20) were near the driveway entrance.  At approximately 2210 hours, Federal Protective Service (FPS) Bravo Team member 5P802 advised that the Pepper Ball Launching System (PLS) had been deployed to the ground toward a subject who was using a strobe light directed at officers. At approximately 2323 hours, officers observed a subject in a wheelchair, who continued using a high-powered light towards Federal officers.  At approximately 2328 hours, Bravo Team member ████ advised that the Pepper Ball Launching System (PLS) had been deployed to the ground toward the subject for Area Denial.  At approximately 2328 hours, a PSO advised there were approximately seventy (70) demonstrators in the area, with twenty (20) to twenty-five (25) in front of the facility.  At approximately 2348 hours, there were approximately forty-five (45) demonstrators, with seven (7) directly in front of the property.  At approximately 2353 hours, during operations to clear the driveway and allow vehicle entry and exit, Federal Protective Service (FPS) officers deployed Pepper Ball Launching System (PLS). U.S. Immigration and Customs Enforcement (ICE) Special Response Team (SRT) personnel deployed hand-thrown chemical munitions, and Pepper Ball Launching System (PLS). There were no arrests or detentions, and no injuries were reported. At approximately 0016 hours, an estimated forty-eight (48) protesters remained in front of the facility and in the surrounding area.
All FPS personnel will continue to perform LE operations at the facility on September 07, 2025. All FPS personnel expected to perform OT (various times due to shift assignments, approximately three to four (3-4) hours per FPS Law Enforcement Officer based on operational needs.
Yes
Yes
Yes
(DIC/Senior Inspector)




↟
12. Facility Damage Report
Enter number of facilities for each category for this
operational period.  Detailed reporting for each facility
should be submitted on a separate with building number,
status, type of damage, etc.
Risk
Level
Closed Damaged Destroyed
Threatened
(next 72
hours)
FSL 3/4/5
FSL 1/2
Other

OREGON_DEFS_00001409_0006

13. Occupant Status:
Location Evacuated Sheltered Injured Fatalities Missing
14. Enforcement Activities:
Status FPS Agency _____ Agency _____
Arrests
Citations
Use of Force (Level 4&5)
15. LEO Status:
Assigned to IC?s AOR FPS Agency _____ Agency _____ Agency _____
Injury
Illness
Missing
Fatalities
16. Personnel Resource Commitment:
Personnel
FPS Host
Region
FPS
Deployed
Partner
Agency
_____
Partner
Agency
_____
Partner
Agency
_____
Partner
Agency
_____
Other
_____
Total
Supervisors
Inspectors/Officers
EDCTs
Special Agents
Non-LE (Fed)
Contractors
Other
17. Personnel Assignments:
Personnel
Assigned
Location
_____
Assigned
Location
_____
Assigned

**PLS' EX. 852**
**Page 7 of 11**

OREGON_DEFS_00001409_0007

Location
_____
Assigned
Location
_____
Assigned
Location
_____
Assigned
Location
_____
Other
_____
Total
Commanders/Supv
Inspectors
EDCTs
Special Agents
Non-LE (Fed)
Contractors
Other
Agency _____
0
0
0
0
0
0
0
0
4310 S Macadam
0
0
1
0
0
0
0
0
0
0
0
0
0
0
1
4
1
7
0

**A348**

OREGON_DEFS_00001409_0008

21
5
27
0
0
0
0
0
3
0
3
1
0
0
1
1
0
0
1
0
0
0
0
3
1
0
4
21
5
0
26
0
0
0
0
3
0
0
3
1
0
0
1
1
0
0
1
0
0
0

PLS' EX. 852
Page 9 of 11

OREGON_DEFS_00001409_0009

```
0
ICE SRT
ICE/SRT
ICE SRT
0R6732
ICE/SRT
OR0043
```

♠

18. Equipment and Countermeasures:
Type
Assigned
Location
_____
Assigned
Location
_____
Assigned
Location
_____
Assigned
Location
_____
Assigned
Location
_____
Assigned
Location
_____
Other
_____
Total
MCV
SCV
Arrest Kits
Fence (linear feet)
PSO Posts
Light Tower
Port. Video System
cUAS
LRAD
0
0
0
0
0

**A350**

```
0
0
0
1
0
0
1
0
0
0
0
1
0
0
1
0
0
0
0
0
0
0
0
0
0
0
0
1
1
0
2
0R6732
ICE/SRT
OR0043
```

↑

OREGON_DEFS_00001409_0011

| From: | Edwards, John |
|---|---|
| To: | Maxey, Brent; Tackett, Todd; Sheppard, Nathan; Hughes, Brian |
| Subject: | Thursday night ICE update |
| Date: | Thursday, September 4, 2025 9:18:41 PM |

Will Turner is the OIC this week. I spoke to him a bit about the events the entire week since I was not here Monday and Wednesday.

Labor day they had over 200 protesters in front of the facility. They did several push outs and arrested a few. Most people left after the initial, but had around 100 - 150 loitering around all night. There was significant media coverage around the guillotine.

Tuesday was completely un eventful. No calls for service and around 20 of the usuals.

Wednesday, an unknown subject was flying a drone in front of the upper windows in violaion of the TFR. Agents figured out who the drone operator was, contacted and arrested. The susepect got violent and spit on agents. He was arrestd and booked.

Today, (Thursday) I counted 20 at the beginning of the shift and around 15 at 2030 hours.

Tuner told me they are seeing several older transients that are being cooersed into approaching the gate and causing a distraction or just told to rattel the gate. This was cooberated by watching the instigators escorting different subjects, mostly described as elder transients up to the gate. One one occasion, FPS took custody of an elderly man after he asked the agents if he could just come up to the gate and rattle it so the antifa instigators would leave him and others alone. He was escorted behind the gates and interviewed. He told agents he and several other transients are being coerced to act on their behalf to instigate agent response. The subject was given a cite and released.

Tracy Molina is a daily chronic problem. She is the subject in the flyer from Intel that was carrying what appeared to be a pink synthetic rifle with a Glock pistol that fits in the middle. For those that do not know her, she is a very aggressive 1234 with a military background. She has been arrested more times than one can count and has been excluded and arrested numerous times from city property. She likes to interupt city councel and business at city hall, etc. She can be very violent.

FPS had been looking for her for several weeks as she has made threats to ICE agents and has expended her three strikes at the facility. She was arrested and escorted in the building. She cut her arms in the holding cell and graffitied the wall with a lot of blood before being taken to the hospital. FPS executed a warrant on her apartment and later lodged at jail pending

State of Oregon, et al v. Trump

**EXHIBIT 496**

USDC No. 3:25-cv-01756-IM

Federal charges. She is on supervised pre trial release with a no contact at ICE restriction.

As of 2100 hours tonight, there have been no calls for service and no reportable activity at the facility. There is an elderly Alaskan male (Daniel Cox) at the facility who has some severe medical issues with his legs (Infection/MRSA) that is a chronic. He knows jail will not take him if arrested and is therefore empowered to stay and be a problem.

That is all I have for tonight. Feel free to inquire if you have questions.

**Sgt. John Edwards #32391**
**Portland Police Bureau**
**Central Precinct/C Shift (3pm-1am)**
**Cell- (971) 804-2161**
**Office (503) 823-0097**

CITY_000233

To:

From:
**Sent:** Thur 9/4/2025 6:19:44 PM
**Subject:** ICE Agent Doxing flyers located on Portland, OR trolly
**Received:** Thur 9/4/2025 6:19:59 PM
IMG_0356.jpeg
IMG_1549.jpeg
IMG_1550.jpeg
IMG_2192.jpeg
IMG_1551.jpeg

Good afternoon,

The attached doxing flyers where brought to the attention of ICE ERO Portland yesterday after a concerned citizen called in reporting them. The doxing flyers are posted of the three agents in Portland previously doxed by Rose City Antifa and Rose City Counter Info. Flyers located on the Portland street car (trolly) route and photos sent by the FBI. One location is SW Harrison St between Harbor and Naito glued to the trolly shelter glass.

Next to these doxing flyers a new one was found stating "Your inaction has a body count" "Fight Dirty". With a 2 Roses and an A on the flyer likely associated with rose city Antifa.

Supervisory Detention and Deportation Officer
Criminal Alien Program/Task Force Officer/Field Intelligence Officer
Seattle Field Office, Portland, Oregon
**Enforcement and Removal Operations**
**U.S. Immigration and Customs Enforcement**

This communication is UNCLASSIFIED//FOR OFFICIAL USE ONLY (U//FOUO). It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. 552). It is to be controlled, stored, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to FOUO information and is not to be released to the public or other personnel who do not have a valid "need-to-know" without prior approval of
an authorized DHS official. No portion of this communication should be furnished to the media, either in written or verbal form.

*Oregon v. Trump*
No. 3:25-cv-01756
**Defendants' Exhibit**
1066

**A354**

# FPS INCIDENT SUMMARY (ICS 209)

**1. Incident Name:** Operation Skip Jack Portland-2025

| 2. Version: | 3. Incident Command: | 4. Incident Type: |
|---|---|---|
| ☐ Initial | Name: Turner, William A/DC | ☑ FPS Operation |
| ☑ Update — Report No. 82 | Title: **Incident Commander** | ☐ Support to Other LE |
| ☐ Final | Name: ▇▇▇▇▇ | ☑ Multi Agency Operation |
| | Title: {DIC/Senior Inspecto ☐ N/A | |

| 5. Incident Location: | 6. Operational Period: |
|---|---|
| Portland, Oregon | September 01, 2025, 0001 hours |

| 7. Submitted By: | 8. Date Submitted: |
|---|---|
| Turner, William A/DC | September 01, 2025, 2359 hours |

**9. Incident Objectives This Operational Period:**

As First Amendment activities against immigration raids continue at the ICE facility downtown Portland, Oregon, Federal Protective Service (FPS) requires an increased security posture in and around federally protected buildings. The ICE facility has been experiencing large demonstrations ranging from

**10. Significant Events for the Reporting Period:**

• At approximately 1255 hours, a subject was observed walking around the perimeter of the building, taking photographs and inspecting the locks. The subject wore brown pants and a cowboy hat and carried a black bag.

• At approximately 1343 hours, Alpha ▇▇ ▇▇▇▇▇, advised of a protester shouting, "It's going to be a long night." Another protester displayed a flag reading "I love ICE," indicating opposing protesters were on site.

• At approximately 1419 hours, Alpha ▇▇ ▇▇▇▇▇) advised that a protester was observed carrying a

**11. Projected Incident Activity for the Next Operational Period:**

All FPS personnel will continue to perform LE operations at the facility on September 02, 2025.

All FPS personnel expected to perform OT (various times due to shift assignments, approximately three to four (3-4) hours per FPS Law Enforcement Officer based on operational needs.

State of Oregon, et al v. Trump
**EXHIBIT**
**847**
USDC No. 3:25-cv-01756-IM

### 12. Facility Damage Report
Enter number of facilities for each category for this operational period. Detailed reporting for each facility should be submitted on a separate with building number, status, type of damage, etc.

| Risk Level | Closed | Damaged | Destroyed | Threatened (next 72 hours) |
|---|---|---|---|---|
| FSL 3/4/5 | 0 | 0 | 0 | 0 |
| FSL 1/2 | 0 | 0 | 0 | 0 |
| Other | | | | |

### 13. Occupant Status:

| Location | Evacuated | Sheltered | Injured | Fatalities | Missing |
|---|---|---|---|---|---|
| 4310 S Macadam | | | | | |
| | | | | | |
| | | | | | |

### 14. Enforcement Activities:

| Status | FPS | Agency ICE SRT | Agency _____ | Agency _____ |
|---|---|---|---|---|
| Arrests | 0 | 0 | | |
| Citations | 0 | 0 | | |
| Use of Force (Level 4&5) | 0 | 0 | | |

### 15. LEO Status:

| Assigned to IC's AOR | FPS | Agency ICE/SRT | Agency _____ | Agency _____ |
|---|---|---|---|---|
| Injury | 0 | | | |
| Illness | 0 | 0 | | |
| Missing | 0 | 0 | | |
| Fatalities | 0 | 0 | | |

### 16. Personnel Resource Commitment:

| Personnel | FPS Host Region | FPS Deployed | Partner Agency ICE SRT | Partner Agency _____ | Partner Agency _____ | Partner Agency _____ | Other _____ | Total |
|---|---|---|---|---|---|---|---|---|
| Supervisors | 1 | 3 | 2 | | | | | 6 |
| Inspectors/Officers | 0 | 21 | 6 | | | | | 27 |
| EDCTs | 0 | 0 | 0 | | | | | 0 |
| Special Agents | 0 | 3 | 0 | | | | | 3 |
| Non-LE (Fed) | 0 | 0 | 0 | | | | | 0 |
| Contractors | 1 | 0 | 0 | | | | | 1 |
| Other | 0 | 0 | 0 | | | | | 0 |

### 17. Personnel Assignments:

| Personnel | Assigned Location OR6732 | Assigned Location ICE/SRT | Assigned Location OR0043 | Assigned Location | Assigned Location | Assigned Location | Other | Total |
|---|---|---|---|---|---|---|---|---|
| Commanders/Supv | 3 | 2 | 0 | | | | | 5 |
| Inspectors | 21 | 6 | 0 | | | | | 27 |
| EDCTs | 0 | 0 | 0 | | | | | 0 |
| Special Agents | 3 | 0 | 0 | | | | | 3 |
| Non-LE (Fed) | 0 | 0 | 0 | | | | | 0 |
| Contractors | 1 | 0 | 0 | | | | | 1 |
| Other | 0 | 0 | 0 | | | | | 0 |

**A356**
Confidential
**PLS' EX. 847
Page 2 of 12**
OREGON_DEFS_00001395
OREGON_DEFS_00001394_0002

## 18. Equipment and Countermeasures:

| Type | Assigned Location OR6732 | Assigned Location ICE/SRT | Assigned Location OR0043 | Assigned Location | Assigned Location | Assigned Location | Other | Total |
|---|---|---|---|---|---|---|---|---|
| MCV | 0 | 0 | 0 | | | | | 0 |
| SCV | 0 | 0 | 0 | | | | | 0 |
| Arrest Kits | 1 | 0 | 0 | | | | | 1 |
| Fence (linear feet) | 0 | 0 | 0 | | | | | 0 |
| PSO Posts | 1 | 0 | 0 | | | | | 1 |
| Light Tower | 0 | 0 | 0 | | | | | 0 |
| Port. Video System | 0 | 0 | 0 | | | | | 0 |
| cUAS | 0 | 0 | 0 | | | | | 0 |
| LRAD | 1 | 1 | 0 | | | | | 2 |

Confidential

OREGON_DEFS_00001396

OREGON_DEFS_00001394_0003

FPS INCIDENT SUMMARY (ICS 209)
1. Incident Name:
2. Version:
   Report No.
   _____            3. Incident Command:
Name: _____
Title:    Incident Commander
Name: _____
Title:    _____
4. Incident Type:
5. Incident Location: 6. Operational Period:
7. Submitted By: 8. Date Submitted:
9. Incident Objectives This Operational Period:
10. Significant Events for the Reporting Period:
11. Projected Incident Activity for the Next Operational Period:
FPS Operation
Support to Other LE
Multi Agency Operation
Initial
Update
Final
N/A
Operation Skip Jack Portland-2025
Turner, William  A/DC
82
████████████████
Portland, Oregon
September 01, 2025, 0001 hours
Turner, William  A/DC
September 01, 2025, 2359 hours
As First Amendment activities against immigration raids continue at the ICE
facility downtown Portland, Oregon, Federal Protective Service (FPS) requires an
increased security posture in and around federally protected buildings. The ICE
facility has been experiencing large demonstrations ranging from peaceful to
violent protest activities. The possibility of civil unrest around the city, and
the general threat to the federal government necessitates an increased FPS presence
at FPS Protected Facilities in Portland, Oregon.  The objectives of this
operational period are to prevent additional damage to the facility and provide
security for contracted services to conduct repairs to the facility.

   At approximately 1255 hours, a subject was observed walking around the perimeter
of the building, taking photographs and inspecting the locks. The subject wore
brown pants and a cowboy hat and carried a black bag.  At approximately 1343 hours,
Alpha ████████, advised of a protester shouting, "It's going to be a long night."
Another protester displayed a flag reading "I love ICE," indicating opposing
protesters were on site.  At approximately 1419 hours, Alpha ████████ advised that
a protester was observed carrying a baseball bat in a backpack, in front of the
facility.  At approximately 1427 hours, FPS Bravo Team arrived on site and relieved
FPS Alpha Team.  At approximately 1442 hours, a protester was observed recording
Federal Protective Service (FPS) and U.S. Immigration and Customs Enforcement (ICE)

personnel entering or departing the Portland ICE Facility.  At approximately 1513 hours, a ████████████ was observed jumping on and off the property in the driveway area.  At approximately 1515 hours, a ██████ protester dressed in all black was observed writing on the right side of the driveway.  At approximately 1516 hours, a verbal warning was issued to the ██████ subject, who complied.  At approximately 1525 hours, a ██████ subject wearing a black shirt, and a pink skirt was observed writing on the wall before leaving the area.  At approximately 1526 hours, six (6) peaceful protesters were observed off the property near the vehicle driveway entrance.  At approximately 1533 hours, Bravo ████████████ issued a verbal warning to stay off the property.  At approximately 1542 hours, Bravo Team Member ██████ advised that two opposing protesters were arguing with each other near the north side entrance.  At approximately 1608 hours, Bravo Team member ██████ advised that an LRAD warning was issued to clear the driveway for Charlie Team?s arrival.  At approximately 1613 hours, a ██████ subject wearing a dress was observed walking onto and off the driveway.  At approximately 1619 hours, a young ████ subject, holding an umbrella and wearing a gray shirt, tan pants, and glasses, was observed writing on the wall on the right side of the driveway. Multiple verbal warnings had already been issued to the subject.  At approximately 1641 hours, multiple children were observed accompanying protesters at the trolley station.  At approximately 1710 hours, additional individuals were observed arriving at the facility. Tents were set up, and some individuals were in possession of baseball bats and gas masks.  At approximately 1728 hours, a group of 40?50 protesters were observed masking up in front of South Macadam.  At approximately 1828 hours, Bravo Team member ██████ reported two individuals approaching the gate. One individual was described as wearing a blue camouflage sweatshirt and gray shorts. The ██████ subject was described as wearing pink leggings, a white shirt, and blonde hair.  At approximately 1849 hours, a group of 200?250 peaceful protesters were observed in front of the building and scattered around the area. Some protesters were seen carrying bats, improvised weapons, shields, and what appeared to be ballistic vests. The group was blocking the main entrance, diverting traffic, and placing multiple objects on both Macadam and Moody. Local authorities were advised.  At approximately 1936 hours, 75?150 protesters were observed in front of the facility and dispersed along Macadam and Bancroft.  At approximately 1950 hours, protesters were observed in front of the facility, off Federal property, surrounding a black truck and obstructing its movement.  At approximately 1958 hours, Bravo Team member ██████ advised he deployed Pepper Ball Launching System (PLS) when protesters were removing wooden boards from the fence. Protesters removed three boards.  At approximately 2032 hours, three protesters were observed on Federal property near the gate, beyond the card reader. An estimated 150?200 protesters were observed in front of the building and in the surrounding area.  At approximately 2033 hours, FPS officers issued multiple verbal warnings instructing individuals to stay off Federal property and clear the driveway entrance.  At approximately 2036 hours, protesters placed a prop guillotine in front of the facility, blocking the roadway.  At approximately 2101 hours, two vehicles were positioned on Moody to block traffic. Protesters remained blocking the roadway and the facility entrance. Protesters continued to be confrontational, yelling obscenities toward FPS and ICE personnel, and coming onto and off Federal property.  At approximately 2138 hours, Pepper Ball Launching System (PLS) was deployed for area dispersal. Protesters continued blocking the main entrance. Protective Security Officers (PSOs) awaiting shift change were pending to access the facility.  At approximately 2140 hours, an

estimated 150?200 protesters were observed, with approximately 20?30 individuals conducting traffic control at the intersection of Bancroft and Moody. At approximately 2153 hours, Training Program Division (TPD) advisor ███ oserved that a fire had been set across the street. At approximately 2155 hours, protesters extinguished the fire. At approximately 2157 hours, the Incident Commander (IC) ███ requested that local police be notified that protesters were still blocking the street. At approximately 2200 hours, a Long-Range Acoustic Device (LRAD) warning was issued to clear the driveway entrance. At approximately 2201 hours, the Incident Commander (IC) ███ advised that protesters maintained a shield wall on the driveway and that several individuals possessed impact weapons, including bats and sticks. Approximately 75 protesters continued in front of the facility and at the driveway entrance. At approximately 2205 hours, a second Long-Range Acoustic Device (LRAD) warning was issued to clear the driveway entrance. At approximately 2207 hours, protesters carrying bats, hand thrown made devises, and shields continued in front of the facility and at the driveway entrance. At approximately 2210 hours, a third Long-Range Acoustic Device (LRAD) warning was issued to clear the driveway entrance. At approximately 2215 hours, a fourth Long-Range Acoustic Device (LRAD) warning was issued to clear the driveway entrance. At approximately 2223 hours, protesters launched a smoke canister. At approximately 2223 hours, Federal Protective Service (FPS) and U.S. Immigration and Customs Enforcement Special Response Team (ICE SRT) personnel moved out to clear the driveway and allow vehicle entry and exit to and from the facility. At approximately 2223 hours, during operations to clear the driveway and allow vehicle entry and exit, Federal Protective Service (FPS) officers deployed FN 303 and Pepper Ball Launching System (PLS). U.S. Immigration and Customs Enforcement (ICE) Special Response Team (SRT) personnel deployed noise-flash diversionary device (distraction device), hand-thrown chemical munitions, and Pepper Ball Launching System (PLS). There were no arrests or detentions, and no injuries were reported. At approximately 2235 hours, the Tactical Commander ███ advised that all teams were back on Federal property. At approximately 2240 hours, the Tactical Commander ███ advised that all teams were inside the facility; no injuries were reported. At approximately 2240 hours, an estimated 100 protesters remained in front of the facility and in the surrounding area. At approximately 2305 hours, 10?13 protesters remained in front of the driveway, with an estimated 30?35 in the surrounding area. At approximately 0100 hours, Federal Protective Service (FPS) Bravo Team and U.S. Immigration and Customs Enforcement (ICE) Special Response Team (SRT) cleared the facility.
 All FPS personnel will continue to perform LE operations at the facility on September 02, 2025. All FPS personnel expected to perform OT (various times due to shift assignments, approximately three to four (3-4) hours per FPS Law Enforcement Officer based on operational needs.
Yes
Yes
Yes
(DIC/Senior Inspector)

12. Facility Damage Report
Enter number of facilities for each category for this
operational period.  Detailed reporting for each facility
should be submitted on a separate with building number,
status, type of damage, etc.
Risk
Level
Closed Damaged Destroyed
Threatened
(next 72
hours)
FSL 3/4/5
FSL 1/2
Other
13. Occupant Status:
Location Evacuated Sheltered Injured Fatalities Missing
14. Enforcement Activities:
Status FPS Agency _____ Agency _____
Arrests
Citations
Use of Force (Level 4&5)
15. LEO Status:
Assigned to IC?s AOR FPS Agency _____ Agency _____ Agency _____
Injury
Illness
Missing
Fatalities
16. Personnel Resource Commitment:
Personnel
FPS Host
Region
FPS
Deployed
Partner
Agency
_____
Partner
Agency
_____
Partner
Agency
_____
Partner
Agency
_____
Other
_____
Total
Supervisors

Inspectors/Officers
EDCTs
Special Agents
Non-LE (Fed)
Contractors
Other
17. Personnel Assignments:
Personnel
Assigned
Location
_____
Assigned
Location
_____
Assigned
Location
_____
Assigned
Location
_____
Assigned
Location
_____
Assigned
Location
_____
Other
_____
Total
Commanders/Supv
Inspectors
EDCTs
Special Agents
Non-LE (Fed)
Contractors
Other
Agency _____
0
0
0
0
0
0
0
0
4310 S Macadam
0
0
0
0

**A362**

```
0
0
0
0
0
0
0
0
0
0
1
3
2
6
0
21
6
27
0
0
0
0
0
3
0
3
0
0
0
0
1
0
0
1
0
0
0
0
3
2
0
5
21
6
0
27
0
0
0
0
```

PLS' EX. 847
Page 9 of 12

OREGON_DEFS_00001394_0009

```
3
0
0
3
0
0
0
0
1
0
0
1
0
0
0
0
ICE SRT
ICE/SRT
ICE SRT
0R6732
ICE/SRT
OR0043
```

↑

18. Equipment and Countermeasures:
Type
Assigned
Location

_____
Assigned
Location

_____
Assigned
Location

_____
Assigned
Location

_____
Assigned
Location

_____
Assigned
Location

_____
Other

_____

Total
MCV
SCV
Arrest Kits
Fence (linear feet)
PSO Posts
Light Tower
Port. Video System
cUAS
LRAD
0
0
0
0
0
0
0
0
1
0
0
1
0
0
0
0
1
0
0
1
0
0
0
0
0
0
0
0
0
0
0
0
1
1
0
2
0R6732
ICE/SRT
OR0043

A365

OREGON_DEFS_00001394_0011

✦

PLS' EX. 847
Page 12 of 12

OREGON_DEFS_00001394_0012

# FPS INCIDENT SUMMARY (ICS 209)

| | |
|---|---|
| **1. Incident Name:** Portland 2025 | |

**2. Version:**

☑ Initial

☐ Update    **Report No.** 069

☐ Final

**3. Incident Command:**

Name: TOC - Skip Jack - Portland

Title: **Incident Commander**

Name: Turner, William

Title: IC/(A) DC     ☐ N/A

**4. Incident Type:**

☑ FPS Operation

☐ Support to Other LE

☐ Multi Agency Operation

| **5. Incident Location:** | **6. Operational Period:** |
|---|---|
| Portland, Oregon | August 18, 2025, 0001 hours |
| **7. Submitted By:** | **8. Date Submitted:** |
| Turner, William | August 18, 2025, 2359 hours |

**9. Incident Objectives This Operational Period:**

As First Amendment activities against immigration raids continue at the ICE facility downtown Portland, Oregon, Federal Protective Service (FPS) requires an increased security posture in and around federally protected buildings. The ICE facility has been experiencing large demonstrations ranging from

**10. Significant Events for the Reporting Period:**

Portland Ops Daily Log 08.18.2025, (AC/DIC) ████, █████, 0001-2359 Hours:

At approximately 1200-1230 hours, two groups of protesters arrived on scene and set up on the northeast corner off Federal property. A younger group of 'Black Bloc' type of protesters arrived on scene as well and have attempted to rile up protesters.

FPS Special Agents arrived at the Portland ICE facility and were engaged with an agitator at their vehicle attempting to photograph and other peculiar activities. FPS Special Agents detained the Subject.

**11. Projected Incident Activity for the Next Operational Period:**

All FPS personnel will continue to perform LE operations at the facility on August 19th, 2025.

All FPS personnel expected to perform OT (various times due to shift assignments, approximately three to four (3-4) hours per FPS Law Enforcement Officer based on operational needs.

State of Oregon, et al v. Trump
**EXHIBIT**
**835**
USDC No. 3:25-cv-01756-IM

**A367**
Confidential

**PLS' EX. 835**
**Page 1 of 11**

ORE
OREGON_DEFS_00001351_0001

## 12. Facility Damage Report

Enter number of facilities for each category for this operational period. Detailed reporting for each facility should be submitted on a separate with building number, status, type of damage, etc.

| Risk Level | Closed | Damaged | Destroyed | Threatened (next 72 hours) |
|---|---|---|---|---|
| FSL 3/4/5 | | | | |
| FSL 1/2 | | | | |
| Other | | | | |

## 13. Occupant Status:

| Location | Evacuated | Sheltered | Injured | Fatalities | Missing |
|---|---|---|---|---|---|
| 4310 S Macadam | | | | | |
| | | | | | |
| | | | | | |

## 14. Enforcement Activities:

| Status | FPS | Agency _____ | Agency _____ | Agency _____ |
|---|---|---|---|---|
| Arrests | 0 | | | |
| Citations | 2 | | | |
| Use of Force (Level 4&5) | 2 | | | |

## 15. LEO Status:

| Assigned to IC's AOR | FPS | Agency _____ | Agency _____ | Agency _____ |
|---|---|---|---|---|
| Injury | 0 | | | |
| Illness | 0 | | | |
| Missing | 0 | | | |
| Fatalities | 0 | | | |

## 16. Personnel Resource Commitment:

| Personnel | FPS Host Region | FPS Deployed | Partner Agency ERO | Partner Agency _____ | Partner Agency _____ | Partner Agency _____ | Other Travel | Total |
|---|---|---|---|---|---|---|---|---|
| Supervisors | 1 | 4 | 2 | | | | | 7 |
| Inspectors/Officers | 0 | 20 | 18 | | | | | 38 |
| EDCTs | 0 | 0 | 0 | | | | | 0 |
| Special Agents | 0 | 4 | 0 | | | | | 4 |
| Non-LE (Fed) | 0 | 0 | 0 | | | | | 0 |
| Contractors | 1 | 0 | 0 | | | | | 1 |
| Other | 0 | 0 | 0 | | | | | 0 |

## 17. Personnel Assignments:

| Personnel | Assigned Location OR6732 | Assigned Location OR0043 | Assigned Location | Assigned Location | Assigned Location | Assigned Location Hospital | Other | Total |
|---|---|---|---|---|---|---|---|---|
| Commanders/Supv | 5 | 0 | | | | | | 5 |
| Inspectors | 20 | 0 | | | | | | 20 |
| EDCTs | 0 | 0 | | | | | | 0 |
| Special Agents | 4 | 0 | | | | | | 4 |
| Non-LE (Fed) | 0 | 1 | | | | | | 1 |
| Contractors | 1 | 0 | | | | | | 1 |
| Other | 0 | 0 | | | | | | 0 |

**A368**
Confidential

OREGON_DEFS_00001352
OREGON_DEFS_00001351_0002

**18. Equipment and Countermeasures:**

| Type | Assigned Location OR5732 | Assigned Location OR0043 | Assigned Location | Assigned Location | Assigned Location | Assigned Location Hospital | Other | Total |
|---|---|---|---|---|---|---|---|---|
| MCV | 0 | 0 | | | | | | |
| SCV | 0 | 0 | | | | | | |
| Arrest Kits | 1 | 0 | | | | | | 1 |
| Fence (linear feet) | 0 | 0 | | | | | | |
| PSO Posts | 1 | 0 | | | | | | 1 |
| Light Tower | 0 | 0 | | | | | | |
| Port. Video System | 0 | 0 | | | | | | |
| cUAS | 0 | 0 | | | | | | |
| LRAD | 1 | 0 | | | | | | 1 |

**A369**
Confidential

OREGON_DEFS_00001353
OREGON_DEFS_00001351_0003

FPS INCIDENT SUMMARY (ICS 209)
1. Incident Name:
2. Version:
    Report No.
    _____          3. Incident Command:
Name: _____
Title:    Incident Commander
Name: _____
Title:    _____
4. Incident Type:
5. Incident Location: 6. Operational Period:
7. Submitted By: 8. Date Submitted:
9. Incident Objectives This Operational Period:
10. Significant Events for the Reporting Period:
11. Projected Incident Activity for the Next Operational Period:
FPS Operation
Support to Other LE
Multi Agency Operation
Initial
Update
Final
N/A
Portland 2025
TOC - Skip Jack - Portland
069
Turner, William
Portland, Oregon
August 18, 2025, 0001 hours
Turner, William
August 18, 2025, 2359 hours
As First Amendment activities against immigration raids continue at the ICE
facility downtown Portland, Oregon, Federal Protective Service (FPS) requires an
increased security posture in and around federally protected buildings. The ICE
facility has been experiencing large demonstrations ranging from peaceful to
violent protest activities. The possibility of civil unrest around the city, and
the general threat to the federal government necessitates an increased FPS presence
at FPS Protected Facilities in Portland, Oregon.  The objectives of this
operational period are to prevent additional damage to the facility and provide
security for contracted services to conduct repairs to the facility.
Portland Ops Daily Log 08.18.2025, (AC/DIC) ████████████: 0001-2359 Hours: At
approximately 1200-1230 hours, two groups of protesters arrived on scene and set up
on the northeast corner off Federal property. A younger group of ?Black Bloc? type
of protesters arrived on scene as well and have attempted to rile up protesters.
FPS Special Agents arrived at the Portland ICE facility and were engaged with an
agitator at their vehicle attempting to photograph and other peculiar activities.
FPS Special Agents detained the Subject. Between 1230-1530 hours, there are between
30-35 protesters in front of the ICE driveway along the city sidewalk off Federal
property. Subject/Protester ████████ is on site wearing a black baseball hat,
white short sleeved tee-shirt, green camouflaged pants, a black backpack with a

Mexican Flag emblem, and was observed carrying what may be a ?Micro Conversion Kit (Gen1) for a Glock 20/21,? and/or some type of weapon black and pink in color. Within the crowd of protesters there are numerous agitators attempting to rile up the crowds and to antagonize FPS Law Enforcement Specialists and ICE Personnel entering and/or departing through the ICE ingress/egress driveway. Protective Security Officer (PSO) informed the DMC Dispatch that there was a female protester wearing black over black writing on the exterior guard shack wall outside the fenced ICE perimeter area. At about 1745 hours, FPS informed that there was a physical altercation between two Subjects/Protesters (Protester & Counter Protester). Between 1745 to 1815 hours, protesters begin yelling verbal threats towards female FPS Officer ███████████████, by stating something to the effect of, ?We?re going to pull your ponytail (hair).? ?You better watch your ponytail tonight, because we?re going to pull it!? Protesters are also stating that they are making more money than our Federal Law Enforcement Officers do, for us to quit and join their anarchy. A White Male Subject driving a white Ford with Washington State license plates ████████, stopped in front of the ICE driveway, and yelled ?Fuck You Motherfuckers! Fuck You!? Protesters have been warned to clear the ICE driveway on numerous occasions this afternoon. At approximately 1850 hours, a White Female Protester stopped in front of the Portland ICE Facility?s driveway along the city street, got off the car, pretended like she was going to ask a question, and ran eastbound towards the ?Protesters Encampment,? leaving her blue 4-door Honda with Oregon license plates ███████. *** (NOTE) *** FPS Law Enforcement Specialist Gerald ████████████, gave a verbal command to remove the vehicle off Federal property. The SUBJECT ████ did not comply to the verbal command refusing to leave. At approximately 1856 hours, the SUBJECT ████ ran away from her vehicle with the car keys in hand traveling East bound of S. Bancroft Street. SUBJECT ████ abandoned the vehicle in the driveway in front of Federal property (ICE Driveway), impeding official government business. I, Commander ████████ then requested that the DMC Dispatch run Oregon license plates ████████ via NCIC and requested that Incident Commander/(A) District Commander, ████████████, request an Explosives Detection Canine Team respond to the Portland ICE Facility to ensure the abandoned vehicle is not a Vehicle Borne Explosives Device (VBIED). Subject ████ has had additional encounters with FPS & ICE with the associated CCN: F25100091628: 25011075D: OR6732 - Incident Report - 03/29/2025 - ICE Disturbance/Directives There were between 25-33 protesters by the ICE driveway and the majority were being confrontational towards FPS Law Enforcement personnel. FPS & ICE SRT Teams cleared the area surrounding the abandoned vehicle for protesters and officer?s safety and overall well-being, in the case that the vehicle may have been a ?Vehicle Borne Improvised Explosives Device? (VBIED). At approximately 1932 hours, Portland Bomb Squad arrived on scene with an Explosives Detection Canine Team, with no change in behavior from canine. Driver/Subject ████████████ ████████████, of the Abandoned Vehicle was identified and emailed a photograph to FPS Teams if feasible for detainment and to conduct a field interview. Sergeant Towing arrived on scene at approximately 1947 hours, Portland Police Department issued the abandoned vehicle a Parking Violation# 504830, with Tow Slip 224770. There approximately 35-40 protesters around Bancroft and Macadam, with many protesters being unruly, screaming profanities, racial slurs, and demeaning comments towards FPS & ICE SRT Federal Law Enforcement Officers. At approximately 1955 hours, FPS Teams brought back all FPS vehicles that were utilized to block traffic back inside of the facility. At approximately 2115 hours, FPS Inspectors

reported that there were two Male Protesters on Federal properties within the ICE driveway, with most of the protesters towards the east Trolley Area, across the street, and Protesters Encampment towards the front of the school vicinity far east. FPS reported that there were two Male Protesters on Federal properties within the ICE driveway, with most of the protesters towards the east Trolley Area, across the street corner, and Protesters Encampment towards the front of the school vicinity. At approximately 2130 hours, FPS Inspectors reported that there were about nine (9) protesters blocking the ICE driveway. FPS issued an LRAD Warning to get off the ICE driveway or be subject to detention or arrest or face the appropriate degree of force, including chemical agents, to remove them from the restricted area. Protesters were also observed throwing trash onto the ICE driveway. At approximately 2135 hours, protesters were observed donning gas masks to mitigate against the effect of chemical agents. FPS Team Charlie Leader requested that an LRAD Warning be given, due to protesters not clearing the ICE driveway, or be subject to detention, arrest, and/or face the appropriate degree of force, including chemical agents, to remove them from the restricted area. Protesters were also observed throwing trash onto the ICE driveway. At approximately 2234 hours, Protesters are throwing rocks towards the ICE mechanical gate. A second LRAD Warning is being issued to the Unlawful Assembly. At approximately 2135 hours, a large group of protesters towards the front of the Portland ICE Facility are wearing ?Black Bloc? attire, helmets, gas masks, black over black, cameras, and other miscellaneous items. Protesters are also yelling to FPS Law Enforcement Specialists that they know where we (FPS) live and what hotels we are staying at. At approximately 2243 hours, FPS issued a third LRAD Warning to protesters on Federal property who are blocking the ICE driveway and may be subject to detention, arrest, and/or face the appropriate degree of force, including chemical agents, to remove them from the restricted area. At approximately 2248 hours, FPS Bravo and Charlie Teams conducted exited the gate since protesters were ?Failing to Comply with Federal Law Enforcement Officers Lawful Commands to Clear the ICE driveway. Between 2258 to 2305 hours, FPS Law Enforcement Specialists and ICE SRT have two Subjects/Protesters Detained. Subject ███████████ Violated 41 CFR 102-74.380 and was issued CVB Violation# E1763414. Subject#2 ████████████ , Violation of 41 CFR 102.74.385, CVB Violation# E1763399. Both with a Mandatory Court Appearance. Between 2305 to 2359 hours, there are still about 20-25 protesters in the area.
All FPS personnel will continue to perform LE operations at the facility on August 19th, 2025. All FPS personnel expected to perform OT (various times due to shift assignments, approximately three to four (3-4) hours per FPS Law Enforcement Officer based on operational needs.
Yes
Yes
IC/(A) DC

↑
12. Facility Damage Report
Enter number of facilities for each category for this

OREGON_DEFS_00001351_0006

operational period.  Detailed reporting for each facility
should be submitted on a separate with building number,
status, type of damage, etc.
Risk
Level
Closed Damaged Destroyed
Threatened
(next 72
hours)
FSL 3/4/5
FSL 1/2
Other
13. Occupant Status:
Location Evacuated Sheltered Injured Fatalities Missing
14. Enforcement Activities:
Status FPS Agency _____ Agency _____
Arrests
Citations
Use of Force (Level 4&5)
15. LEO Status:
Assigned to IC?s AOR FPS Agency _____ Agency _____ Agency _____
Injury
Illness
Missing
Fatalities
16. Personnel Resource Commitment:
Personnel
FPS Host
Region
FPS
Deployed
Partner
Agency
_____
Partner
Agency
_____
Partner
Agency
_____
Partner
Agency
_____
Other
_____
Total
Supervisors
Inspectors/Officers
EDCTs
Special Agents

Non-LE (Fed)
Contractors
Other
17. Personnel Assignments:
Personnel
Assigned
Location
_____

Assigned
Location
_____

Assigned
Location
_____

Assigned
Location
_____

Assigned
Location
_____

Assigned
Location
_____

Other
_____

Total
Commanders/Supv
Inspectors
EDCTs
Special Agents
Non-LE (Fed)
Contractors
Other
Agency _____
4310 S Macadam
0
2
2
0
0
0
0
1
4
2
7
0
20
18
38

```
0
0
0
0
0
4
0
4
0
0
0
0
1
0
0
1
0
0
0
0
5
0
5
20
0
20
0
0
0
4
0
4
0
1
1
1
0
1
0
0
0
ERO
Travel
OR6732
OR0043
Hospital
```

OREGON_DEFS_00001351_0009

⏶

18. Equipment and Countermeasures:
Type
Assigned
Location
_____
Assigned
Location
_____
Assigned
Location
_____
Assigned
Location
_____
Assigned
Location
_____
Assigned
Location
_____
Other
_____
Total
MCV
SCV
Arrest Kits
Fence (linear feet)
PSO Posts
Light Tower
Port. Video System
cUAS
LRAD
0
0
0
0
1
0
1
0
0
1
0
1
0
0
0
0

PLS' EX. 835
Page 10 of 11

OREGON_DEFS_00001351_0010

```
0
0
1
0
1
OR6732
OR0043
Hospital
```

↑

OREGON_DEFS_00001351_0011

# FPS INCIDENT SUMMARY (ICS 209)

**1. Incident Name:** Portland 2025

| 2. Version: | 3. Incident Command: | 4. Incident Type: |
|---|---|---|
| ☑ Initial | **Name:** TOC - Skip Jack - Portland | ☑ FPS Operation |
| ☐ Update   Report No. 060 | **Title:** Incident Commander | ☐ Support to Other LE |
| ☐ Final | **Name:** Turner, William | ☐ Multi Agency Operation |
| | **Title:** IC/DC ☐ N/A | |

| 5. Incident Location: | 6. Operational Period: |
|---|---|
| Portland, Oregon | August 09, 2025, 0001 hours |

| 7. Submitted By: | 8. Date Submitted: |
|---|---|
| Turner, William | August 09, 2025, 2359 hours |

**9. Incident Objectives This Operational Period:**

As First Amendment activities against immigration raids continue at the ICE facility downtown Portland, Oregon, Federal Protective Service (FPS) requires an increased security posture in and around federally protected buildings. The ICE facility has been experiencing large demonstrations ranging from

**10. Significant Events for the Reporting Period:**

Portland Ops Daily Log 08.09.2025, (AC/DIC) ███ █ ████

• At approximately 0001-0100 hours, a group of protesters ranging from about 30-40 protesters dressed in 'Black Bloc' attire, numerous protesters with helmets, gas masks, and other miscellaneous items were yelling towards FPS Law Enforcement Specialists by stating something to the effect of, "Take off your ballistic gear and come face us like men!" "Take off your vests and let's go!" Other unidentified protesters yelled out, "Take off your gear bitches and we'll kick your asses!" Inspector ████████ aired the verbal threats over the radio to the DMC Dispatch.

**11. Projected Incident Activity for the Next Operational Period:**

All FPS personnel will continue to perform LE operations at the facility on August 10th, 2025.

All FPS personnel expected to perform OT (various times due to shift assignments, approximately three to four (3-4) hours per FPS Law Enforcement Officer based on operational needs.

State of Oregon, et al v. Trump
**EXHIBIT**
**827**
USDC No. 3:25-cv-01756-IM

**12. Facility Damage Report**
Enter number of facilities for each category for this operational period. Detailed reporting for each facility should be submitted on a separate with building number, status, type of damage, etc.

| | Risk Level | Closed | Damaged | Destroyed | Threatened (next 72 hours) |
|---|---|---|---|---|---|
| | FSL 3/4/5 | | | | |
| | FSL 1/2 | | | | |
| | Other | | | | |

**13. Occupant Status:**

| Location | Evacuated | Sheltered | Injured | Fatalities | Missing |
|---|---|---|---|---|---|
| 4310 S Macadam | | | | | |
| | | | | | |
| | | | | | |

**14. Enforcement Activities:**

| Status | FPS | Agency _____ | Agency _____ | Agency _____ |
|---|---|---|---|---|
| Arrests | 0 | | | |
| Citations | 0 | | | |
| Use of Force (Level 4&5) | Multiple | | | |

**15. LEO Status:**

| Assigned to IC's AOR | FPS | Agency _____ | Agency _____ | Agency _____ |
|---|---|---|---|---|
| Injury | 0 | | | |
| Illness | 0 | | | |
| Missing | 0 | | | |
| Fatalities | 0 | | | |

**16. Personnel Resource Commitment:**

| Personnel | FPS Host Region | FPS Deployed | Partner Agency ERO | Partner Agency ___ | Partner Agency ___ | Partner Agency ___ | Other Travel | Total |
|---|---|---|---|---|---|---|---|---|
| Supervisors | 1 | 2 | 2 | | | | | 5 |
| Inspectors/Officers | 0 | 20 | 18 | | | | | 38 |
| EDCTs | 0 | 0 | 0 | | | | | 0 |
| Special Agents | 0 | 4 | 0 | | | | | 4 |
| Non-LE (Fed) | 0 | 0 | 0 | | | | | 0 |
| Contractors | 1 | 0 | 0 | | | | | 1 |
| Other | | | | | | | | |

**17. Personnel Assignments:**

| Personnel | Assigned Location OR6732 | Assigned Location OR0043 | Assigned Location | Assigned Location | Assigned Location | Assigned Location Hospital | Other | Total |
|---|---|---|---|---|---|---|---|---|
| Commanders/Supv | 3 | 0 | | | | | | 3 |
| Inspectors | 20 | 0 | | | | | | 20 |
| EDCTs | 0 | 0 | | | | | | 0 |
| Special Agents | 4 | 0 | | | | | | 3 |
| Non-LE (Fed) | 0 | 1 | | | | | | 1 |
| Contractors | 1 | 0 | | | | | | 1 |
| Other | | | | | | | | |

**A379**
Confidential

**PLS' EX. 827
Page 2 of 12**

OREGON_DEFS_00001327
OREGON_DEFS_00001326_0002

### 18. Equipment and Countermeasures:

| Type | Assigned Location OR5732 | Assigned Location OR0043 | Assigned Location | Assigned Location | Assigned Location | Assigned Location Hospital | Other | Total |
|---|---|---|---|---|---|---|---|---|
| MCV | 0 | 0 | | | | | | |
| SCV | 0 | 0 | | | | | | |
| Arrest Kits | 1 | 0 | | | | | | 1 |
| Fence (linear feet) | 0 | 0 | | | | | | |
| PSO Posts | 1 | 0 | | | | | | 1 |
| Light Tower | 0 | 0 | | | | | | |
| Port. Video System | 0 | 0 | | | | | | |
| cUAS | 0 | 0 | | | | | | |
| LRAD | 1 | 0 | | | | | | 1 |

**A380**
Confidential

```
FPS INCIDENT SUMMARY (ICS 209)
1. Incident Name:
2. Version:
   Report No.
   _____          3. Incident Command:
Name: _____
Title:    Incident Commander
Name: _____
Title:    _____
4. Incident Type:
5. Incident Location: 6. Operational Period:
7. Submitted By: 8. Date Submitted:
9. Incident Objectives This Operational Period:
10. Significant Events for the Reporting Period:
11. Projected Incident Activity for the Next Operational Period:
FPS Operation
Support to Other LE
Multi Agency Operation
Initial
Update
Final
N/A
Portland 2025
TOC - Skip Jack - Portland
060
Turner, William
Portland, Oregon
August 09, 2025, 0001 hours
Turner, William
August 09, 2025, 2359 hours
```

As First Amendment activities against immigration raids continue at the ICE facility downtown Portland, Oregon, Federal Protective Service (FPS) requires an increased security posture in and around federally protected buildings. The ICE facility has been experiencing large demonstrations ranging from peaceful to violent protest activities. The possibility of civil unrest around the city, and the general threat to the federal government necessitates an increased FPS presence at FPS Protected Facilities in Portland, Oregon. The objectives of this operational period are to prevent additional damage to the facility and provide security for contracted services to conduct repairs to the facility.

Portland Ops Daily Log 08.09.2025, (AC/DIC) ███████████: At approximately 0001-0100 hours, a group of protesters ranging from about 30-40 protesters dressed in ?Black Bloc? attire, numerous protesters with helmets, gas masks, and other miscellaneous items were yelling towards FPS Law Enforcement Specialists by stating something to the effect of, ?Take off your ballistic gear and come face us like men!? ?Take off your vests and let?s go!? Other unidentified protesters yelled out, ?Take off your gear bitches and we?ll kick your asses!? Inspector ████████ aired the verbal threats over the radio to the DMC Dispatch. At approximately 0100 hours, as FPS Team Bravo and ICE SRT Teams were driving out of the ICE ingress/egress driveway, protesters became aggressive by hitting ICE & FPS vehicles

with their fists as Federal Law Enforcement Officers were driving out. FPS Team
Bravo observed protesters becoming confrontational, displaying pre-assault
indicators, and yelling threats from the crowds towards FPS Team Charlie (9-FPS
Officers). As such, FPS Team Bravo dismounted from our vehicles without helmets or
gas masks to assist FPS Team Charlie who were easily out numbered three to one, by
about 30-40 protesters. During this engagement between FPS & Aggressive Protesters,
9R511 advised pepper balls were deployed by FPS. At approximately 0108 hours, I,
Commander ██████████ advised the DMC Dispatch that some of the demonstrators
were becoming aggressive when ICE vehicles were departing, and some were striking
vehicles with their fists, to include FPS Inspector ██████████ rental. At
approximately 0109 hours, ██████████ requested EMS for a detained subject having a
reaction to the pepper balls and pepper spray. FPS provided the subject with water
to help decontaminate. The subject was detained for impeding, failing to comply,
and for fighting FPS. *** (NOTE) *** During this engagement, a White Male Subject
dressed in Middle Eastern Attire (Thobe long robe worn by Muslim men), and long
Beard was making indirect threats to the effect of, ?You deserve to be
decapitated!? ?I am not scared of you and am not afraid to die!? IC/(A) DC Turner
asked the White Male Subject dressed in Middle Eastern Attire if he was making
threats towards FPS, of which he stated something to the effect of, ?No, but you
should be!? While still yelling towards FPS Officers from the east side of the
driveway, towards the rear of the PSO?s Guard Shack. Once FPS Team Charlie had
everything under control, FPS Team Bravo cleared the areas, and headed to the hotel
after our tour of duty. At approximately 1530 hours, there?s about seven peaceful
protesters towards the front of the ICE facility along the city sidewalk off
Federal property. Between 1530-1800 hours, there were between 7-12 protesters
towards the east side of the premises off Federal property. At approximately 1845
hours, FPS Inspector ██████████ while observing the Video Surveillance System
(VSS) observed two protesters struck a pinata resembling POTUS Trump, and the
pinata had what appeared to be an ICE Tactical Vest, one female protester who
appeared to be white, wearing a blank tank top, black leggings, dark shoes was
observed to be kicking the pinata. The second protester who has been identified as
a ██████████ was observed striking the POTUS Trump pinata until
it broke apart. ██████████ was wearing what appears to be a black shirt, red & white
scarf, camouflaged cargo pants, and white shoes. A third White Male Protester was
observed picking it the pinata?s head that resembled POTUS Trump and he was
observed shaking the head towards FPS Law Enforcement Specialists. Inspector
██████████ bookmarked this activity on the VSS footage in the case this footage may
be needed for further investigation. Between 1845 to 1845 hours, there?s about
10-15 protesters scattered throughout the area, trolley area, street corners, and
towards the front of the facility. At approximately 2045 hours, there are now
approximately between 25 to 30 peaceful protesters in the area off Federal
property. At approximately 2200 hours, there are now about 40 protesters in the
area and many of them are wearing helmets, gas masks, black over black, and have
yelled that something is coming soon. At approximately 2215 to 2230 hours, there
are about 40 to 50 protesters in the area and many of them are wearing helmets, gas
masks, black over black, and are yelling comments to the effect of ?Here Piggy
Piggy!? ?It?s about to get Spicy, just watch!? and ?ICE aren?t shit!? At
approximately 0001-0100 hours, a group of protesters ranging from about 30-40
protesters dressed in ?Black Bloc? attire, numerous protesters with helmets, gas
masks, and other miscellaneous items were yelling towards FPS Law Enforcement

Specialists by stating something to the effect of, ?Take off your ballistic gear
and come face us like men!? ?Take off your vests and let?s go!? Other unidentified
protesters yelled out, ?Take off your gear bitches and we?ll kick your asses!?
Inspector ███████ aired the verbal threats over the radio to the DMC Dispatch. At
approximately 0100 hours, as FPS Team Bravo and ICE SRT Teams were driving out of
the ICE ingress/egress driveway, protesters became aggressive by hitting ICE & FPS
vehicles with their fists as Federal Law Enforcement Officers were driving out.
FPS Team Bravo observed protesters becoming confrontational, displaying pre-assault
indicators, and yelling threats from the crowds towards FPS Team Charlie (9-FPS
Officers). As such, FPS Team Bravo dismounted from our vehicles without helmets or
gas masks to assist FPS Team Charlie who were easily outmanned, three to one, by
about 30-40 protesters. During this engagement between FPS & Aggressive Protesters,
9R511 advised pepper balls were deployed by FPS. At approximately 0108 hours, I,
Commander███████████ advised the DMC Dispatch that some of the demonstrators
were becoming aggressive when ICE vehicles were departing, and some were striking
vehicles with their fists, to include FPS Inspector ███████████ rental. At
approximately 0109 hours, ███████ requested EMS for a detained subject having a
reaction to the pepper balls and pepper spray. FPS provided the subject with water
to help decontaminate. The subject was detained for impeding, failing to comply,
and for fighting FPS. *** (NOTE) *** During this engagement, a White Male Subject
dressed in Middle Eastern Attire (Thobe-long robe worn by Muslim men), and long
Beard was making indirect threats to the effect of, ?You deserve to be
decapitated!? ?I am not scared of you and am not afraid to die!? IC/(A) DC Turner
asked the White Male Subject dressed in Middle Eastern Attire if he was making
threats towards FPS, of which he stated something to the effect of, ?No, but you
should be!? While still yelling towards FPS Officers from the eastside of the
driveway, towards the rear of the PSO?s Guard Shack. Once FPS Team Charlie had
everything under control, FPS Team Bravo cleared the areas, and headed to the hotel
after our tour of duty. At approximately 1530 hours, there?s about seven peaceful
protesters towards the front of the ICE facility along the city sidewalk off
Federal property. Between 1530-1800 hours, there were between 7-12 protesters
towards the east side of the premises off Federal property. At approximately 1845
hours, FPS Inspector ███████████ while observing the Video Surveillance System
(VSS) observed two protesters struck a pinata resembling POTUS Trump, and the
pinata had what appeared to be an ICE Tactical Vest, one female protester who
appeared to be white, wearing a blank tank top, black leggings, dark shoes was
observed to be kicking the pinata. The second protester who has been identified as
a ██████████████████████████ was observed striking the POTUS Trump pinata until
it broke apart. ███████ was wearing what appears to be a black shirt, red & white
scarf, camouflaged cargo pants, and white shoes. A third White Male Protester was
observed picking it the pinata?s head that resembled POTUS Trump and he was
observed shaking the head towards FPS Law Enforcement Specialists. Inspector
███████ bookmarked this activity on the VSS footage in the case this footage may
be needed for further investigation. Between 1845 to 1845 hours, there?s about
10-15 protesters scattered throughout the area, trolley area, street corners, and
towards the front of the facility. At approximately 2045 hours, there are now
approximately between 25 to 30 peaceful protesters in the area off Federal
property. At approximately 2200 hours, there are now about 40 protesters in the
area and many of them are wearing helmets, gas masks, black over black, and have
yelled that something is coming soon. At approximately 2215 to 2230 hours, there

are about 40 to 50 protesters in the area and many of them are wearing helmets, gas masks, black over black, and are yelling comments to the effect of ?Here Piggy Piggy!? ?It?s about to get Spicy, just watch!? and ?ICE aren?t shit!?  At approximately 0001-0100 hours, a group of protesters ranging from about 30-40 protesters dressed in ?Black Bloc? attire, numerous protesters with helmets, gas masks, and other miscellaneous items were yelling towards FPS Law Enforcement Specialists by stating something to the effect of, ?Take off your ballistic gear and come face us like men!? ?Take off your vests and let?s go!? Other unidentified protesters yelled out, ?Take off your gear bitches and we?ll kick your asses!? Inspector ▆▆▆▆ aired the verbal threats over the radio to the DMC Dispatch.  At approximately 0100 hours, as FPS Team Bravo and ICE SRT Teams were driving out of the ICE ingress/egress driveway, protesters became aggressive by hitting ICE & FPS vehicles with their fists as Federal Law Enforcement Officers were driving out. FPS Team Bravo observed protesters becoming confrontational, displaying pre-assault indicators, and yelling threats from the crowds towards FPS Team Charlie (9-FPS Officers). As such, FPS Team Bravo dismounted from our vehicles without helmets or gas masks to assist FPS Team Charlie who were easily outmanned, three to one, by about 30-40 protesters. During this engagement between FPS & Aggressive Protesters, ▆▆▆▆ advised pepper balls were deployed by FPS.  At approximately 0108 hours, I, Commander ▆▆▆▆▆▆ advised the DMC Dispatch that some of the demonstrators were becoming aggressive when ICE vehicles were departing, and some were striking vehicles with their fists, to include FPS Inspector ▆▆▆▆▆▆ s rental. At approximately 0109 hours, 11P1653 requested EMS for a detained subject having a reaction to the pepper balls and pepper spray. FPS provided the subject with water to help decontaminate. The subject was detained for impeding, failing to comply, and for fighting FPS.  *** (NOTE) *** During this engagement, a White Male Subject dressed in Middle Eastern Attire (Thobe-long robe worn by Muslim men), and long Beard was making indirect threats to the effect of, ?You deserve to be decapitated!? ?I am not scared of you and am not afraid to die!? IC/(A) DC Turner asked the White Male Subject dressed in Middle Eastern Attire if he was making threats towards FPS, of which he stated something to the effect of, ?No, but you should be!? While still yelling towards FPS Officers from the eastside of the driveway, towards the rear of the PSO?s Guard Shack.  Once FPS Team Charlie had everything under control, FPS Team Bravo cleared the areas, and headed to the hotel after our tour of duty.  At approximately 1530 hours, there?s about seven peaceful protesters towards the front of the ICE facility along the city sidewalk off Federal property.  Between 1530-1800 hours, there were between 7-12 protesters towards the east side of the premises off Federal property.  At approximately 1845 hours, FPS Inspector ▆▆▆▆▆▆ while observing the Video Surveillance System (VSS) observed two protesters struck a pinata resembling POTUS Trump, and the pinata had what appeared to be an ICE Tactical Vest, one female protester who appeared to be white, wearing a blank tank top, black leggings, dark shoes was observed to be kicking the pinata. The second protester who has been identified as a ▆▆▆▆▆▆▆▆ was observed striking the POTUS Trump pinata until it broke apart. ▆▆▆▆ was wearing what appears to be a black shirt, red & white scarf, camouflaged cargo pants, and white shoes. A third White Male Protester was observed picking it the pinata?s head that resembled POTUS Trump and he was observed shaking the head towards FPS Law Enforcement Specialists. Inspector ▆▆▆▆ bookmarked this activity on the VSS footage in the case this footage may be needed for further investigation.  Between 1845 to 1845 hours, there?s about

10-15 protesters scattered throughout the area, trolley area, street corners, and towards the front of the facility. At approximately 2045 hours, there are now approximately between 25 to 30 peaceful protesters in the area off Federal property. At approximately 2200 hours, there are now about 40 protesters in the area and many of them are wearing helmets, gas masks, black over black, and have yelled that something is coming soon. At approximately 2215 to 2230 hours, there are about 40 to 50 protesters in the area and many of them are wearing helmets, gas masks, black over black, and are yelling comments to the effect of ?Here Piggy Piggy!? ?It?s about to get Spicy, just watch!? and ?ICE aren?t shit!? At approximately 2245 hours, there are approximately 19-25 protesters blocking the driveway, which is affecting government operations, and they are taunting Federal Law Enforcement Officers to come out and deploy tear gas. There are two other larger groups towards the east side of the premises, and across the street from this ICE facility. Totaling over 50 protesters. At approximately 2316 hours, FPS & ICE SRT Teams issued over five (5) LRAD Notifications #6 to Clear the ICE Driveway and to Get Off of Federal property. However, between 25-30 protester ?Failed to Comply? with Federal Law Enforcement Officers Lawful Orders. As such, ICE SRT conducted an area SAT with pepper balls along the ICE perimeter lines. After numerous ?Failures to Comply,? FPS & ICE SRT pushed out to clear the driveway and to remove protesters from Federal property. Additional protesters came to support the protesters who were on the line and started to run from the east side and from across the street to support the unlawful assembly and unruly protesters. Between 2316-2400 hours, FPS & ICE SRT Teams held the line on Federal property. It appears that there?s still about 25 unruly protesters, and a large number of protesters walked towards the east side along Bancroft Avenue. Status: Closed Status: Closed All FPS personnel will continue to perform LE operations at the facility on August 10th, 2025. All FPS personnel expected to perform OT (various times due to shift assignments, approximately three to four (3-4) hours per FPS Law Enforcement Officer based on operational needs.
Yes
Yes
IC/DC

⬆

12. Facility Damage Report
Enter number of facilities for each category for this operational period. Detailed reporting for each facility should be submitted on a separate with building number, status, type of damage, etc.
Risk
Level
Closed Damaged Destroyed
Threatened
(next 72
hours)
FSL 3/4/5

FSL 1/2
Other
13. Occupant Status:
Location Evacuated Sheltered Injured Fatalities Missing
14. Enforcement Activities:
Status FPS Agency _____ Agency _____
Arrests
Citations
Use of Force (Level 4&5)
15. LEO Status:
Assigned to IC?s AOR FPS Agency _____ Agency _____ Agency _____
Injury
Illness
Missing
Fatalities
16. Personnel Resource Commitment:
Personnel
FPS Host
Region
FPS
Deployed
Partner
Agency

_____
Partner
Agency

_____
Partner
Agency

_____
Partner
Agency

_____
Other

_____
Total
Supervisors
Inspectors/Officers
EDCTs
Special Agents
Non-LE (Fed)
Contractors
Other
17. Personnel Assignments:
Personnel
Assigned
Location

_____
Assigned
Location

```
_____
Assigned
Location

_____
Assigned
Location

_____
Assigned
Location

_____
Assigned
Location

_____
Other

_____
Total
Commanders/Supv
Inspectors
EDCTs
Special Agents
Non-LE (Fed)
Contractors
Other
Agency _____
4310 S Macadam
0
0
Multiple
0
0
0
0
1
2
2
5
0
20
18
38
0
0
0
0
0
4
0
4
0
0
```

**PLS' EX. 827**
**Page 10 of 12**

OREGON_DEFS_00001326_0010

```
0
0
1
0
0
1
3
0
3
20
0
20
0
0
0
4
0
3
0
1
1
1
0
1
ERO
Travel
OR6732
OR0043
Hospital
```

♠

18. Equipment and Countermeasures:
Type
Assigned
Location

_____
Assigned
Location

_____
Assigned
Location

_____
Assigned
Location

_____
Assigned

Location
_____

Assigned
Location
_____

Other
_____

Total
MCV
SCV
Arrest Kits
Fence (linear feet)
PSO Posts
Light Tower
Port. Video System
cUAS
LRAD
0
0
0
0
1
0
1
0
0
1
0
1
0
0
0
0
0
0
1
0
1
OR6732
OR0043
Hospital

↑

| To: | Turner, William W |
| --- | --- |

Robert R]
Wamsley, Cammilla | **PII/Security** | @fbi.gov]

**From:** Johnson, Erik R
**Sent:** Tue 7/22/2025 3:25:19 PM
**Subject:** Fw: (U//LES) FPS Intelligence Operations Division Message // Nationwide // Concerning Social Media Post
**Received:** Tue 7/22/2025 3:25:35 PM

Good morning. Please see below Intel report concerning the Macadam facility.

Will,
let's discuss potential mitigation measures later today.

Erik

Erik R. Johnson
Regional Director
Federal Protective Service, Region-10
DHS - Management Directorate

**From:** FPS-INTEL_Mbx <FPSINTEL@fps.dhs.gov>
**Sent:** Tuesday, July 22, 2025 6:52:03 AM
**To:**

Paramore, Faron
<Faron.Paramore@fps.dhs.gov>; FPS IMC <fpsimc@fps.dhs.gov>; FPS-HQ Intel <FPS-HQIntel@fps.dhs.gov>
**Subject:** (U//LES) FPS Intelligence Operations Division Message // Nationwide // Concerning Social Media Post

Good Morning,

**A390**

*Oregon v. Trump*
No. 3:25-cv-01756
**Defendants' Exhibit**
1079

Highly Confidential

OREGON_DEFS_00005254

(U//LES) **BLUF**: Portland, OR: On July 22, 2025, a potentially concerning social media post was observed that could impact an ICE facility or facilities. The post provides pictures of focused areas of a utility pole located at 555 SW Bancroft St, Portland, OR 97239, where a potential subject with malicious intent can disengage or destroy transformer lead cables that distribute power to buildings.

(U//LES) **Context Statement**: The following information was provided by HSI Protective Intelligence.

(U//LES) **Key Point**: Based on the post, the intent stated is to turn the power off to an ICE facility. The user stated, "Portland resisters, if you want to turn the power off on the ICE building, the first pic has the things that connect the building to city power. The tube those lines are going into goes down the PVC pipe and under the road to power the building." The user never stated the actual address of the ICE facility; however, the location of the listed utility pole address is within 39ft of the ICE facility located at 4310 S Macadam Ave, Portland, OR 97239 (**FPS protected facility** - OR6732). In addition, the user has over 7K followers nationwide, by which this TTP could potentially provide guidance against other ICE facilities.

**Source:** https://bsky.app/profile/ssgtmullitard.bsky.social/post/3luihi6zvg22h



**A391**

 OREGON_DEFS_00005255





**A392**



@ssgtmullitard.bsky.social

Portland resisters, if you want to turn the power off on the ICE building, the first pic has the things that connect the building to city power. The tube those lines are going into goes down the PVC pipe and under the road to power the building.

July 21, 2025 at 12:56 PM · Everybody can reply

1 repost   7 likes

Respectfully,

███████████████

Strategic Integration Support Services Team
Intelligence Operations Division
Federal Protective Service
Phone (mobile): ████████████

**FPS**

*Information on 1st Amendment Protected Activities is provided for situational awareness and contingency planning which may require adjustments in the security arrangements based on events targeting or occurring in the vicinity of a FPS-protected facility.*

*(U) The products listed in this report may contain FOR OFFICIAL USE ONLY (FOUO) or LAW ENFORCEMENT SENSITIVE (LES) information. This information may be exempt from public release under the Freedom of Information Act (5 U.S.G. 552). It is to be controlled, stored, handled, transmitted, distributed, and disposed of in accordance with appropriate policy relating to FOUO and/or LES information and is not to be released to the public, the media, foreign nationals, or other personnel who do not have a valid "need-to-know" without prior approval of an authorized official.*

**A393**

# Public Order Post Event Debrief Summary

**Date and time:** 7/42025

**Location of start of Event:** 4310 S Macadam Ave (ICE building)

**IC:** D. Abrahamson

**Narrative of event:**

Tonight, we had one bike squad (ALPHA), three partner cars, and a DLO team in the field. FPS maintained between 42-46 officers throughout the evening.

At onset, the emphasis was on high visibility presence and engagement in the neighborhood in the SW Bancroft area to diminish fear within the community, prior to larger crowds gathering at ICE. Officers were on foot/bikes and made great connections with neighbors who were appreciative. Additionally, Officers were provided with a dozen coffee cards, who they issued to broad age group of neighbors.

Free America Event / Sellwood Bridge
Between 1730 and 1900 hours, approximately 300 individuals gathered lawfully on the Sellwood Bridge, staying on the sidewalks, with no issues.

ICE Protest
At 1800 hours, nearly 50 protesters congregated in front of the ICE facility and kept to the sidewalks. By 1900 hours, the crowd grew to approximately 100, with half on the south sidewalks of Bancroft. At least 15-20 were observed in padded motorcycle gear, make-shift body armor, or dawning helmets. At 1918 hours, several individuals lit non-aerial fireworks but kept them in the street. Alpha contacted the group and advised the group of the fireworks ban. Some were receptive, but hostility began to grow.

By 1930, 20-30 protesters occupied the eastbound lanes of Bancroft, but vehicular traffic continued to flow in both directions. However, shortly after, a vehicle slowed, and a verbal altercation occurred between the driver and a handful of members of the crowd. Approximately 30 protesters began to quickly approach the vehicle, appearing animated. The vehicle departed prior to a larger crowd forming around it; however, water bottles and unknown items were thrown at the truck. The victim did not want to file a report or provide information.

Although our DLOs were invaluable tonight and maintained rapport, crowd demeanor began to change, who were clearly energized, and intent on altercation with FPS. At approximately 1940 hours, we transitioned Alpha to a hard squad as potential use for vehicle rescues and staged them out of view. We conducted a consult with on the on-call RRT sergeant to determine if available resources would be available if needed. Vehicle traffic continued to flow on Bancroft for the remainder of evening without issue.

Crowd size grew to approximately 100-150 by 2100, with at least 50 lingering in front of the ICE facility. Consistent social media streams were not available until nearly 2200, and Air-1's video did not clearly capture protester behavior in front of the ICE facility. Communication was limited from FPS throughout the evening. We did not receive specific information related to crimes occurring or suspect descriptions, where we could provide periphery support/custodies. We later learned protesters had hurled mortars at the ICE facility. FPS used munitions and tear gas to address crimes crowd a block north and/or east of their facility several times. During each FPS push,

State of Oregon, et al v. Trump
**EXHIBIT
410**
USDC No. 3:25-cv-01756-IM

disperse and return to the ICE building.  FPS made multiple arrests, but the count is unknown.

By 2330, the crowd size diminished to approximately 35, and there were no issues with traffic flowing on Bancroft.   At 2330, we transitioned control to Central Precinct (A/Lt. Hefley).  We conducted a debrief with the IMT, team sergeants, and the DLOs.

**Significant Decision Points:**

After the altercation with the vehicle, we considered deploying PBOT reader boards to divert traffic from accessing traffic onto Bancroft, which would potentially minimize further vehicle-crowd risks.  The PIO drafted messages which were provided to OPS personnel if needed. However, directly following this, FPS made a push/arrests that quelled the crowd's energy. Vehicles continued to travel in both directions on Bancroft without issue. OPS and Alpha comprised a vehicle rescue plan if needed.

**Significant Issues and Problems:**

No major concerns surfaced tonight and overall, went well considering the crowd dynamic. Crowd action was directed at FPS.  See below lessons/recommendations.

**Use of Force:**

No use of force by PPB.

**Number of arrests and charges:**

No arrests by PPB.

**Lessons learned / recommendations:**

Although we staffed tonight's events based on intel, having only one hard squad and limited tools, a vehicle rescue could potentially pose a challenge and heighten risks for our members in a hostile crowd, which could result in a higher level of force, while also jeopardizing member safety. For future events on major holidays, such as the Fourth of July, it would be advantageous to have a minimum of two RRT squads, which would provide a secondary hardened team who could provide cover during a vehicle rescue.  At a minimum, it would be recommended to have RRT on-call to resource as needed, as member availability was sparse.

Lastly, even though the crowd was hostile tonight, the DLOs conveyed they maintained rapport and did not feel their safety was in jeopardy.  They also posited key leaders within the crowd came with a set intent tonight and avoided the DLO team as the interactions with FPS unfolded.

*Forward this document to the incoming IC, CHO and CAO

CITY_000127

# FPS INCIDENT SUMMARY (ICS 209)

**1. Incident Name:** Portland 2025

| 2. Version: | 3. Incident Command: | 4. Incident Type: |
|---|---|---|
| ☑ Initial | Name: TOC - Skip Jack - Portland | ☑ FPS Operation |
| ☐ Update  Report No. 019 | Title: **Incident Commander** | ☐ Support to Other LE |
| ☐ Final | Name: ██████████ | ☐ Multi Agency Operation |
| | Title: IC ☐ N/A | |

| 5. Incident Location: | 6. Operational Period: |
|---|---|
| Portland, Oregon | June 29, 2025, 0001 hours |

| 7. Submitted By: | 8. Date Submitted: |
|---|---|
| ██████ ██████ | June 29, 2025, 2400 hours |

**9. Incident Objectives This Operational Period:**

As First Amendment activities against immigration raids continue at the ICE facility downtown Portland, Oregon, Federal Protective Service (FPS) requires an increased security posture in and around federally protected buildings. The ICE facility has been experiencing large demonstrations ranging from

**10. Significant Events for the Reporting Period:**

Crowd size was approximately 31 demonstrators off and on federal property in the early morning. One subject was observed attempting to damage the vehicle entrance card reader. LE detained subject who physically resisted arrest by biting and kicking LE. Subject was charged with "Assault on an Officer" and transported. Crowd size was estimated at 5 demonstrators throughout the morning, afternoon, and early evening. The crowd size increased to an estimated at 25 demonstrators in the evening. Late in the evening a subject was warned repeatedly about encroaching upon federal property. CS gas and pepper ball were deployed for dispersion while LE went out for detention. One subject detained for "failure to comply" has multiple prior citations. Second subject detained for attempting to "un-arrest" first subject ("creating a disturbance"). Protesters continued to utilize megaphones with high frequency tones. The gathering was mostly peaceful with periods of verbal antagonism directed toward federal officers.

**11. Projected Incident Activity for the Next Operational Period:**

All FPS personnel will continue to perform LE operations at the facility on June 30, 2025.

All FPS personnel expected to perform OT (various times due to shift assignments, approximately 4 hours per Officer).

State of Oregon, et al v. Trump
**EXHIBIT**
**788**
USDC No. 3:25-cv-01756-IM

**12. Facility Damage Report**
Enter number of facilities for each category for this operational period. Detailed reporting for each facility should be submitted on a separate with building number, status, type of damage, etc.

| Risk Level | Closed | Damaged | Destroyed | Threatened (next 72 hours) |
|---|---|---|---|---|
| FSL 3/4/5 | | | | |
| FSL 1/2 | | | | |
| Other | | | | |

**13. Occupant Status:**

| Location | Evacuated | Sheltered | Injured | Fatalities | Missing |
|---|---|---|---|---|---|
| 4310 S Macadam | | | | | |
| | | | | | |
| | | | | | |

**14. Enforcement Activities:**

| Status | FPS | Agency _____ | Agency _____ | Agency _____ |
|---|---|---|---|---|
| Arrests | 3 | | | |
| Citations | 0 | | | |
| Use of Force (Level 4&5) | N | | | |

**15. LEO Status:**

| Assigned to IC's AOR | FPS | Agency _____ | Agency _____ | Agency _____ |
|---|---|---|---|---|
| Injury | | | | |
| Illness | | | | |
| Missing | | | | |
| Fatalities | | | | |

**16. Personnel Resource Commitment:**

| Personnel | FPS Host Region | FPS Deployed | Partner Agency ERO | Partner Agency | Partner Agency | Partner Agency | Other TVL | Total |
|---|---|---|---|---|---|---|---|---|
| Supervisors | 1 | 1 | 1 | | | | | 3 |
| Inspectors/Officers | 1 | 22 | 16 | | | | 1 | 40 |
| EDCTs | | | | | | | | |
| Special Agents | 2 | 2 | | | | | | 4 |
| Non-LE (Fed) | | | | | | | | |
| Contractors | 1 | | | | | | | 1 |
| Other | | | | | | | | |

**17. Personnel Assignments:**

| Personnel | Assigned Location OR6732 | Assigned Location OR0043 | Assigned Location | Assigned Location | Assigned Location | Assigned Location | Other | Total |
|---|---|---|---|---|---|---|---|---|
| Commanders/Supv | 2 | | | | | | | 2 |
| Inspectors | 23 | | | | | | | 23 |
| EDCTs | | | | | | | | |
| Special Agents | 3 | 1 | | | | | | 4 |
| Non-LE (Fed) | | | | | | | | |
| Contractors | 1 | | | | | | | 1 |
| Other | | | | | | | | |

**A397**
Confidential

OREGON_DEFS_00001210
OREGON_DEFS_00001209_0002

**18. Equipment and Countermeasures:**

| Type | Assigned Location OR5732 | Assigned Location OR0043 | Assigned Location | Assigned Location | Assigned Location | Assigned Location | Other | Total |
|---|---|---|---|---|---|---|---|---|
| MCV | | | | | | | | |
| SCV | | | | | | | | |
| Arrest Kits | 1 | | | | | | | 1 |
| Fence (linear feet) | | | | | | | | |
| PSO Posts | 1 | | | | | | | 1 |
| Light Tower | | | | | | | | |
| Port. Video System | | | | | | | | |
| cUAS | | | | | | | | |
| LRAD | 1 | | | | | | | 1 |

**A398**
Confidential

**PLS' EX. 788**
**Page 3 of 8**

OREGON_DEFS_00001211
OREGON_DEFS_00001209_0003

```
FPS INCIDENT SUMMARY (ICS 209)
1. Incident Name:
2. Version:
   Report No.
   _____         3. Incident Command:
Name: _____
Title:    Incident Commander
Name: _____
Title:     _____
4. Incident Type:
5. Incident Location: 6. Operational Period:
7. Submitted By: 8. Date Submitted:
9. Incident Objectives This Operational Period:
10. Significant Events for the Reporting Period:
11. Projected Incident Activity for the Next Operational Period:
FPS Operation
Support to Other LE
Multi Agency Operation
Initial
Update
Final
N/A
Portland 2025
TOC - Skip Jack - Portland
019
```
███████

Portland, Oregon
June 29, 2025, 0001 hours
███████

June 29, 2025, 2400 hours
As First Amendment activities against immigration raids continue at the ICE
facility downtown Portland, Oregon, Federal Protective Service (FPS) requires an
increased security posture in and around federally protected buildings. The ICE
facility has been experiencing large demonstrations ranging from peaceful to
violent protest activities. The possibility of civil unrest around the city, and
the general threat to the federal government necessitates an increased FPS presence
at FPS Protected Facilities in Portland, Oregon.  The objectives of this
operational period are to prevent additional damage to the facility and provide
security for contracted services to conduct repairs to the facility.
Crowd size was approximately 31 demonstrators off and on federal property in the
early morning. One subject was observed attempting to damage the vehicle entrance
card reader. LE detained subject who physically resisted arrest by biting and
kicking LE. Subject was charged with "Assault on an Officer" and transported. Crowd
size was estimated at 5 demonstrators throughout the morning, afternoon, and early
evening. The crowd size increased to an estimated at 25 demonstrators in the
evening. Late in the evening a subject was warned repeatedly about encroaching upon
federal property. CS gas and pepper ball were deployed for dispersion while LE went
out for detention. One subject detained for ?failure to comply? has multiple prior
citations. Second subject detained for attempting to "un-arrest" first subject

("creating a disturbance").  Protesters continued to utilize megaphones with high frequency tones. The gathering was mostly peaceful with periods of verbal antagonizing directed toward federal officers. Multiple LRAD warnings were issued to clear the vehicle entrance for arriving/departing personnel. At the time of this report there were approximately 30 protesters, peaceful.
All FPS personnel will continue to perform LE operations at the facility on June 30, 2025. All FPS personnel expected to perform OT (various times due to shift assignments, approximately 4 hours per Officer).
Yes
Yes
IC

♠
12. Facility Damage Report
Enter number of facilities for each category for this operational period.  Detailed reporting for each facility should be submitted on a separate with building number, status, type of damage, etc.
Risk
Level
Closed Damaged Destroyed
Threatened
(next 72
hours)
FSL 3/4/5
FSL 1/2
Other
13. Occupant Status:
Location Evacuated Sheltered Injured Fatalities Missing
14. Enforcement Activities:
Status FPS Agency _____ Agency _____
Arrests
Citations
Use of Force (Level 4&5)
15. LEO Status:
Assigned to IC?s AOR FPS Agency _____ Agency _____ Agency _____
Injury
Illness
Missing
Fatalities
16. Personnel Resource Commitment:
Personnel
FPS Host
Region
FPS
Deployed

Partner
Agency
_____
Partner
Agency
_____
Partner
Agency
_____
Partner
Agency
_____
Other
_____
Total
Supervisors
Inspectors/Officers
EDCTs
Special Agents
Non-LE (Fed)
Contractors
Other
17. Personnel Assignments:
Personnel
Assigned
Location
_____
Assigned
Location
_____
Assigned
Location
_____
Assigned
Location
_____
Assigned
Location
_____
Assigned
Location
_____
Other
_____
Total
Commanders/Supv
Inspectors
EDCTs
Special Agents
Non-LE (Fed)

Contractors
Other
Agency _____
4310 S Macadam
3
0
N
1
1
1
3
1
22
16
1
40
2
2
4
1
1
2
2
23
23
3
1
4
1
1
ERO
TVL
OR6732
OR0043

♠
18. Equipment and Countermeasures:
Type
Assigned
Location

_____
Assigned
Location

_____
Assigned
Location

OREGON_DEFS_00001209_0007

_____
Assigned
Location

_____
Assigned
Location

_____
Assigned
Location

_____
Other

_____
Total
MCV
SCV
Arrest Kits
Fence (linear feet)
PSO Posts
Light Tower
Port. Video System
cUAS
LRAD
1
1
1
1
1
1
OR6732
OR0043

⬆

# ACTIVITY LOG (ICS 214)

| 1. Incident Name: | 2. Operational Period: Date From          Date To: |
|---|---|
|  | Time From:          Time To: |
| 6/24/2025 ICE PROTEST | **06/24/2025 17:00 TO 06/25/2025 00:17** |

| 3. Name:<br>KATHRYN LINZEY | 4. ICS Position: Scribe - ICP/ECC | 5. Home Agency (and Unit):<br>PPB - TRAINING |
|---|---|---|

**6. Resources Assigned:**

| Name | ICS Position | Home Agency (and Unit) |
|---|---|---|
| CMDR. LEASURE | INCIDENT COMMANDER | PPB - DET |
|  | DEPUTY INCIDENT COMMANDER |  |
| LT. GREULICH | OPERATIONS | PPB - NORTH |
|  | DEPUTY OPERATIONS |  |
| SGT. FRANCIS | PLANNING | PPB - EMU |
| CATHY ROSSETTO | LOGISTICS | PPB - NOC |
| ███████████ | INTEL | PPB - CIU |
| ███████████ | INTEL | PPB - CIU |
|  | SITUATION STATUS |  |
| KATHRYN LINZEY | SCRIBE | PPB - TRAINING |
|  | EOC MANAGER |  |
|  | RESOURCES |  |
| SEAN HUGHY | LEGAL | MCDA |
| CARLOS IBARRA | COMMUNICATIONS | PPB - PIO |

**7. Activity Log:**

| Date/Time | Notable Activities |
|---|---|
| 6/24/25 | OPS BRIEFING |
|  |  |
|  | IC – CMDR. LEASURE |
| 17:00 | THERE WAS AN EVENT WITH A SMALL CROWD AT CITY HALL ABOUT 25 PPL – NOT TOO HOSTILE, I WALKED THROUGH IN MY UNIFORM |
|  | ONE MORE DAY OF IMT – APPRECIATE THE SACRAFICE |
|  | GONNA PASS IT OFF TO MARK FOR INTEL |
|  |  |
|  | ███████  – INTEL |
|  | NOT A LOT OF NEW INTEL – EVENT BEEN TALKED ABOUT FOR A WEEK IS SUPPOSED TO START AT 1900. IT'S DESCRIBED AS BLOCK PARTY - |

| 8. Prepared by: Name: | Position/Title: | Signature: _____ |
|---|---|---|
| **ICS 214   Page 1 of 9** | Date/Time: |  |

State of Oregon, et al v. Trump
**EXHIBIT 372**
USDC No. 3:25-cv-01756-IM

# ACTIVITY LOG (ICS 214)

| 1. Incident Name: | 2. Operational Period: Date From          Date To: |
|---|---|
|  | Time From:          Time To: |
| 6/24/2025 ICE PROTEST | **06/24/2025 17:00 TO 06/25/2025 00:17** |

|  |  |
|---|---|
|  | THEY ARE TRYING TO TIE IN THE NO WAR TOPIC TO THE ICE BLOCK PARTY. WE DO NOT EXPECT AN INFLUX OF NO WAR CROWD NUMBERS. POTENTIALLY SOME NEW NUMBERS BUT MOST LIKELY THE SAME PPL FROM PRIOR DAYS. |
|  | SOME CITY COUNCILORS HAVE MADE COMMENTS THAT CAN BE CONSIDERED SUPPORTIVE – THE CROWD MIGHT BE ENCOURAGED BY THOSE REMARKS. NO INTEL OTHER THAN THE PRIOR, BUT THERE MIGHT BE CHANGE IN THE ENERGY OF THE CROWD. |
|  | OUTSIDE OF THAT, ORGANIZERS ARE ENCOURAGING FOLKS TO GO DOWN TO THE ICE BLDG AFTER THE CITY HALL EVENT – 50 TO 70 PPL AT THE CITY HALL EVENT. GRAND TOTAL OF FIVE PPL IN FRONT OF ICE THIS AFTERNOON. MIGHT PEEL SOME OFF FROM THE CITY HALL EVENT NOW THAT IT'S COMPLETED |
|  |  |
|  | TODAY'S CASE# 25-680393, THE COST OBJECT IS STILL IO 9PLOP-814, RADIO STILL SE TAC1 |
|  |  |
|  | LOGISTICS – CATHY ROSSETTO |
|  | MEALS ARRIVE AT 1800 - SERVING AT KELLY |
|  | ALSO AT ICP – DLO'S WILL RECEIVE MEALS AT ICP AS WELL |
|  |  |
|  | PLANNING – SGT. FRANCIS |
|  | OBJECTIVES: |
|  | REMAIN SAME – SEE IAP FOR DETAILS |
|  | SITUATIONAL AWARENESS |
|  | COMMUNICATION WITH PARTICIPANTS, ENSURING SAFE LAWFUL ASSEMBLY AND DETERRING UNLAWFUL CONDUCT |
|  | ARREST/ENGAGE PPL FOR PERSON AND PROPERTY CRIMES |
|  | PROVIDE APPROPRIATE RESPONSE TO FIRE AND MEDICAL EVENTS |
|  |  |
|  | OPS – LT GREULICH |
|  | EVERYTHING TONIGHT IS SCALED BACK – IZZY AND ZAJAC WILL GIVE INTEL ON THE GROUND |

| 8. Prepared by: Name: | Position/Title: | Signature: _____ |
|---|---|---|
| **ICS 214**   Page **2** of **9** | Date/Time: |  |

# ACTIVITY LOG (ICS 214)

| 1. Incident Name: | 2. Operational Period: Date From | Date To: |
|---|---|---|
| | Time From: | Time To: |
| 6/24/2025 ICE PROTEST | 06/24/2025 17:00 TO 06/25/2025 00:17 | |

| | |
|---|---|
| | DLO WILL STAY STAGED AT KELLY – MIGHT MOVE CLOSER IF NEEDED |
| | RINSE AND REPEAT – SAME AS YESTERDAY |
| | |
| | APPRECIATE IT – THANK YOU AGAIN. TAKE CARE OF FOLKS – GET THEM BRIEFED. THAT'S IT. GOOD NIGHT. |
| | |
| 18:45 | DLO WITH YOUR 6:45 UPDATE: 20-25 LOW ENERGY IE TEAM CAME OUT BUT WENT BACK IN. CROWD WENT ROWDY FOR A BIT THEN CALMED BACK DOWN. OPS: COPY |
| | |
| 19:08 | DLO GATE IS OPEN, FPS IS STARTING TO COME OUT. OPS COPIES. |
| 19:11 | ALL VEHS ARE IN, FPS INSIDE, GATE CLOSED. NO PROBLEM FROM CROWD. OPS COPIES |
| 19:16 | DLO TO OPS: OPS: GO AHEAD DLO: THE CROWD HAS GROWN TO 50 PPL. WHEN ICE CAME OUT SOME PPL TEMPORARILY RESISTED GETTING OUT OF THE WAY FOR VEH. CROWD HAS SOME ENERGY, BUT NOTHING CRAZY. OPS COPIES. |
| 19:22 | ALSO MAYBE ONE OR TWO CAMERA CREWS ACROSS THE STREET FROM THE ICE BLDG OPS: COPY |
| 19:51 | DLO TO OPS: OPS: GO AHEAD DLO: THE ENERGY IS ABOUT THE SAME, BUT THE CROWD IS ABOUT 70 PPL NOW. ABOUT THE THIRD OF THE GROUP HAS HELMETS AND GAS MASKS ON. OPS: COPY |
| 20:25 | LIVESTREAM: ON SIDEWALK NEAR ICE BLDG 23 PEOPLE, TENT ON OTHER SIDE OF BANCROFT; UNKNOWN CROWD SIZE ON TENT SIDE |

| 8. Prepared by: Name: | Position/Title: | Signature: _____ |
|---|---|---|
| ICS 214   Page 3 of 9 | Date/Time: | |

# ACTIVITY LOG (ICS 214)

| 1. Incident Name: | 2. Operational Period: Date From      Date To:<br>     Time From:            Time To: |
|---|---|
| 6/24/2025 ICE PROTEST | 06/24/2025 17:00 TO 06/25/2025 00:17 |

| | |
|---|---|
| 21:00 | DLO TO OPS:<br>OPS: GO AHEAD<br>DLO: WE'VE RECEIVED A REQUEST FROM A RESIDENT AT A NEARBY APARTMENT BLDG – PPL HANGING OUT AROUND HER BLDG AND SHE'S HOPING TO HAVE US CALM THINGS DOWN WITH OUR PRESENCE. WE'RE GOING TO GO OVER THERE AND CHECK IT OUT.<br>OPS: COPY |
| 21:00 | OPS: DLO CAN YOU GIVE US CROWD SIZE ESTIMATE AND ENERGY LEVELS?<br>DLO: MMMM, 75-100 PPL, A LITTLE MORE ENERGY, SOME MUSIC, A LITTLE MORE CHANTS, AND ABOUT HALF OF THAT GRP IS STANDING IN THE ICE DRIVEWAY<br>OPS: COPY |
| 21:02 | DLO1: THE PROBLEM PEOPLE [AT THE APARTMENT BLDG] ARE GONE. OPS COPIES |
| 21:16 | OPEN SOURCE LIVESTREAM SHOWING 30-ISH PPL DIRECTLY IN FRONT OF ICE BLDG. |
| 21:46 | DLO:<br>OPS: OPS GO AHEAD<br>DLO: THE CROWD SIZE ABOUT SAME, MOST DRIVEWAY OR ALLONG RR TRAX. LOW ENERGY, NO CHANTING NO SHOUTING.<br>OPS COPIES |
| 21:59 | DLO TO OPS:<br>OPS: GO AHEAD<br>DLO: SMALL GROUPS, ABOUT 1-2, HAVE BEEN LEAVING. WE'RE DOWN TO ABOUT 80 PPL.<br>OPS COPIES. |
| 22:10 | DLO TO OPS:<br>OPS: GO AHEAD<br>DLO: FEDS MADE ANNOUNCEMENTS TO CLEAR DRIVEWAY, THAT ENERGIZED THE CROWD. CROWD SIZE DOWN TO 60.<br>OPS: COPY |
| 22:25 | LIVESTREAM: THREE ICE AGENTS STANDING ON OTHER SIDE OF FENCE. CROWD IS NOT INTERACTING JUST FILMING. |
| 22:26 | LIVESTREAM: FEDS MAKING ANNOUNCEMENTS, CROWD IS CHANTING "FUCK ICE" BUT MOVING OUT OF THE WAY. |

| 8. Prepared by: Name: | Position/Title: | Signature: _____ |
|---|---|---|
| **ICS 214**    Page **4** of **9** | Date/Time: | |

# ACTIVITY LOG (ICS 214)

| 1. Incident Name: | 2. Operational Period: Date From | Date To: |
|---|---|---|
| | Time From: | Time To: |
| 6/24/2025 ICE PROTEST | 06/24/2025 17:00 TO 06/25/2025 00:17 | |

| | |
|---|---|
| 22:28 | DLO TO OPS: THE FEDS HAVE LAUNCHED PEPPERBALLS AT THE DRIVEWAY AND ARE OPENING THE GATES. OPS: COPY |
| | DLO TO OPS THERE ARE STILL QUITE A FEW PPL BLOCKING THE DRIVEWAY. OPS COPIES. |
| 22:30 | LIVESTREAM: FEDS LAUNCHED GAS CANISTERS AND ARE MAKING ANNOUNCEMENTS TO MOVE OFF DRIVEWAY. |
| 22:30 | DLO TO OPS: FEDS ARE MAKING ANNOUNCEMENTS TO CLEAR THE DRIVEWAY. OPS: COPY |
| 22:33 | LIVESTREAM: CROWD NOW CHANTING "FUCK ICE" IN UNISON |
| 22:38 | LIVESTREAM: FEDS ARE MAKING ANNOUNCEMENTS FOR CROWD INDIVIDUALS TO REMOVE THEMSELVES FROM DRIVEWAY. |
| 22:39 | DLO: FEDS CAME OUT AND CLEARED SOME ROCKS FROM THE EAST SIDE WALL OF THE BLDG. NOT MUCH CROWD REACTION. |
| 22:45 | LIVESTREAM: FEDS MAKING ANNOUNCEMENTS TO CLEAR DRIVEWAY AND MOVE TO SIDEWALKS; GIVING SUBJECT TO ARREST WARNING FOR NONCOMPLIANCE. |
| 22:51 | DLO TO OPS: FEDS ARE MOVING OUT INTO THE DRIVEWAY AND SHOOTING PEPPERBALLS INTO THE CROWD. OPS: COPY |
| 22:52 | LIVESTREAM: FEDS COMING OUT WITH GAS AND GASMASKS AND SECURING DRIVEWAY |
| 22:53 | DLO: FEDS WENT BACK INSIDE THE FACILITY AND THE CROWD WENT BACK TO MOVING INTO THE DRIVEWAY. <br> OPS COPIES. <br> DLO: THERE'S ABOUT 50 PPL IN THE DRIVEWAY. <br> OPS: COPY |
| 22:54 | DLO TO OPS: THEY JUST SET OFF A FLASH BANG OPS: OPS COPIES |
| 22:55 | LIVESTREAM HAS AT LEAST TWO MIN DELAY. |
| 22:56 | DLO: THE GATE IS OPENING AGAIN. OPS: COPY |
| 22:57 | LIVESTREAM: FEDS MAKING THE ANNOUNCEMENT. SOUND OF PEPPERBALL DEPLOYMENT. CROWD IS CHANTING "ICE OUT OF PORTLAND" |
| 22:58 | DLO: THE GATE IS NOW CLOSED AND THE AGENTS ARE BEHIND THE GATE. |

| 8. Prepared by: Name: | Position/Title: | Signature: _____ |
|---|---|---|
| ICS 214 Page 5 of 9 | Date/Time: | |

# ACTIVITY LOG (ICS 214)

| 1. Incident Name: | 2. Operational Period: Date From          Date To:<br>Time From:          Time To: |
|---|---|
| 6/24/2025 ICE PROTEST | **06/24/2025 17:00 TO 06/25/2025 00:17** |

| | |
|---|---|
| 23:00 | 1623 TO OPS:<br>OPS: GO AHEAD<br>1623: FYI THERE WAS A SILVER FORD 994MKJ PARKED ON SE SIDE OF PRICINCT BY THE ROLL UP DOORS. JUST LEFT, NO REASON FOR IT TO BE HERE. STICKER ON DRIVER SIDE DOOR – COULDN'T MAKE OUT WHAT IT WAS.<br>OPS: COPY |
| 23:03 | DLO TO OPS: FEDS ARE CREATING A SCRIMMAGE LINE OF SORTS. THEY ARE DEPLOYING FLASH BANGS – HOPEFULLY SMOKE NOT GAS.<br>OPS: COPY |
| 23:03 | DLO: THEY DID TOSS SOME GAS OUT ON TO BANCROFT. OPS: COPY |
| 23:05 | LIVESTREAM: FEDS MOVING CROWD OFF OF PROPERTY. GREEN GAS OBSCURING VIEW. CROWD CHANTING "KILL YOURSELF". PEPPERBALLS DEPLOYED. |
| 23:06 | DLO: THEY JUST LET OFF ANOTHER CAN OF GAS. OPS: COPY |
| 23:08 | LIVESTREAM: FEDS MOVING INTO CROWD. GREEN SMOKE OBSCURRING THE ACTION.  PEPPERBALLS DEPLOYED. FEDS TOOK SOMEONE INTO CUSTODY. |
| 23:09 | LIVESTREAM: FEDS ARE ANNOUNCING THAT THE FACILITY IS CLOSED AND THAT THEY SHOULD REMAIN ON THE SIDEWALK. FEDS RETREATING BACK UP THE DRIVEWAY. |
| 23:10 | LIVESTREAM: GATES CLOSING, SMALLER CROWD MOVING BACK INTO PLACE ON SIDEWALK |
| 23:11 | DLO TO OPS: CROWD IS DOWN TO ABOUT 30. OPS COPIES. |
| 23:20 | LIVESTREAM HAS FEDS USING LESS LETHAL MUNITIONS. |
| 23:21 | DLO: FEDS ARE PUSHING EB ON BANCROFT – HALF BLOCK AWAY FROM OFFICE. THINK THEY'RE MAKING ARREST. DEPLOYING PEPPERBALLS AND IT LOOKS LIKE GAS.<br>OPS: COPY |
| 23:23 | DLO: EVERONE IS STILL JUST EAST OF MOODY. MOST OF THE CROWD ON THE CORNER, A FEW PEOPLE BY THE DRIVEWAY. |
| 23:24 | DLO: FOR YOUR KNOWLEDGE COUPLE OF PEOPLE YELLING FOR MEDICS BUT NO OBVIOUS SIGNS OF INJURY AT THIS POINT. GAS CANISTER THROWN OUT BY FEDS – PROTESTERS KICKED IT BACK. OPS: COPY |

| 8. **Prepared by:** Name: | Position/Title: | Signature: _____ |
|---|---|---|
| **ICS 214**   Page **6** of **9** | Date/Time: | |

# ACTIVITY LOG (ICS 214)

| 1. Incident Name: | 2. Operational Period: Date From | Date To: |
|---|---|---|
| | Time From: | Time To: |
| 6/24/2025 ICE PROTEST | 06/24/2025 17:00 TO 06/25/2025 00:17 | |

| | |
|---|---|
| 23:25 | DISPATCH: WE'RE GETTING CALL FROM FED POLICE. THEY HAVE PERSON IN CUSTODY WHO WAS NEEDING MEDICAL ATTENTION FOR SCRAPES. DID YOU WANT ME TO GET THEM STARTED?<br>OPS: YES.<br>DISPATCH: COPY |
| 23:26 | DLO: LOOKS LIKE FEDS MAKING THEIR WAY BACK TO THE DRIVEWAY BEING FOLLOWED BY PROTESTERS. DEPLOYING MORE GAS AND PEPPERBALLS. |
| 23:27 | DLO: APPARENTLY CROWD GOT TOO CLOSE. DISPATCH FYI THEY ARE GETTING OUT OF THE WAY FOR BUSSES AND CARS, SO IF THEY COME DOWN MOODY IT'LL BE FINE.<br>OPS COPIES.<br>DISPATCH COPIES. |
| 23:28 | DIPATCH: WE'RE GETTING ANOTHER MED CALL STARTED. SOMEONE IS UNCONSCIOUS AFTER THE CANNISTER HIT THEM IN THE HEAD. PERSON IN CUSTODY.<br>OPS: COPY |
| 24:33 | DISPATCH: CAN YOU ADVISE BEST ROUTE IN FOR THE AMBULANCE? WE TRIAGED THE 2ND CALL FOR THE UNCONSCIOUS PERSON CODE 3.<br>OPS: YES, BEST ROUTE IN IS MOODY IF DLO DOESN'T SAY OTHERWISE.<br>DLO: EITHER WAY – FASTEST ROUTE FOR THEM IS FINE. |
| 23:36 | MEDICAL WENT IN TO FACILITY WITHOUT ANY ISSUES. |
| 23:37 | DLO: PPL ARE PRETTY UPSET HERE. PRETTY AGITATED STATE RIGHT NOW.<br>OPS COPIES |
| 23:38 | 2ND AMR ARRIVED. AGAIN, NO ISSUES GETTING INTO DRIVEWAY |
| 23:56 | DLO TO OPS: PROBABLY 25 AGENTS JUST CAME OUT PROBABLY GOING TO DO MORE DIRECTED ARRESTS.<br>OPS COPIES.<br>DLO: THEY'VE EFFECTIVELY CREATED A SKIRMISH LINE DOWN BANCROFT TO THE E SIDE OF MOODY.<br>OPS COPIES. |
| 00:00 | DLO TO OPS: 1 AMBULANCE ARE LEAVING NOW AND THE CROWD IS MOVING OUT OF TH WAY FOR THEM. OPS: COPY. |
| 00:01 | OPS: ANY OTHER VEHICLES FOLLOWING AMBULANCE?<br>DLO: NO<br>OPS: COPY |

| 8. Prepared by: Name: | Position/Title: | Signature: _____ |
|---|---|---|
| ICS 214   Page 7 of 9 | Date/Time: | |

# ACTIVITY LOG (ICS 214)

| 1. Incident Name: | 2. Operational Period: Date From          Date To: |
| --- | --- |
| | Time From:          Time To: |
| 6/24/2025 ICE PROTEST | **06/24/2025 17:00 TO 06/25/2025 00:17** |

| | |
| --- | --- |
| 00:05 | DLO TO OPS: 2ND AMBULANCE IS AWAY<br>OPS: WAS IT ALONE?<br>DLO: IT WAS ALONE, NO OTHER VEHICLES<br>OPS: COPY |
| 00:06 | OPS TO DLO: WHAT'S THE CROWD SIZE?<br>DLO: CROWD HAS SHRUNK TO ABOUT 30 PEOPLE<br>OPS: WHAT'S THE ENERGY?<br>DLO: LOW ENERGY – NO CHANTING, ANGRY PEOPLE YELLING. FEDS CAME OUT OF THE BLDG BUT CROWD ONLY DID SOME YELLING.<br>OPS: COPY |
| 00:11 | PASSING TO CENTRAL: BRIEFING SGT. WORTHINGTON<br>LOW ENERGY – DOWN TO ABOUT 60. FPS TOOK A VERY AGGRESSIVE POSTURE TODAY. TOOK PPL INTO CUSTODY, MEDICAL FOR ONE UNCONSCIOUS AND A SECOND PERSON FOR SCRAPES. AMR CAME STAYED FOR 30 MINS, LEFT NO ISSUES. CROWD DOWN TO 30 PPL.<br>DON'T KNOW EXTENT OF INJURIES. EMAIL TO COMMAND. |
| 00:15 | IMT DEBRIEF:<br>NO DECISION POINTS – NO INVOLVEMENT<br>NO CLEAR INTENT – IF IT WERE NOT ICE, WE COULD ASSIST DIRECTLY<br>CITY COUNCIL POSTURING AND MESSAGING AND NO PPB PRESENCE<br>HEAVY HANDED FED RESPONSE FIRED UP AND GALVANIZED CROWD<br>LET'S DEMOBILIZE |

| 8. Prepared by: Name: | Position/Title: | Signature: _____ |
| --- | --- | --- |
| **ICS 214**   Page **8** of **9** | Date/Time: | |

## ACTIVITY LOG (ICS 214)

| 1. Incident Name: | 2. Operational Period: Date From          Date To: |
| | Time From:          Time To: |
|---|---|
| 6/24/2025 ICE PROTEST | **06/24/2025 17:00 TO 06/25/2025 00:17** |

| | |
|---|---|
| 00:17 | OPS TO FIELD ARREST TEAM<br>FIELD ARREST<br>YOU CAN SECURE<br>COPY THANK YOU<br>OPS TO DLO<br>DLO<br>YOU CAN SECURE<br>COPY THAT<br>OPS TO SOUNDTRUCK<br>SOUNDTRUCK<br>YOU CAN SECURE<br>COPY<br>OPS TO 1LINCOLN1<br>GO AHEAD<br>YOUR TEAM CAN SECURE<br>COPY THAT RRT []<br>OPS TO DISPATCH<br>DISPATCH YOU CAN SECURE<br>DISPATCH COPIES<br>THIS IS OPS. IMT IS DEMOBILIZED. OPS OUT. |

| 8. Prepared by:  Name: | Position/Title: | Signature: _____ |
|---|---|---|
| **ICS 214**   Page **9** of **9** | Date/Time: | |

CONFIDENTIAL
A412

CITY_000552

| | |
|---|---|
| **To:** | Wamsley, Cammilla█████████████████ |
| **From:** | Johnson, Erik R |
| **Sent:** | Thur 6/19/2025 8:14:37 PM |
| **Subject:** | RE: Portland, OR ICE protest - placing motor oil on driveway |
| **Received:** | Thur 6/19/2025 8:14:59 PM |

Copy, thank you.

**From:** Wamsley, Cammilla ████████████████████
**Sent:** Thursday, June 19, 2025 12:11 PM
**To:** Johnson, Erik R ████████████████████
**Subject:** FW: Portland, OR ICE protest - placing motor oil on driveway

Sent with BlackBerry Work
(www.blackberry.com)

**From:** ████████████████
**Date:** ████████████████

**Subject:** Portland, OR ICE protest - placing motor oil on driveway

Good afternoon,

Information was just passed to the ERO Intel team that activists/protesters are pouring used motor oil on the driveway of the ICE building in Portland, OR. Potentially causing a fire hazard and/or making the driveway slick for federal agents assigned to protest the property. See photos attached

Sent with BlackBerry Work
(www.blackberry.com)

████████████████
Supervisory Detention and Deportation Officer
Criminal Alien Program/Task Force Officer/Field Intelligence Officer
Seattle Field Office, Portland, Oregon
**Enforcement and Removal Operations**
**U.S. Immigration and Customs Enforcement**
████████████████████

This communication is UNCLASSIFIED//FOR OFFICIAL USE ONLY (U//FOUO). It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. 552). It is to be controlled, stored, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to FOUO information and is not to be released to the public or other personnel who do not have a valid "need-to-know" without prior approval of
an authorized DHS official. No portion of this communication should be furnished to the media, either in written or verbal form.

*Oregon v. Trump*
No. 3:25-cv-01756
**Defendants' Exhibit**
1076

**A413**

Confidential

OREGON_DEFS_00005234

# ACTIVITY LOG (ICS 214)

| 1. Incident Name: June 14 | 2. Operational Period: Date From 06/14/25  Date To: 06/15/25  Time From: 1700  Time To: |
|---|---|
| | |

| 3. Name:<br>Franz Schoening | 4. ICS Position: CMIC | 5. Home Agency (and Unit):<br>PPB |
|---|---|---|

### 6. Resources Assigned:

| Name | ICS Position | Home Agency (and Unit) |
|---|---|---|
| Schoening | INCIDENT COMMANDER | |
| Abrahamson | DEPUTY INCIDENT COMMANDER | |
| Nutting | OPERATIONS | |
| | DEPUTY OPERATIONS | |
| Pak | PLANNING | |
| Erspamer | LOGISTICS | |
| ███████ | INTEL | |
| | SITUATION STATUS | |
| | SCRIBE | |
| Francis | EOC MANAGER | |
| | RESOURCES | |

### 7. Activity Log:

| Date/Time | Notable Activities |
|---|---|
| 1700 | Ops Briefing |
| 1700 | RRT CEOT authorized based on information from FPS that members of the crowd are assaulting federal |
| | Employees and using incendiary fireworks to target a federal building. |
| 1717 | Fire alarm activated at ICE. Confirmed with FPS no fire. |
| 1740 | FPS 877-437-7411 asking for a call |
| 1748 | ICE calling saying they are barricaded in the building and fire lit. Difficult to get accurate information from them.  What they say is happening is frequently contradicted by video feeds and subsequent activity.  Air 1 shows no fire.  Shortly after they reported being barricaded, |
| 1750 | ICE needs medical |
| 1756 | Based on fire and barricades doors, sound truck providing announcements |
| 1759 | RRT putting together a plan to intervene if life safety issue presents |
| 1810 | Federal employee who is injured is stable and treating in place. |
| 1810 | Sound truck tried making announcements but crowd immediately became hostile towards them |
| 1824 | Based on assaults on FPS agents, breach of the doors, ongoing criminal activity, Sound truck riot declaration authorized. Sound truck moved to I-5 for announcements |
| 1830 | BWC activation is authorized. |
| 1833 | Sound truck announcements not clear. Repositioning |
| 1835 | Announcement going out from Moody and Gaines. Riot declaration. |

| 8. Prepared by: Name: | Position/Title: | Signature: _____ |
|---|---|---|
| ICS 214   Page **1** of **3** | Date/Time: | |

State of Oregon, et al v. Trump<br>**EXHIBIT**<br>**327**<br>USDC No. 3:25-cv-01756-IM

**PLS' EX. 327**
**Page 1 of 3**

# ACTIVITY LOG (ICS 214)

| 1. Incident Name:  June 14 | 2. Operational Period:  Date From  06/14/25 | Date To: 06/15/25 |
|---|---|---|
|  | Time From:  1700 | Time To: |
|  |  |  |

| 1836 | OSP authorized for PAVA |
|---|---|
| 1850 | Riot declarations going out again. Direction to RRT for targeted arrests if PC exists |
| 1855 | FPS will call back when they are ready to transport |
| 1900 | Crowd has mostly moved away from front of building.  No visible crimes being committed. |
| 1925 | FPS employee just came out of Macadam side of building and said they have been using this door regularly for employee ingress/egress.  This door was reported earlier to be barricaded. |
| 1933 | Per LM1, FPS employee said officer who had reported head injury earlier just has minor abrasion. |
| 1945 | Working on locating persons we have PC to arrest for attempt APSO.  Putting plan together to arrest |
| 2006 | RRT putting together plan to arrest rock thrower at Moody/Lowell. |
| 2008 | RRT in custody |
| 2009 | Requesting medic for citizen. Leg injury. Not force related. |
| 2015 | FAT away with arrest. No resistance from crowd. |
| 2100 | No change. FPS planning to go back inside |
| 2120 | FPS still outside |
| 2128 | Requesting mutual aid from County RRT. |
| 2130 | FPS went back inside |
| 2140 | Warnings about criminal activity pushed out |
| 2145 | Asked about any calls from neighborhood about calls regarding health and safety concerns.  Answer is no. |
| 2155 | Report from inside ICE about fire next to facility. |
| 2200 | Air 2 and ground units confirm no fire.  Flickering yellow lights in driveway |
| 2215 | Crowd slowly dwindling. Down to 150 |
| 2220 | People kicking at door but no damage, no PC |
| 2235 | PC for person throwing rock. Sound truck pushing out targeted arrest announcements. RRT making plans |
|  | For targeted arrest. |
| 2238 | 5 Large 4-wheel drive trucks driving through area. |
| 2243 | RRT putting together plan for arrest. |
| 2245 | Moody/Lowell arrest made. RRT officers pepper sprayed and liquid thrown at them. |

| 8. Prepared by:  Name: | Position/Title: | Signature: _____ |
|---|---|---|
| ICS 214   Page **2** of **3** | Date/Time: | |

# ACTIVITY LOG (ICS 214)

| 1. Incident Name:  June 14 | 2. Operational Period: Date From  06/14/25        Date To: 06/15/25 |
|---|---|
| | Time From:  1700                     Time To: |
| | |

| 2315 | FPS asking for assistance with transports for 1 adult and 1 juvenile. Also have 1 juvenile in custody on bad-pc but want to hand them off to us. We are declining to assist in facilitating transport |
|---|---|
| 2325 | Based on violence, RRT bikes is transitioning to full PPE |
| 0045 | Truck dropping barricades at ICE and then driving on Macadam stealing additional barricades. |
| 0100 | MFF in-custody with barricade theft suspect. |
| 0110 | Crowd has been subdued. Down to 30-40.  Demob plan being put together to hand event over to Central and North MFF. |
| | |
| | |
| | |
| | |
| | |
| | |

| 8. Prepared by:  Name: | Position/Title: | Signature: _____ |
|---|---|---|
| **ICS 214**   Page **3** of **3** | Date/Time: | |



# Oregon State Police
## Post Incident Summary: DRAFT
## Portland "ICE" Protests

### June 14, 2025:

**Portland Daytime:** MRT deployed 8 Troopers and 1 Sergeant to the City of Portland for a pre-planned daytime "No Kings" rally and march. This was a nationwide protest event. The MRT Troopers worked with members of the Portland Police Bureau with a mission to aid and facilitate the peaceful rally and subsequent march throughout the city. These members deployed on police mountain bikes and 'leap-frogged' ahead of the march blocking intersections, preventing vehicle traffic from interfering with the march. The group gathered around the Battleship Memorial in the waterfront and after approximately an hour of speeches, left the area in a planned, albeit unpermitted march in downtown. The group was estimated to be nearly 50k people and took several hours to complete the 2.5 mile loop back to the waterfront. This event remained peaceful and required no enforcement activity from OSP personnel. No incidents of criminal activity were reported to OSP command.

**Portland Evening:** Following this event, MRT had gathered one squad of Troopers and a handful of support personnel, in public order protective equipment along with a small team of SWAT personnel acting as an emergency quick response team. This team was deployed following an approved request from the Portland Police Bureau for mutual aid to assist them with a known protest event at the ICE facility in Portland.

MRT left the Portland Patrol Office in Milwaukie around 5:30pm and headed to a staging location off S. Macadam Ave, south of the Tesla building and about 2 blocks south of the ICE facility.

While this team (and PPB's team) were in route, a large crowd had already gathered around the ICE facility, post downtown march, and before the proper resources were in place.

The crowd numbered approximately 400, with around 1/3 being individuals dressed in 'black bloc.' The individuals dressed in 'black bloc' were very active, high energy and engaged in active criminal conduct. The remaining individuals seemed to be just around for 'the show,' as they posed no threat and did not engage in criminal activity. They simply observed from a distance.

Due to the high level of criminal activity, it became an objectively dangerous and unlawful situation, and a riot was declared by the incident commander from PPB.

**PLAINTIFF'S EXHIBIT**
**36**
3:25-cv-01756-IM



EXHIBIT
3
DEPONENT NAME: Dailey, Cameron   DATE: 10 12/3/25

Level 3 - Restricted
CONFIDENTIAL

Due to several issues with the sound truck and the announcements/admonishments being projected, and resources not being readily available, no immediate law enforcement intervention was available at that time.

Federal law enforcement officers regularly engaged the crowd with a variety of riot control agents presumably including pepperballs and hand-toss CS gas grenades.

Once MRT and RRT arrived at the staging location, they immediately prepared to intervene and restore order in the streets outside the facility.

By this time, multiple announcements from an LRAD were broadcast notifying all present of the riot declaration and that criminal activity had been observed. Time was provided for individuals to leave the area, per the admonishment. Some did leave; most remained.

Eventually the dynamics of the situation calmed and instead transitioned into a 'cat and mouse' game with federal officers. This lasted for several hours and well into the evening.

Protestors would gather in front of the facility, vandalize it, and throw rocks at it until federal officers exited the building and engaged the group with riot control agents and CS gas. This response was only temporarily effective. The crowd would immediately scatter but only for a few minutes until the gas had dissipated and then they regrouped at the building in a standoff type of posture. This cycle of back and forth continued for hours.

In the late evening, probable cause was developed for several individuals. These individuals were arrested by members of PPB's bike team, supported by members of MRT.

Officers who entered this area were met with criminal violence and attempted or real assaults on police officers, with PPB bike officers getting objects thrown at them and two getting pepper sprayed. This group would not engage with dialogue officers and bike officers felt unsafe entering the area by themselves. As a result, there was little to no officer presence.

This activity continued until the early morning hours of Sunday, until MRT was released for the night.

MRT members reported no uses of force, no injuries to personnel, no arrests and no munitions deployed.

Initial challenges included the seemingly high threshold PPB had for arrests. This included only felony level person crimes, or crimes involving life-safety, but also included felony level property crimes.

This threshold proved difficult to meet and resulted in no real intervention by law enforcement, while simultaneously allowing low-level public disorder criminal activity to continue.

Level 3 - Restricted
CONFIDENTIAL

NATG-OR-000196

A418

Plaintiff's Exhibit 36
Page 2 of 4

Protestors were scattered throughout the street, effectively blocking civilian traffic without consequence from law enforcement. Protestors were free to throw objects at the building, kick at doors, graffiti the windows and walls and no enforcement action was taken by local law enforcement.

Additionally, the tactics deployed by federal agents were not effective and only seemed to provoke or encourage further criminal conduct. It was very reminiscent of the tactics observed by federal officers during the protests in 2020 at the Federal Courthouse in downtown Portland.

By not addressing the unlawful crowd in the street who were engaged in or assisting those conducting acts of violence and destruction to the federal facility, the protestors were free do as they pleased with no real risk of arrest, or intervention by police.

Law enforcement needs to address (as they have done in the past), *and* effectively communicate the difference between maintaining or restoring public order to a state of normalcy from the perception of assisting or facilitating federal immigration agents.


June 15, 2025:
MRT deployed with the same footprint as the previous night. Except on this night, the team was staged and ready by 5:30pm.

There was no known event planned for this night at the ICE facility however, the past week's nightly events had concerned law enforcement for the potential of another unlawful gathering.

The crowd size this night was much smaller, numbering around 100 with only 40-50 dressed in "black bloc.' This group had very low energy and remained gathered in front of, or near the ICE facility.

Criminal conduct was limited to a potential criminal trespass and disorderly conduct, as a few individuals were in the street or remained on federal property.

Due to the low energy and lack of public order related criminal conduct, there was no enforcement action taken by police with the group. At some point in the evening hours, a plan was put in place to address the handful of individuals walking across the street or gathering momentarily in the street. At this time, traffic was still moving freely and unrestricted.

This plan was never executed, and no arrests were made.

This represented a *significant* decrease in the presumed threshold of criminal conduct from the previous night. Although the new approach was welcomed, it was ultimately not necessary for this group based on their conduct and the overall dynamics of the group.

Level 2 - Restricted
CONFIDENTIAL

Plaintiff's Exhibit 36
Page 3 of 4

Federal agents did not engage with the group either, and MRT was released for the night shortly before 11pm.

Upon the team's return to the patrol office, criminal activity was being broadcast on the radio as the group had now begun to throw objects at the facility and consolidate their resources in preparation to vandalize the building or engage in 'cat and mouse' style tactics with federal officers.

A call was made to the incident commander asking if MRT was needed to return and assist. This request was denied as PPB had enough resources to handle the situation.

The team was ultimately released from the event, and Troopers returned to their duty stations.

The following morning, I learned after MRT was released, PPB was able to make several arrests. One of these arrests resulted in an injury to a suspect.

In the evening of June 16th, I learned PPB officers did not engage with the group gathered in front of ICE. Their officers remained within sight, but kept their distance and did not interact with the group. The group size was reported to be around 40 individuals dressed in 'black bloc.' They had very low energy and remained mostly on the sidewalk.

PPB released their officers around 11:30pm. They reported no arrests, no uses of force, no injuries and no munitions deployed.

However, federal officers did engage with the group. Federal officers utilized riot control shields to combat the protestors who were also equipped with homemade shields. This interaction resulted in federal officers making several arrests, possibly up to 4. Additionally, the ICE facility is now boarded up, with windows and exposed glass doors being covered with plywood.

Looking further into the week, there is one known protest event scheduled to occur tomorrow evening at ICE. PPB is also presuming more events to occur this Friday and Saturday as we head into the weekend.

Cameron Bailey, Captain
Criminal Investigations Division

Level 3 – Restricted
CONFIDENTIAL

Plaintiff's Exhibit 36
Page 4 of 4

| From: | Crooker, James |
|---|---|
| To: | Abrahamson, David; Schoening, Franz; Jensen, Jacob; Clark, Jacob; Leasure, Michael; Dobson, Craig; McMillan, Amanda; Giovik, Christopher; Porter, Mike; Hughes, Brian; Dulio, Ken; PIO, Police Bureau; Day, Robert |
| Subject: | Public Order Summary - ICE, June 12 |
| Date: | Friday, June 13, 2025 2:57:49 AM |
| Attachments: | Public Order Summary 25.06.12 - ICE Facility.pdf |

See attached.

A more comprehensive timeline of events:

1600hrs – Command post established. Livestream on public media is found and streamed into the ICP for real-time situational awareness. HUMINT also in the crowd.

1700hrs – Briefing

1730hrs – Crowd size before event is approx. 40-50.

1800hrs – Event starts. Crowd is hostile towards police. DLOs not deployed yet until RRT is in position for safety reasons.

1800hrs – CMIC makes direct phone contact with the SRT commander to open a channel of communication and share expectations regarding our involvement is primarily focused on life-safety as the crowd size gets large and was very hostile yesterday.

1806 – Black Bloc protester with helmet and pepper spray is hanging donuts on the ICE facility entry control speaker. Crowd is beginning to arrive in numbers. No crimes yet, other than standing in the driveway.

1807 – Sound amplification devices begin. Mic Checks, etc.

1810 – North Precinct staged nearby in 2-person cars.

1812 – Antifa presence is significant. Antifa handbooks seen at scene, handed out.

1820 – Crowd is growing, approx. 100 ppl. Helmets, gas masks, pepper spray visible. The crowd is cursing at ICE from outside. Still no criminal activity observed beyond standing in large numbers in the driveway. Debris in driveway.

1823 – RRT enroute from staging location after briefing.

1826 – The crowd now numbers approx. 200 people.

1826 – Federal personnel exit the ICE facility in tactical gear in a skirmish line with what appear to be FN303s. No warnings are heard, and federal personnel begin firing pepper balls on the crowd. This enraged the crowd, who begins pulling out makeshift shields and throwing things at the agents who fired on them. PPB DLOs were directed not to engage in this hostile crowd for safety reasons.

1835 – All MFFs begin staging

1840 – Sound Truck staging

1844 – ███ is authorized to observe the crowd in plain clothes. Underlying crimes: Blocking the driveway, throwing objects into the ICE courtyard.

1845 – PIO begins social media messaging (Twitter)

1853 – RRT requests all Field Arrest Team and custody cars stage with RRT to coordinate plans in the event of life-safety intervention

1857 – Crowd size growing to over 300. Difficult to track all activity. Graffiti is starting to appear but unknown suspect (hiding in crowd). Approx 50+ in black bloc

1900 – Lost livestream feed due to technical issues. It returns later in the night.

1905 – 1L1 preparing a clearing plan with all resources in the event of a life-safety risk that requires intervention. Still no life-safety risks. Graffiti spreading. No felony PC for anyone at this time.

1914 – RRT Alpha (Bike Squad) on scene and gets eyes on the crowd from distance. Updates provided via radio. Still no PC for serious crimes. No life-safety risks. Crowd extremely hostile towards ICE and police.

State of Oregon, et al v. Trump
EXHIBIT
318
USDC No. 3:25-cv-01756-IM

1916 – Crowd continuing to grow with more people not dressed in all black. People begin wearing orange reflective vests and providing traffic control on the streets.

1918 – While the crowd grows, those closest to the ICE facility appear to be continuously screaming at ICE personnel while those furthest away appear to be holding signs and engaging in voicing their message more broadly.

1920 – RRT Bravo squad has eyes on and reports approximately half the crowd (~200) is in black bloc and ready for a fight. The other half is not in this dress or posture.

1928 – As opportunity to engage with the less militant crowd presents itself, DLOs and bicycles begin engaging directly with the crowd. This is successful initially, and expands communicating directly with corkers later.

1934 – Ops Chief makes phone contact with the FPS Area Commander to open a channel of communication. Communicates expectations. We are focused on life-safety. Confirms there are approx. 15 people inside the facility.

1936 – Crowd continues to grow. Several individuals in black bloc are carrying squirt guns with unknown fluid and appear to be seeking confrontation with police.

1943 – PC is established for a female in black bloc seen spraypainting a window (misdemeanor). She is dressed in all black. Images of her were sent to the CMIC and Intel from FPS personnel with a camera inside the facility. The crowd is nearly 400 people at this time. This PC was considered and determined to be a high-risk and high-cost custody. She disappeared in the crowd and no action was taken at this time.

1945 – Ops chief gives RRT Commander field authority to make appropriate initiative arrests if opportunities present themselves to eliminate lag-time in the process.

1945 – DLOs continue to engage. PIO tweets engagement on social media.

1948 – FPS advises a person or people in black bloc are using slingshots to shoot cameras. Crowd numbers exceed 400. Angry chanting anti-police curses, etc.

1952 – RRT (███) has PC and eyes on a suspect in the heart of the crowd. Planning to watch and arrest at time/place to prevent any potential flashpoint in the large crowd. The suspect is later lost in the dense crowd. Pictures distributed.

1953 – Corkers are observed blocking traffic for the group. DLOs attempt to engage with them, but are rebuffed. The corkers do not like police, and all efforts at engagement are met with hostility. DLOs disengage to prevent flashpoint.

2000 – Crowd is so large, it's blocking all lanes of travel in the area. Various people helping with traffic control effectively rerouting cars.

2020 – Bags of what appear to be rocks appear staged throughout the inner crowd. Any plans to attempt to seize the rocks would result in significant force and confrontation in the 400+ crowd. The rocks are placed in the driveway of the facility. It is overheard in the crowd that direct action is planned for after sunset.

2023 – Front doors appear to be ziptied and barricaded. There are other doors for entry/exit. Unknown if they are also barricaded. FPS is contacted to confirm.

2026 – The crowd now appears to have 100+ in black bloc. Some appear to be attempting to light a fire in the driveway. FPS reports all their doors are ziptied. This information resulted in PPB preparing to clear the hostile crowd due to life-safety. Before executing the plan, we began efforts to confirm whether they did or did not have other avenues of ingress/egress accessible.

2027 – 1L1 directed to develop and execute a plan pending confirmation that the doors are all locked. It took over 30 minutes for them to confirm this information was incorrect, and the plan was not executed.

2036 – Crowd is well over 400+. Part of the crowd announces they intend to march. PPB RRT Alpha (bikes) is peeled away to ensure traffic control for the unpermitted march.

2050 – March begins. About half the crowd remains behind. They are the more militant

half, hovering around rocks. Many in bloc are seen holding rocks.

2052 – Marchers dissipate, appear to go home. The scale of graffiti begins to be apparent on the building. The crowd at the facility remains approx. 200.

2105 – Doors are now confirmed to not be barricaded.

2105 – FPS personnel are observed on the livestream in the command post as they exit through a door of the ICE facility and begin firing pepper balls into the crowd again, and then return to the building. We were not in communication with FPS during this time, and had no knowledge of their intent to deploy force.

2125 – FPS calls the command post to advise someone has thrown or slungshot rocks at a second story window and broken it. A picture was shared with field personnel but was not actionable.

2127 – Dumpster is seen being pushed into the driveway of the ICE facility by people wearing all black. Flares are later observed in the crowd, but none are lit or used to start a fire.

2144 – The plan to clear the crowd is directed due to all the attempts to light these fires. It begins with soundtruck admonishments.

2147 – Soundtruck admonishments are effective. Members of the crowd immediately begin to clear out. After observing this, a tactical pause was implemented to allow the crowd to clear out before engaging.

2201 – Crowd down to about 100. Very hostile, but thinning out. Chanting anti-police and anti-ice chants.

2232 – Crowd down to approx. 75. Chanting "Fuck ICE." Still thinning out, but hostile.

2304 – Crowd maintaining the same posture. Still chanting. Approx 100 now. Very hostile.

2332 – MFFs released as crowd shrinks

2336 – SRT Commander Tom Persad called me. He advised they are locked in the building all doors are barricaded. I confirmed this 3 times during the call. This initiated a rescue plan for life-safety. RRT cameras activated.

2337 – RRT coordinates arrest of Austin Laughlin for Arson II

2339 – SRT Cmdr Tom Persad calls back to inform me that they are not, in fact, barricaded in. They have options available for egress.

2340 – A fire is reported and observed on livestream. RRT gets on a line and begins clearing the crowd.

2344 – RRT is 10-61 with second coordinated arrest

0000 – RRT is 10-61 with third coordinated arrest

0006 – RRT is 10-61 with fourth coordinated arrest

0007 – Central Precinct is requested to send officers to post guard on police cars as we engage with the crowd.

0008 – The remaining crowd is focused on RRT. There is moderate resistance. RRT has PC and arrests 6 more individuals (Total 10 so far).

0008 – A tactical pause. Coordinate custody car rotations. Reset for next move.

0008 – RRT Forming a line formation on Bancroft, stabilizing the scene and preparing for the next wave. The crowd is focused on RRT, screaming and flashing lights.

0044 – RRT still in a tactical pause. Discussions about whether this is a good point to disengage.

0105 – FPS is notified of the 10 arrests and the plan to disengage.

0107 – Exit plan initiated. Crowd amps up.

0125 – All livestreams go down. PPB no longer has eyes on the event. Sgt Worthington (CE) notified he has command of the event. He is briefed and provided with contact info for FPS SRT Commander.

0137 – Crowd down to 30 per DLO. All resources released.

Captain James Crooker
Portland Police Bureau

CONFIDENTIAL

CITY_000339

# ACTIVITY LOG (ICS 214)

| 1. Incident Name: | 2. Operational Period: Date From          Date To: |
|---|---|
| | Time From:          Time To: |
| ICE Protests | 6/12/2025 16:30 – 6/13/25 01:30 |

| 3. Name:<br>Kathryn Linzey | 4. ICS Position: Scribe - ICP/ECC | 5. Home Agency (and Unit):<br> PPB Training |
|---|---|---|

**6. Resources Assigned:**

| Name | ICS Position | Home Agency (and Unit) |
|---|---|---|
| Captain Crooker | INCIDENT COMMANDER | PPB SRD |
| None | DEPUTY INCIDENT COMMANDER | |
| Lt. Greulich | OPERATIONS | PPB North Precinct |
| None | DEPUTY OPERATIONS | |
| None | PLANNING | |
| Thomas Nancarrow | LOGISTICS | PPB East Precinct |
| ▮▮▮▮▮▮▮ | INTEL | PPB CIU |
| None | SITUATION STATUS | |
| Kathryn Linzey | SCRIBE | PPB Training |
| None (Thomas, Lt. Quick) | EOC MANAGER | PPB |
| PFR | RESOURCES | |
| Rob Root | Fire Medical Ops | PFR |
| CHO PIO | Terri Wallo-Strauss | PPB |

**7. Activity Log:**

| Date/Time | Notable Activities |
|---|---|
| 6/12/2025 | |
| 17:00 | OPS Briefing including PPB and PFR |

| 8. Prepared by: Name: | Position/Title: | Signature: _____ |
|---|---|---|
| ICS 214    Page **1** of **19** | Date/Time: | |

CONFIDENTIAL<br>A425

CIT

State of Oregon, et al v. Trump
**EXHIBIT
319**
USDC No. 3:25-cv-01756-IM

# ACTIVITY LOG (ICS 214)

| 1. Incident Name: | 2. Operational Period: Date From Date To: |
|---|---|
| | Time From: Time To: |
| ICE Protests | 6/12/2025 16:30 – 6/13/25 01:30 |

| | |
|---|---|
| 17:30 | Cpt. Crooker:<br>Life safety most important – other is distraction<br>Mostly focused on this and no other missions<br>Crowds trying to light fire, PFR is here to handle these concerns.  RRT will handle rigs getting into<br>24 hr changes: new booking reqs, signed trespass agreement for TriMet on N side of tracks – states includes property 13 ft from tracks on both sides of tracks<br><br>Lt. Greulich:<br>ORS field arrest team T Tyler 4 cars – may change from MFF to Custody, take overall photos it's easier to id in crowds based in evidence.  Make better determination in crimes than last activation.  DETS has given clarification.<br>Go through observational objectives – focus more on BLOs – who is organizer and make contact, extend olive branch.  Engage in meaningful conversations – not just observers and get on radio.  Sit awareness – paint picture of situation on ground. OBJ 4,5,6 will be what RRT commander conveys on radio.<br>IN this situation RRT Commander will be centralized authority.<br>Lt. Quick:<br>Gave PPoint presentation, upadated case number, cost object, channel – go live at 1800<br><br>Supervisors – inspect teams, crowd control numbers, batteries charged, be ready to make arrests, strategic arrests, transition as quickly as possible back to crowd stewardship<br>Teams not actively assigned/MFF – engage in high visibility. |
| | Case #25-680325 1700 - 0200 – SE TAC 1<br>9PLOP0000814 |
| 18:00 | (Quick) No 204 from RRT – contacted and still waiting |
| | Tik tok being reviewed given to FPS commander SERT Team |
| | |
| 18:04 | GL01 to OPS:<br>OPS: go ahead<br>GL01: At staging location drove by facility 40-50 people in a line. Low energy<br>OPS: monitoring |
| | Field Commander – Lt. Duilio |
| | ICE building – mandoor on inside of gate was blocked last night – main doors to the west were barricaded with bars or something.  That's where the fuel was placed. |
| 18:08 | Protesters using noise amplification devices, people wearing all black with masks in crowd, drinking alcohol on tik tok feed |

| 8. Prepared by:  Name: | Position/Title: | Signature: _____ |
|---|---|---|
| **ICS 214**   Page **2** of **19** | Date/Time: | |

# ACTIVITY LOG (ICS 214)

| 1. Incident Name: | 2. Operational Period: Date From                    Date To:<br>Time From:                    Time To: |
|---|---|
| ICE Protests | 6/12/2025 16:30 – 6/13/25 01:30 |

| | |
|---|---|
| | Courier to OPS:<br>OPS: go ahead<br>Courier: North staged at the south side of the Ross Island bridge<br>OPS: copy |
| 18:06 | One of individuals in black block had can of pepper spray on his person (his belt) |
| 18:13 | Antifa manifesto handbook displayed on tik tok feed.  "Fuck ICE" chanted.  Low energy. |
| 18:16 | Ski masks and motorcycle/bike helmets going near ICE gate about five loitering loosely gathered |
| | Amanda Siebe in wheelchair present at ICE Building |
| 18:21 | Gas masks helmets pepper spray hanging out on driveway.  Starting to see makeshift shields out of Tupperware/plastic bin tops. Chanting "Chinga la Migra" |
| | Energy increasing on driveway – ICE presence behind gate.  Amplified chanter is becoming more energized.  Protesters waiving American flag with Anarchy symbol spray painted on it.  Chanting "Why are you wearing riot gear?  We don't see no riot here." |
| 18:25 | Chants changed:  "No cops, no KKK, no racist USA"<br>ICE Gate opened – ICE officers coming out. Moving the protesters back with pepper balls |
| 18:29 | OPS to RRT Commander: Giving update on ICE officers from above<br>RRT Commander: [Acknowledged]<br>OPS: Forming line now pressing up against the gate, protesters moving back into place<br>RRT Commander: Copy that.  Squad and bikes – you ready?<br>OPS: Looks like we got one car [coming out]<br>RRT Commander: Deploy the DLOs and half the bike squad<br>OPS: Don't think deploying the DLOs would be appropriate – crowd is not violent, just loud<br>RRT Commander: Copy that<br>OPS: about 200 protesters<br>RRT C: Copy that<br>OPS: What just occurred was to allow 4 cars to leave facility. Deployed pepper balls to clear driveway and moved back behind gate. NO PPB members – directed DLOs to disengage for their safety. |
| | IC:  No warnings heard at IMT for pepper ball deployment? No |
| | ██████████ : 200 people (roughly half blak blok) |
| 18:34 | Crooker over radio – For situational awareness:  About 200 people, blak blok/helmets, throwing donuts at the gate, ICE came out with pepper balls and the crowd is angry now |

| 8. Prepared by:  Name: | Position/Title: | Signature: _____ |
|---|---|---|
| ICS 214   Page **3** of **19** | Date/Time: | |

# ACTIVITY LOG (ICS 214)

| 1. Incident Name: | 2. Operational Period: Date From          Date To:<br>Time From:         Time To: |
|---|---|
| ICE Protests | 6/12/2025 16:30 – 6/13/25 01:30 |

| | |
|---|---|
| 18:36 | Crooker over radio:  Shortly activating the East and Central North forces already activated in 4 2-person cars |
| 18:40 | Courier:<br>RRT: Go ahead<br>Courier:  If something pops off and we need – I came come out down Moody..<br>RRT Command: We ended up in the middle of the crowd [travelling on Moody] going to come down McAdam<br>Courier: We're going to need everyone – so condensed an area – need to have a lot of manpower<br>8-10 people in neon green vests and blocking Bancroft. They've set up their own traffic control.<br>Copy<br>They are out on the street, blocking the street |
| 18:43 | Hobbs: based on criminal acts we are seeing. Authorized to activate [unit] if they're ready.  RRT Commander: Lt Duilio copies |
| 18:46 | OPS: East and Central mobile forces are now in route |
| | |
| 18:42 | Sound truck is staging by McCormick and Schmitz and preparing messages in anticipation of activation. |
| 18:49 | Protest Chants:<br>No bans, no walls – free them all<br>Say it loud and say it clear: immigrants are welcome here<br>Say it once and say it twice: we will not put up with ICE<br>Fuck-ing Racists (call and response) |
| 18:49 | OPS: Who wants to be Field Arrest Team Sergeant?<br>T Tyler<br>Where are you currently stationed<br>Central Precinct<br>Copy. Stand by |

| 8. Prepared by:  Name: | Position/Title: | Signature: _____ |
|---|---|---|
| **ICS 214**   Page **4** of **19** | Date/Time: | |

## ACTIVITY LOG (ICS 214)

| 1. Incident Name: | 2. Operational Period: Date From | Date To: |
|---|---|---|
| | Time From: | Time To: |
| ICE Protests | 6/12/2025 16:30 – 6/13/25 01:30 | |

| | |
|---|---|
| 18:49 | IC: go ahead<br>Custody cars staging<br>Copy ghost location<br>We are directly to the west of the building – South of the Tesla facility<br>Copy does the Field Arrest copy?<br>Just confirming that it's Field Arrest team not MFF<br>We want both of them here<br>IC: Okay, that makes it easy<br>Fiel<br>North: North copies – what's the best way in there?<br>Come down just before Ross Island bridge before Nato, right on to McAdam<br>So come in from the south<br>If that was Courier asking, whoever, it's easier to go down McAdam or go all the way around and come up from the south. It's a longer route. |
| 18:53 | OPS to North – meet with Soundtruck where they are staged at McAdam<br>North: Copy<br>OPS to East – meet at Hamilton to stage with RRT? Field Arrest team and Central, please mount up and stage with RRT. Soundtack staged nearby with ready-made message. |
| 19:00 | OPS explaining to RRT Commander radio discipline but also enough description to inform. Going to start moving – ▮▮▮ 15 minutes out. Then going to deploy bike squad, but will be difficult because of the street being block. Sergeants need to start communicating on the radio because we've lost our live feed. Briefed |
| 19:04 | ▮▮▮ : 300, 50 blocked up – gas masks and shields |
| 19:06 | OPS gave above states via radio<br>Do we have MFF Central and East?<br>Central departing precinct in 2 minutes<br>East is leaving East (now)<br>Plan in place without notice – breach and make entry, fill in on fire, with MFF come off McAdam and push crowd to east – live formation and push and push. Bikes stage at trolley line and good place for you to engage<br>Bikes copied<br>Alpha copied |
| 19:07 | OPS: ▮▮▮ in place in 10 minutes in which place Bikes will be out and patrolling. Sgts have been requested to communicate out on radio. Our feed is hit and miss and it's not always steady and accurate. |

| 8. Prepared by: Name: | Position/Title: | Signature: _____ |
|---|---|---|
| ICS 214  Page **5** of **19** | Date/Time: | |

# ACTIVITY LOG (ICS 214)

| 1. Incident Name: | 2. Operational Period: Date From Date To:<br>Time From: Time To: |
|---|---|
| ICE Protests | 6/12/2025 16:30 – 6/13/25 01:30 |

| | |
|---|---|
| 19:10 | SRT Commander:  For the bikes when ▇▇▇ in go up to the tracks and get eyes on and be visible from a distance<br>OPS copies |
| 19:13 | MFF en route from precinct – central bikes in two cars and [] behind the scenes<br>OPS copies<br>RRT Command copies<br>Field Arrest is in Moody at Hamilton<br>RRT would like you to stage with RRT at [Watermond] building |
| | OPS over radio:<br>We lost the live feed so as of right now the are our eyes and ears now |
| 19:16 | Bikes are two blocks east and have eyes on them.  Protesters cover entire eastbound blocked.  looks like people in vests – peacekeepers – trying to keep safety and traffic – half dozen of those out<br>What do you think about deploying DLO's to make contact?<br>OPS: absolutely – as long as you have a safety plan<br>TLO 1: Copy sounds good |
| 19:21 | Bikes made contact with people in vests and offered assistance – they have traffic under control.  Might be the people to contact if needed. |
| 19:22 | ▇▇▇ is in |
| 19:24 | IC: Received info that crowd size about 350 still growing |
| 19:26 | OPS gave radio update – have new live feed reestablished |
| 19:27 | Bravo2: Bravo2 to OPS<br>OPS: go ahead<br>Bravo2:  So just had City employees come make contact – no more trolleys coming down near ICE building, no more trolleys tonight. |
| 19:30 | Lost live feed – replay.  INTEL looking for new feed. |
| 19:31 | Reestablished live feed |
| 19:33 | Protester chant:<br>No one is illegal<br>Power to the people |
| 19:34 | OPS Chief reached out to Area Commander at ICE: 16 to 17 people in the ICE Building generally clears out 0130.  Expects them to leave around 0130 to |
| 19:35 | From Radio:  20 people with squirt guns with unknown liquid near sally port – looks like they want to confront.  OPS copied |

| 8. Prepared by:  Name: | Position/Title: | Signature: _____ |
|---|---|---|
| **ICS 214**   Page **6** of **19** | Date/Time: | |

# ACTIVITY LOG (ICS 214)

| 1. Incident Name: | 2. Operational Period: Date From       Date To: |
|---|---|
| | Time From:       Time To: |
| ICE Protests | 6/12/2025 16:30 – 6/13/25 01:30 |

| | |
|---|---|
| 19:37 | Watching live feed – at ICE gate, e-bikes placed against gate to block it from opening. Possibly 3-4 against gate |
| 19:39 | IC receiving texts from FTS that Blak Blokers are actively spray-painting cameras/vandalizing cameras |
| 19:42 | IC to INTEL Share videos from FPS with larger group – blak blok actively spray-painting cameras. Send to RRT Command so that we can act on their videos. |
| 19:45 | Over radio: we have general officers making contact<br>OPS:  We've sent out videos over email of videos female spray-painting windows and cameras – up to RRT Commander to take action on that<br>RRT Commander: copy |
| 19:48 | IC is receiving information from FPS. Reporting that they are using sling shots to take out cameras (informed us that they believe this) |
| 19:49 | OPS gave above information over radio – INTEL received photo of alleged sling shot perp |
| 19:51 | ████ ████ got eyes on the perp.<br>Bravo2: a couple of people bringing pallets to probably make another barricade.<br>OPS copies all. Where are pallets coming from?<br>Pallets from somewhere on foot – people are carrying them in from the east. |
| 19:52 | Bike Squad has eyes on sling shotter – 1 person – not going to attempt to take into custody unless they try to leave.  OPS copies |
| 19:53 | DLO1: going to make contact with the corkers and see if they'll talk with us.<br>OPS: copies |
| 19:53 | Protest Speaker is asking if everyone has a mask, and if they need one they have some to pass out |
| 19:54 | Over radio to Bikes – either will get a description out or a photo |
| 19:56 | DLO1 backing off because blak blok is gathering and being hostile.  They're backing out, bikes are going to escort them because blockers are following them. This is a change of behavior from last night – last night DLOs were aloud to mingle in crowd. |
| 19:57 | Over radio:  We're getting pepper down wind.  ICE must have just used.<br>CMIC: FPS feels that they are being blocked in and that their gate is being blocked. They advise that their camera was taken out by the sling shot.  From we can gather viewing live stream, it's just the people. |
| 20:00 | FYI over radio: the DLOs back in their position |
| 20:01 | Live streamer confirmed that ICE used pepper balls to allow someone to leave – made a comment about needing pepper balls you might be a nazi |
| 20:03 | Photo of suspect is near sally port – won't take into custody unless she tries to leave |

| 8. Prepared by:  Name: | Position/Title: | Signature: _____ |
|---|---|---|
| **ICS 214**   Page **7** of **19** | Date/Time: | |

PLS' EX. 319<br>Page 7 of 19

# ACTIVITY LOG (ICS 214)

| 1. Incident Name: | 2. Operational Period: Date From          Date To: |
|---|---|
| | Time From:          Time To: |
| ICE Protests | 6/12/2025 16:30 – 6/13/2025 01:30 |

| | |
|---|---|
| 20:04 | DA texted to say that he's stuck in the Spaghetti Factory parking lot and can't get out because people are blocking the driveway |
| 20:08 | Live stream confirms that crowd is blocking street in front of ICE facility |
| 20:10 | DA texted that they no longer need assistance.  Road cleared and they left. IC notified RRT Command.  RRT radioed to cancel mission. |
| 20:13 | Supplies and food brought in by protesters under 10X10 blue covers.  Crowd probably at 350 – 400 with live feed estimate |
| 20:18 | Radio:  Food should be here shortly – sounds like the crowd is waiting for the sun to go down. |
| 20:21 | 1L1 bags that seem to be positioned for action later – duffle bags around. OPS copies – was there an opportunity to retrieve those? ▉▉▉▉ I don't think so, I think they're right there with the crowd OPS: copy |
| 20:23 | Duffle bags are being protested info from ▉▉▉▉ squad. Folks that are guarding duffles are same guys with spray paint and sling shots – front is protected and doesn't think that people inside can get out. CMIC copies and contacting FPS to see if they have another route out of the building CMIC for 1L1 develop but not implement plan to unblock the front door 1L1 – gave plan to CMIC over radio CMIC copies – 1L1 found door on back.  OPS on phone with FPS. |
| 20:27 | OPS over radioed 1L1:  FPS says all exits zip tied and barricaded from inside and will need to exit out of blocked door.  Sound truck will start messaging to work in concert with that effort. |
| 20:28 | Live feed changed to determine if fire is being started near building – no fire seen at IMT |
| 20:30 | IC wants OPS to confirm with FPS that the exits are actually blocked – 1L1 states that they see McAdam door and it's clear externally.  On phone with FPS – confirms they are in the building and not just monitoring – OPS asking for call back to confirm. |
| 20:33 | Over radio:  100, maybe 200 [people] |

| 8. Prepared by:  Name: | Position/Title: | Signature: _____ |
|---|---|---|
| ICS 214   Page 8 of 19 | Date/Time: | |

## ACTIVITY LOG (ICS 214)

| 1. Incident Name: | 2. Operational Period: | Date From | | Date To: | |
|---|---|---|---|---|---|
| | | | Time From: | | Time To: |
| ICE Protests | **6/12/2025 16:30 – 6/13/25 01:30** | | | | |

| | |
|---|---|
| 20:37 | Bravo2 to OPS<br>OPS: go ahead<br>Bravo: Think we've found location where getting pallets. Coming from construction building – South of Bond across from Bancroft. Bravo is going to go investigate.<br>OPS copies<br>Thick gloves, duct tape around wrist. Staged rocks and we think they're plan is that if ICE comes out, blocks are<br>Metal pipes, concrete, pallets – this is probably where all their stuff's coming from |
| 20:40 | If they start to march, IC wants to use: over radio – people in crowd intending to march via live stream for DLO's heavy set female in 20's, purple hair, carrying loud speaker. Copy – see if liaison will relay their intention<br>CMIC – 5051 types going to march – rest will stay. Suggestion that one bike squad break off if there is a march. We're thinking they'll go to Caruthers's Park. Maybe Willamette Park to the south. |
| 20:42 | ■■■■■ 100 rocks staged – not any law enforcement |
| 20:44 | Received over radio – Purple hair female confirmed to LEOs that group is marching to Caruthers's Park to get people safely to their cars. That will be the end of their march. |
| 20:45 | From ■■■■ via radio: they got some of the rocks in their hands. OPS copies. |
| 20:49 | Another protest announced at the ICE building on Wednesday over live stream. |
| 20:50 | ■■■■ over radio: March is about to kick off. Crowd announced that they are coming back tomorrow. |
| 20:52 | OPS over radio to LEO: Still waiting for confirmation from FPS about the zip tied exits. Haven't heard back but haven't forgotten. |
| 20:53 | Live stream looks like most of the people not blocked up are marching to park. INTEL looking for live stream not marching away from building. INTEL says there is no camera back at the ICE building. Continuing with marching stream. |
| 20:54 | TLO1 to OPS: Just saw someone spray paint with an extender pole. ■■■■ confirmed and added that they can hear banging on the windows. CMIC asked how many left over – says about half still there. |
| 20:58 | Bravo to OPS: So with one group going north on Vaughn and all the traffic that's leaving heading west – a lot of cars are backing up on Bancroft. Yeah, it's opening up. OPS copied. |
| 21:00 | CMIC wants status check on those we have PC on. |

| 8. Prepared by: Name: | Position/Title: | Signature: _____ |
|---|---|---|
| **ICS 214** Page **9** of **19** | Date/Time: | |

# ACTIVITY LOG (ICS 214)

| 1. Incident Name: | 2. Operational Period: Date From           Date To:<br>Time From:           Time To: |
|---|---|
| ICE Protests | 6/12/2025 16:30 – 6/13/25 01:30 |

| | |
|---|---|
| 21:01 | Live Streamer went back to building – looks like about half of the crowd is still there. Some traffic able to come through. |
| 21:02 | OPS to RRT:  Do we still have eyes on folks we have PC on?<br>RRT:  Wasn't high priority<br>OPS: Copy<br>OPS to CMIC – that's a no |
| 21:05 | CMIC: Live stream kept at facility because life safety risk is higher there |
| 21:06 | OPS call to FPS to confirm if doors clear? FPS confirmed the doors are clear. OPS to LEOs on radio:  doors are no longer zip tied or barricaded.  They can get out of the building. |
| 21:08 | Fire creackers sounds on live stream – FPS is using pepper balls on crowd on east side due to their proximity to the fence. Shooting through railing of metal fence. Protesters throwing unknown items over fence at ICE officers.  Sounds of items hitting metal – protesters throwing rocks at building.  They have their umbrellas and shields. |
| 21:12 | Separation of crowd – approximately 75 individuals blocked up close to building.  Others moved back/across the street. Live stream showing whole pallets/ebikes jammed against front gate, roken grating.  ICE Officers coming out and pepper balling individuals on east fence – protesters throwing projectiles, most likely rocks, at officers – officers retreated.  Evidence of spray-painting on ICE facility |
| 21:15 | Over radio:  People on the trolley-track side are washing their hands (due to pepper ball fire) |
| 21:15 | CMIC messaging on phone that we will not be authorizing OC gas, not seeing anything that will justify the use of that.  Would need to receive authorization from Police Commissioner if arson or blocking of building where people cannot get out. |
| 21:18 | CMIC to OPS:  Check with RRT Command if we need to stage for clearing out crowd and possibly making arrests. The building has been damaged/tagged, cameras have been broken. No life safety issues as of yet. Possibly 150 militant people in crowd. RRT Command wants to move protesters away from building. Fearing going in to arrest or move will create more hostility and galvanize crowd. Decided to wait on action. Use 40mm and 303s as max force. |

| 8. Prepared by:  Name: | Position/Title: | Signature: _____ |
|---|---|---|
| **ICS 214**   Page **10** of **19** | Date/Time: | |

# ACTIVITY LOG (ICS 214)

| 1. Incident Name: | 2. Operational Period: Date From          Date To: |
|---|---|
|  | Time From:          Time To: |
| ICE Protests | 6/12/2025 16:30 – 6/13/25 01:30 |

| | |
|---|---|
| 21:25 | Lincoln3 to OPS – there's couple more people in crowd arming themselves with sling shots.<br>OPS copies.<br>Over radio:  Think there is a trashcan/dumpster being moved from alleyway.<br>OPS copies.<br><br>CMIC on phone with FPS:  FPS states that their second floor windows are being broken with rocks.  CMIC told them we are going to start pushing messaging out to move away with Soundtruck staged.  Trying to weigh creating life safety risk with property safety risk. |
| 21:29 | Estimated crowd size 200 – was probably 450 at peak |
| 21:30 | Lincoln1 to OPS:  looks like gearing up to do something<br>OPS: copy |
| 21:31 | CMIC to OPS:  Sound truck to send message monitoring individuals causing damage to building and arrests are being made shortly<br>OPS to CMIC: this is going to pop off either with us acting, maybe wait until some of the individuals peel off so that we can minimize |
| 21:32 | Lincoln3:  they're spray painting the front windows now<br>OPS: OPS copies |
| 21:35 | Lincoln3 to OPS: they do have flares, one is in the street [] nothing, but I'm sure they have more. |
| 21:36 | OPS to CMIC: sound truck planning messaging and egress in case of protesters throwing rocks and they have to disengage |
| 21:38 | CMIC to OPS: if the front gate is breached, that is considered life safety risk, we have to activate. |
| 21:40 | ██████ to OPS: fire has started.<br>OPS: Location of fire?<br>██████ In front of sally port.<br>CMIC: District Command of FPS has stated that if the sally port or gate is breached, we'll need a plan if that occurs due to life safety risk for them. |
| 21:42 | CMIC to RRT Command: two sources have fire set, we need to move on that.  Let's set the sound truck messaging and move in on that. |
| 21:43 | Alpha squad to CMIC: have cameras on when we activate?<br>CMIC: confirmed |
| 21:44 | Lincon3 – getting info from ██████ that the fire is starting to go out. CMIC wants to continue with plan – intent to start fires is plain. |

| 8. Prepared by:  Name: | Position/Title: | Signature: _____ |
|---|---|---|
| ICS 214    Page 11 of 19 | Date/Time: | |

## ACTIVITY LOG (ICS 214)

| 1. Incident Name: | 2. Operational Period: Date From | Date To: |
|---|---|---|
| | Time From: | Time To: |
| ICE Protests | 6/12/2025 16:30 – 6/13/25 01:30 | |

| | |
|---|---|
| 21:46 | RRT Command: confirm to OPS – did the fire go out?<br>OPS: we don't have confirmation from live stream that fire goes out – not on live stream<br>We'd like you to continue, we know what intent of crowd is with use of flares, fire, and sling shots |
| 21:47 | Ready at Hamilton – messages heard on live steam from sound truck to clear. Protesters are marching south – OPS wants to keep our primary focus on building not march.<br>OPS – if you can peel of a MFF or bikes to monitor march, like to keep most of the resources at building |
| 21:49 | Central and East coming up behind RRT, in front of North |
| 21:50 | How many marching, how many staying? 10-15 people going home – majority staying |
| 21:51 | Olliphant confirmed via radio - no fire seen, no crowd excitement. No fire. |
| 21:52 | OPS via radio: Wants to continue sound truck messaging<br>Crowd is very low energy, not engaging in chanting |
| 21:53 | Alpha van confirms over radio hearing messaging from a block or two from the south |
| 21:55 | Two motorcycles on live stream blocking traffic. Live streamer shows dumpster tipped over, not on fire, up against gate. Intent looks to block gate so that it won't open. |
| 21:57 | Sound truck to CMIC: Crowd forming – truck moving back to maintain safety<br>CMIC approved |
| 21:58 | CMIC to RRT Command – giving info on dumpster, driveway littered with clutter but no fire. Crowd still chanting but that seems to be the extent of their activity. |
| 22:00 | Crowd size update: 100 to 150, people are leaving and energy is waning. |
| 22:03 | Lincoln1 – circle back to staging. People are starting to leave so focus on IDing those we have with PC<br>Bravo1: For every 10 that leave, 3-4 coming in to crowd |
| 22:05 | Main gate has two dumpsters against it, pallets, ebikes, cardboard and various large pieces of debris. 5-10 people are standing behind debris, one is waiving LGBT flag. One is wearing a Mexico flag draped around their shoulders. |
| 22:08 | Bravo1: They just set off a mortar next to the building. Think it scared some of the crowd.<br>OPS: copy |
| 22:10 | FPS called CMIC to find out what that was. CMIC confirmed it was a mortar, but that we're sitting tight to see if it breaks up due to lower energy |
| 22:10 | ▮▮ Have eyes on one of their PCs the original lady |
| 22:14 | CMIC to OPS: Contact ▮▮ paying attention to PC? |

| 8. Prepared by: Name: | Position/Title: | Signature: _____ |
|---|---|---|
| ICS 214  Page 12 of 19 | Date/Time: | |

# ACTIVITY LOG (ICS 214)

| 1. Incident Name: | 2. Operational Period: Date From | Date To: |
|---|---|---|
| | Time From: | Time To: |
| ICE Protests | 6/12/2025 16:30 – 6/13/25 01:30 | |

| | |
|---|---|
| 22:16 | OPS: Is there anyone still tracking those potentially to be arrested in the crowd? <br> ▮ still has eyes on the one – the female, but they think she's one who will stay to the end |
| 22:23 | Crowd down to about 100 people, hostile to LE, but if left alone their energy is getting lower – less chanting |
| 22:30 | Bravo1 to OPS: Still slow trickle leaving, but people coming in are more hard-core – still less than coming in <br> OPS: copy |
| 22:33 | Bravo1: Female green/yellow hat with megaphone – she's leaving <br> OPS: copy |
| 22:33 | Livestream has protesters aiming a strong strobe light at the ICE building. Also using strong flashlights to light up top and windows. Sally port has two or three pallets and metal bars blocking it. |
| 22:45 | Oliphant: Definitely more leaving than coming in. The crowd is chanting, but not a ton of other energy coming off of them. |
| 22:50 | Bravo1: So one of the dumpsters they are using to block the lane at Bancroft and McAdam. <br> Medium sized blue dumpster that they've placed to give themselves a safety zone for cars <br> They have lookouts out there; they're only blocking traffic coming off McAdam – only blocking right lane, the other is open for traffic |
| 22:57 | Dumpster was the one in front of the sally port or is it another one? <br> It's nice and clean – it's not damaged at all <br> Cars can see it – it's not an extreme hazard? <br> It's not an extreme hazard <br> OPS, if you're okay with it, we'll leave it and maybe try to push it out of the way when we're leaving <br> OPS: copy that – sounds good |
| 23:04 | Crowd's down to about 100 – all blocked up |
| 23:09 | Livestream confirmed smaller crowd, standing around |
| 23:11 | Bravo1: Moving out of area, back off a little bit since crowd was starting to focus on PPB. Still more people moving out than coming in. <br> OPS: copy |
| 23:12 | Fireworks on livestream hit ICE building. Very little crowd reaction. |

| 8. Prepared by: Name: | Position/Title: | Signature: _____ |
|---|---|---|
| ICS 214   Page 13 of 19 | Date/Time: | |

# ACTIVITY LOG (ICS 214)

| 1. Incident Name: | 2. Operational Period: Date From | Date To: |
|---|---|---|
| | Time From: | Time To: |
| ICE Protests | 6/12/2025 16:30 – 6/13/25 01:30 | |

| | |
|---|---|
| 23:16 | OPS to North MFF:<br>North MFF: Go ahead<br>OPS: You can return to your precinct<br>North MFF: North copies<br>OPS: East MFF – you can return to your precinct<br>East MFF: Copy |
| 23:18 | Around 75 still loitering in front of ICE Building |
| 23:21 | Sounds like it's likely that they're going to start the fire again<br>OPS: Confirm and start admonishments<br>Oh – they put it down.<br>OPS: copy |
| 23:24 | Over radio: Info was they started a fire in the bucket, and they were bringing the bucket to the dumpster, and then they set it down<br>OPS: copy |
| 23:26 | OPS: Can anyone see if they are setting a fire near the vehicle gate?<br>Bikes can try to ride over there and see<br>Per ▇▇▇▇ the fire is out all the way<br>OPS copies |
| 23:29 | Livestream – people are gathering at the gate and pointing bright spot lights at the gate<br>Over radio:<br>Suspect for the fire is the female who spray painted the cameras<br>OPS copies<br>Confirming with ▇▇▇▇ again that she was able to get the fire going and it was stomped out by other protesters. |
| 23:30 | Livestream – protesters threw fireworks over the gate. Stopped lighting gate. |
| 23:32 | There's going to be an S2 – white helmet, male (boyfriend). He is the only one with a white helmet on with face shield.<br>Bravo1: Sounds like one of the guys that was stomping out the fires and the crowd turned on him – he's gone by the staging area and he's leaving |
| 23:34 | Just set off a firework and the crowd cheered<br>Sounds like they're banging on the [garage] doors<br>Both S1 and S2 are in the driveway in the sally port. It looks like they're trying to throw over mortars. |

| 8. Prepared by: Name: | Position/Title: | Signature: _____ |
|---|---|---|
| ICS 214    Page 14 of 19 | Date/Time: | |

# ACTIVITY LOG (ICS 214)

| 1. Incident Name: | 2. Operational Period: Date From | Date To: |
|---|---|---|
| | Time From: | Time To: |
| ICE Protests | 6/12/2025 16:30 – 6/13/2025 01:30 | |

| | |
|---|---|
| 23:37 | FPS on phone is stating that there are no doors that they can get out of in the facility. CMIC is asking them to confirm again that this is the case. FPS confirmed – they have no doors Tom Persad/SRT Commander just told Cpt. Crooker that all of the doors are barricaded – Captain triple confirmed. |
| 23:38 | S3 is leaving all by himself – gray top, gray shorts<br>OPS copies<br>CMIC – copy that also advised by SRT Commander that all doors are barricaded.  IF that is the case, we need to confirm and activate plan<br>RRT Command wants announcements – checking McAdam door now. |
| 23:40 | Fire seen at front gate on livestream. Small fire near smaller dumpster. |
| 23:40 | LT projecting his radio on the PA<br>OPS confirmed they are able to get out – confirmed that it's duct tape<br>OPS radioed that fire is seen at front gate<br>Mobilizing and moving crowd away from front of building<br>Announcements<br>Alpha confirming BWC for this push<br>OPS confirms<br>Following female, heavy-set, all black, has cleaning solution in side of backpack<br>OPS copies<br>Livestream shows PPB in formation on street |
| 23:43 | Lincoln2 – got two medics and fire going around to make sure<br>Someone just threw eggs<br>61 on the girl<br>Alpha one – taking eggs on the line<br>Need custody car at McAdam and Lowell the very first street on Bancroft<br>Mobile one have copy on custody car<br>We're 61 on the backside of Tesla and sending other custody car<br>Lincoln3 – make sure you get photos in what they're wearing before you take off with them<br>Copy with have photos<br>Have all three in custody?<br>Trying to get S1 and S2<br>Alpha1 – what was the description on the White Helmet – we think we have eyes on him<br>Alpha1 to OPS – what is the description of the white helmet |

| 8. Prepared by:  Name: | | Position/Title: | Signature: _____ |
|---|---|---|---|
| ICS 214   Page **15** of 19 | | Date/Time: | |

# ACTIVITY LOG (ICS 214)

| 1. Incident Name: | 2. Operational Period: Date From          Date To: |
|---|---|
|  | Time From:          Time To: |
| ICE Protests | 6/12/2025 16:30 – 6/13/25 01:30 |

| | |
|---|---|
| 23:49 | Bikes coming up behind command truck – stop here for a second |
| | Row or two back from the skirmish line. He's very tall so he should stand out. |
| | Okay if Alpha gets an opportunity safely, we'll have him grab him |
| | OPS copies |
| | We're going to wait for the rest of the bikes after their custody and then we'll send them up to assist with S1 and S2 |
| | Are we going to have a custody car at McAdams |
| | Looks like these custodies might take place in front of your line, so you might want to push the line behind them |
| | Alpha copies |
| | So if you come right in front of the command truck, I'll be [] |
| | S2 has a shield in his hand and a stick in his stand |
| | Alpha has a plan to snatch that guy if they have |
| | Alpha2 has given orders to take him into custody if the opportunity presents, but we're scaring him and he's moving back. S1 is with him |
| | Bravo1: S1 in front of Alpha – who is the female we picked up over here? |
| | That's S4 |
| | Copy |
| | If we have time, who has PC on S4? |
| | Standby |
| | Okay our plan is Alpha is going to snatch both if we can, so if bikes are fully ready, that might be our option to do it |
| | OPS copies |
| | PC for S4 is Arson 2 – Agency is PPB |
| 23:53 | PFR states that All the doors are clear, |
| | OPS:Fire has gone around and visually confirmed that all the doors are unsecure and can be used to get out. |
| 23:56 | Status of bike squad? |
| | ¾'s of bike squad is at command |
| | Once bikes are there, arrest of S1 and S2 – they keep stepping back because we're looking at them |
| | OPS: copy |
| | Standby – do not book them until someone has called Meredith Hopper |
| | Wouldn't dream |
| 23:59 | Livestream is up on the officers in the line – who are standing by. Potentially other protesters also standing in front of the line. Confirmed, at least two others. |
| 00:00 | Changed livestream – changed platforms |

| 8. Prepared by: Name: | Position/Title: | Signature: _____ |
|---|---|---|
| ICS 214    Page **16** of 19 | Date/Time: | |

## ACTIVITY LOG (ICS 214)

| 1. Incident Name: | 2. Operational Period: Date From              Date To: |
|---|---|
| | Time From:              Time To: |
| ICE Protests | 6/12/2025 16:30 – 6/13/25 01:30 |

| | |
|---|---|
| 00:02 | Alpha2 – suspects are moving, also suspect in pink gasmask are moving.  Now they're stopping |
| | Bikes are on the move |
| | Girl with no helmet and guy with helmet – both have shields |
| | We're taking custodies and pushing them back |
| | Protesters tried to string something across the road to [stop] up the bikes |
| | Trying to locate custody in crowd – right in front of Zajack |
| | No hoody, standing next to stop sing next to Potter |
| | Yeah Oliphant, she's in front of you |
| | I see her, she's right in the middle I got her |
| | Diamond, she's right in the middle |
| | The person that Oliphant has is the correct one |
| | That's a good 61 on S1 |
| | OPS: Sound truck for making announcements |
| | Sound truck: Same one or make something else? |
| | OPS: Same one |
| | Patrol resources watching the cars |
| | Yeah give me a code 2 – have a lot of custodies and don't have them stabilized yet |
| | En route |
| 00:08 | Let's pull these custodies back behind and reform the line |
| | And we have a safe line of travel for the custody cars |
| | Yeah we'll need to have the MFF to break off or make multiple trips |
| | Regain control, get the custodies behind the line |
| | Probably need some Central or regular patrol to be custody cars |
| | OPS: copy – contacting Central Sgt |
| | Central cars can come to our location to get these custodies |
| 00:11 | OPS – asking Central Sgt to peel off a couple of patrol cars to come to ICE and assist with custody?  Can you tell me which cars? Alright thank you. |
| 00:12 | OPS confirming 4 custodies – Central tapped out, might need to transfer them to a secure spot then shuttle them, otherwise you gotta wait for East or North. |
| 00:14 | Burned out area is outside of 15 feet of the building per PFR. |
| 00:15 | Lincoln3: S1 through S4 all need to be transported to Detectives once they get out of here |
| | Going to be here a little bit then we're going to get these custody cars in here |
| 00:17 | OPS calling East Sgt because Central is unavailable.  Code 2 to McAdam and Bancroft. |
| 00:18 | OPS – East is sending three cars, Code 2.  Notified RRT |

| 8. Prepared by:  Name: | Position/Title: | Signature: _____ |
|---|---|---|
| ICS 214    Page 17 of 19 | Date/Time: | |

# ACTIVITY LOG (ICS 214)

| 1. Incident Name: | 2. Operational Period: Date From | Date To: |
|---|---|---|
| | Time From: | Time To: |
| ICE Protests | 6/12/2025 16:30 – 6/13/2025 01:30 | |

| | |
|---|---|
| 00:19 | OPS to CMIC – have 4 in custody, but might have up to 8 more. Can't get Central, but have three cars coming from East, code 2. |
| 00:20 | Livestream showing protesters more concentrated near PPB presence, but mostly calm and standing around. |
| 00:22 | Alpha2 – everyone has been briefed, team is doing excellent job of holding the line and crowd is subdued since custody action.<br>CMIC: Copy |
| 00:24 | Can we get a fire medic at the custody van please?<br>Medic wants to know where you are<br>All the custodies are by the van |
| 00:26 | OPS – We have 908, 948, 928, 699, coming up on SE, direct them where to go<br>[Cars calling out their location]<br>Once again for the custody cars, access off of McAdam, on McAdam and Bancroft |
| 00:30 | OPS: Confirmed 10 custodies |
| 00:35 | OPS to CMIC - want to focus on getting the custodies out, then maybe do a final push. Focus on custodies first. |
| 00:38 | Custody cars arrived per Lt. Quick |
| 00:45 | So tomorrow, press conference – need info take poll of all people who used forced, BWC rolling, any significant force or arrest that could be controversial, but need those names for report to CHO. |
| 00:47 | Alpha2: Crowd is starting to leave<br>OPS: copy |
| 00:49 | 10 custodies: 4 arson; 6 IPO. 2 officers injured, 1 protester injured, potential head injury: refused all PFR evaluation and treatment. Oliphant scraped knuckle. |
| 00:59 | Any other custodies needing to be processed?<br>Doing our last one right now<br>All units – does anybody here still have a custody that they need taken to jail?<br>[no response] |
| 01:02 | Livestream showing officers in line engaging in conversation with protesters |
| 01:04 | Barber, does your custody have a cellphone?<br>Barber: Yeah it's in his backpack<br>The officer who has him says he doesn't have a cellphone<br>Barber: Yeah he does – it's in his backpack |
| 01:06 | RRT: Starting exit plan<br>OPS: OPS copies – you are starting the exit plan |

| 8. Prepared by: Name: | Position/Title: | Signature: _____ |
|---|---|---|
| **ICS 214**   Page 18 of 19 | Date/Time: | |

# ACTIVITY LOG (ICS 214)

| 1. Incident Name: | 2. Operational Period: Date From         Date To: |
|---|---|
| | Time From:         Time To: |
| ICE Protests | **6/12/2025 16:30 – 6/13/25 01:30** |

| | |
|---|---|
| 01:09 | ALPHA: Alpha out and heading back to staging. Crowd following pretty amped up at the moment. |
| | Livestream ended by streamer |
| 01:11 | Estimated 60 -70 people still protesting |
| 01:11 | Lincoln1 to OPS: We're all back at staging. We don't have eyes on them anymore |
| | OPS: OPS copies, we also don't have eyes |
| 01:15 | CMIC calling Central and passing off incident, briefing – no eyes on crowd, no situational awareness, no other livestreaming, livestreamer ended stream. Not doing another push, no more arrests. |
| 01:18 | Alpha2 to OPS |
| | OPS: go ahead |
| | Alpha2: Just for policy – 3 applications of OC Spray and 1 round of paint |

| 8. Prepared by: Name: | Position/Title: | Signature: _____ |
|---|---|---|
| **ICS 214**   Page **19** of 19 | Date/Time: | |



# After Action Report

**Case Number:** 2025-680310, 2025-155706     **Start Date:** 6/11/2025

Law Enforcement Sensitive (LES)



## 2025-680310, 2025-155706

## TYPE(S) OF AFTER ACTION

| | | | |
|---|---|---|---|
| ☑ FORCE | ☑ MEMBER INJURY | ☐ PURSUIT | ☐ DAMAGE/STOLEN/LOST/CRASH |
| ☐ SERT/CNT/CIC | ☑ SPECIAL EVENTS | ☐ K9 | ☐ SUBJECT INJURY | ☐ OTHER |

## CATEGORY OF FORCE

CATEGORY 3

## GENERAL INFO

**CASE NUMBER:** 2025-680310, 2025-155706     **REVIEW DATE:** 6/12/2025

**SQUAD/PRECINCT:** RRT

**START DATE:** 06/11/2025     22:45:00     **END DATE:** 06/13/2025     17:55:00

**TO:** MCMILLAN, AMANDA     **FROM:** BIRKINBINE, JOHN

## LOCATION OF OCCURRENCE

**LOCATION TYPE:**

**ADDRESS:**

## SUMMARY OF EVENTS

RRT responded to an event of civil unrest. Between 60-100 persons were present, engaged in behavior such as starting fires next to a federal building, assaulting police officers, and interfering with officers arresting persons. Officers we directed per the CMIC to make targeted arrests and move the crowd and restore order.

## BUREAU MEMBER(S)

**NAME:** Wheeler, Brian     **DPSST:** 57813     **ROLE:** Primary     **INVOLVEMENT:** INVOLVED

☐ ECIT?

☑ MEMBER INTERVIEWED SEPARATELY

☑ THE MEMBERS STATEMENT WAS MATERIALLY CONSISTENT WITH THEIR WRITTEN DOCUMENTATION

☑ DID THIS MEMBER USE FORCE

☐ MEMBER INJURED?

**WHERE DID THEY RECEIVE TREATMENT?**

☐ COMPLETE A DISABILITY PACKET?     ☐ COMPLETE AN ELECTRONIC INJURY LOG ENTRY?

**MEMBER INJURY COMMENT:**

---

**NAME:** Wheeler, Brian     **DPSST:** 57813     **ROLE:** Primary     **INVOLVEMENT:** INVOLVED

☐ ECIT?

☑ MEMBER INTERVIEWED SEPARATELY

☑ THE MEMBERS STATEMENT WAS MATERIALLY CONSISTENT WITH THEIR WRITTEN DOCUMENTATION

☑ DID THIS MEMBER USE FORCE

☐ MEMBER INJURED?

**WHERE DID THEY RECEIVE TREATMENT?**

☐ COMPLETE A DISABILITY PACKET?     ☐ COMPLETE AN ELECTRONIC INJURY LOG ENTRY?

**MEMBER INJURY COMMENT:**

---

*Oregon v. Trump*
No. 3:25-cv-01756
**Defendants' Exhibit**
**1111**

CITY_007374

**NAME:** Kofoed, Andrew    **DPSST:** 40928    **ROLE:** SUPERVISOR    **INVOLVEMENT:** INVOLVED

☐ ECIT?
☑ MEMBER INTERVIEWED SEPARATELY
☑ THE MEMBERS STATEMENT WAS MATERIALLY CONSISTENT WITH THEIR WRITTEN DOCUMENTATION
☑ DID THIS MEMBER USE FORCE
☐ MEMBER INJURED?
**WHERE DID THEY RECEIVE TREATMENT?**
☐ COMPLETE A DISABILITY PACKET?    ☐ COMPLETE AN ELECTRONIC INJURY LOG ENTRY?
**MEMBER INJURY COMMENT:**

---

**NAME:** Livingson, Ariel    **DPSST:** 57429    **ROLE:** Cover    **INVOLVEMENT:** INVOLVED

☐ ECIT?
☑ MEMBER INTERVIEWED SEPARATELY
☑ THE MEMBERS STATEMENT WAS MATERIALLY CONSISTENT WITH THEIR WRITTEN DOCUMENTATION
☑ DID THIS MEMBER USE FORCE
☐ MEMBER INJURED?
**WHERE DID THEY RECEIVE TREATMENT?**
☐ COMPLETE A DISABILITY PACKET?    ☐ COMPLETE AN ELECTRONIC INJURY LOG ENTRY?
**MEMBER INJURY COMMENT:**

---

**NAME:** Kuntz, Cody    **DPSST:** 58045    **ROLE:** Primary    **INVOLVEMENT:** INVOLVED

☑ ECIT?
☑ MEMBER INTERVIEWED SEPARATELY
☑ THE MEMBERS STATEMENT WAS MATERIALLY CONSISTENT WITH THEIR WRITTEN DOCUMENTATION
☑ DID THIS MEMBER USE FORCE
☐ MEMBER INJURED?
**WHERE DID THEY RECEIVE TREATMENT?**
☐ COMPLETE A DISABILITY PACKET?    ☐ COMPLETE AN ELECTRONIC INJURY LOG ENTRY?
**MEMBER INJURY COMMENT:**

---

**NAME:** De Anda, James    **DPSST:** 57476    **ROLE:** Primary    **INVOLVEMENT:** INVOLVED

☑ ECIT?
☑ MEMBER INTERVIEWED SEPARATELY
☑ THE MEMBERS STATEMENT WAS MATERIALLY CONSISTENT WITH THEIR WRITTEN DOCUMENTATION
☑ DID THIS MEMBER USE FORCE
☐ MEMBER INJURED?
**WHERE DID THEY RECEIVE TREATMENT?**
☐ COMPLETE A DISABILITY PACKET?    ☐ COMPLETE AN ELECTRONIC INJURY LOG ENTRY?
**MEMBER INJURY COMMENT:**

---

**NAME:** Lukic    **DPSST:** 60431    **ROLE:** Cover    **INVOLVEMENT:** INVOLVED

☐ ECIT?
☑ MEMBER INTERVIEWED SEPARATELY
☑ THE MEMBERS STATEMENT WAS MATERIALLY CONSISTENT WITH THEIR WRITTEN DOCUMENTATION
☑ DID THIS MEMBER USE FORCE
☐ MEMBER INJURED?

A445

CITY_007375

**WHERE DID THEY RECEIVE TREATMENT?**

☐ COMPLETE A DISABILITY PACKET?     ☐ COMPLETE AN ELECTRONIC INJURY LOG ENTRY?

**MEMBER INJURY COMMENT:**

---

| **NAME:** | Lowery | **DPSST:** | 59482 | **ROLE:** | Cover | **INVOLVEMENT:** | INVOLVED |

☐ ECIT?

☑ MEMBER INTERVIEWED SEPARATELY

☑ THE MEMBERS STATEMENT WAS MATERIALLY CONSISTENT WITH THEIR WRITTEN DOCUMENTATION

☑ DID THIS MEMBER USE FORCE

☑ MEMBER INJURED?

**WHERE DID THEY RECEIVE TREATMENT?**     EMS

☐ COMPLETE A DISABILITY PACKET?     ☑ COMPLETE AN ELECTRONIC INJURY LOG ENTRY?

**MEMBER INJURY COMMENT:**

Officer Lowery was grabbed from behind with an arm around her neck and then punch her in the face by the subject. Another subject punched her in the helmet and grabbed her vest.

## SUBJECT(S)

| **NAME:** | Carrasco, Geovanna | **RACE:** | UNKNOWN | **GENDER:** | FEMALE | **DOB:** | 02/04/1998 |

| **ADDRESS:** | 1551 N Killingsworth St Apt A | | | **PHONE NUMBER:** | 909-731-2356 |

☐ SUBJECT ARMED

**WEAPON TYPE:**                    **ARMED WITH:**

**SUBJECT STATEMENT:**
no interview completed

## WITNESS(ES)

☑ Unidentified Witness Present

| **WITNESS NAME:** | | **RACE:** | | **GENDER:** | | **DOB:** | |

| **ADDRESS:** | | | | **PHONE NUMBER:** | |

**WITNESS STATEMENTS OR DESCRIPTION OF UNIDENTIFIED WITNESS:**

multiple witnesses present in the crowd. None were interviewed or identified

## VEHICLE(S)

☑ No Vehicle Involved

## SPECIAL EVENT

| **EVENT NAME:** | ICE Building protest |

| **EVENT DATE:** | 6/11/2025 | **ROLL CALL:** | unk | **START TIME:** | unk | **END TIME:** | unk |

| **# OF OFFICERS:** | 50 | **+/- FROM PREVIOUS:** | 0 | **+/- PREVIOUS YEAR:** | 0 |

| **# OF PARTICIPANTS:** | 100 |

☑ NO INITIAL FISCAL REVIEW ESTIMATE

| CLASS | REG HOURS | HOURLY RATE | REG HOUR COST | O/T HOURS | OT HOURLY RATE | O/T HOUR COST | TOTALS |
|---|---|---|---|---|---|---|---|
| OFFICER | 0 | $0.00 | $0.00 | 0 | $0.00 | $0.00 | $0.00 |
| MOTOR OFC. | 0 | $0.00 | $0.00 | 0 | $0.00 | $0.00 | $0.00 |
| SGT/DET/FED | 0 | $0.00 | $0.00 | 0 | $0.00 | $0.00 | $0.00 |
| MOTOR SGT | 0 | $0.00 | $0.00 | 0 | $0.00 | $0.00 | $0.00 |
| LIEUTENANT | 0 | $0.00 | $0.00 | 0 | $0.00 | $0.00 | $0.00 |
| CAPT/COMD | 0 | $0.00 | $0.00 | 0 | $0.00 | $0.00 | $0.00 |

## INVESTIGATING SUPERVISOR ACTION STATEMENT

I was assigned by the CMIC as the RRT AAR Sgt. I had not been in this assignment previously. I talked with RRT Sgt Kofoed prior to the event, who told me it would not be reasonable or safe to come to the scene of the event and attempt to interview persons in an angry group who were engaged in civil unrest. He told me that when force is used by RRT, the members will likely not be able to report the force until the event is over or until they have been removed to a place of safety. He told me that during previous events the AAR Sgt would regularly interview members by phone and review BWC footage. After this event I received a phone call from RRT members who described the force they had used. I talked with all members individually by phone. I was not able to interview any other persons who may have witnessed the force, and any suspects were removed from the location and processed. I noted in evidence.com it does not appear any photos were taken of any of the subjects of the force. In watching the BWC it would be unreasonable for members to attempt to take photos during these dynamic events. I was not notified of any actual or perceived injury with the exception of 1 police officer. I made EIS entries and forwarded AAR to RRT Lt.

## REVIEW OF THE OFFICER(S) REPORT(S)

☑ THE OFFICER(S) ADEQUATELY ADDRESSED THE ASSESSMENT OF THE TYPE OF CALL AND THE REASON OR NEED FOR POLICE CONTACT

☑ THE OFFICER(S) ASSESSMENT OF THEIR LEGAL AUTHORITY FOR THE CONTACT WAS SATISFACTORY

☑ THE OFFICER(S) ADEQUATELY ADDRESSED THEIR PERCEPTION OF THE CONDITIONS AND LACK OF COMPLIANCE FROM THE SUBJECT PRIOR TO FORCE

☑ THE OFFICER(S) SATISFACTORILY ADDRESSED THE SUBJECT'S MENTAL HEALTH

☑ THE OFFICER(S) ADDRESSED THE USE OF SPECIALTY UNITS FOR THIS CALL THAT WERE APPROPRIATE
**Speciality Units**

☑ GIVEN THE CIRCUMSTANCES, DISENGAGEMENT WAS NOT REASONABLE

| DE-ESCALATION TECHNIQUE USED OR ATTEMPTED | EFFECTIVE |
|---|---|
| NUMBER OF OFFICERS | yes |
| VERBAL TECHNIQUES | yes |
| TACTICS | yes |
| COMMUNICATE FROM DISTANCE | yes |
| AVOID PHYSICAL CONFRONTATION | yes |
| TIME | yes |

☑ GIVEN THE CIRCUMSTANCES, THE OFFICER(S) ACTIONS DID NOT ESCALATE THE SITUATION

☑ THE OFFICER(S) CORRECTLY IDENTIFIED THE LAWFUL PURPOSE(S) TO USE FORCE

☑ THE OFFICER(S) APPROPRIATELY DOCUMENTED A WARNING OR LACK OF WARNING

☑ THE OFFICER(S) INCLUDED ALL UNIQUE DATA POINTS REQUIRED FOR EACH USE OF FORCE

☑ THE OFFICER(S) SATISFACTORILY REPORTED OTHER MEMBERS USE OF FORCE (IF APPLICABLE)

☑ THE OFFICER(S) PROPERLY DOCUMENTED ANY INJURIES (OR LACK OF INJURIES), AND/OR MEDICAL TREATMENT REQUIRED FOR THE SUBJECT OR ANY OTHER PERSON DURING THE INCIDENT WAS HANDLED IN A TIMELY MANNER

☑ THE OFFICER(S) APPROPRIATELY DOCUMENTED ATTEMPTS AND/OR CONTACTING OF WITNESSES

☑ OFFICER(S) INJURIES OR LACK OF INJURIES WERE DOCUMENTED AND HANDLED CORRECTLY
**EXPLANATION FOR ANY UNCHECKED BOXES**

| |
|---|
| |

**RECONCILIATION OF OFFICER(S) REPORTING DIFFERENCES OR DISCREPANCIES**

## REVIEW OF THE INCIDENT AND ANALYSIS OF OFFICER(S) DECISION POINTS

I have reviewed the officer's report(s), interviewed to the best of my ability all involved parties and witnesses, gathered the necessary information and based on the preponderance of the evidence:

**IN REGARD TO EACH USE OF FORCE, I FIND THE FOLLOWING:**

Monday, July 28, 2025

| | |
|---|---|
| **OFFICER:** | Lukic |
| **ACTION / TYPE OF FORCE:** | TAKE DOWN |
| **MEETS GRAHAM STANDARD:** | YES |
| **IN OR OUT OF POLICY:** | IN POLICY |

| | |
|---|---|
| **OFFICER:** | De Anda, James |
| **ACTION / TYPE OF FORCE:** | TAKE DOWN |
| **MEETS GRAHAM STANDARD:** | YES |
| **IN OR OUT OF POLICY:** | IN POLICY |

| | |
|---|---|
| **OFFICER:** | Kuntz, Cody |
| **ACTION / TYPE OF FORCE:** | TAKE DOWN |
| **MEETS GRAHAM STANDARD:** | YES |
| **IN OR OUT OF POLICY:** | IN POLICY |

| | |
|---|---|
| **OFFICER:** | Livingson, Ariel |
| **ACTION / TYPE OF FORCE:** | KINETIC IMPACT PROJECTILE (KIP) |
| **MEETS GRAHAM STANDARD:** | YES |
| **IN OR OUT OF POLICY:** | IN POLICY |

| | |
|---|---|
| **OFFICER:** | Livingson, Ariel |
| **ACTION / TYPE OF FORCE:** | KINETIC IMPACT PROJECTILE (KIP) |
| **MEETS GRAHAM STANDARD:** | YES |
| **IN OR OUT OF POLICY:** | IN POLICY |

| | |
|---|---|
| **OFFICER:** | Kofoed, Andrew |
| **ACTION / TYPE OF FORCE:** | TAKE DOWN |
| **MEETS GRAHAM STANDARD:** | YES |
| **IN OR OUT OF POLICY:** | IN POLICY |

| | |
|---|---|
| **OFFICER:** | Wheeler, Brian |
| **ACTION / TYPE OF FORCE:** | TAKE DOWN |
| **MEETS GRAHAM STANDARD:** | YES |
| **IN OR OUT OF POLICY:** | IN POLICY |

| | |
|---|---|
| **OFFICER:** | Wheeler, Brian |
| **ACTION / TYPE OF FORCE:** | TAKE DOWN |
| **MEETS GRAHAM STANDARD:** | YES |
| **IN OR OUT OF POLICY:** | IN POLICY |

| | |
|---|---|
| **OFFICER:** | Wheeler, Brian |
| **ACTION / TYPE OF FORCE:** | TAKE DOWN |
| **MEETS GRAHAM STANDARD:** | YES |
| **IN OR OUT OF POLICY:** | IN POLICY |

| | |
|---|---|
| **OFFICER:** | Wheeler, Brian |
| **ACTION / TYPE OF FORCE:** | TAKE DOWN |
| **MEETS GRAHAM STANDARD:** | YES |
| **IN OR OUT OF POLICY:** | IN POLICY |

A448

CITY_007378

| | |
|---|---|
| **OFFICER:** | Lowery |
| **ACTION / TYPE OF FORCE:** | KICK/STRIKE |
| **MEETS GRAHAM STANDARD:** | YES |
| **IN OR OUT OF POLICY:** | IN POLICY |

**I FIND THE OFFICER(S) SATISFACTORILY DID THE FOLLOWING:**

☑ OFFICER(S) RESPONDED TO THE LOCATION USING SOUND AND EFFECTIVE TACTICS IN A SAFE AND REASONABLE MANNER

☑ UPON MAKING CONTACT WITH THE SUBJECT, OFFICER(S) RESPONDED REASONABLY, USING GOOD COMMUNICATION SKILLS AND SOUND PATROL TACTIC PRINCIPLES (UP UNTIL THE FORCE EVENT)

☑ OFFICER(S) SATISFACTORILY DOCUMENTED THIS USE OF FORCE

☑ THE OFFICER(S) POST CUSTODY ACTIONS, UNDER THE TOTALITY OF THE CIRCUMSTANCES WERE APPROPRIATE

COMMENTS ARE MANDATORY IF THE BOX IS NOT CHECKED

**AREA OF IMPROVEMENT, LESSONS LEARNED, CORRECTIVE ACTION(S) TAKEN**

**GENERAL ADDITIONAL COMMENTS NOT ADDRESSED ABOVE**

**OTHER POLICIES THAT APPLY TO THIS INCIDENT:**

  **Policy:**

  **In Or Out:**

  **Comment:**

## NON-FORCE RELATED (905.00 Administrative Review)

## ADMINISTRATIVE CHECKLIST

☐ POSSIBLE CRIMINAL CONDUCT?

☐ POSSIBLE SIGNIFICANT MISCONDUCT?

☐ THERE WAS A MENTAL HEALTH COMPONENT TO THIS USE OF FORCE

☐ THIS WAS A SERIOUS USE OF FORCE

☐ THIS FORCE VIOLATED THE GRAHAM STANDARD

☐ COMMUNITY MEMBER/BUREAU MEMBER ALLEGES MISCONDUCT (Directive 0330.00§2.2.1)

☐ PSD NOTIFIED

☐ SHIFT SUPERVISOR NOTIFIED

**IF ANY OF THE ABOVE WERE MARKED YES, WHO WAS NOTIFIED, HOW WERE THEY NOTIFIED, AND WHAT DIRECTION WAS GIVEN?**

☐ PHOTO(S) WERE TAKEN (INCLUDING VIDEO)

☐ NON PHOTO EVIDENCE WAS COLLECTED

**EVIDENCE COMMENTS (OPTIONAL)**

## ADMINISTRATIVE REVIEW

☑ I HAVE DOCUMENTED ALL OF THE ABOVE CONCERNS, NON DISCIPLINARY CORRECTIVE ACTIONS AND POSITIVE PERFORMANCE IN EIS

**COMMENT:**

☑ I CONFIRMED THAT ALL PHOTOGRAPHIC EVIDENCE FOR THIS REVIEW HAS BEEN PLACED INTO Evidence.com

**COMMENT:**

no photos taken

☑ I HAVE NOT FOUND CONCERNS AND/OR RECOMMENDATIONS IN THE BUREAU'S POLICY, TRAINING OR EQUIPMENT

**COMMENT:**

☑ I FORWARDED A COPY OF THE INITIAL PORTION OF THIS AFTER ACTION TO MY RU'S ADMIN TO BE FORWARDED TO THE DA OFFICE FOR THE CRIMINAL CASE AGAINST THE SUBJECT

☑ I FORWARDED THE FORCE AFTER ACTION WITHIN 72 HOURS OF THE EVENT AND/OR 7 DAYS OF THE NON FORCE EVENT

| **RANK:** | SGT | **NAME:** | BIRKINBINE, JOHN | **DPSST:** | 29351 |
|---|---|---|---|---|---|

**I FORWARDED THIS AFTER ACTION TO:**

| **RANK:** | LT | **NAME:** | DUILIO, KENNETH |
|---|---|---|---|

**DPSST:** 34491     **DATE:** 6/13/2025

## CHAIN OF CUSTODY

| Sender | Recipient | Timestamp |
|---|---|---|
| SGT BIRKINBINE, JOHN | LT DUILIO, KENNETH | Submitted 06/13/2025 18:01 |
| Police Lieutenant Ken Duilio | Police Captain CROOKER, JAMES | Submitted 06/21/2025 22:15 |
| CAPT James Crooker | LT HETTMAN, CASEY | Reassigned 06/23/2025 11:38 |
| Police Lieutenant Casey Hettman | ppbopsXO, | Submitted 06/26/2025 11:37 |
| Police Lieutenant Alicia Russell | INSPECTOR, | Submitted 07/02/2025 16:08 |

## COMMAND REVIEW: Police Lieutenant Ken Duilio 6/20/2025 12:03:36 PM

**I RECEIVED THIS ACTION FROM:**

| RANK | NAME: | DPSST | DATE AND TIME |
|---|---|---|---|
| SGT | BIRKINBINE, JOHN | 29351 | 6/13/2025 |

☑ THIS AFTER ACTION WAS RECEIVED WITHIN 72 HOURS OF THE INCIDENT OR WITHIN 7 DAYS OF NON FORCE EVENT

☐ RETURN TO LOWER LEVEL FOR CORRECTION

☑ I HAVE REVIEWED ALL OF THE REPORTS ASSOCIATED WITH THIS INCIDENT AND FIND THAT THEY ARE ACCURATE

☑ I HAVE REVIEWED THE SERGEANT'S INVESTIGATION AND FIND IT TO BE THOROUGH AND COMPLETE

The sergeant's narrative was light, so I referred mostly to the check boxes, and then conducted my own review. It should be noted that one additional case # of 25-155769 needs to be added for this review and is where I found 2 FDCRs and one supplemental for Ofc DeAnda and Ofc Lukic (also, their Body Cams and reports use a combination of the 3 different case numbers).

I concur that each individual use of force used during this incident was in policy.

RRT was activated to work a protest at the ICE facility located near the south waterfront. During the event, we developed probable cause to arrest 2 subjects for Arson. RRT command developed a plan to affect those arrest, and that plan was approved by the Incident Commander (CMIC).

The sound truck gave several force warnings before RRT executed that plan. RRT used both its full PPE squad and its Bike squads to affect these arrests. As RRT deployed, the Bike squads located the suspects in the crowd and attempted to take them into custody. The Bike squads met significant resistance. Our full PPE squad then pushed into the crowd to form a protective circle around the custodies. Several members of the crowd attempted to interfere and un-arrest our custodies. One individual actually punched one of our officers (Officer Lowery) in the face and attempted to choke her from behind (Officer Lowery was given medical attention and was later diagnosed with a concussion).

Both de-minimis force and category 3 force was used to make these arrest and to keep protesters back for safety purposes. Force was also necessary to effect the arrest on the subject who assaulted Officer Lowery. In my review of these separate uses of force through reading police reports and watching the officer's body worn cameras, I found all the individual applications of force to be justified and within policy.

This was our first night of deployment and first arrests made during these nightly ICE facility protests. The timing of our full PPE squad and our Bike squad wasn't ideal. The goal was to have the Full PPE squad make contact with the crowd first and then to coordinate with the Bike squads to come in and make arrest as needed. We discussed this timing issue during a team debrief and were able to make the necessary changes. We were able to see immediate improvement with this tactic the very next night during a deployment involving almost the same set of circumstances.

In reading Officer Livingston's report and reviewing the video, I felt further articulation was needed. I asked her to write a supplemental to further describe and support her two applications of force from her Less lethal launcher (FN 303). The two areas I wanted further articulation on was around the bike being used as a weapon against PPB officers and the second deployment of the FN 303. The PPB bike that the subject was picking up could clearly have been used as a dangerous weapon against the officers on the ground, and the second deployment of the FN 303, was consistent with an action reaction on what was occurring, combined with this subject's resistive and combative behavior shown before, during and after the force was used. Officer Livingston wrote the supplemental report and further covered the necessary elements to my satisfaction.

In reviewing body cams, I found them not super helpful in close quarters hand to hand combat situations, which was a lot of what occurred during this event. I discussed a desire to bring back the use of pole cams, which would give a better view, provide more transparency and also allow for more effective prosecutions.

It should be noted, one consistent theme I heard from several of the RRT officers was how they were surprised on how much resistance they encountered, with protestors fighting back and trying to un-arrest individuals. They stated that towards the end of 2020, most times, once they deployed off the rails, protesters would take off running. But tonight, they stood their ground and fought. This is worth noting as to the importance of having a fully staffed RRT team available, while still needing to use Mobile Field Forces in support.

☑ I HAVE REVIEWED THE SERGEANT'S DECISION POINT ANALYSIS AND CONCUR

Referred to the check boxes

☐ I HAVE IDENTIFIED AN AREA OF REVIEW FOR THE TRAINING DIVISION

☐ THERE ARE POSSIBLE POLICY VIOLATIONS WITH THIS INCIDENT

☐ I FIND THAT THIS CASE NEEDS TO BE REVIEWED FURTHER FOR POSSIBLE CRIMINAL CONDUCT OR SIGNIFICANT MISCONDUCT

**I FORWARDED OR RETURNED THIS AFTER ACTION TO**

| RANK | NAME: | DATE |
|---|---|---|

| CAPT | CROOKER, JAMES | 6/21/2025 |
|------|----------------|-----------|

I CONFIRMED THE PROPER EIS ENTRIES WERE MADE:     YES

I CONFIRMED THE PHOTOS WERE IN Evidence.com     N/A

**COMMAND REVIEW: Police Lieutenant Casey Hettman 6/26/2025 11:07:37 AM**

**I RECEIVED THIS ACTION FROM:**

| RANK | NAME: | DPSST | DATE AND TIME |
|------|-------|-------|---------------|
| LT | Ken Duilio | 34491 | 6/21/2025 |

☑ THIS AFTER ACTION WAS RECEIVED WITHIN 72 HOURS OF THE INCIDENT OR WITHIN 7 DAYS OF NON FORCE EVENT

☐ RETURN TO LOWER LEVEL FOR CORRECTION

☑ I HAVE REVIEWED ALL OF THE REPORTS ASSOCIATED WITH THIS INCIDENT AND FIND THAT THEY ARE ACCURATE

☑ I HAVE REVIEWED THE SERGEANT'S INVESTIGATION AND FIND IT TO BE THOROUGH AND COMPLETE

The event contained within this AAR can be found associated within 3 PPB case numbers: 25-680310, 25-155706, and 25-155769.

Sgt. Birkinbine's investigation was documented within this AAR report, in some areas mostly through checkboxes with little supporting written context. Lt. Duilio has provided some additional information and context which was helpful for the review.

Some fields within the AAR were left blank or incomplete (applicable information provided below):
- Location of Occurrence: 4310 S Macadam Ave., Portland, OR
- Axon Evidence: Several BWC videos and photos pertaining to this case can be located under case numbers 25-680310 and 25-155706
- Subject: (Ofc. DE ANDA's custody is not listed) BARKER, Trenton Edward (M/W 05/30/91)

As highlighted by Sgt. Birkinbine, still photographs of the use of force subjects were not taken. There is nuance to these public order events, and there are times when taking still photographs would not be feasible. That said, I believe there could have been opportunities for photographs of arrested subjects by field arrest officers as they processed the individuals for transport to jail. Absent still photographs, there is BWC footage of two of the involved subjects who had force used on them and lack of observable injury:
- CARRASCO, Giovanna M (F/U 02/04/98) - BWC footage from Ofc. Trummer (Case 25-155706) video timestamps: 00:02:44-00:03:27; 00:06:20-00:07:30
- BARKER, Trenton E (M/W 05/30/91) - BWC footage from Ofc. Trummer (Case 25-155706) video timestamp: 00:41:20 (23:29:00PDT)

I concur with the limitations of BWCs as highlighted by Lt. Duilio. For close quarter uses of force that involve officers being struck in the head or face, or even other parts of their body, it is extremely difficult to ascertain what is occurring on the BWC footage. Reviews of BWC are also complicated when officers are utilizing a tool that may hinder the camera's field of view, i.e. FN 303. Pole cams or other video devices that provide a more holistic overview of the event and force applications could aid in later reviews. It is important to remember that the officers in the field deploying or utilizing force in these highly volatile and rapidly evolving events don't have the benefits provided to later reviewers who have various capabilities of pausing or slowing videos, or enhancing through zoom, etc.

☑ I HAVE REVIEWED THE SERGEANT'S DECISION POINT ANALYSIS AND CONCUR

I concur with the determinations contained within this AAR and agree that all reviewed force events were IN POLICY. I agree with Lt. Duilio's efforts to obtain further clarification from Ofc. Livingston regarding her FN 303 deployments.

☐ I HAVE IDENTIFIED AN AREA OF REVIEW FOR THE TRAINING DIVISION

☐ THERE ARE POSSIBLE POLICY VIOLATIONS WITH THIS INCIDENT

☐ I FIND THAT THIS CASE NEEDS TO BE REVIEWED FURTHER FOR POSSIBLE CRIMINAL CONDUCT OR SIGNIFICANT MISCONDUCT

**I FORWARDED OR RETURNED THIS AFTER ACTION TO**

| RANK | NAME: | DATE |
|------|-------|------|
| CHO | ppbopsXO, | 6/26/2025 |

I CONFIRMED THE PROPER EIS ENTRIES WERE MADE:     YES

I CONFIRMED THE PHOTOS WERE IN Evidence.com     YES

**COMMAND REVIEW: Police Lieutenant Alicia Russell 7/2/2025 4:03:11 PM**

**I RECEIVED THIS ACTION FROM:**

| RANK | NAME: | DPSST | DATE AND TIME |
|------|-------|-------|---------------|
| LT | Casey Hettman | 47718 | 6/26/2025 |

☑ THIS AFTER ACTION WAS RECEIVED WITHIN 72 HOURS OF THE INCIDENT OR WITHIN 7 DAYS OF NON FORCE EVENT

☐ RETURN TO LOWER LEVEL FOR CORRECTION

☑ I HAVE REVIEWED ALL OF THE REPORTS ASSOCIATED WITH THIS INCIDENT AND FIND THAT THEY ARE ACCURATE

☑ I HAVE REVIEWED THE SERGEANT'S INVESTIGATION AND FIND IT TO BE THOROUGH AND COMPLETE

☑ I HAVE REVIEWED THE SERGEANT'S DECISION POINT ANALYSIS AND CONCUR

I appreciate Lts. Duilio and Hettman's review of this incident.  There is a considerable amount of work that needs to be done in crowd control situations where there are multiple uses of force.  I concur we need to explore the use of pole cam video, as it is able to capture more of the scene. I agree the uses of force in these incidents are in-policy.

☐ I HAVE IDENTIFIED AN AREA OF REVIEW FOR THE TRAINING DIVISION

☐ THERE ARE POSSIBLE POLICY VIOLATIONS WITH THIS INCIDENT

☐ I FIND THAT THIS CASE NEEDS TO BE REVIEWED FURTHER FOR POSSIBLE CRIMINAL CONDUCT OR SIGNIFICANT MISCONDUCT

**I FORWARDED OR RETURNED THIS AFTER ACTION TO**

| RANK | NAME: | DATE |
|---|---|---|
|  | INSPECTOR, | 7/2/2025 |

I CONFIRMED THE PROPER EIS ENTRIES WERE MADE:      YES

I CONFIRMED THE PHOTOS WERE IN Evidence.com      YES

☐ Collision Review Board




# After Action Report

| Case Number: | 25-680411 | Start Date: | 7/4/2025 |
|---|---|---|---|

Law Enforcement Sensitive (LES)

## 25-680411

## TYPE(S) OF AFTER ACTION

| ☐ FORCE | ☑ MEMBER INJURY | ☐ PURSUIT | ☐ DAMAGE/STOLEN/LOST/CRASH |
|---|---|---|---|
| ☐ SERT/CNT/CIC | ☑ SPECIAL EVENTS | ☐ K9 | ☐ SUBJECT INJURY | ☐ OTHER |

## GENERAL INFO

| CASE NUMBER: | 25-680411 | | REVIEW DATE: | 7/4/2025 |
|---|---|---|---|---|
| SQUAD/PRECINCT: | Central Precinct | | | |
| START DATE: | 07/04/2025 | 14:00:00 | END DATE: | 07/05/2025 | 00:00:00 |

| TO: | DOBSON, CRAIG | FROM: | TUMA, CHRISTINA |
|---|---|---|---|

## LOCATION OF OCCURRENCE

LOCATION TYPE:

ADDRESS: 4310 S Macadam Ave, Portland, OR 97239

## SUMMARY OF EVENTS

On the evening of Friday, July 4, 2025, the Portland Police Bureau (PPB) monitored the South Portland neighborhood for criminal behavior. The local U.S. Immigration and Customs Enforcement (ICE) facility is in this neighborhood, and it has been the scene of recent protest activity. In support of PPB's presence in the neighborhood, an Incident Command Team was again activated. The team managed numerous resources that included Dialogue Liaison Officers, Rapid Response Team, Air Support Unit, and public safety partners. PPB made no arrests. No force was used by PPB members and no officers were injured.

## BUREAU MEMBER(S)

| NAME: | DPSST: | ROLE: | INVOLVEMENT: |
|---|---|---|---|

☐ ECIT?

☒ MEMBER INTERVIEWED SEPARATELY

☒ THE MEMBERS STATEMENT WAS MATERIALLY CONSISTENT WITH THEIR WRITTEN DOCUMENTATION

☒ DID THIS MEMBER USE FORCE

☒ MEMBER INJURED?

**WHERE DID THEY RECEIVE TREATMENT?**

☒ COMPLETE A DISABILITY PACKET?          ☒ COMPLETE AN ELECTRONIC INJURY LOG ENTRY?

**MEMBER INJURY COMMENT:**

## SUBJECT(S)

| NAME: | RACE: | GENDER: | DOB: |
|---|---|---|---|
| ADDRESS: | | PHONE NUMBER: | |

☒ SUBJECT ARMED

| WEAPON TYPE: | ARMED WITH: |
|---|---|

SUBJECT STATEMENT:

## WITNESS(ES)

☑ No Witness Present

## VEHICLE(S)

☑ No Vehicle Involved

## SPECIAL EVENT

**EVENT NAME:** July 4th Event

**EVENT DATE:** 7/4/2025    **ROLL CALL:** 1500    **START TIME:** 1400    **END TIME:** 0000

**# OF OFFICERS:** 0    **+/- FROM PREVIOUS:** 0    **+/- PREVIOUS YEAR:** 0

**# OF PARTICIPANTS:** 0

☐ NO INITIAL FISCAL REVIEW ESTIMATE

| CLASS | REG HOURS | HOURLY RATE | REG HOUR COST | O/T HOURS | OT HOURLY RATE | O/T HOUR COST | TOTALS |
|---|---|---|---|---|---|---|---|
| OFFICER | 105 | $50.40 | $5292.00 | 41.34 | $75.60 | $3125.30 | $8417.30 |
| MOTOR OFC. | 0 | $0.00 | $0.00 | 0 | $0.00 | $0.00 | $0.00 |
| SGT/DET/FED | 31.5 | $62.26 | $1961.19 | 31.5 | $93.39 | $2941.79 | $4902.98 |
| MOTOR SGT | 0 | $0.00 | $0.00 | 0 | $0.00 | $0.00 | $0.00 |
| LIEUTENANT | 40 | $81.28 | $3251.20 | 0 | $0.00 | $0.00 | $3251.20 |
| CAPT/COMD | 10 | $93.92 | $939.20 | 0 | $0.00 | $0.00 | $939.20 |

## INVESTIGATING SUPERVISOR ACTION STATEMENT

## NON-FORCE RELATED (905.00 Administrative Review)

After-Action Summary: Event Planning Reflections

Planning for this event presented several challenges, many of which were tied to the timing around the July 4th holiday. Limited availability of personnel made it more difficult to submit and fulfill resource requests in a timely manner. Additionally, due to scheduling conflicts among command and general staff, the Tactics Meeting was not held until June 30th. During the meeting, I confirmed with the Operations Section Chief (OSC), Lt. Sparling, that the plan had been reviewed and approved by the Incident Commander (IC), Capt. Abrahamson. Lt. Sparling shared that she had spoken with the IC the evening prior and received approval. However, she requested that resource requests not be submitted by Logistics until she had the opportunity to reconnect with the IC. On the morning of July 1st, I was informed that the IC had shared the plan with the Chief's Office, where it was not approved due to the absence of bike squad. As a result, the IC directed changes to the plan, and revised resource requests were submitted by noon on July 1st. This unfortunately delayed the process by another 24 hours.

There were moments where delays in decision-making created bottlenecks for the general staff. It would take 24 hours or more to get answers/replies back to emails at times that I had sent to the IC.

Clarification on Resource Request Communications

Logistics received some pushback from the Responsibility Units (RUs) regarding the submitted resource requests. While I understand and respect the concerns raised, the feedback should not have been directed at the Logistics Section Chief. The Logistics Chiefs within PPB are non-sworn members who do not participate in the operational planning process. As such, they are not responsible for determining assignments or duties. Any questions or concerns related to operational decisions, resource assignments, or deployment strategies should be directed to the Operations Section Chief (OSC) or the Incident Commander (IC), who are the appropriate points of contact for such matters. Clear communication channels help ensure accountability and efficiency, and I recommend reinforcing this protocol during future planning cycles to avoid unnecessary confusion or misdirected feedback.

Lastly, the event concluded with a single debrief that included both the IMT and field supervisors. In previous events, these debriefs were held separately, one focused on the planning and operational processes, and another on field operations. Conducting separate debriefs would have allowed for a more detailed and constructive review of the planning process.

In summary, while the event was ultimately successful, several areas for improvement were identified that could enhance the efficiency and effectiveness of future IMT deployments.

There were 67.42 OT hours for this event that cost $6067.00 according to the Finance Chief.

## ADMINISTRATIVE CHECKLIST

☐ POSSIBLE CRIMINAL CONDUCT?

☐ POSSIBLE SIGNIFICANT MISCONDUCT?

☐ THERE WAS A MENTAL HEALTH COMPONENT TO THIS USE OF FORCE

☐ THIS WAS A SERIOUS USE OF FORCE

☐ THIS FORCE VIOLATED THE GRAHAM STANDARD

☐ COMMUNITY MEMBER/BUREAU MEMBER ALLEGES MISCONDUCT (Directive 0330.00§2.2.1)

☐ PSD NOTIFIED

☐ SHIFT SUPERVISOR NOTIFIED

**IF ANY OF THE ABOVE WERE MARKED YES, WHO WAS NOTIFIED, HOW WERE THEY NOTIFIED, AND WHAT DIRECTION WAS GIVEN?**

☐ PHOTO(S) WERE TAKEN (INCLUDING VIDEO)

☐ NON PHOTO EVIDENCE WAS COLLECTED

**EVIDENCE COMMENTS (OPTIONAL)**

## ADMINISTRATIVE REVIEW

☐ I HAVE DOCUMENTED ALL OF THE ABOVE CONCERNS, NON DISCIPLINARY CORRECTIVE ACTIONS AND POSITIVE PERFORMANCE IN EIS

**COMMENT:**

☑ I CONFIRMED THAT ALL PHOTOGRAPHIC EVIDENCE FOR THIS REVIEW HAS BEEN PLACED INTO Evidence.com

**COMMENT:**

☑ I HAVE NOT FOUND CONCERNS AND/OR RECOMMENDATIONS IN THE BUREAU'S POLICY, TRAINING OR EQUIPMENT

**COMMENT:**

☐ I FORWARDED A COPY OF THE INITIAL PORTION OF THIS AFTER ACTION TO MY RU'S ADMIN TO BE FORWARDED TO THE DA OFFICE FOR THE CRIMINAL CASE AGAINST THE SUBJECT

☑ I FORWARDED THE FORCE AFTER ACTION WITHIN 72 HOURS OF THE EVENT AND/OR 7 DAYS OF THE NON FORCE EVENT

**RANK:** SGT          **NAME:** TUMA, CHRISTINA          **DPSST:** 47651

**I FORWARDED THIS AFTER ACTION TO:**

**RANK:** LT          **NAME:** SPARLING, LACEY

**DPSST:** 37631          **DATE:** 7/8/2025

## CHAIN OF CUSTODY

| Sender | Recipient | Timestamp |
|---|---|---|
| SGT TUMA, CHRISTINA | LT SPARLING, LACEY | Submitted 07/08/2025 15:33 |
| Police Lieutenant Lacey Sparling | Police Captain ABRAHAMSON, DAVID | Submitted 07/14/2025 16:25 |
| Police Captain David Abrahamson | Police Commander DOBSON, CRAIG | Submitted 07/21/2025 11:56 |

## COMMAND REVIEW: Police Lieutenant Lacey Sparling 7/14/2025 7:12:24 AM

**I RECEIVED THIS ACTION FROM:**

| RANK | NAME: | DPSST | DATE AND TIME |
|---|---|---|---|
| SGT | TUMA, CHRISTINA | 47651 | 7/8/2025 |

☑ THIS AFTER ACTION WAS RECEIVED WITHIN 72 HOURS OF THE INCIDENT OR WITHIN 7 DAYS OF NON FORCE EVENT

☐ RETURN TO LOWER LEVEL FOR CORRECTION

☑ I HAVE REVIEWED ALL OF THE REPORTS ASSOCIATED WITH THIS INCIDENT AND FIND THAT THEY ARE ACCURATE

☑ I HAVE REVIEWED THE SERGEANT'S INVESTIGATION AND FIND IT TO BE THOROUGH AND COMPLETE

☑ I HAVE REVIEWED THE SERGEANT'S DECISION POINT ANALYSIS AND CONCUR

Coordination and Planning:

This was a challenging event from the beginning as the IMT was created with the understanding that the 50501 Group was going to have a rather large event and March on the 4th of July. After the decision was made to stand up in IMT, further intelligence indicated that this event was not going to occur. Over the next one to two weeks the only intelligence obtained for any event was a call to ICE, which is a nightly occurrence, and a couple of events that were low risk on intelligence assessment. As the Ops Chief I came up with a plan based on the intelligence. The 4th of July can be and has traditionally been a very busy night citywide. Given the low likelihood that there would be a large protest event and the fact that our footprint at ICE had been reduced due to them being self-sufficient, I had put together a plan to have five two-officer cars with two sergeants that could be a mobile response team for any unanticipated march or event. I did not feel based on intelligence that a full or even partial team deployment of RRT was appropriate since most of the team was off duty and not on call. Further, I did not feel that bikes would be very efficient given the increased concerns for officer safety with respect to fireworks. As we learned in 2020, fireworks were often thrown at our members, and we had some member injuries as a result.

The night before the Tactics Meeting, I spoke with the IC and gave him a rough outline of my plan. I had spoken with our team leaders who all agreed with my plan. The IC acknowledged my plan and asked if I had considered bikes but ultimately said that it was up to me as the OPS Chief, so long as I was able to meet the objectives. The Tactics Meeting was conducted on Monday June 30th. Immediately preceding the tactics meeting I spoke again with the IC and relayed my plan that did not involve bicycles. The direction I received was that this needed to be run through the Chief's Office and that he would get back to me. The delay in response was over 24 hours and ultimately the IC decided that we could not meet the objectives without a contingent of bicycles.

The delay in response after the Tactics Meeting, and the creation of a new plan presented challenges for Logistics which Sergeant Tuma has addressed above. It further created challenges in finding resources two days prior to an event. Initially I asked for volunteers citywide. After

receiving one volunteer to work overtime, I was able to facilitate on duty RRT bikes which would give us the ability for them to go to a hard squad should there be a life safety issue.

Event deployment:
DLO's were sent to the Sellwood Bridge event. They monitored the event and made several citizen contacts. As anticipated, there were no crimes being committed and the event posed no safety risks. DLOs were transitioned down to the ICE facility and remained there for the duration of the July 4th evening. DLOs were very effective and spent the entire time within a couple blocks of the ICE Facility. Fortunately, our DLO program has grown in such a way that protesters did not focus on them. They received a few negative comments but overwhelmingly they had relatively positive interactions. There were no safety concerns other than the gas that was being deployed and the ability to breathe at times. Although they were several blocks away, a significant amount of gas was deployed by the Federal Police and the wind was carrying it.
The RRT bikes rode around the area and provided a visible presence. The citizens in the neighborhood were very appreciative and receptive to seeing a police presence on bicycles, however the protesters were not appreciative and became hostile and yelled at our bike officers every time they were in close proximity. To avoid causing any confrontation, bike squads remained out of sight for much of this evening and provided intelligence. As nightfall grew and fireworks began throughout the city and in front of the ICE Facility, our bike squad transitioned to a hard squad. At that time their sole responsibility was to respond to a life safety incident to support federal officers in extreme circumstances or to perform an officer or citizen rescue. Federal Police had a significant number of employees working and deployed a significant amount of munitions. Because we were not in communication with them it is unknown what the specific reasons were, however, we believed they were likely launching fireworks at Federal police or the building.
Of note, Fire and Medical responded to the ICE Facility for a protester that was arrested and had an injury. The crowd allowed the ambulance and fire trucks to come in and did not restrict their movement. These actions verified our belief that the sole emphasis by these protesters was directed at the ICE Facility and federal police.
It was very clear throughout the night that the Federal Police were fully equipped and prepared to handle incidents occurring at their building. At no time did they request our support or assistance.

Debrief:
I agree with Sgt Tuma regarding the combined debrief. The IMT debrief should been separated. The whole team debrief occurred via teams just after securing. None of the field supervisors could hear the start of the debrief discussions from the IMT since the audio wasn't loud enough. Field supervisors were doing meetings on their phones since they were in transit with team members back to RUs. This was not ideal for any meaningful debrief. Below are the points that were captured in the debrief.

From combined IMT/OPS debrief:
RRT Command - teams worked well in the field, nobody operated individually, felt the transition to hard squad was appropriate as the bikes were no longer effective once darkness and fireworks began
Field Command (cars) -overall communication was good, high visibility patrol in a three-block area created over saturation and created diminished returns
DLO - apricated command concerns for safety during the event. There were zero concerns for safety by DLOs. Learned might be better to stay farther back to provide an eye due to large amounts of gas and potential for people to turn on them, although this did not occur on this night.
IMT - collectively no issues or concerns reported in this forum

Overall, I believe the night was a success in that we met the objectives, and we did not have any significant events unfold. I still believe the original plan of having on duty RRT members in two officer cars rather than bikes would have been more efficient use of resources and would have provided a greater ability to respond outside of ICE should there have been an incident elsewhere. The cars would have also provided cover and the ability to quickly extricate in an emergency. The ability for bikes to be effective on 4th of July was only in the extended community and it was such a short time they were able to do that.

☐ I HAVE IDENTIFIED AN AREA OF REVIEW FOR THE TRAINING DIVISION

☐ THERE ARE POSSIBLE POLICY VIOLATIONS WITH THIS INCIDENT

☐ I FIND THAT THIS CASE NEEDS TO BE REVIEWED FURTHER FOR POSSIBLE CRIMINAL CONDUCT OR SIGNIFICANT MISCONDUCT
**I FORWARDED OR RETURNED THIS AFTER ACTION TO**

| RANK | NAME: | DATE |
|------|-------|------|
| CAPT | ABRAHAMSON, DAVID | 7/14/2025 |

I CONFIRMED THE PROPER EIS ENTRIES WERE MADE:     N/A

I CONFIRMED THE PHOTOS WERE IN Evidence.com     N/A

**COMMAND REVIEW: Police Captain David Abrahamson 7/21/2025 9:16:14 AM**
**I RECEIVED THIS ACTION FROM:**

| RANK | NAME: | DPSST | DATE AND TIME |
|------|-------|-------|---------------|
| LT | Lacey Sparling | 37631 | 7/14/2025 |

☑ THIS AFTER ACTION WAS RECEIVED WITHIN 72 HOURS OF THE INCIDENT OR WITHIN 7 DAYS OF NON FORCE EVENT

☐ RETURN TO LOWER LEVEL FOR CORRECTION

☑ I HAVE REVIEWED ALL OF THE REPORTS ASSOCIATED WITH THIS INCIDENT AND FIND THAT THEY ARE ACCURATE

☑ I HAVE REVIEWED THE SERGEANT'S INVESTIGATION AND FIND IT TO BE THOROUGH AND COMPLETE

☑ I HAVE REVIEWED THE SERGEANT'S DECISION POINT ANALYSIS AND CONCUR

Initially in the planning phase, objectives, priorities and the Commander's Intent were based on intelligence obtained from CIU the week approaching the event(s). These were sent to the acting AC of Operations for approval a week prior to the event. After several days, these were approved four days prior to the event. The Operation Section Chief (OSC) intended to request a squad of officers in vehicles. Not believing officers in vehicles were the appropriate resource to accomplish an appropriate response in a crowd control environment or respond as fluidly as a bike

squad, I requested a squad of bike officers and a small team of vehicles who could meet the objective of high-visibility presence, community engagement, while ensuring selective targeted arrests. I provided direction to the OSC/Logistics to detach officers, or if needed, order officers in, in reverse order. I was informed that RRT was not on-call during the period the event was occurring. I spoke with the PPA regarding concerns about ordering members in on a holiday, however, I communicated our need to successfully staff for the objectives.

Following approval of the objectives, the Chief provided bureau-wide clarification for how bureau members were expected to enforce illegal fireworks. Upon receiving this email, I sought clarification from the Chief regarding the feasibility of enforcing related laws in a crowd control environment and/or the need to adjust objectives/resources to support his expectations. The Chief conveyed he supported us using discretion to enforce firework violations when it was safe/feasible to do so.

On July 3rd, OSC informed me one precinct would not support Logistic's request for resources, positing they would not detach their members as they were -2 below minimums. I contacted the precinct's acting Commander and was able to obtain support for personnel. I believe pushback occurred as this process was unfamiliar to the acting Commander.

The IAP was sent to me for review on July 4th, several hours before the event started. Although there were challenges with staffing, this process should have been expedited sooner, allowing time for potential changes. I concur with the recommendation for having a separate debrief for the IMT that is in addition to the supervisor debriefing.

July 4th Event
One bike squad (ALPHA), three partner cars, and a DLO team supported the July 4th events.
During the briefing, I emphasized the importance of high visibility presence and engagement in the neighborhood in the SW Bancroft area to diminish fear within the community, prior to larger crowds gathering at ICE. Officers were on foot/bikes and made great connections with neighbors who were appreciative. Additionally, Officers were provided with a dozen coffee cards, who they issued to broad age group of neighbors.

Free America Event / Sellwood Bridge
Between 1730 and 1900 hours, approximately 300 individuals gathered lawfully on the Sellwood Bridge, staying on the sidewalks, with no issues.

ICE Protest
At 1800 hours, nearly 50 protesters congregated in front of the ICE facility and kept to the sidewalks. By 1900 hours, the crowd grew to approximately 100, with half on the south sidewalks of Bancroft. At least 15-20 were observed in padded motorcycle gear, make-shift body armor, or dawning helmets. At 1918 hours, several individuals lit non-aerial fireworks but kept them in the street. Alpha contacted the group and advised the group of the fireworks ban. Some were receptive, but hostility began to grow.

By 1930 hours, 20-30 protesters occupied the eastbound lanes of Bancroft, but vehicular traffic continued to flow in both directions. However, shortly after, a vehicle slowed, and a verbal altercation occurred between the driver and a handful of members of the crowd. Approximately 30 protesters began to quickly approach the vehicle, appearing animated. The vehicle departed prior to a larger crowd formed around it; however, water bottles and unknown items were thrown at the truck as it departed the area. The victim was contacted but did not want to file a report or provide information.

Although our DLOs maintained rapport, crowd demeanor began to change after 1930 hours, who were clearly energized, and displayed intent on altercation with FPS. At approximately 1940, we transitioned Alpha to a hard squad as potential use for vehicle rescues and staged them out of view. I conducted a consultation with the on-call RRT sergeant to determine if available resources would be available if needed. I was informed RRT resources were limited, and we they would have less than 8 to 10 personnel available if needed. Following, vehicular traffic continued to flow on Bancroft for the remainder of evening without issue.

Crowd size grew to approximately 100-150 by 2100, with at least 50 lingering in front of the ICE facility. Consistent social media streams were not available until nearly 2200, and Air-1's video did not clearly capture protester behavior in front of the ICE facility. Communication was limited from FPS throughout the evening. We did not receive specific information related to crimes occurring or suspect descriptions, where we could provide periphery support/custodies. We later learned protesters had hurled mortars at the ICE facility. FPS used munitions and tear gas to address crimes, pushing the crowd a block north and/or east of their facility several times. During each FPS push, the crowd would disperse and return to the ICE building. FPS made multiple arrests, but the total count is unknown.

By 2330, the crowd size diminished to approximately 35, and there were no issues with traffic flowing on Bancroft. At 2330, we transitioned control to Central Precinct (A/Lt. Hefley). We conducted a debrief with the IMT, team sergeants, and the DLOs. During this, teams conveyed a concern around not having RRT available.

Significant Decision Points:
After the altercation with the vehicle, we considered deploying PBOT reader boards to divert traffic from accessing traffic onto Bancroft, which would potentially minimize further vehicle-crowd risks. The PIO drafted messages which were provided to OPS personnel if needed. However, directly following this, FPS made a push/arrests that quelled the crowd's energy. Vehicles continued to travel in both directions on Bancroft without issue. OPS and Alpha comprised a vehicle rescue plan if needed.

Significant Issues and Problems:
No major concerns surfaced and overall, the went well considering the crowd dynamic. Crowd action was directed at FPS.

Use of Force:
No use of force by PPB.

Number of arrests and charges:
No arrests by PPB.

Lessons learned / recommendations:
Although we staffed tonight's events based on intel, having only one hard squad and limited tools, a vehicle rescue could potentially pose a challenge and heighten risks for our members in a hostile crowd, which could result in a higher level of force, while also jeopardizing member safety. For future events on major holidays, such as the Fourth of July, it would be advantageous to have RRT on call to resource if needed. RRT provides unique expertise in responding to vehicle rescues.

Lastly, even though the crowd was hostile tonight, the DLOs conveyed they maintained rapport and did not feel their safety was in jeopardy. They also posited key leaders within the crowd came with a set intent tonight and avoided the DLO team as the interactions with FPS escalated.

☐ I HAVE IDENTIFIED AN AREA OF REVIEW FOR THE TRAINING DIVISION

☐ THERE ARE POSSIBLE POLICY VIOLATIONS WITH THIS INCIDENT

☐ I FIND THAT THIS CASE NEEDS TO BE REVIEWED FURTHER FOR POSSIBLE CRIMINAL CONDUCT OR SIGNIFICANT MISCONDUCT

**I FORWARDED OR RETURNED THIS AFTER ACTION TO**

| **RANK** | **NAME:** | **DATE** |
|---|---|---|
| CHO | DOBSON, CRAIG | 7/21/2025 |

| | |
|---|---|
| I CONFIRMED THE PROPER EIS ENTRIES WERE MADE: | N/A |
| I CONFIRMED THE PHOTOS WERE IN Evidence.com | YES |

☐ Collision Review Board

**THE WHITE HOUSE**

WASHINGTON

June 7, 2025

MEMORANDUM FOR THE SECRETARY OF DEFENSE
      THE ATTORNEY GENERAL
      THE SECRETARY OF HOMELAND SECURITY

SUBJECT:   Department of Defense Security for the Protection
       of Department of Homeland Security Functions

Numerous incidents of violence and disorder have recently
occurred and threaten to continue in response to the enforcement
of Federal law by U.S. Immigration and Customs Enforcement (ICE)
and other United States Government personnel who are performing
Federal functions and supporting the faithful execution of
Federal immigration laws.  In addition, violent protests
threaten the security of and significant damage to Federal
immigration detention facilities and other Federal property.  To
the extent that protests or acts of violence directly inhibit
the execution of the laws, they constitute a form of rebellion
against the authority of the Government of the United States.

In light of these incidents and credible threats of continued
violence, by the authority vested in me as President by the
Constitution and the laws of the United States of America, I
hereby call into Federal service members and units of the
National Guard under 10 U.S.C. 12406 to temporarily protect ICE
and other United States Government personnel who are performing
Federal functions, including the enforcement of Federal law, and
to protect Federal property, at locations where protests against
these functions are occurring or are likely to occur based on
current threat assessments and planned operations.  Further, I
direct and delegate actions as necessary for the Secretary of
Defense to coordinate with the Governors of the States and the
National Guard Bureau in identifying and ordering into Federal
service the appropriate members and units of the National Guard
under this authority.  The members and units of the National
Guard called into Federal service shall be at least 2,000
National Guard personnel and the duration of duty shall be for
60 days or at the discretion of the Secretary of Defense.  In
addition, the Secretary of Defense may employ any other members

Oregon v. Trump
No. 3:25-cv-01756
**Defendants' Exhibit**
1052

**A459**

2

of the regular Armed Forces as necessary to augment and support the protection of Federal functions and property in any number determined appropriate in his discretion.

To carry out this mission, the deployed military personnel may perform those military protective activities that the Secretary of Defense determines are reasonably necessary to ensure the protection and safety of Federal personnel and property  The Secretary of Defense shall consult with the Attorney General and the Secretary of Homeland Security prior to withdrawing any personnel from any location to which they are sent.  The Secretaries of Defense and Homeland Security may delegate to subordinate officials of their respective Departments any of the authorities conferred upon them by this memorandum.



**A460**